# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE WILDERNESS SOCIETY
1615 M Street NW
Washington, D.C. 20036

DEFENDERS OF WILDLIFE
1130 17th Street NW
Washington, D.C.  20036

NATURAL RESOURCES DEFENSE COUNCIL, INC.
40 West 20th Street, 11th Floor
New York, New York 10011

SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111

GRAND CANYON TRUST
2601 North Fort Valley Road
Flagstaff, Arizona 86001

GREAT OLD BROADS FOR WILDERNESS
605 East 7th Avenue
Durango, Colorado 81301

WESTERN WATERSHEDS PROJECT
126 South Main Street, Suite B2
Hailey, Idaho 83333

WILDEARTH GUARDIANS
516 Alto Street
Santa Fe, New Mexico 87501

SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, California 94612

CENTER FOR BIOLOGICAL DIVERSITY
378 North Main Avenue
Tucson, Arizona 85701

Case No. _____

|  |  |
|---|---|
| *Plaintiffs,*<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States<br>1600 Pennsylvania Avenue NW<br>Washington, D.C. 20500<br><br>RYAN ZINKE, in his official capacity as Secretary of<br>the Interior<br>1849 C Street NW<br>Washington, D.C. 20240<br><br>BRIAN STEED, in his official capacity as the official<br>exercising the authority of the Director of the Bureau<br>of Land Management<br>1849 C Street NW<br>Washington, D.C. 20240<br><br>       *Defendants.* |  |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## INTRODUCTION

1.     This case challenges President Donald J. Trump's unlawful December 4, 2017 proclamation that attempts to revoke monument status and protections from roughly half of the Grand Staircase-Escalante National Monument (the Monument), which was designated in 1996 pursuant to the Antiquities Act of 1906. President Trump's unlawful proclamation would replace the Monument in large

part with three separate, significantly smaller units.  The President's unlawful action strips monument protection from nearly 900,000 acres of federal public lands—or nearly half of the Monument—and leaves remarkable fossil, cultural, scenic, and geologic treasures exposed to immediate and ongoing harm.

2.     In derogation of the Antiquities Act's text and protective purpose, President Trump has flouted 111 years of conservation history.  His decision to abolish the Monument in part and to remove monument protection from many of the remarkable objects identified in the 1996 Proclamation that created the Monument exceeds his authority under the U.S. Constitution and the Antiquities Act

3.     Congress enacted the Antiquities Act of 1906, 54 U.S.C. § 320301 *et seq.,* to ensure that the nation's rich historic, cultural, and scientific heritage enjoyed lasting protection, safe from damage or loss through activities like mining, development, looting, or vandalism.  The Act achieves the lasting protection of these important public resources by authorizing Presidents, through a narrow delegation of Congress's otherwise exclusive authority under the Property Clause, to designate national monuments.  Beginning with President Theodore Roosevelt, Presidents have provided permanent protection to more than one hundred and fifty national monuments throughout our country—from the Statue of Liberty to the Grand Canyon—ensuring that landscapes of extraordinary beauty, as well as irreplaceable and exceptional objects and sites of scientific and historic importance, will be preserved and enjoyed for generations to come.

4.     When President Clinton designated the Monument in 1996—over twenty-one years ago—he provided needed protection to approximately 1.7 million acres of geologic and historic treasures, including unique paleontological resources found nowhere else in the world, and vividly beautiful landscapes.  *See* Proclamation No. 6920, Establishment of the Grand Staircase-Escalante National Monument, 61 Fed. Reg. 50,223 (Sept. 18, 1996) (the 1996 Proclamation).  These resources were threatened by a range of activities—most notably a large coal mine that would have brought industrial-scale development, including roads, heavy equipment, structures, waste pits, degradation of natural springs, and noise to the Kaiparowits Plateau, which lies in the heart of the Monument.  After the Monument's designation, the Department of the Interior negotiated the repurchase of the coal leases, the mine proposal was abandoned, and the area, with its world-class paleontological resources has been protected ever since.  Areas of the Monument with coal deposits have yielded astonishing new dinosaur fossils found nowhere else in the world.

5.     The Monument's size matches the vast grandeur of the geologic formations for which it is named:  the stair-stepping benches of towering sandstone formations and plateaus that stretch from near the Grand Canyon northwards to Utah's wildlife-rich Paunsaugunt Plateau.  According to the Utah Geological Survey, "[t]his staircase is like no other," with layered, 2,000-foot tall sandstone "risers."  This geologic wonder, eons in the making, documents the area's slow evolution from a vast ocean, to a landscape eventually inhabited by dinosaurs and

blanketed by tropical vegetation, to the arid, largely rock-bound terrain visible today.

6.     Historic and cultural resources within the Monument include archaeological sites and artifacts from thousands of years ago, to the more recent evidence of early explorers like John Wesley Powell and the settlement of early Mormon pioneers.

7.     Renowned for its natural beauty, the Monument affords rare opportunities to experience an intact, iconic, and rugged Western landscape in its natural state.  The region's beauty and national importance are reflected in the multiple national parks in the vicinity of the Monument: Bryce Canyon, Zion, Capitol Reef, and Grand Canyon National Parks are all within a day's drive or less, and Glen Canyon National Recreation Area borders the Monument to the east.  The Monument was the last place in the continental United States to be mapped, and, as President Clinton's Proclamation recognized, its remote location contributes to the wild and undeveloped character of the Monument to this day.

8.     The Monument provides Plaintiffs, their members, scientists, and the American public with outstanding opportunities to conduct scientific research, observe archaeological sites, hike in these magnificent landscapes, camp, view the abundant native animal and plant life, and engage in a variety of other recreational activities.  Recent visitation data indicates that approximately 900,000 people visit the Monument annually to enjoy this spectacular ecological, historic, and cultural treasure.

9.      On December 4, 2017, President Trump issued an unlawful proclamation revoking monument status and protections from roughly half of the Grand Staircase-Escalante National Monument, and replacing it with three much smaller, non-contiguous units, which he named the Grand Staircase, Kaiparowits, and Escalante Canyons units. As a result of President Trump's action, federal public lands that had been protected for over twenty years—including vast swaths of the Kaiparowits Plateau at the heart of the Grand Staircase-Escalante National Monument where troves of unique dinosaur fossils have been found—will now be open to harmful developments such as coal mining, new roads, off-highway vehicle abuse, and oil and gas drilling.  These types of developments will scar the lands, compromise vital parts of the paleontological record, ruin their wild, natural character, and destroy the resources the Monument was created to protect.

10.     President Trump's unlawful reversal of Grand Staircase-Escalante's full protective reach exceeds his authority under the Antiquities Act.  The Act authorizes Presidents to create national monuments; it does not authorize Presidents to abolish them either in whole or in part, as President Trump's action attempts to do.

11.     President Trump's action even purports to overturn congressional legislation that added lands to the Monument.

12.     Accordingly, the President's decision exceeds his authority under the Antiquities Act, violates the separation of powers between Congress and the President and the "take Care" clause of the U.S. Constitution, and is therefore

unlawful.  Actions by the Department of the Interior and the Bureau of Land

Management (BLM) to implement the President's unlawful proclamation are

likewise themselves unlawful and should be enjoined.

## JURISDICTION AND VENUE

13.     This case arises under the Constitution and the laws of the United

States.  Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal

question).  Jurisdiction is also proper pursuant to 5 U.S.C. §§ 701-706 (the

Administrative Procedure Act).

14.     The Court has authority to grant declaratory and injunctive relief

pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable

relief. Injunctive relief is also authorized by 5 U.S.C. § 706.

15.     The Court has authority to award costs and attorneys' fees under 28

U.S.C. § 2412.

16.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(e)(1)

because Plaintiffs The Wilderness Society and Defenders of Wildlife reside in this

District and the Southern Utah Wilderness Alliance, Natural Resources Defense

Council, Center for Biological Diversity, and Sierra Club maintain offices in the

District.

17.     Venue is also proper in this court pursuant to 28 U.S.C. § 1391(b)(1),

(b)(2), and (e)(1) because the Defendants reside in this District.  Additionally, the

events giving rise to the action challenged here—including Defendant Zinke's

national monument review and transmittal of his recommendations to the

President concerning the Monument, as well as Defendant Zinke and Defendant Steed's actions in response to that proclamation—took place in this judicial district.

## PLAINTIFFS

18.     Plaintiff THE WILDERNESS SOCIETY is a non-profit national organization founded in 1935, with members who reside throughout the nation, including in Utah.

19.     The Wilderness Society works to protect America's wilderness lands through public education, scientific analysis, and advocacy.  The Wilderness Society's mission is to protect wilderness and inspire Americans to care about our wild places, so that future generations will enjoy the clean air, water, wildlife, beauty, and opportunities for recreation and renewal that pristine deserts, mountains, forests, and rivers provide.  Protecting wilderness-quality and other sensitive lands managed by BLM is vital to achieving The Wilderness Society's mission.

20.     Prior to the designation of the Monument, The Wilderness Society had already worked for years to protect BLM wilderness lands and other sensitive lands located within the Monument.  The Wilderness Society has initiated and intervened in numerous lawsuits to ensure that the lands within the Monument are protected from roads and off-highway vehicle abuse, including in *Kane County v. Salazar*, 562 F.3d 1077 (10th Cir. 2009), in which it intervened to defend successfully the Monument's off-highway vehicle travel plan.

8

21.    The Wilderness Society supported the Monument's creation, and since 1996 it has continued to advocate for the protection of all lands within the Monument.  It has actively engaged with the BLM Monument managers to support protective provisions in the Monument Management Plan, and engaged in related efforts to halt the damage from roads and off-highway vehicle use.  The Wilderness Society has been involved in every major action and management decision in the Grand Staircase-Escalante National Monument since its establishment.

22.    Many of The Wilderness Society's members, including Ray Bloxham and Phillip Hanceford, visit the Monument, including the areas that have now been stripped of protection, to experience their remote wilderness quality, view wildlife, camp, hike, and enjoy the vivid, natural beauty of the area.  Additionally, its members are drawn to Monument lands to view the numerous archaeological sites and rock art.  Its members plan to visit the area regularly in the future, including in 2018. Mr. Hanceford has represented the environmental community on the Monument Advisory Committee since 2011.

23.    Plaintiff DEFENDERS OF WILDLIFE (Defenders) is a national, non-profit conservation organization founded in 1947, which is dedicated to the protection of all native animals and plants in their natural, undeveloped, native habitats.  Headquartered in Washington, D.C., Defenders has more than 1.2 million members and supporters throughout the United States, including in Utah.

24.    Defenders works to ensure that the diverse wildlife populations in North America are secure and thriving, sustained by a network of healthy lands

9

and waters.  Through education, advocacy, litigation, and other efforts, Defenders works to preserve species and the habitats upon which they depend.  The Monument is vital to this work due to its outstanding rare, diverse, and sensitive biological resources.  The variety of ecosystems, ranging from low-lying desert to coniferous forest, as well as areas of relict vegetation found within its boundaries, combined with its remoteness, allows the Monument to preserve its important ecological values.

25.     Defenders has an interest in the preservation and conservation of the Monument and the ecological resources contained therein that will be harmed by the removal of the protections afforded by national monument status.  Defenders' members, including Brad Tollefson, live near and regularly visit the Monument for wildlife observation, recreation, and other uses.  These members derive aesthetic, educational, professional, health, and spiritual benefits from their activities within the Monument, including the areas that have now been stripped of protection.  Mr. Tollefson and other Defenders' members have specific intentions to continue using and enjoying these areas frequently and on an ongoing basis in the future.

26.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC. (NRDC) is a non-profit environmental membership organization with hundreds of thousands of members nationwide.  Part of NRDC's core mission is to preserve the earth's wild places and wildlife, to safeguard the integrity of undeveloped lands, and to prevent the destructive impacts of extractive industry exploration and development on public lands.

10

27.   NRDC has a longstanding commitment to the protection of federal public lands in Utah, and it actively supported the designation of the Grand Staircase-Escalante National Monument.

28.   NRDC has individual members, including Utah residents Susan Harrington, Kevin Walker, and David Delthony, who use and enjoy the Monument lands (including the areas that have now been stripped of protection) for a variety of purposes, including scientific study, hiking and recreation, wildlife viewing, meditation and quiet contemplation, education, and aesthetic appreciation.  These NRDC members intend to continue visiting the Monument lands in 2018 and beyond.  Both Ms. Harrington and Mr. Walker plan to return there for backpacking trips within the next six months.  Mr. Delthony lives near the entrance of the Monument and plans on returning there in the near future.

29.   Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE (SUWA) is a non-profit environmental membership organization with members in all fifty states and offices in Washington, D.C. and Utah.  It is dedicated to the sensible management of all federal public lands within the State of Utah, the preservation and protection of plant and animal species, the protection of clean air and water found on federal public lands, the preservation and protection of cultural and archaeological resources, and the permanent preservation of Utah's remaining wild lands.

30.   SUWA staff and members actively supported President Clinton's exercise of his authority under the Antiquities Act to designate the Grand

Staircase-Escalante National Monument and preserve the objects identified in the 1996 Proclamation for current and future generations of Americans.

31.     SUWA staff and members have worked for decades to obtain protection for the Grand Staircase area.  SUWA has initiated and intervened in numerous lawsuits to ensure that the lands within the Monument are protected from roads and off-highway vehicle abuse, including in *Utah Association of Counties v. Bush*, 316 F. Supp. 2d 1172 (D. Utah 2004), in which it intervened to defend successfully President Clinton's establishment of the Monument against a broad legal challenge. In the early 1990s, SUWA opposed a large coal mine and associated developments in the heart of the Monument and successfully challenged before the state's Board of Oil, Gas and Mining the State of Utah's decision to grant a permit to the mine operator.

32.     Since 1996, SUWA has regularly met with Monument managers to express concerns, and at times opposition to, vegetation treatments, recreation planning, and ongoing issues with off-highway vehicle use.  SUWA will continue to advocate for protection of the Monument lands through engagement in land planning and management activities, through public education, and through political outreach.

33.     SUWA has individual members, including Neal Clark and Kya Marienfeld, who often visit the Monument (including the areas that have now been stripped of protection) for a host of reasons, including spiritual renewal, recreation, and appreciation of the area's significant natural resources, flora and fauna, and

geology.  SUWA members, including Mr. Clark and Ms. Marienfeld, plan to visit the area regularly in the future, including in 2018.

34.     Plaintiff GRAND CANYON TRUST is a non-profit public lands advocacy organization founded in 1985.  The Grand Canyon Trust's members and staff live and work throughout the Colorado Plateau, in Utah, Colorado, Arizona, and New Mexico.  The Grand Canyon Trust's mission is to protect and restore the public lands throughout the Colorado Plateau.  Through its advocacy, the Grand Canyon Trust ensures that the Colorado Plateau remains characterized by vast open spaces, healthy ecosystems, and communities enjoying a sustaining relationship with the natural environment.

35.     The Grand Canyon Trust's members and staff supported President Clinton's designation of the Monument and have since advocated for the protection of the nearly 1.9 million acres of federal public lands in the Grand Staircase-Escalante National Monument through active participation in the development of the Monument's Management Plan and other management actions related to the Monument.

36.     The Grand Canyon Trust's members and staff, including Tim Peterson and Ellen Heyn, regularly visit areas in the Monument, including the areas that have now been stripped of protection, to recreate, find solitude, practice photography and other creative arts, experience the unique landscape, examine the region's unique geology and paleontology, monitor and study wildlife and plants, and view Native American cultural sites, including ancient structures, pictographs,

and petroglyphs.  Mr. Peterson, Ms. Heyn, and other Grand Canyon Trust members and staff will continue to visit the Monument lands in the future to engage in these activities, including in 2018.

37.     Plaintiff GREAT OLD BROADS FOR WILDERNESS (Great Old Broads) is a national grassroots non-profit organization, led by elders, that engages in and inspires activism to preserve and protect wilderness and wild lands. Great Old Broads has over 8,000 members and supporters, many of whom reside and/or engage in recreational activities in Utah.  It was formed, in part, to protect the interests of senior populations who value roadless areas, enjoy them without mechanized means of transportation, and want to see these areas protected in their natural state for future generations.

38.     Protection of wild federal public lands in southern Utah has been an important focus of Great Old Broads since it began in 1989.  Great Old Broads has conducted educational, stewardship, documentation, and advocacy activities related to the lands within the Grand Staircase-Escalante National Monument.  The organization submitted public comments on the Monument Management Plan in 1999 and also requested its members to submit comments.  Great Old Broads has also advocated for wilderness designations in areas within the Monument.

39.     Great Old Broads has monitored land health and watershed health conditions in multiple field visits over many years, most recently in 2014 and 2015. In 2009, Great Old Broads submitted comments on the Monument's Rangeland Health Draft Environmental Impact Statement.  It also advocated for a grazing

management plan for the Monument over many years. Great Old Broads filed a lawsuit in 2009, along with a dozen conservation organizations, against the Department of the Interior, challenging the designation of energy corridors in western states, including within the Monument.

40.     Great Old Broads has organized multi-day camping events in or adjacent to the Monument, including five-day education, advocacy, and stewardship events in 1996, 1997, and 1998, and the organization's 20th anniversary "Broadwalk" in 2009. Great Old Broads has attended Monument Advisory Committee meetings. Great Old Broads has been a member of the Escalante River Watershed Partnership since its inception and has held an annual week-long stewardship project for the last five years to restore the Escalante River, which flows through the Monument, by removing invasive Russian olive trees.

41.     Because Great Old Broads is headquartered in Durango, Colorado, many members consider Grand Staircase-Escalante their "backyard." Members, including Steve Allen, regularly visit the federal public lands in the Monument (including the areas that have now been stripped of protection) to hike, backpack, enjoy the outstanding scenery and fascinating archaeological sites, view native plant and animal life, take photographs, conduct historical research, and experience the remoteness and quiet of the area. Mr. Allen and other members will continue to do so, including in 2018.

42.     Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a non-profit conservation organization founded in 1993 with the mission of protecting and

restoring western watersheds and wildlife through education, public policy initiatives, and legal advocacy.  Headquartered in Hailey, Idaho, Western Watersheds Project has field offices and members throughout the West.  WWP has a long-standing interest in the preservation of the Monument because its members place a high value on the wild, undeveloped deserts that are protected from industrial uses.  WWP actively seeks to protect and recover the desert ecosystems of the Monument and has for many years advocated for protection of native plants and ecosystem health there from a variety of uses.  It has done so both in the context of specific permits and in land-use planning processes.

43.    WWP has participated in a biological soil crust study, taken photos of riparian damage and cored trees, addressed the Monument Advisory Council, made presentations on vegetation treatments to the Monument's managers, submitted numerous public comments regarding management of the Monument, appeared in a TV segment on grazing impacts to the Monument, and conducted field trips in the Monument.

44.    WWP staff and members, including Laura Welp and Jonathan Ratner, regularly use lands in the Monument (including the areas that have now been stripped of protection) for hiking, wildlife viewing, nature study, photography, scenery viewing, and viewing of geological and archaeological features.  Mr. Ratner, Ms. Welp, and other members and staff make multiple trips to this national monument each year.  They have concrete plans to visit the Monument in 2018, and future years.

16

45.     Plaintiff WILDEARTH GUARDIANS (Guardians) is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West.  The protection of the Monument is vital to this work because the Monument preserves large tracts of unrestricted wildlife habitat and migration routes.  Thus, Guardians has an interest in the protection of the Monument and the ecological resources contained therein that will be harmed by the removal of the protections afforded by national monument status.

46.     Guardians' members and supporters recreate on public lands in Utah and specifically in the Monument.  Guardians' staff and members, including Louise Excell and David Pettit, frequently visit the Monument for the purposes of hiking, observing archeological sites, bird watching, observing wildlife, spiritual rejuvenation, landscape photography, and other recreational and professional pursuits.  Ms. Excell, Mr. Pettit, and other Guardians' members and staff have firm plans to continue visiting the scenic vistas, wildlife ecosystems, archeological sites, and paleontological treasures in the Monument (including the areas that have now been stripped of protection) in, 2018, and future years.

47.     Plaintiff SIERRA CLUB was founded in 1892 and is the nation's oldest grass-roots environmental organization.  It is a national non-profit organization of over 800,000 members, including a Utah chapter with thousands of members.  The Sierra Club's purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and

human environment; and to use all lawful means to carry out these objectives. Among the Sierra Club's highest priorities is protecting and preserving the nation's national monuments. The Sierra Club's concerns encompass all aspects of national monuments, including the protection of wildlands, wildlife habitat, water resources, air, archaeological sites, public health, and the health of its members, all of which stand to be affected by Defendants' actions as set forth herein.

48.     Sierra Club members live, work, and recreate in the Grand Staircase-Escalante area and use and enjoy the Monument on a regular basis for outdoor recreation, nature study, birdwatching, photography, fishing, canoeing, hunting, backpacking, camping, solitude, and a variety of other activities; they will continue to do so in the future.

49.     Sierra Club has a longstanding interest in protecting Grand Staircase-Escalante National Monument. In addition to advocacy in support of the designation of monument, Sierra Club has been active in ensuring that the resources within the Monument are properly protected. The Utah Chapter of the Sierra Club has engaged in advocacy regarding the management of the Monument. Sierra Club has also taken action in the courts, for example, by filing an *amicus curiae* brief in a case regarding road development within the Monument.

50.     Sierra Club members' concerns encompass the exploration, enjoyment, and protection of the Monument for themselves and future generations. For example, Sierra Club Utah Chapter member Jim Catlin first visited the area that would become the Monument in 1976. For years, he actively supported protection

for the Monument through scientific research and public engagement.  He attended
the ceremony when President Clinton designated the Monument.  He also wrote the
Sierra Club comments for the Department of the Interior's 2017 national monument
review.  Mr. Catlin plans to continue visiting the Monument (including the areas
that have now been stripped of protection) in the future, including in 2018.

51.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a
national non-profit organization dedicated to the protection of native species and
their habitats through science, policy, and environmental law.  The Center has over
61,000 members and is headquartered in Tucson, Arizona.

52.      The Center's members and staff, including Taylor McKinnon, have
visited the public lands within the Monument (including the areas that have now
been stripped of protection) for hiking, camping, viewing and studying wildlife,
photography, and other vocational and recreational activities.  The Center's
members and staff derive recreational, spiritual, professional, scientific,
educational, and aesthetic benefit from their activities in these areas.
Mr. McKinnon and other members and staff have specific intentions to continue
using and enjoying these areas frequently and on an ongoing basis in the future.

53.      The Center has a long history of environmental advocacy within the
southwestern United States generally, and in relation to public lands conservation
in particular.  As specifically relevant to this matter, the Center has worked to
protect species and habitats that occur on these public lands in Utah within the
Monument including Mexican Spotted Owl, northern goshawk, California condor,

greater sage-grouse, Southwestern willow flycatcher, yellow-billed cuckoo, spotted bat, Arizona toad, Colorado cutthroat trout, Colorado pikeminnow, and razorback sucker.  Further, Center members participated in efforts to establish the Monument.

54.     In their effort to support the Grand Staircase-Escalante National Monument's designation, many of the Plaintiff groups submitted comments on the Department of the Interior review of the Monument between May and July 2017.

## DEFENDANTS

55.     Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States.  He currently resides and conducts his duties in Washington, D.C.

56.     Defendant RYAN ZINKE is sued in his official capacity as the Secretary of the Interior of the United States.

57.     Secretary Zinke is responsible for ensuring that the Department of the Interior and its constituent agencies, including the BLM, comply with the applicable law, including the 1996 Proclamation's direction and requirements for managing the Monument.

58.     The Secretary of the Interior resides and conducts his duties in Washington, D.C.

59.     Defendant BRIAN STEED is sued in his official capacity as the official who is exercising the authority of the Director of the BLM, a bureau within the U.S. Department of the Interior.

60.     The Director of the BLM (and currently Mr. Steed) is responsible for

ensuring that the BLM complies with the applicable law, including the 1996

Proclamation's direction and requirements for managing the Monument.

61.     The Director of the BLM (and currently Mr. Steed) resides and

conducts his duties in Washington, D.C.

62.     The above-named Defendants have the authority, ability, and

obligation to remedy the harms alleged to Plaintiffs' interests.

## LEGAL BACKGROUND

### THE ANTIQUITIES ACT AND RELATED CONSTITUTIONAL LIMITS ON THE PRESIDENT'S AUTHORITY

63.     The U.S. Constitution's Property Clause gives Congress the exclusive

"[p]ower to dispose of and make all needful Rules and Regulations respecting the

Territory or other Property belonging to the United States."  U.S. Const. art. IV, § 3,

cl. 2 (the Property Clause).  Exercising this power, Congress may withdraw federal

public land from entry or manage it and prescribe limitations on its use.  It may

also sell, lease, or otherwise convey federal public land to third parties.

64.     In 1906, Congress delegated a discrete part of its Property Clause

power to the President when it enacted the Antiquities Act.  The Act authorizes the

President to "declare by public proclamation historic landmarks, historic and

prehistoric structures, and other objects of historic or scientific interest that are

situated on land owned or controlled by the Federal Government to be national

monuments," and to "reserve parcels of land as a part of the national monuments"

that comprise "the smallest area compatible with the proper care and management of the objects to be protected."  54 U.S.C. § 320301(a), (b).

65.    Using Congress's delegation of authority in the Antiquities Act, Presidents have declared by proclamation 157 national monuments in thirty-two states, four territories, two oceans, and the District of Columbia.  Depending on the nature and location of the objects to be protected, national monument designations have ranged from just a few acres to millions of acres in size.

66.    A President's national monument designation immediately confers enhanced protection for the identified "objects of scientific and historic interest" and for the lands on which they are found.  54 U.S.C. § 320301(a).  Once designated as a national monument, those lands must be managed for the purpose of preserving and safeguarding the objects of scientific and historic interest located there.

67.    The President may also restrict specified uses in the proclamation itself.  For example, to ensure that objects of scientific or historic interest are effectively protected, Presidents have used their Antiquities Act authority to "withdraw" national monument lands from mineral location under the General Mining Law of 1872, 30 U.S.C. § 21 *et seq*., and from leasing for oil and gas exploration and development under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq*.—as President Clinton did in the 1996 Proclamation establishing the Monument.

68.     In a national monument, the protection of the identified objects of historic or scientific interest is the paramount purpose for which the land is to be managed.

69.     In the Antiquities Act, Congress granted the President *limited* authority to "*declare* . . . national monuments" and "*reserve* parcels of land as a part of the national monuments."  54 U.S.C. § 320301(a), (b) (emphases added). Congress did *not* authorize the President to abolish national monuments, in whole or in part, once they have been designated.  Only Congress has that power.

**THE GRAND STAIRCASE-ESCALANTE NATIONAL MONUMENT**

70.     The Grand Staircase-Escalante National Monument is the 104th national monument to be established under the Antiquities Act.  The land within the Monument boundary is federal public land, owned by all Americans.  The 1996 Proclamation establishing the Monument describes in detail the geological, paleontological, ecological, archaeological, historic, and cultural significance of the Grand Staircase landscape and the landmarks and objects found there, and sets forth provisions and requirements that are essential to their future protection.

71.     For example, the Proclamation describes the following objects of scientific and historic importance found within the Monument and that warranted protection under the Antiquities Act:

> a.  World-class paleontological sites and the best record of late Cretaceous terrestrial life in the world, resources whose importance has been repeatedly borne out since the Monument's designation.  Thousands of

23

fossils have been recovered from the Kaiparowits Plateau within the Monument, and they have significantly advanced scientists' understanding of the ecosystems that existed before the Cretaceous-Paleogene extinction.  Twenty-one species of dinosaurs previously unknown to science have been discovered in the Monument.  The sites also contain large, unbroken petrified wood specimens exceeding thirty feet in length and fossils of mollusks, turtles, crocodilians, lizards, fishes, and mammals, which continue to provide unrivaled opportunities to study the paleontology of the late Cretaceous Era.

b. Brilliantly colored landscape showcasing geologic treasures of sedimentary rock formations unobscured by vegetation, and which lay bare millennia of Earth's geologic history.  Canyon systems—formed by eons of erosional forces—wind through thousands of square miles of successively ascending plateaus and layered rock formations.  The serpentine rock formations of the upper Escalante Canyons reveal vivid sandstone and shale deposits in shades of red, maroon, chocolate, tan, gray, and white.

c. The grand geologic staircase of great cliffs and plateaus that rise from the Grand Canyon to Zion, and then another 8,300 feet to the Aquarius Plateau, which was first described as a "stairway" by explorer Clarence Dutton in the 1800s.

    d. The Monument was a point of intersection and contact for different Native American cultures, providing significant opportunities for archaeological study, including sites with extensive archaeological objects left behind by ancient Native American cultures. Diverse groups of Ancestral Puebloan cultures mingled in the area, providing opportunities for archaeological study based on their rock art panels, occupation sites, campsites, and granaries. Many more undocumented sites remain in the Monument and are of significant scientific and historic value worthy of preservation for future study. Hundreds of recorded rock art panels, occupation sites, campsites, and granaries exist throughout the Monument. Native American tribes such as the Southern Paiute, Navajo, Hopi, Zuni, and other tribes continue to use the Monument today.

    e. Explorer John Wesley Powell conducted scientific field work in the Monument, and early Mormon pioneers left their marks there, including migration routes and trails, rock inscriptions, ghost towns, rock houses, and cowboy line camps.

72.     The Monument is also an outstanding biological resource, with what the Proclamation describes as "perhaps the richest floristic region in the Intermountain West." 61 Fed. Reg. at 50,224. As the Proclamation recognizes, the Monument's remoteness and limited travel corridors helped preserve its unique desert flora and fauna. The landscape hosts many endemic species and an

abundance of hanging gardens, tinajas (natural pockets in the rock that hold water), along with rock crevices, canyons, and dunal plant communities.  The geologic uplift, deformation, and erosion of the landscape have exposed large expanses of soil layers with distinct physical and chemical characteristics, which, in turn, support numerous vegetative communities, endemic plants, and their pollinators.  Undisturbed by human impacts, remote locations within the Monument harbor relict plant communities, with pinon-juniper trees up to 1,400 years old.  There are over 650 species of bees in the Monument, including approximately four dozen species that were unknown to scientists before 2003.  Over 200 species of birds are also found in the Monument, including bald eagles, peregrine falcons, and neotropical migrant songbirds that concentrate around rivers and streams within the Monument.

73.     Based on the grand scale of the Monument's geology and the importance of protecting it from degradation and other impacts, as well as the presence of other objects requiring protection in the Grand Staircase region, President Clinton determined that the boundaries of the Monument represented the smallest size compatible with the protection of the objects contained therein.

74.     The 1996 Proclamation made clear that the listed objects were immediately subject to the Antiquities Act's protections, stating: "Warning is hereby given to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of this monument and not to locate or settle upon any of the lands thereof."

75.     The 1996 Proclamation also mandated specific protections and use limitations.  It provided that "[a]ll Federal lands . . . within the boundaries of this monument are hereby appropriated and withdrawn from entry, location, selection, sale, leasing, or other disposition"—an immediate prohibition of the location of any new mining claims and the offering of any new leases, including the processing of non-competitive lease sale offers, for oil and gas development.

76.     The 1996 Proclamation required the BLM to "manage the monument" consistently with "the purposes of this proclamation"—that is, the protection of the listed geological, paleontological, ecological, archaeological, historic, and cultural resources it was created to protect.  The 1996 Proclamation specifically required the BLM to prepare a management plan for the Monument to ensure that the purposes of the Proclamation were achieved.

**The Grand Staircase-Escalante Monument Management Plan**

77.     Prior to the Monument's designation, the BLM managed these lands pursuant to the Federal Land Policy and Management Act (FLPMA).  Except for public lands governed by a special protective designation, such as a national monument designation, FLPMA generally requires the BLM to manage federal public lands in accordance with the "multiple use, sustained yield" principle, which allows for a range of uses, including oil and gas drilling, mining, off-highway vehicle use, and wilderness protection.  *See, e.g.*, FLPMA, 43 U.S.C. §§ 1702(c), 1712 (implementing multiple use in development and revision of land use plans); *id.* § 1732(a) (lands dedicated to specific uses not governed by FLPMA).

78.     Before 1996, this multiple-use approach to land management in the Grand Staircase region failed to safeguard the unique landscape and the historic and cultural sites situated there.  For example, ineffective management and poorly regulated off-highway vehicle use led to environmental damage as well as the looting and vandalism of cultural sites and fossils.  Relying on multiple-use principles, the BLM also leased large tracts of federal public land for coal mining and oil and gas drilling, and in the years leading up to 1996, it was working toward the approval of a large coal mine in the Kaiparowits Plateau.

79.     The 1996 Proclamation dramatically changed BLM's development-oriented approach to the management of these remarkable lands, requiring an integrated management approach across the Monument to focus instead on preservation of the objects identified in the Proclamation.  It also laid the groundwork for a new management regime that would identify and implement for years to come the changes necessary to ensure that the Monument's resources were protected.  Specifically, the 1996 Proclamation required the BLM to "prepare . . . a management plan for this monument, and [to] promulgate such regulations for its management as [the agency] deems appropriate."  Proclamation No. 6920, 61 Fed. Reg. at 50,225.

80.     The Monument Management Plan ensures that the protective purposes for which the Monument was designated are fulfilled and that all future activities on the Monument conform to the management plan.  The Proclamation and the Plan meant that for the first time the BLM would focus on the conservation,

instead of the exploitation, of the federal public lands within the Monument boundaries.

81.    In 2000, after a three-year-long process, the BLM issued a Monument Management Plan comprehensively detailing the BLM's management prescriptions for the Monument's protected resources—including archaeology, fish and wildlife, geology, history, paleontology, soils, water, and vegetation.  The BLM has managed the Monument pursuant to that plan since 2000.  BLM, Grand Staircase-Escalante National Monument Management Plan (Monument Management Plan) (Feb. 2000).

82.    In particular, the Monument Management Plan required the BLM to manage and monitor uses of the Monument to prevent damage to its resources, increase public education and appreciation of the resources, and facilitate research of the resources to promote the Monument's role as a laboratory for the preservation, study, and appreciation of cultural heritage.  Pursuant to the Plan, the BLM manages a variety of uses that are consistent with the conservation mandate of the Act and the Proclamation.  In particular, it provides for heightened protection in certain zones within the Monument to safeguard their remote and wild character.  These areas of the Monument provide a primitive and undeveloped visitor experience with limited motorized access and no facilities in areas designated as the "primitive zone."  They also provide opportunities for landscape-scale research.

83.    The Monument Management Plan recognized the wealth of information on prehistoric life and environment provided by numerous

paleontological sites in the Monument.  "The sequence of rocks found on the Kaiparowits Plateau contains one of the best and most continuous records of Late Cretaceous terrestrial life in the world."  The Plan requires the BLM to inventory and monitor the Monument for paleontological resources and manage uses to prevent damage to these resources.  *Id.*

84.     The Monument Management Plan also established a Monument Advisory Committee (the Committee), chartered under the Federal Advisory Committee Act, to consult with the Monument's managers in the adaptive management process.  *Id.* at 66.  The Committee included scientists with expertise in areas relevant to the management of the Monument, including archaeology, paleontology, geology, botany, wildlife biology, history, social science, and systems ecology, as well as members of the community, including county officials, educators, local outfitters and guides, tribal government officials, and environmental advocates.  *Id.*  The Committee provided a mechanism for stakeholders, including Plaintiffs, to participate directly in the Monument's management decisions and to more effectively protect the landscape and the objects in them.  Some Plaintiffs' members have served on the Committee or have participated in public meetings since the Committee was chartered.

85.     Because of the conferral of Monument status and the resulting Monument Management Plan, research in the Monument has expanded significantly and in ways that were not possible before the designation.  This research has contributed to a growing wealth of knowledge about a previously

unknown fossil record, the prehistory of the early Native Americans, and aspects of the ecological functions of desert plant and animal life.  Fossils excavated from the Monument are now studied, interpreted, and on display in local, regional, and national museums.

### Enhanced Administrative and Congressional Protection for National Monuments

86.     In 2000, the Department of the Interior established the National Landscape Conservation System (NLCS), a new system of conservation for BLM-managed lands designated as national monuments (including Grand Staircase-Escalante National Monument), national conservation areas, wilderness areas, wilderness study areas, wild and scenic rivers, national historic and scenic trails, and other similar designations.

87.     Congress formally adopted the NLCS framework in the Omnibus Public Land Management Act of 2009, which "establishe[s] in the Bureau of Land Management, the National Landscape Conservation System" to "conserve, protect, and restore nationally significant landscapes that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations." 16 U.S.C. § 7202(a).  The 2009 Act specifies that "[t]he system shall include . . . [e]ach area that is designated as . . . a national monument."  *Id.* § 7202(b)(1)(A). Congress thereby expressly ratified the Grand Staircase-Escalante National Monument as defined in the 1996 Proclamation.

88.     On a number of occasions prior to that point, Congress had also specifically confirmed its approval of—and added more land to–the Monument.  In 1998, Congress ratified an agreement exchanging lands controlled by Utah within various federal tracts for federal lands outside of the Monument to "resolve many longstanding environmental conflicts and further the interest of the State trust lands, the school children of Utah, and these conservation resources."  Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998).  As part of the agreement, Utah exchanged "approximately 176,698.63 acres of land and the mineral interest in approximately an additional 24,000 acres" that were "within the exterior boundaries of the Monument" for federal lands outside the Monument boundaries.  Agreement to Exchange Utah School Trust Lands Between the State of Utah and the United States of America, *as ratified by* Pub. L. No. 105-335, §§ 2-3, 112 Stat. at 3139-41.  Also in 1998, Congress passed the Automobile National Heritage Area Act that added and removed certain lands on the boundaries of the Monument.  Pub. L. No. 105-355, § 110, 112 Stat. at 3247, 3252-53.  Together, these two Acts of Congress added roughly 200,000 acres of land to the Monument, making its total area 1.9 million acres.

89.     Further, between 1996 and 2017, Congress appropriated millions of dollars to the Monument's budget every year, supporting the BLM's efforts to implement its conservation mandate and protect the objects set forth in the 1996 Proclamation, and to increase the number of BLM staff members dedicated to managing the Monument in accordance with the 1996 Proclamation.  To ensure the

Monument enjoyed lasting protection from the proposed coal mining, Congress also appropriated funds to buy back the coal leases in the Monument.  Department of the Interior and Related Agencies Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat, 1501, 1501A-215.

90.    The congressional budget appropriations also supported the creation of four visitor centers that interpret the Monument and its historic and scientific objects through exhibits, a large-scale archaeology excavation diorama, a topographic relief of the Monument, vibrant murals, and dinosaur fossil exhibits.

### PRESIDENT TRUMP'S UNLAWFUL PROCLAMATION REVOKING MONUMENT STATUS FROM ROUGHLY HALF OF THE MONUMENT

91.    Even before President Trump's January 20, 2017 inauguration, Utah politicians, including members of the state's congressional delegation and those who support coal mining on the Kaiparowits, began to lobby him to abolish or cut back the Monument.

92.    On April 26, 2017, President Trump issued Executive Order 13,792, 82 Fed. Reg. 20,429 (Apr. 26, 2017), which directed the Secretary of the Interior to "review" national monuments designated since 1996, the year President Clinton designated the Monument.  On information and belief, the twenty-one year timeframe was designed specifically because Defendants intended to abolish in whole or in part the Grand Staircase-Escalante National Monument.

93.    As the President prepared to sign the order, Vice President Mike Pence presaged the outcome of the review, explaining that President Trump was about "to

undo one of the great Federal overreaches of recent decades: the abuse of the Antiquities Act . . . to grab land and power at the American people's expense." President Trump followed with his own preview of the outcome of the process: "I'm signing a new executive order to end another egregious abuse of federal power," referring to previous Presidents' use of the Antiquities Act. Although the affected monument lands are federal public property owned by all Americans and have never been under state control, the President declared: "Today we are putting the states back in charge." The President also highlighted the lobbying by Senator Orrin Hatch of Utah to reverse monument designations in Utah and the "never-ended prodding" by Senator Mike Lee of Utah toward the same end. The President stated, "I'm very proud to be doing it in honor of you guys."

94.     Executive Order 13,792 required the Secretary to provide reports and recommendations to the President concerning future actions regarding the monuments.

95.     The Order directed the Secretary of the Interior to evaluate the monuments according to a variety of factors absent from the Antiquities Act, including:

> a. "the effects of a designation on the available uses of designated Federal lands, including consideration of the multiple-use policy of section 102(a)(7) of the Federal Land Policy and Management Act (43 U.S.C. § 1701(a)(7)), as well as the effects on the available uses of Federal lands *beyond* the monument boundaries;

     b.  "the effects of a designation on the use and enjoyment of non-federal

lands within or *beyond* the monument boundaries;

     c.  "concerns of State, tribal, and local governments affected by a

designation, including the economic development and fiscal condition

of affected States, tribes and localities;

     d.  "the availability of federal resources to properly manage designated

areas; and

     e.  "such other factors as the Secretary deems appropriate."

Exec. Order No. 13,792 § 2(a) (emphasis added).

96.    On May 11, 2017, the Department of the Interior announced that it

was accepting public comments on twenty-seven monuments it intended to review

pursuant to the Executive Order, including the Grand Staircase-Escalante National

Monument, and that it would conduct the review based on the criteria set forth in

Section 2 of the President Trump's Order.  82 Fed. Reg. 22,016, 22,016-17 (May 11,

2017).  The public comment period for all 27 monuments under review, including

Grand Staircase-Escalante, was open for just sixty days.  Despite the brief comment

period, the Interior Department received 2.8 million comments, which, with near

unanimity, supported the monuments under review.

97.    On information and belief, the Secretary of the Interior applied the

factors set forth in Executive Order 13,792 and submitted his report on Grand

Staircase-Escalante National Monument (among other monuments) to President

Trump on August 24, 2017.  Neither Secretary Zinke nor President Trump released

this report publicly, but national news reporters obtained what appears to be a leaked copy of the report.  The Secretary's report acknowledged that the public comments received were "overwhelmingly in favor of maintaining existing monuments."  Nevertheless, as to Grand Staircase-Escalante, the Secretary recommended that the President eliminate portions of the Monument and associated protective management for those excised areas.

98.    President Trump issued a Presidential Proclamation "Modifying the Grand Staircase-Escalante National Monument" on December 4, 2017 (the Trump Proclamation), revoking monument status from nearly half of the Grand Staircase-Escalante National Monument, and segmenting it into three smaller, non-contiguous units, which he named the Grand Staircase, the Kaiparowits, and the Escalante Canyons units.  Although the Proclamation claimed to "modif[y]" the Grand Staircase-Escalante National Monument, it abolished monument status for nearly 900,000 acres of previously protected public lands (including 80,000 acres of land that Congress had added to the Monument), on which the 1996 Proclamation identified numerous objects of scientific and historic importance worthy of protection under the Antiquities Act.

99.    President Trump's proclamation lacks a rational explanation of the President's authority to issue the proclamation, or an explanation for the decision to exclude areas with documented values that qualify for protection under the Antiquities Act.

100.    President Trump's use of the term "modify" does not change the fact that his action strips monument status from nearly 900,000 acres of previously protected land.  The President has no constitutional or statutory authority to take such action.

101.    Because of President Trump's proclamation eliminating much of the Monument from protected status under the Antiquities Act, the Department of the Interior will no longer implement the protections required by President Clinton's 1996 Proclamation on the lands removed from national monument status.  On information and belief, Defendants will no longer implement or comply with the 1996 Proclamation unless the Court declares President Trump's action unlawful and sets it aside.

102.    On information and belief, there is a substantial likelihood that Defendants will promptly revert to their pre-designation land management approach for the lands stripped of monument protection under the more permissive, pro-development "multiple use" regime, without the protective mandate of the Proclamation.  The Trump Proclamation will, accordingly, result in significantly less protection of the resources identified in the 1996 Proclamation and the 2000 Management Plan.  Without monument status, the BLM will not protect the scenic, scientific, ecological, historic, and cultural resources on these lands, and, on information and belief, it will reopen lands to coal mining and oil and gas drilling, with devastating consequences to the wild character and the scientific resources of the Monument.

## PRESIDENT TRUMP'S ACTION HARMS PLAINTIFFS' INTERESTS BY ELIMINATING PROTECTIONS REQUIRED BY THE 1996 PROCLAMATION

103.    The Plaintiff organizations actively supported the designation and protection of the Monument and have long advocated for its effective management. They have participated in numerous public processes involving a variety of issues, including development of the Monument Management Plan, grazing permits, oil and gas drilling on grandfathered leases, off-highway vehicle management, watershed restoration, and recreation management.

104.    Each of the Plaintiff organizations also has individual members who regularly use and enjoy the Monument, including the lands stripped of protection by the Trump Proclamation, for a variety of purposes, including scientific study, hiking and recreation, wildlife viewing, cultural and spiritual purposes, and aesthetic appreciation of the unmarred night skies, natural quiet, and pristine beauty.

105.    Plaintiffs' members value the beauty, remoteness, and largely unspoiled nature of the landscape and the geological, paleontological, archaeological, historic, cultural, and ecological resources found throughout the Monument, including in the areas that President Trump's proclamation stripped of monument protection.

106.    For example, the Circle Cliffs form a towering forty-mile loop in the northeastern corner of the Grand Staircase-Escalante National Monument. The Circle Cliffs area contains known deposits of tar sands and falls in a Designated Special Tar Sand Area.  Because the Circle Cliffs fall within the Monument as

designated in 1996, those tar sands have not been exploited and the remote

wilderness landscape has been preserved.  Plaintiffs' members visit the Circle Cliffs

for quiet solitude and to hike.  Following Trump's Proclamation, the Circle Cliffs

have been stripped of monument status.



*Fig. 1: Circle Cliffs*
*Credit: Jeff Foott*

107.   The Rimrocks are a collection of sandstone spires eroded over millions

of years.  These unique toadstool formations were formed by boulders falling on top

of softer sandstone rocks, which protected the underlying sandstone from erosion.

Plaintiffs' members visit the Rimrocks for aesthetic appreciation and to observe its

remarkable geology.  Following Trump's Proclamation, the Rimrocks have been

stripped of monument status.



*Fig. 2: Rimrocks*
*Credit: James Kay*

108.    Near Hole in the Rock Road, the Sunset Arch is a spectacular sandstone formation on the south slopes of Fortymile Ridge.  It is a popular hiking destination that provides expansive views and a wealth of photo opportunities. Prior to monument designation, this area was leased for oil and gas drilling and subject to exploratory drilling.  Plaintiffs' members hike to the Sunset Arch to appreciate its geology.  Following Trump's Proclamation, Sunset Arch has been stripped of monument status.



*Fig. 3: Sunset Arch*
*Credit: James Kay*

109.   The 1996 Proclamation benefited Plaintiffs' members by withdrawing those lands from mineral entry and leasing, and protecting them from the damaging impacts of mining, oil and gas exploration and development, trail and road construction, excessive off-highway vehicle use, artifact and fossil theft and destruction, and other harmful activities.

110.   Plaintiffs' members' use and enjoyment of the Monument have been enhanced by the protection required by the 1996 Proclamation, as implemented by the 2000 Management Plan, because Monument status conferred additional protections above and beyond the inadequate prior management regime on the area's fragile resources.  It also ended the threat of new coal leasing and mining, the location and development of new hardrock mining claims, and new oil and gas leasing on Monument lands.

111.   The geology, biology, and cultural sites in the Monument have significant value for the American public at large, and for Plaintiff organizations and their members specifically.  Plaintiffs' members visit this area to admire the unique geology, learn about the ecology, and examine the objects of antiquity found throughout the Monument.  The Monument has also provided Plaintiffs' members with important opportunities to view and study wildlife in an undisturbed, natural environment.

112.   President Trump's action will adversely affect Plaintiffs' members' interests by removing those protections on nearly 900,000 acres—including the protections against mineral leasing, coal mining, oil and gas exploration and development, hardrock mining claims, road construction, and off-highway vehicle access on lands that they regularly use—and allowing activities to commence that will disturb the tranquility and scenic beauty of the area and expose irreplaceable paleontological and cultural sites to heightened risk of damage and looting.

113.   TWS's members are also harmed by Defendants' abandonment of stakeholder processes for lands excluded from the 1996 Monument—including their participation on the Monument Advisory Committee.  These processes are designed to fulfill the requirements of the 1996 Proclamation, which have enabled Plaintiffs' members to have input and influence decisions about how to manage the Monument, all of which led to the BLM's more effective conservation of the Monument.

114.    President Trump's action renders one of the country's most pristine, unique landscapes vulnerable to immediate and imminent harm, and thus injures the aesthetic, recreational, scientific, cultural, spiritual, and educational values that Plaintiffs' members derive from the Monument as designated in 1996 and then expanded by subsequent congressional action.

### Coal Mining

115.    In particular, President Trump's action will reopen previously protected Monument lands to coal mining under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq*.

116.    Before the 1996 Proclamation, coal companies had leased numerous sites within the Monument boundaries, particularly on the Kaiparowits Plateau, where the U.S. Geological Survey estimated in 1996 that there were 62.3 billion tons of coal.  The Kaiparowits Plateau is a fifty-mile-long, high-elevation escarpment in the heart of the Monument and from which researchers and volunteers have excavated and studied tens of thousands of rare fossils.

117.    After the 1996 Proclamation, the Secretary of the Interior negotiated the repurchase of large coal leases to eliminate the threats of industrial development and to manage the lands in the Monument boundaries as an unspoiled natural area.  In 2000, Congress appropriated the funds for this transaction.

118.    Absent the protection conferred by the 1996 Proclamation, there is a substantial likelihood that the BLM will authorize new coal leases in the now-excluded areas and allow leaseholders to engage in activities with long-lasting

impacts—including the excavation of coal mines, elimination of surface vegetation and displacement of native fauna, release of pollution into waterways, and the construction of new roads (for hauling soil and coal) with the resulting truck traffic, fumes, debris, noise, and other damage. These activities threaten to disrupt not only the land on which the leases are sold, but will also affect the surrounding areas.

119. President Trump has acknowledged that he initiated the monument review, in part, at the behest of Utah Senator Orrin Hatch, a vocal proponent of coal mining in the Monument. Members of Utah's state legislature have also pressured the administration to open the Monument for coal mining. According to Senator Hatch, the President diminished the Monument specifically to allow coal mining in the Kaiparowits Plateau. When Secretary Zinke visited Grant Staircase, the Kane County government presented him with a map proposing boundary adjustments that would exclude areas with coal deposits.

120. On information and belief, the BLM will lease lands for coal mining that would, absent the Trump Proclamation, have been protected by the 1996 Proclamation and the 2000 coal lease repurchase authorized by Congress, posing an immediate and substantial threat to the invaluable geological and paleontological resources found there.

### Oil and gas leasing

121. Additionally, because of President Trump's action, lands that were protected under the 1996 Proclamation and subsequent congressional legislation

44

are now also open for oil and gas leasing under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq*.

122.   Absent the Monument's protections, the BLM may authorize new leaseholders to engage in activities with long-lasting, harmful impacts—including the scraping of surface vegetation (for drill pads, tanks, and other facilities associated with drilling) and the construction of new roads and pipelines (with the resulting truck traffic, fumes, debris, and other damage)—with few restrictions. These activities threaten not only to disrupt the land on which leases are sold, but will also affect the surrounding areas.

123.   Prior to the 1996 Proclamation, the oil and gas industry commonly sought leases and permits to drill on lands within the Monument boundaries, and in many instances the BLM approved the sale of oil and gas leases and applications for permits to drill on those lands.  In particular, the BLM sold leases in Kaibab Gulch, Middle Moody Canyon, Stud Horse Peaks, along the Hole-in-the-Rock road, and near the town of Escalante—all areas that were included within the Monument under the 1996 Proclamation, but which President Trump has cut out of the Monument.  As a result of the Trump Proclamation, the BLM is expected to again sell leases within the Grand Staircase-Escalante National Monument's boundaries, creating an immediate and substantial risk of development that would threaten the Monument objects identified in the 1996 Proclamation for years to come.

124.   On information and belief, the BLM's first oil and gas lease sale where it could offer these lands will be held in March 2018.

125.    There also remain some active leases within the Grand Staircase-Escalante National Monument's boundaries.  These leases now will be developed more easily without the protective limitations that monument status requires.

### *Hard-rock mining*

126.    Because of President Trump's action, the BLM will no longer protect from mineral entry Monument lands that were protected under the 1996 Proclamation or added by later congressional legislation, and there is a substantially heightened risk that these lands will be subject to staking and mining claims under the General Mining Law of 1872, 30 U.S.C. § 21 *et seq.*

127.    There are deposits of hardrock minerals, including copper, uranium, titanium, alabaster, and zirconium, throughout the Grand Staircase-Escalante National Monument.  On information and belief, new mining claims will imminently be located on federal public lands that were protected under the 1996 Proclamation and on lands that Congress subsequently added to the Monument.

128.    Prospectors do not need permits or other prior authorization from the BLM or any other government agency to locate and record hard-rock mining claims on lands excluded from Monument status.  Where valuable minerals are present, mining claims constitute valid property interests, creating a persistent cloud on the affected public land and often limiting the federal land managers' ability to preserve the natural character of the land.

129.    President Trump's decision to strip monument status from nearly 900,000 acres of the Grand Staircase-Escalante National Monument substantially

increases the risk that prospectors will engage in exploration activities ("casual use" and "notice use" activities) on public lands and mining claims where they previously could not. *See* 43 C.F.R. §§ 3809.10(a), 3809.605(b) (casual use); *id*. §§ 3809.21, 3809.312(a) (notice use).

130.   Notice-level activities may involve road construction, which can generate dust and waste, scrape lasting scars into the soil, remove native vegetation, disturb wildlife habitat, introduce exotic species, increase erosion, and harm water quality. *See id.* § 3809.5 (defining exploration activities).  Truck traffic and other surface development associated with hardrock mining activity result in new auditory and visual intrusions in areas that would otherwise be quiet and pristine.  All of these impacts harm Plaintiffs' members' interests and diminish their enjoyment of the natural setting in the Monument.

131.   There is a substantial risk that these activities will resume as a result of the Trump Proclamation, and that the natural, paleontological, and archaeological resources in the Monument will be harmed, as will the interests of Plaintiffs' members who visit the Monument for quiet recreation, solitude, and aesthetic appreciation.

132.   Mineral exploration and development have destructive impacts not only on the claimed land itself, but also on the surrounding area.  Increased noise and vehicle traffic threaten the unique character of the Monument, described in the 1996 Proclamation as a "high, rugged, and remote region, where bold plateaus and

multi-hued cliffs run for distances that defy human perspective" and where the "unspoiled natural area remains a frontier."

### *Roads and off-highway vehicle use*

133.   After years of the BLM's failure to manage off-highway vehicles and prevent the widespread damage they caused throughout the Monument lands, the 1996 Proclamation required the BLM to regulate off-highway vehicle use to protect the natural, archaeological, cultural, and paleontological resources within the Monument's boundaries.   As a part of the Monument Management Plan, the BLM implemented a travel management plan that substantially reduced the miles of dirt roads and trails available for motorized vehicles and further delineated certain trails where off-highway vehicles could not be used.   Plaintiffs successfully defended that travel plan from a challenge by local counties and entities.

134.   The Trump Proclamation provides that "the Secretary may allow motorized … use on roads and trails existing immediately before the issuance [of President Clinton's Proclamation] and maintain roads and trails for such use."   The Trump Proclamation, stripping monument status from excised Monument lands, as well as purporting to modify the status of lands retaining Monument status, makes it substantially more likely that restrictions on roads and motorized vehicles in these areas will be lost.

135.   On information and belief, with the Monument designation rescinded, new dirt roads and trails will be constructed and designated, existing dirt roads and trails will be widened and improved, and motorized use, including off-highway

vehicle use, will increase and spread into new areas currently not accessed by vehicular traffic.  For example, the BLM has previously relied on the Monument transportation plan to close hundreds of miles of dirt roads and trails to motorized and off-highway vehicle use; those protections will now be jeopardized in the areas excluded from monument status.

136.   The revocation of the Monument designation and its limitations on off-highway vehicles harms Plaintiffs' members' aesthetic, cultural, spiritual, recreational, scientific, and educational interests through noise, air pollution, and other physical damage to the land, water, wildlife habitat, scenery, and cultural resources that Plaintiffs' members wish to enjoy in their pristine state.

137.   The revocation of the Monument designation and the removal of the limitations on off-highway vehicles will put paleontological, ecological, and cultural sites in serious jeopardy.  On information and belief, the lands stripped of monument protections would no longer receive protections specifically for those sites and artifacts.

### Agency Defendants have decided not to carry out their duties under the 1996 Proclamation

138.   Due to President Trump's action, on information and belief, Defendants have decided not to carry out their duties under the 1996 Proclamation.

139.   President Trump (by attempting to revoke monument status from nearly half of the Grand Staircase-Escalante National Monument and nullify the 1996 Proclamation) and Defendants Secretary of the Interior and Director of the

49

Bureau of Land Management (by failing to carry out their duties under the 1996 Proclamation) have deprived Plaintiffs of the benefits of the protections guaranteed by the 1996 Proclamation.

140.    Defendants' actions adversely affect and irreparably injure the Plaintiffs' and their members' interests, and those injuries will continue unless the Court grants the relief Plaintiffs seek.

141.    Plaintiffs' injuries would be redressed by the relief sought here.

142.    Plaintiffs have no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**
**Antiquities Act,**
**54 U.S.C. § 320301 *et seq.***
***(Defendant Trump)***

143.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

144.    Judicial review is available to ensure that presidential actions are consistent with constitutional principles and that the President has not exceeded his statutory authority.

145.    The President has the authority to regulate federal public lands only to the limited extent that Congress has delegated that authority to the President.

146.    In issuing his December 4, 2017 Proclamation, President Trump exceeded his authority under the Antiquities Act, 54 U.S.C. § 320301 *et seq.*  Under the Act, Congress authorized the President to designate federal public lands as national monuments, but not to abolish them either in whole or in part.

147.    As a result, the Trump Proclamation revoking monument status from nearly half of the Grand Staircase-Escalante National Monument exceeds the scope of the President's authority, is *ultra vires* and unlawful.  Even if President Trump's action were, as he termed it, a "modif[ication]" of the Grand Staircase-Escalante National Monument and not an abolition, the result would be the same: nearly 900,000 previously protected acres of land have now been stripped of monument status.  The President has no authority to modify a monument in this way.

## SECOND CLAIM FOR RELIEF
### U.S. Constitution, art. II, and separation-of-powers doctrine
### *(Defendant Trump)*

148.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

149.    Judicial review is available to ensure that presidential actions are consistent with constitutional principles and that the President has not unlawfully intruded on Congress's exclusive power over federal public lands under the Property Clause of the U.S. Constitution.  U.S. Const. art. IV, § 3, cl. 2.

150.    The Property Clause provides that "Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."  U.S. Const. art. IV, § 3, cl. 2. The President has the authority to regulate such property only to the limited extent that Congress has delegated that authority to the President.

151.    Congress has not delegated the President the authority to rescind or amend the monument designations of his predecessors or Congress pursuant to the

Antiquities Act.  To the contrary, Congress has affirmed its sole jurisdiction to regulate the Monument through a series of legislative acts, including the Federal Land Policy and Management Act of 1976, the Omnibus Public Land Management Act of 2009, the Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998); the Automobile National Heritage Area Act, Pub. L. No. 105-355, § 110, 112 Stat. at 3247, 3252-53.

152.    The President lacks the authority to reverse protections Congress has enacted with respect to the Monument.

153.    In issuing his December 4, 2017 Proclamation, President Trump exceeded his authority under Article II of the U.S. Constitution and intruded on Congress's exclusion power to regulate federal property under the Property Clause, in violation of the doctrine of separation of powers.

## THIRD CLAIM FOR RELIEF
### Take Care Clause, U.S. Const. art. II, § 3
### *(Defendant Trump)*

154.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

155.    The U.S. Constitution requires the President to "take Care that the Laws be faithfully executed."  U.S. Const. art II, § 3.

156.    President Trump must "take Care" to faithfully execute the Antiquities Act, including its narrow delegation of authority to Presidents to declare (but not to abolish) national monuments.

157.     The 1996 Proclamation, as a lawful exercise of congressional authority delegated to President Clinton under the Antiquities Act, is a "law" within the meaning of the "take Care" clause.  Accordingly, the U.S. Constitution requires President Trump to faithfully execute that law.

158.     The Omnibus Public Land Management Act of 2009 and the Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998), as lawful exercises of congressional authority, are  "laws" within the meaning of the "take Care" clause.  Accordingly, the U.S. Constitution requires President Trump to faithfully execute that law.

159.     President Trump has violated the "take Care" clause of the U.S. Constitution by attempting to repeal and replace the 1996 Proclamation and remove national monument status and protection from nearly 900,000 acres of the Monument, including 80,000 acres of land that Congress later added to the Monument.  The lands that the Trump Proclamation purports to remove from the Monument contain objects and resources that the 1996 Proclamation identified as eligible and worthy of protection under the Antiquities Act.

### FOURTH CLAIM FOR RELIEF
### Antiquities Act,
### 54 U.S.C. § 320301 *et seq.*
### (*Defendant Trump*)

160.     Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

161.    Even if President Trump had the authority to abolish, in whole or in part, the Grand Staircase-Escalante National Monument—which he does not—he could only do so in a manner consistent with the terms and the purposes of the Antiquities Act.

162.    When President Clinton designated the Grand Staircase-Escalante National Monument, he described the objects of scientific and historic importance that qualified for protection under the Antiquities Act.  He also determined that, based on the grand scale of the Monument's geologic features—most notably the "Grand Staircase" of geologic strata—and the dispersed location of the objects of scientific and historic interest, the Monument's boundaries were "the smallest area compatible with the proper care and management of the objects to be protected." Those findings are grounded in fact, have survived a legal challenge, and are confirmed by the twenty-one years of research conducted since the Monument's designation.

163.    The Trump Proclamation eliminating national monument status and protection from nearly 900,000 acres of the Monument excludes objects of scientific and historic importance from the decades-long protection they enjoyed under the Antiquities Act, leaving them vulnerable to the damage that the 1996 Proclamation effectively barred.

164.    The Trump Proclamation is based on considerations wholly outside the Antiquities Act and lacks legal or factual justification.

## FIFTH CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*
### *(Defendants Secretary of the Interior and*
### *Director of BLM)*

165.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

166.    The Administrative Procedure Act (APA) confers a right of action on any person adversely affected by a final agency action or a failure to act, and waives the federal government's sovereign immunity.  5 U.S.C. §§ 701-706.

167.    Because President Trump had no lawful authority to abolish, in whole or in part, the Monument, the Secretary of the Interior and his subordinate officers remain subject to the 1996 Proclamation's direction to undertake specific, mandatory duties to protect the special values of the Grand Staircase-Escalante National Monument.

168.    President Trump's purported revocation of national monument status for nearly half of the Grand Staircase-Escalante National Monument conflicts with the Omnibus Public Land Management Act of 2009, which "establishe[s] in the Bureau of Land Management, the National Landscape Conservation System," and which—along with several previous actions by Congress—ratified national monuments generally and the Grand Staircase-Escalante National Monument specifically.  16 U.S.C. § 7202(a).  Accordingly, the Trump Proclamation conflicts with these statutes and, further, is an unconstitutional intrusion on Congress's sole

authority to regulate federal property in violation of the separation of powers doctrine.

169.    Any BLM action contrary to the 1996 Proclamation constitutes arbitrary and capricious agency action not in accordance with the law.

170.    As a result of the Trump Proclamation, Defendants Secretary of the Interior and Director of the BLM will promptly violate the terms of the 1996 Proclamation by managing the public lands under the pre-1996, less protective multiple use regime.  Accordingly, there is a substantial risk that the BLM will no longer protect the objects of historic and scientific interest identified in the 1996 Proclamation and will instead authorize oil and gas leasing and development, coal leasing, and will discontinue efforts and resource allocations necessary to protect the lands that lost protection from the harmful impacts of roads, off-road vehicles, and other activities.  All of these actions are inconsistent with the 1996 Proclamation and subsequent acts of Congress.

171.    On information and belief, Defendants will not carry out their duties under the 1996 Proclamation as long as the Trump Proclamation remains in place.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court:

1.    Declare that President Trump's December 4, 2017 Proclamation is *ultra vires* and exceeds his authority under the Antiquities Act,

2.      Declare that President Trump's December 4, 2017 Proclamation exceeds the scope of his authority under Article II of the U.S. Constitution and violates the separation of powers doctrine and the "take Care" clause;

3.      Issue injunctive relief invalidating President Trump's December 4, 2017 Proclamation and barring its implementation;

4.      Issue injunctive relief against Defendants Secretary of the Interior and Director of BLM, directing them to carry out their mandatory duties imposed in the 1996 Proclamation and enjoining them from implementing President Trump's unlawful order;

5.      Award Plaintiff fees and costs pursuant to 28 U.S.C. § 2412; and

6.      Grant such other relief as the Court deems just and proper.


Dated: December 4, 2017                     Respectfully submitted,

                                            */s/ James Pew*
                                            James Pew (D.C. Bar No. 448830)
                                            Earthjustice
                                            1625 Massachusetts Ave., NW, Ste. 702
                                            Washington, D.C. 20036
                                            Tel.: (202) 667-4500
                                            Fax: (202) 667-2356
                                            E-mail: jpew@earthjustice.org

                                            Heidi McIntosh (*pro hac vice* pending)
                                            Yuting Yvonne Chi (*pro hac vice* pending)
                                            Earthjustice
                                            633 17th Street, Suite 1600
                                            Denver, CO 80202
                                            Tel.: (303) 623-9466
                                            Fax: (303) 623-8083
                                            E-mail: hmcintosh@earthjustice.org
                                            E-mail: ychi@earthjustice.org

*Counsel for Plaintiffs The Wilderness Society,
Defenders of Wildlife, Grand Canyon Trust,
Great Old Broads for Wilderness, Western
Watersheds Project, WildEarth Guardians,
Sierra Club, and Center for Biological
Diversity*

*/s/ Sharon Buccino*
Sharon Buccino (D.C. Bar No. 432073)
Jacqueline M. Iwata (D.C. Bar No. 1047984)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
Tel.: (202) 289-6868
Fax: (415) 795-4799
E-mail: sbuccino@nrdc.org
E-mail: jiwata@nrdc.org

Michael E. Wall
Katherine Desormeau
Ian Fein
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Tel.: (415) 875-6158
Fax: (415) 795-4799
E-mail: mwall@nrdc.org
E-mail: kdesormeau@nrdc.org
E-mail: ifein@nrdc.org
*Counsel for Natural Resources Defense
Council*

*/s/ Stephen Bloch*
Stephen H.M. Bloch (*pro hac vice* pending)
Landon C. Newell
Laura E. Peterson
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
E-mail: steve@suwa.org
E-mail: landon@suwa.org

58

E-mail: laura@suwa.org
*Counsel for Southern Utah Wilderness Alliance*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of December 2017, I electronically filed

the foregoing COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

with the Clerk of the District Court using the CM/ECF system, which will send

notification of such filing to counsel of record in this proceeding.


*/s/*James Pew
James Pew (D.C. Bar No. 448830)
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, D.C. 20036
Tel.: (202) 667-4500
Fax: (202) 667-2356
E-mail: jpew@earthjustice.org