**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE WILDERNESS SOCIETY, *et al.*,<br><br>           *Plaintiffs*,<br><br>      v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>           *Defendants*. | Civil Action No. 17-2587 (TSC) |
| GRAND STAIRCASE ESCALANTE<br>PARTNERS, *et al.*,<br><br>           *Plaintiffs*,<br><br>      v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>           *Defendants*. | Civil Action No. 17-2591 (TSC)<br><br><br><br>**CONSOLIDATED CASES** |

**BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
   CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF *AMICI CURIAE* ........................................................................ 1

INTRODUCTION ................................................................................................ 1

ARGUMENT........................................................................................................ 4

    I.  By Empowering Presidents To Establish but Not Diminish National Monuments, Congress Preserved Its Constitutional Prerogatives While Advancing the Goal of Safeguarding National Treasures ................................................................. 4

    II.  Congress Has Not Changed the Meaning of the Antiquities Act by "Acquiescing" in Presidential Diminishments of National Monuments ............................................. 10

        A.  Statutory Disputes Like This One Involve Different Interpretive Rules than Disputes About the Scope of Executive Power Where Congress Has Not Legislated ............................................................. 10

        B.  Congressional Inaction Cannot Amend a Duly Enacted Statute ................ 15

        C.  Congress Has Not Given Presidents the Power To Diminish National Monuments ............................................................. 20

CONCLUSION.................................................................................................... 25

APPENDIX.......................................................................................................... 1A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*A.F.L.-C.I.O. v. Kahn*,
   618 F.2d 784 (D.C. Cir. 1979) ....................................................................... 11

*Alaska v. Carter*,
   462 F. Supp. 1155 (D. Alaska 1978) ........................................................... 10

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ........................................................................... 19, 23, 25

*Apex Hosiery Co. v. Leader*,
   310 U.S. 469 (1940) ..................................................................................... 17

*Bob Jones Univ. v. United States*,
   461 U.S. 574 (1983) ................................................................................. 17, 18

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ..................................................................................... 19

*Boys Markets, Inc. v. Retail Clerks Union*,
   398 U.S. 235 (1970) ..................................................................................... 18

*Brown v. Gardner*,
   513 U.S. 115 (1994) ..................................................................................... 19

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ......................................................................................... 19

*Butte City Water Co. v. Baker*,
   196 U.S. 119 (1905) .................................................................................... 4, 5

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
   566 U.S. 399 (2012) ..................................................................................... 19

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ........................................................................ 3, 16, 18, 20

*Chickasaw Nation v. United States*,
   534 U.S. 84 (2001) ....................................................................................... 15

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ................................................................................. 19, 20

*Cochnower v. United States*,
   248 U.S. 405 (1919) ....................................................................................... 8

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*C.P.S.C. v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980) .................................................................................... 16

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) .................................................................................... 14

*Doe v. Chao*,
  540 U.S. 614 (2004) .................................................................................... 19

*Flood v. Kuhn*,
  407 U.S. 258 (1972) .................................................................................... 17, 18

*Forest Grove Sch. Dist. v. T.A.*,
  557 U.S. 230 (2009) .................................................................................... 16

*Free Enter. Fund v. P.C.A.O.B.*,
  561 U.S. 477 (2010) .................................................................................... 19

*Girouard v. United States*,
  328 U.S. 61 (1946) ...................................................................................... 18

*Gulf Oil Corp. v. Copp Paving Co.*,
  419 U.S. 186 (1974) .................................................................................... 16

*Haig v. Agee*,
  453 U.S. 280 (1981) .................................................................................... 14

*Helvering v. Hallock*,
  309 U.S. 106 (1940) .................................................................................... 16, 23

*I.N.S. v. Chadha*,
  462 U.S. 919 (1983) .................................................................................... 19, 20

*Johnson v. Transp. Agency, Santa Clara County*,
  480 U.S. 616 (1987) .................................................................................... 16

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976) .................................................................................... 4

*Light v. United States*,
  220 U.S. 523 (1911) .................................................................................... 4

*Medellín v. Texas*,
  552 U.S. 491 (2008) .................................................................................... 15

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006) ...................................................................................... 16

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Mistretta v. United States,*
    488 U.S. 361 (1989) ................................................... 3

*N.L.R.B. v. Noel Canning,*
    134 S. Ct. 2550 (2014) ............................................... 3, 15

*N.L.R.B. v. SW Gen., Inc.,*
    137 S. Ct. 929 (2017) .................................... 4, 19, 20, 21, 22

*Patterson v. McLean Credit Union,*
    491 U.S. 164 (1989) ................................................... 3, 16, 24

*Pension Benefit Guar. Corp. v. LTV Corp.,*
    496 U.S. 633 (1990) ................................................... 16

*The Pocket Veto Case,*
    279 U.S. 655 (1929) ................................................... 15

*Pub. Citizen, Inc. v. Dep't of Health & Human Servs.,*
    332 F.3d 654 (D.C. Cir. 2003) ................................... 24, 25

*Pub. Emps. Ret. Sys. of Ohio v. Betts,*
    492 U.S. 158 (1989) ................................................... 15, 25

*Saxbe v. Bustos,*
    419 U.S. 65 (1974) ..................................................... 17

*S.E.C. v. Sloan,*
    436 U.S. 103 (1978) ................................................... 21, 24

*Scripps-Howard Radio v. F.C.C.,*
    316 U.S. 4 (1942) ....................................................... 16

*Shearson/Am. Express, Inc. v. McMahon,*
    482 U.S. 220 (1987) ................................................... 18

*Sinclair v. United States,*
    279 U.S. 263 (1929) ................................................... 2, 4

*Solid Waste Agency v. U.S. Army Corps of Engineers,*
    531 U.S. 159 (2001) ................................................... 19

*Springer v. Gov't of Philippine Islands,*
    277 U.S. 189 (1928) ................................................... 13

*Udall v. Tallman,*
    380 U.S. 1 (1965) ....................................................... 21

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*United States v. California,*
436 U.S. 32 (1978) ......................................................................... 6

*United States v. City & Cty. of San Francisco,*
310 U.S. 16 (1940) ......................................................................... 4

*United States v. Gratiot,*
39 U.S. 526 (1840) ......................................................................... 2, 4

*United States v. Midwest Oil Co.,*
236 U.S. 459 (1915) .............................................. 10, 11, 12, 15, 21

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ................................................................ *passim*

*Zemel v. Rusk,*
381 U.S. 1 (1965) ....................................................................... 17, 18

*Zivotofsky v. Kerry,*
135 S. Ct. 2076 (2015) .......................................................... 3, 12, 15

*Zuber v. Allen,*
396 U.S. 168 (1969) ..................................................................... 21

CONSTITUTIONAL PROVISIONS AND LEGISLATIVE MATERIALS

40 Cong. Rec. (June 5, 1906)........................................................ 9

43 U.S.C. § 1714(f)....................................................................... 10

43 U.S.C. § 1714(*l*)...................................................................... 10

54 U.S.C. § 320301(b) .................................................................. 9

61 Fed. Reg. 50,223 (Sept. 24, 1996) .......................................... 1

82 Fed. Reg. 1,139 (Jan. 5, 2017) ............................................... 2

82 Fed. Reg. 58,081 (Dec. 8, 2017) ............................................. 2

82 Fed. Reg. 58,089 (Dec. 8, 2017) ............................................. 2

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371
(1980) ........................................................................................... 24

An Act For the Preservation of American Antiquities, Pub. L. No. 59-209,
34 Stat. 225 (1906) ................................................................ *passim*

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

An Act Making Appropriations for Sundry Civil Expenses of the Government,
30 Stat. 11 (1897) ..................................................................................... 8, 9

An Act To Establish a New Grand Teton National Park in the State of Wyoming, and
For Other Purposes, Pub. L. No. 81-787, 64 Stat. 849 (1950) ................................. 24

An Act To Repeal Timber-Culture Laws, 26 Stat. 1095 (1891)................................... 8, 9

Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, 90 Stat.
2743 ....................................................................................................... 23

H.R. 11021, 56th Cong. § 1 (1900).............................................................. 9

H.R. Rep. No. 59-2224 (1906)..................................................................... 6

H.R. Rep. No. 94-1163, 1976 WL 14070 (1976) ........................................... 23

H.R. Rep. No. 96-97 (1979).......................................................................... 24

Pub. L. No. 57-161, § 3, 32 Stat. 388 (1902).................................................. 8

Pub. L. No. 61-303, § 1, 36 Stat. 847 (1910).................................................. 8

Pub. L. No. 113-287, § 2(b), 128 Stat. 3094 (2014) ....................................... 17

S. Rep. No. 59-3797 (1906).......................................................................... 6

U.S. Const. art. IV, § 3, cl. 2........................................................................ 4

BOOKS, ARTICLES, AND OTHER AUTHORITIES

President William J. Clinton, Remarks Announcing the Establishment of the Grand
Staircase-Escalante National Monument at Grand Canyon National Park, Arizona
(Sept. 18, 1996) ........................................................................................ 1

Kelly Y. Fanizzo, *Separation of Powers and Federal Land Management:
Enforcing the Direction of the President under the Antiquities Act*, 40 Envtl.
L. 765 (2010) ............................................................................................ 6, 7

David Harmon et al., *The Antiquities Act: The First Hundred Years of a Landmark
Law*, 23 George Wright Forum 5 (2006).............................................. 5, 7, 8

Jayni Foley Hein, *Monumental Decisions: One-Way Levers Towards Preservation in
the Antiquities Act and Outer Continental Shelf Lands Act*, 48 Envtl. L. 125
(2018) ....................................................................................................... 5, 7

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

Richard M. Johannsen, *Public Land Withdrawal Policy and the Antiquities Act*, 56
Wash. L. Rev. 439 (1981) ........................................................ 24

Ronald Freeman Lee, *The Antiquities Act of 1906*, 42 J. of the Sw. 197 (2000).......... 5, 6, 10

John D. Leshy, *Shaping the Modern West: The Role of the Executive Branch*, 72 U.
Colo. L. Rev. 287 (2001)........................................................ 6

Letter from James Madison to Spencer Roane (Sept. 2, 1819) .................................. 15

Nat'l Park Serv. Archeology Program, *Monuments List* (2018)................................. 24

John C. Ruple, *The Trump Administration and Lessons Not Learned from Prior
Presidential National Monument Modifications*, 43 Harv. Envtl. L. Rev.
(forthcoming 2019)................................................................ 22

Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L.
Rev. 473 (2003)................................................................ 5, 7, 9

Alexandra M. Wyatt, Cong. Research Serv., *Antiquities Act: Scope of Authority for
Modification of National Monuments* (2016)........................................... 7

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are members of Congress who have a strong interest in ensuring that presidents respect the limits of the authority delegated to them by the legislative branch. The Constitution vests Congress with plenary power over the federal lands and other property belonging to the United States, and any power exercised by the President in this area must therefore come from a delegation of Congress. In the Antiquities Act of 1906, Congress authorized presidents to designate notable historic and scientific landmarks as national monuments, and to reserve federal lands as part of such monuments, in order to prevent irreversible damage to these unique American landmarks. Congress did not, however, grant presidents the discretion to abolish or diminish the size of existing national monuments, instead reserving that power to itself. Moreover, subsequent Congresses did not, and could not, change the meaning of the Act by "acquiescing" in presidential modifications of national monument boundaries. A full listing of *amici* appears in the Appendix.

## INTRODUCTION

Spurred by an urgent new awareness that treasured American landmarks were being irrevocably damaged, Congress in 1906 authorized presidents to establish national monuments for the preservation of significant "objects of historic or scientific interest," An Act For the Preservation of American Antiquities, Pub. L. No. 59-209 § 2, 34 Stat. 225. Pursuant to this authority, in September 1996 President Bill Clinton established the Grand Staircase-Escalante National Monument, observing that "[i]n protecting it, we live up to our obligation to preserve our natural heritage." Remarks Announcing the Establishment of the Grand Staircase-Escalante National Monument (Sept. 18, 1996); *see* 61 Fed. Reg. 50,223 (Sept. 24, 1996). In December 2016,

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

1

President Barack Obama established Bears Ears National Monument pursuant to the same authority, finding that its "[a]bundant rock art, ancient cliff dwellings, ceremonial sites, and countless other artifacts provide an extraordinary archaeological and cultural record that is important to us all" and that "the land is profoundly sacred to many Native American tribes." 82 Fed. Reg. 1,139 (Jan. 5, 2017). President Donald Trump issued proclamations in December 2017 that would dramatically reduce the size of these national monuments. *See* 82 Fed. Reg. 58,081 (Dec. 8, 2017); 82 Fed. Reg. 58,089 (Dec. 8, 2017). In doing so, he acted without lawful authority.

The Property Clause of the Constitution gives Congress "plenary power" over the federal lands, *Sinclair v. United States*, 279 U.S. 263, 294 (1929), a power that is "without limitation," *United States v. Gratiot*, 39 U.S. 526, 537 (1840). In the Antiquities Act of 1906, motivated by a dawning recognition that priceless American landmarks were being irreparably harmed, Congress delegated some of this power to the President—the power to establish national monuments for the preservation of "objects of historic or scientific interest." Pub. L. No. 59-209 § 2, 34 Stat. 225. By enabling presidents to act quickly to protect such landmarks, the Act ensured that cherished places and objects would not be destroyed before Congress had a chance to decide their fate—thus maintaining Congress's prerogatives under the Property Clause. Congress did not, however, give presidents the authority to diminish or abolish existing national monuments, which would have ill-served the preservationist goals of the Antiquities Act and Congress's own constitutional prerogatives. The Act's text, history, and purpose make this clear.

Lacking support from those sources, the Trump Administration argues that Congress has since authorized presidents to diminish monuments by "acquiescing" in the exercise of that power. This claim has no merit. To begin with, it confuses principles that govern the interpretation of statutes with principles that help define the scope of executive power in the absence of legislation.

2

Historical practice can be significant in the latter scenario, which often involves interpreting broad constitutional provisions that "do not establish and divide fields of black and white." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 597 (1952) (Frankfurter, J., concurring). Thus, when the judiciary is called upon to resolve questions about the Constitution, it often defers to the power-sharing arrangements that the elected branches themselves have developed over time. *See Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2091 (2015) ("*In separation-of-powers cases* this Court has often 'put significant weight upon historical practice.'" (quoting *N.L.R.B. v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014)) (emphasis added)); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) ("traditional ways of conducting government ... give meaning *to the Constitution*" (emphasis added) (quotation marks omitted)).

When the question is the meaning of a statute passed by Congress, however, the judiciary's role is to discern congressional intent—more specifically, the intent of the Congress that passed the statute. That is why, in statutory interpretation, there is little room for considering events that occurred after a statute's enactment, or a subsequent Congress's "acquiescence" in those events. And pure *inaction* by a subsequent Congress is never grounds for concluding that presidential conduct has altered the meaning of a law. Simply put, "Congressional inaction cannot amend a duly enacted statute." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989)).

Yet congressional inaction is the centerpiece of the Trump Administration's argument. The Administration highlights instances from the twentieth century in which presidents modified national monument boundaries, but it fails to show that Congress did anything to ratify the exercise of such power, or that these previous modifications provided any compelling reason for Congress to challenge the President about the correct interpretation of the Antiquities Act. Most adjustments

3

to monument boundaries made by past presidents appear to have been efforts to effectuate the preservationist goals of the Antiquities Act and the original intent of the designations in question. Even assuming those adjustments were widely known and closely examined in Congress, they would have provided little reason to confront the President "just to make a point about compliance with the statute." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017). "In this context, Congress's failure to speak up does not fairly imply that it has acquiesced in the [Administration]'s interpretation." *Id*. And none of the actions that Congress *has* taken—whether its amendments to the Antiquities Act or its passage of the Federal Land Policy and Management Act in 1976—have endorsed a unilateral presidential authority to diminish existing monuments.

## ARGUMENT

I. **By Empowering Presidents To Establish but Not Diminish National Monuments, Congress Preserved Its Constitutional Prerogatives While Advancing the Goal of Safeguarding National Treasures.**

**A.** "The authority of Congress over the public lands is granted by § 3, article 4, of the Constitution," *Butte City Water Co. v. Baker*, 196 U.S. 119, 125-26 (1905), which provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States ...." U.S. Const. art. IV, § 3, cl. 2. Under the Property Clause, Congress has "complete power" over the federal lands. *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976); *see Light v. United States*, 220 U.S. 523, 537 (1911) ("the public lands of the nation are held in trust for the people of the whole country," and "how that trust shall be administered .... is for Congress to determine" (quotation marks omitted)); *United States v. City & Cty. of San Francisco*, 310 U.S. 16, 30 (1940) ("The power over the public land thus entrusted to Congress is without limitations." (citing *Gratiot*, 39 U.S. at 537)).

Because of Congress's "plenary power," *Sinclair*, 279 U.S. at 294, the President has no

4

inherent authority over the public lands of the United States. But Congress may delegate some of its Property Clause power to other governmental actors, *see Butte City*, 196 U.S. at 126, including the President. In the Antiquities Act, Congress did exactly that.

**B.** "As the nineteenth century wound down," Americans "woke up to the disturbing fact that America was finite" and that "the great open landscapes of the West were filling up with settlers or increasingly coming under the control of land speculators." David Harmon et al., *The Antiquities Act: The First Hundred Years of a Landmark Law*, 23 George Wright Forum 5, 9 (2006). Most pressingly, there were "mounting reports of settlers, curiosity-seekers, newfangled tourists, and profiteers ransacking southwestern archaeological sites for building materials, curios, or treasures," *id.* at 9-10, and "private collecting of artifacts on public lands by both professionals and amateurs threatened to rob the public of its cultural heritage," Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 477 (2003). These concerns reached Congress, where hearings provided "evidence of the vandalism of American antiquities that had been going on for years and of the broad national support for corrective legislation." Ronald Freeman Lee, *The Antiquities Act of 1906*, 42 J. of the Sw. 197, 233 (2000).

After years of debate and negotiation, *see id.* at 223-42, Congress in 1906 passed "An Act For the Preservation of American Antiquities," 34 Stat. 225. The Act established a new preservation concept, the "national monument," Lee, *supra*, at 241, and gave presidents the discretionary authority to declare such monuments. *See* Antiquities Act § 2, 34 Stat. 225. "In delegating the authority to create monuments, one of the drafters' aims was to empower the President to act quickly to prevent the destruction of unique and valuable objects and resources." Jayni Foley Hein, *Monumental Decisions: One-Way Levers Towards Preservation in the Antiquities Act and Outer Continental Shelf Lands Act*, 48 Envtl. L. 125, 146 (2018). Indeed, a

sense of urgency pervaded Congress's deliberations. The Senate committee emphasized that "historic and prehistoric ruins and monuments on the public lands of the United States are rapidly being destroyed by parties who are gathering them as relics." S. Rep. No. 59-3797, at 1 (1906). The House committee report incorporated a memorandum by the archeologist who later drafted the Act's language, *see* Lee, *supra*, at 238-39, warning that protection for areas of "historic and scientific interest and scenic beauty" was "urgently needed," H.R. Rep. No. 59-2224, at 3 (1906).

Appreciating the "urgent need for immediate action," *id.* at 7, Congress empowered the President "to identify those sites and objects that might be threatened with destruction or misuse," and "to respond quickly to threats and withdraw the necessary property from the public domain." Kelly Y. Fanizzo, *Separation of Powers and Federal Land Management: Enforcing the Direction of the President under the Antiquities Act*, 40 Envtl. L. 765, 770 (2010). While earlier bills had made Congress responsible for reserving land, *id*. at 779; Lee, *supra*, at 231, the legislative process is deliberative by design. And so leaving the designation of national monuments to this often slow process risked irrevocable damage to sites and objects before Congress could act. The Antiquities Act averted that risk by conferring the power to establish national monuments on the more nimble executive branch. *See* John D. Leshy, *Shaping the Modern West: The Role of the Executive Branch*, 72 U. Colo. L. Rev. 287, 304 (2001) ("where threats do exist, the executive is almost always able to act more quickly than the Congress"). And to ensure the President could move with haste, Congress empowered him to create monuments "in his discretion," Antiquities Act § 2, 34 Stat. 25, "simply by issuing a proclamation," *United States v. California*, 436 U.S. 32, 40 (1978).

By delegating this authority to the President, Congress paradoxically enhanced its own power—because it helped ensure that American treasures would not be destroyed before Congress could help determine their fate. The President's ability to create monuments "with a stroke of his

pen," Harmon et al., *supra*, at 10, "allow[s] the executive branch to protect special objects and places by effectively pressing 'pause,' and reserve[s] to Congress the ability to alter or remove these protections," Hein, *supra*, at 143; *see* Fanizzo, *supra*, at 818-19 ("So that 'objects might [not] be lost before they could be protected by Congress,' the drafters called on the President to take quick action." (quoting Squillace, *supra*, at 557)).

By contrast, allowing presidents to abolish or reduce the size of existing monuments would have undermined Congress's power, and would have been fundamentally at odds with the Act's rationale. Diminishing a national monument lacks the urgency of establishing one, because there is no need for quick action to prevent irreversible damage to unique landmarks. It was sensible for Congress to retain such power, therefore, subjecting decisions about shrinking or eliminating monuments to the more deliberative legislative process. Fanizzo, *supra*, at 821. In due course, Congress may decide to leave a monument as it stands, reduce it, eliminate it, expand it, or convert it into a national park, wilderness area, or wildlife refuge—all of which Congress has done. *See* Alexandra M. Wyatt, Cong. Research Serv., *Antiquities Act: Scope of Authority for Modification of National Monuments* 7 (2016); Squillace, *supra*, at 504. This dynamic exemplifies the Act's value: presidents can take prompt action to protect vulnerable landmarks, and Congress can rely on the continued existence of those protections as it decides how best to treat those landmarks.

In short, the "one-way levers" granted to presidents under the Antiquities Act reflect "a congressional desire to allow relatively unencumbered executive branch action to protect special places, while preserving the legislative branch's prerogative over federal land management as established in the Property Clause." Hein, *supra*, at 148. That arrangement "maintain[s] the traditional separation of powers between Congress and the President, which vests Congress with plenary authority over public lands." *Id*. It also tilts the playing field in favor of preservation—

promoting the goals of an Act that was motivated by "a broad-based anxiety over the loss of key mythic elements of the putative national narrative." Harmon et al., *supra*, at 13.

**C.** Consistent with these goals, the text of the Antiquities Act conferred no authority on presidents to diminish national monuments unilaterally. Instead, the Act's plain language permitted them only to "declare ... objects of historic or scientific interest ... to be national monuments" and to "reserve as a part thereof parcels of land." Antiquities Act § 2, 34 Stat. 25. Unlike other conservation statutes of the era, *e.g.*, Pub. L. No. 61-303, § 1, 36 Stat. 847 (1910); Pub. L. No. 57-161, § 3, 32 Stat. 388 (1902), the Act conspicuously omitted any language allowing presidents to undo previous reservations. And Congress understood the absence of such language as a withholding of this power. For instance, in authorizing the creation of forest reserves, Congress had enabled presidents to "declare the establishment of such reservations and the limits thereof." An Act To Repeal Timber-Culture Laws § 24, 26 Stat. 1095, 1103 (1891). Congress recognized that this language did not implicitly authorize presidents to modify existing reservations, which is why Congress, in 1897, amended the law to give presidents exactly that power. *See* 30 Stat. 11, 36 (1897). And that understanding reflected contemporary doctrine on statutory interpretation:

> Reverting then to the statute, we discover that it was at pains to express clearly the power to 'increase.' If it had been intended to give the power to 'decrease' ... it would have been at equal pains to have explicitly declared it; and thus the unlimited discretion in the Secretary contended for by the government would have been simply and directly conferred and not left to be guessed from a circumlocution of words or to be picked out of a questionable ambiguity.

*Cochnower v. United States*, 248 U.S. 405, 407-08 (1919). In short, the discretion to undo existing reservations of land had to be—and was—granted explicitly when Congress so intended.

Without addressing these points, the Trump Administration rests its textual argument on a provision limiting monument size: "the President ... may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper

care and management of the objects to be protected." Antiquities Act § 2, 34 Stat. 25. But the natural reading of this language is that the size restriction is directed at the initial act of reserving land as part of a monument. That, after all, is what this provision is about—not the ongoing management of monuments and their protected objects, which is addressed in a different section entirely. *See id.* § 3. This natural reading is confirmed by the Act's use of the future tense in referring to "the objects *to be protected*," *id.* § 2 (emphasis added), which indicates that the size determination is being conducted *before* the monument has been created.[2]

Significantly, the Administration's reasoning would apply just as strongly to the 1891 forest reserve legislation, which authorized presidents to "declare the establishment of such reservations *and the limits thereof*." 26 Stat. 1103 (emphasis added). If Congress understood that language as conferring the power to revisit the boundaries of earlier reservations, it would not have needed to enact the 1897 legislation giving presidents that power. *See* 30 Stat. 36. And this point is especially pertinent because early drafts of the Antiquities Act used the same language as the forest reserve statute—authorizing presidents to "declare the establishment of such reservations and the limits thereof." H.R. 11021, 56th Cong. § 1 (1900). That language was changed to limit the size of new monument designations: some legislators "did not want to grant the President broad authority to establish large new reserves on federal lands, in light of their experience with Theodore Roosevelt and his decisions setting aside vast tracts of public land as forest reserves." Squillace, *supra*, at 481; *see* 40 Cong. Rec. 7,888 (June 5, 1906) (Sen. Stephens). Subsequent bills addressed

---

[2] As codified today, the Antiquities Act breaks up this key text into two sentences. *See* 54 U.S.C. § 320301(b) ("The President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."). The original wording—by linking these two parts in a single thought—makes even more obvious the connection between the size restriction and the act of reserving land. And the recodification of the Act that led to these changes in wording was expressly intended to preserve the Act's original meaning. *See infra* note 6.

9

these legislators' concerns by imposing specific acreage limits on monument designations, and this rigid approach was ultimately replaced by the more "flexible provision" found in the final bill. Lee, *supra*, at 241. That provision, therefore, was added to limit the size of initial designations, not to provide discretion to revise existing monuments. Where Congress wants to require periodic reevaluations of land withdrawals, it has done so clearly. *See, e.g.*, 43 U.S.C. § 1714(f), (*l*).

According to the Administration, presidents have an ongoing license—indeed, a duty—to continually reevaluate existing national monuments and reduce them according to their own judgment. *See* Def. Mem. 29. But if that were so, Congress could never rest assured that designated lands would stay protected unless Congress said otherwise. The President could always slash the size of an existing monument—and could do so at the drop of a hat, because the Antiquities Act does not require notice-and-comment rulemaking or adherence to National Environmental Policy Act procedures. *Alaska v. Carter*, 462 F. Supp. 1155, 1160 (D. Alaska 1978). As a result, places and objects regarded by Congress as worth preserving could be irreparably harmed before Congress could protect them. This would throw the kind of time-sensitive burden on the legislative process—and create the kind of risks to vulnerable landmarks—that the Act seeks to avoid.

## II. Congress Has Not Changed the Meaning of the Antiquities Act by "Acquiescing" in Presidential Diminishments of National Monuments.

### A. Statutory Disputes Like This One Involve Different Interpretive Rules than Disputes About the Scope of Executive Power Where Congress Has Not Legislated.

To support its claim that national monument reductions by past presidents—and Congress's supposed "acquiescence" in those reductions—have established the lawfulness of the practice, the Administration relies on cases like *Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952), and *United States v. Midwest Oil Company*, 236 U.S. 459 (1915). But unlike those cases, this dispute is about the meaning of a statute, not about powers that the executive

branch may exercise in the absence of legislation. When Congress enacts a law that gives the President new powers, courts must respect the precise limits of Congress's delegation.

The D.C. Circuit has explained the distinction between statutory cases like this one and the types of cases on which the Trump Administration relies:

> In *Youngstown* President Truman argued that he could constitutionally seize ... the steel mills ... under his "inherent powers" to deal with national emergencies and wartime situations. [Here], however, the Government relies entirely upon authority said to be delegated by statute, and makes no appeal to constitutional powers of the Executive that have not been confirmed by legislation. Thus, although both cases involve challenges to Executive actions, they raise sharply different legal questions.... [H]ere we primarily face a difficult problem of statutory interpretation.

*A.F.L.-C.I.O. v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979). And while courts consider the longstanding practices of the elected branches when resolving ambiguity about the separation of powers—for reasons described below—the role of post-enactment practices in statutory interpretation is sharply circumscribed. *See infra*, Part II.B.

In *United States v. Midwest Oil Company*, President Taft issued a proclamation temporarily barring the purchase of certain federal lands. 236 U.S. at 467. He did so because oil lands in the West were being bought up so rapidly that it would "be impossible for the people of the United States to continue ownership of oil lands for more than a few months." *Id*. at 466-67. The President thus acted "[i]n aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain." *Id*. at 467. Holding Taft's order lawful, the Supreme Court cited "the legal consequences flowing from a long-continued practice to make orders like the one here involved." *Id*. at 469; *id*. ("from an early period in the history of the government .... hundreds of these orders have been made .... without express statutory [authority] but under the claim of power so to do" (quotation marks omitted)). "Congress did not repudiate the power," but rather "uniformly and repeatedly acquiesced in the practice." *Id*. at 471. This "long-continued practice,

11

known to and acquiesced in by Congress," suggested that Congress had recognized the President's authority to act as its "agent" by preserving federal lands from damage so that Congress could legislate concerning them. *Id*. at 474. Congress's longstanding acquiescence was thus "an implied grant of power," *id*. at 475 (a power, notably, that aided Congress by maintaining the status quo).

*Midwest Oil*, in short, was a dispute about the scope of executive power in an area where Congress had never defined the President's authority. That scenario differs from one in which the President's power, if any, rests entirely on legislation—as here. The Court confirmed this distinction in *Youngstown*. There, President Truman ordered the seizure of private steel mills, citing only "inherent power ... supported by the Constitution [and] historical precedent." *Youngstown*, 343 U.S. at 584. Rejecting Truman's claim, Justice Black's majority opinion declared that the President is not "a lawmaker," and that precedents set by earlier presidents could not change this: "It is said that other Presidents without congressional authority have taken possession of private business enterprises in order to settle labor disputes. But even if this be true, Congress has not thereby lost its exclusive constitutional authority to make laws ...." *Id*. at 587, 588-89.

Justice Jackson's concurring opinion, which has become the lens through which the Court evaluates "claims of Presidential power," *Zivotofsky*, 135 S. Ct. at 2083, set forth a test that leaves room for tradition and practice. But these factors are relevant only where Congress has not spoken by legislating. Indeed, the three categories of Jackson's framework are differentiated by whether Congress has legislated and to what end. *See Youngstown*, 343 U.S. at 635-37 (Jackson, J., concurring) (distinguishing between "[w]hen the President acts pursuant to an express or implied authorization of Congress," "[w]hen the President acts in absence of either a congressional grant or denial of authority," and "[w]hen the President takes measures incompatible with the expressed

12

or implied will of Congress").[3]

Critically, only in *Youngstown*'s middle category—where Congress has not legislated—do tradition and practice have a significant role to play in defining the executive's power:

> When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but *there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence* may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility.

*Id*. at 637 (emphasis added). When Congress empowers the President through legislation, on the other hand, courts must respect its decision about exactly how much power to give and to withhold. *Id*. at 639 ("Congress has not left seizure of private property an open field").[4]

In contrast with the intended precision of statutes, however, the "great ordinances of the Constitution do not establish and divide fields of black and white." *Id*. at 597 (Frankfurter, J., concurring) (quoting *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting)). In particular, "[t]he powers of the President are not as particularized as are those of Congress." *Id*. at 610; *see id.* at 661 (Clark, J., concurring) ("The limits of presidential power are obscure."); *id*. at 647 (Jackson, J., concurring) (citing "[t]he vagueness and generality of the clauses that set forth presidential powers"). And it is precisely because the Constitution's general "framework for government" contains "undefined provisions" that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned,

---

[3] Note that Jackson's reference to Congress's "implied authorization" and "implied will" refers to congressional authorization or will implied *in a statute*. *See id*. at 585 (opinion of the Court) ("[N]o statute ... expressly authorizes the President to take possession of property as he did here. Nor is there any act of Congress ... from which such a power can fairly be implied.").

[4] Significantly, the *dissent* in *Youngstown* relied heavily on *Midwest Oil*, *see id*. at 689-93 (Vinson, J., dissenting), arguing that a history of unilateral actions by presidents to meet national emergencies justified the steel seizures, *id*. at 700. The majority found this history insufficient because Congress had implemented "statutory policies." *Id*. at 639 (Jackson, J., concurring).

... may be treated as a gloss on 'executive Power.'" *Id.* at 610-11 (Frankfurter, J., concurring). But things are different where, as here, Congress has passed legislation that amounts to "the denial of such authority." *Id.*

The other decisions cited by the Administration, which apply the same principles, are similarly irrelevant to this statutory dispute. For instance, *Dames & Moore v. Regan*, 453 U.S. 654 (1981), like *Youngstown*, addressed the President's exercise of a power neither granted nor denied by statute—the power to suspend private legal claims against a foreign nation pursuant to an executive agreement with that nation. The Court emphasized that presidents had long exercised similar powers on their own initiative, *id.* at 679-80 & n.8, and that, "'especially ... in the areas of foreign policy and national security,'" the "failure of Congress specifically to delegate authority" does not necessarily imply disapproval of that authority, *id.* at 678 (quoting *Haig v. Agee*, 453 U.S. 280, 291 (1981)). Moreover, Congress had enacted, and repeatedly revised, legislation facilitating the President's use of the settlement power. "By creating a procedure to implement future settlement agreements, Congress placed its stamp of approval on such agreements." *Id.* at 680.[5]

As *Dames* illustrates, the Supreme Court gives weight to past practice when a president claims authority based on the "Executive Power" vested by the Constitution, *id.* at 686 (quoting *Youngstown*, 343 U.S. at 610-11) (Frankfurter, J., concurring), not when a president claims authority under a statute based on how other presidents have interpreted that statute. This is because the Constitution, as a general framework for governance and future legislation, contains many broad terms that do not easily resolve questions about the boundaries between the branches:

> As James Madison wrote, it "was foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms

[5] Thus, while the Court in *Dames* spoke of "congressional acquiescence," this acquiescence was manifest in legislative *action* by Congress and "the inferences to be drawn from the character of [that] legislation," *id.* at 686, not in congressional *inaction*.

14

     & phrases necessarily used in such a charter ... and that it might require a regular
     course of practice to liquidate & settle the meaning of some of them."

*Noel Canning*, 134 S. Ct. at 2560 (quoting Letter from James Madison to Spencer Roane (Sept. 2,

1819)). Judicial decisions "have continually confirmed Madison's view." *Id.* (citing, *inter alia*,

*Midwest Oil*); *see The Pocket Veto Case*, 279 U.S. 655, 690 (1929) ("a practice ... on the part of

the executive department, acquiesced in by the legislative department, ... is entitled to great regard

in determining the true construction of *a constitutional provision the phraseology of which is in

any respect of doubtful meaning*" (emphasis added) (quotation marks omitted)).

     Recent cases reinforce the point. Tradition and practice can be significant in constitutional

disputes, where the President claims authority independent of any legislation. *See Zivotofsky*, 135

S. Ct. at 2084-85 (drawing on historical practice to conclude that, although "the Constitution does

not use the term 'recognition,' .... the President exercises the recognition power based on the

Reception Clause"); *Noel Canning*, 134 S. Ct. at 2559 ("established practice is a consideration of

great weight *in a proper interpretation of constitutional provisions regulating the relationship

between Congress and the President*" (emphasis added) (quotation marks omitted)); *Medellín v.

Texas*, 552 U.S. 491, 524 (2008) ("*In this circumstance*," where Congress has not legislated,

"Presidential authority can derive support from 'congressional inertia, indifference or

quiescence.'" (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)) (emphasis added)).

But when a president claims authority derived from a *statute*, different principles apply.

     **B.**     **Congressional Inaction Cannot Amend a Duly Enacted Statute.**

     In statutory interpretation disputes like this one, the judiciary's goal is to "determine the

Legislature's intent as embodied in particular statutory language." *Chickasaw Nation v. United

States*, 534 U.S. 84, 94 (2001). And what matters is the intent of the Congress that enacted the

statute. *Pub. Emps. Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 168 (1989) (the "interpretation given

by one Congress ... to an earlier statute is of little assistance in discerning the meaning of that statute"); *C.P.S.C. v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) ("the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"). The later behavior of different Congresses, therefore, has little bearing on a law's meaning. And pure *inaction*—when Congress simply has not done *anything* to change the meaning of a law—is never grounds for concluding that presidential conduct has settled the law's meaning. The Supreme Court has put it bluntly: "Congressional inaction cannot amend a duly enacted statute." *Cent. Bank*, 511 U.S. at 186 (quoting *Patterson*, 491 U.S. at 175 n.1).

Common sense explains why. "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction ...." *Id.* at 187 (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)). And to "explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities." *Helvering v. Hallock*, 309 U.S. 106, 119-20 (1940). For that reason, it is "'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of [a] statutory interpretation." *Patterson*, 491 U.S. at 175 n.1 (quoting *Johnson v. Transp. Agency, Santa Clara County*, 480 U.S. 616, 672 (1987) (Scalia, J., dissenting)). Therefore, "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 11 (1942).[6]

---

[6] There are, of course, situations in which Congress's decision not to do something, such as include a particular measure in legislation, sheds light on its intent. For example, when Congress considers a provision while crafting a bill but deletes it before passage, this "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974). Moreover, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009). So too when it repeats the same language in a new statute. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85-86 (2006). But those principles do not support the

When the Supreme Court has taken notice of the actions of later Congresses, it has not relied on pure *inaction*, but rather has pointed to concrete activity of some sort that either ratifies a particular interpretation or otherwise signals that it reflects the statute's original meaning. *E.g.*, *Zemel v. Rusk*, 381 U.S. 1, 11 (1965) (citing "more than mere congressional inaction"); *Flood v. Kuhn*, 407 U.S. 258, 283-84 (1972) (citing "positive inaction" going "far beyond mere inference and implication" that "has clearly evinced a desire" to leave an interpretation intact).

For example, Congress has sometimes revised other portions of the same legislation in a way that reveals its intent to preserve an existing statutory interpretation. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 601 (1983) ("evidence of Congressional approval of the policy ... goes well beyond the failure of Congress to act on legislative proposals" because "Congress affirmatively manifested its acquiescence in the IRS policy when it enacted the present [IRS] Code"); *Saxbe v. Bustos*, 419 U.S. 65, 77-78 (1974) ("[W]hen the 1952 Act was reported, the Senate Judiciary Committee tendered a voluminous report of nearly 1,000 pages ... describing the practice in some detail .... No doubt as to the desirability of the practice was expressed. It is clear that [this report] reveals a congressional acceptance of the system."). Or, Congress has enacted *other* laws whose terms, by implication, ratify the interpretation a court or agency has given to the statute in question. *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 488 (1940) ("Congress has repeatedly enacted laws restricting or purporting to curtail the application of the Act to labor

---

"acquiescence" argument offered here, because they involve discerning what Congress knew or intended *when it enacted the statute in question*. They do not involve construing a statute based on events that occurred *after its enactment*. And notably, the simple recodification of a statute, like Congress's 2014 recodification of the Antiquities Act, does not trigger the "reenactment" doctrine. It certainly does not do so where, as here, Congress explicitly states its intent to preserve the statute's original meaning: "In the codification of laws by this Act, the intent is to conform to the understood policy, intent, and purpose of Congress in the original enactments ...." Pub. L. No. 113-287, § 2(b), 128 Stat. 3094, 3094 (2014).

organizations and their activities, thus recognizing that to some extent [the organizations] remain subject to it.").

If nothing else, the Court has insisted on prolonged and high-profile legislative attention to a matter, the kind that could persuasively suggest a consensus that an existing statutory interpretation was the correct one. *See Flood*, 407 U.S. at 281 ("Legislative proposals have been numerous and persistent.... [M]ore than 50 bills have been introduced in Congress" on the topic.); *Bob Jones*, 461 U.S. at 599-60 ("[F]ew issues have been the subject of more vigorous and widespread debate and discussion in and out of Congress .... During the past 12 years there have been no fewer than 13 bills introduced ...."). Even here, the role of such evidence is limited to confirming the results of other interpretive methods. *See Zemel*, 381 U.S. at 11 ("Under some circumstances, Congress' failure to repeal or revise in the face of [an] administrative interpretation has been ... persuasive evidence that that interpretation is the one intended by Congress.").

In contrast to these situations, which all involve *some* kind of significant activity on Congress's part, the mere *inaction* of subsequent Congresses does not indicate anything about the meaning of an earlier-passed statute. *See Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 238 (1987) (rejecting "congressional inaction" as proof that a later Congress "intended to engraft onto [an] unamended [provision] a meaning different from that of the enacting Congress"); *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 241 (1970) (rejecting reliance on "the failure of Congress to respond to [a decision] on the theory that congressional silence should be interpreted as acceptance of the decision"); *Girouard v. United States*, 328 U.S. 61, 69 (1946) ("It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law."). Significantly, in recent decades the Supreme Court has become even more militant in rejecting statutory arguments based on the inaction of subsequent Congresses. *See Cent. Bank*, 511

U.S. at 187 (acknowledging some past inconsistency but declaring that "these arguments deserve little weight in the interpretive process"); *Brown v. Gardner*, 513 U.S. 115, 120-21 (1994) (eschewing reliance on congressional silence); *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) (same); *Solid Waste Agency v. U.S. Army Corps of Engineers*, 531 U.S. 159, 169-70 (2001) (same); *Doe v. Chao*, 540 U.S. 614, 626-27 (2004) (same); *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 422 (2012) (same). Just last year, the Court rejected a statutory argument based on "post-enactment practice," including actions taken by three presidents "without congressional objection," observing that "Congress's failure to speak up does not fairly imply that it has acquiesced in the [executive branch]'s interpretation." *SW Gen.*, 137 S. Ct. at 943.

This refusal to consider the inaction of subsequent Congresses reflects a broader principle the modern Court has emphasized: the political branches may not cede power to one another except through the mechanisms prescribed in the Constitution. *See I.N.S. v. Chadha*, 462 U.S. 919, 946 (1983) (legislative veto); *Buckley v. Valeo*, 424 U.S. 1, 118 (1976) (appointment of executive officers); *Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (removal of executive officers). And that is so regardless of past practice or a branch's acquiescence. *See Clinton v. City of New York*, 524 U.S. 417, 446 (1998) ("Congress cannot alter the procedures set out in Article I, § 7, without amending the Constitution."); *Chadha*, 462 U.S. at 944 ("our inquiry is sharpened rather than blunted by the fact that Congressional veto provisions are appearing with increasing frequency"). As the Court has explained, "the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment." *Free Enter. Fund v. P.C.A.O.B.*, 561 U.S. 477, 497 (2010) (quotation marks omitted).

Indeed, the Court has increasingly stressed that "the power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure'" set

forth in the Constitution. *Clinton*, 524 U.S. at 439-40 (quoting *Chadha*, 462 U.S. at 951). Congress

and the President, therefore, may alter an existing statute "only through the passage of a bill which

is approved by both Houses and signed by the President." *Cent. Bank*, 511 U.S. at 186; *see Clinton*,

524 U.S. at 439-40 (overturning line-item veto because it allowed presidents to amend "duly

enacted statutes"). In short, presidents cannot change the meaning of a law by repeatedly violating

it, nor can Congress change the meaning of a law by acquiescing in such violations.

### C.     Congress Has Not Given Presidents the Power To Diminish National Monuments.

Even if Congress could change the meaning of the Antiquities Act by *not* altering it, the

Administration fails to show any congressional inaction that could reasonably be understood as

ceding the power to shrink national monuments. The Administration's main argument is that past

presidents have eliminated lands from monuments and "Congress has never revoked this

authority." Def. Mem. 32. Yet there are many explanations for this congressional silence that have

nothing to do with Congress's views about whether presidents are authorized to make such

modifications. *Cf. SW Gen.*, 137 S. Ct. at 943 ("The Senate may not have noticed that certain

nominees were serving as acting officers in violation of [a statute], or it may have chosen not to

reject a qualified candidate just to make a point about compliance with the statute. Either is at least

as plausible as the theory that the Legislature's inaction reflects considered acceptance of the

Executive's practice."). Indeed, the circumstances surrounding past modifications illustrate *why*

the Supreme Court does not give weight to congressional inaction when interpreting statutes.

As evidence of congressional acquiescence, the Administration simply cites three instances

in which Congress created national parks from monuments whose boundaries had earlier been

adjusted by presidents without congressional response. But even if one infers from these instances

that Congress was aware of all three previous modifications, that alone "can hardly be said to have

given the administrative construction the 'notoriety' that [the Supreme] Court found persuasive in *Udall v. Tallman*," where "the Court was impressed by the fact that the Secretary's interpretation had 'been a matter of public record and discussion.'" *Zuber v. Allen*, 396 U.S. 168, 194 (1969) (quoting *Udall v. Tallman*, 380 U.S. 1, 17 (1965)). Even in that case—which concerned the executive branch's interpretation of its own orders, not a statute—the Court did not regard the active engagement of a House committee with the Secretary's interpretation as constituting "'legislative ratification' in any formal sense." *Udall*, 380 U.S. at 18; *cf. S.E.C. v. Sloan*, 436 U.S. 103, 121 (1978) ("We are extremely hesitant to presume general congressional awareness of the Commission's construction based only upon a few isolated statements" and "without additional indication of more widespread congressional awareness."). The Administration fails to show the kind of intense congressional scrutiny that the Supreme Court has required before ascribing *any* significance to events occurring after a statute's enactment. *See supra* at 17-18.[7]

Moreover, the Administration has not shown that Congress ever deliberated on whether those modifications were lawful—much less reached a consensus on that legal question. Mere awareness that a president adjusted a monument does not mean that Congress blessed the practice simply because it did not enact corrective legislation. Members of Congress, like their constituents, focus on the real-world effects of government policies, not just the means through which those policies are implemented. If members believed that a particular adjustment was reasonable—as a matter of historic and scientific conservation—there may have been little incentive to confront the

---

[7] These few incidents, moreover, do not remotely compare with the settled practices that the Court has relied upon in the absence of a statute. *See, e.g.*, *SW Gen.*, 137 S. Ct. at 943 (noting that *Noel Canning* addressed "an issue that has attracted intense attention and written analysis from Presidents, Attorneys General, and the Senate," with a "voluminous historical record dat[ing] back to the beginning of the Republic, and includ[ing] thousands of intra-session recess appointments" (quotation marks omitted)); *Midwest Oil*, 236 U.S. at 469 (citing "hundreds" of presidential orders dating "from an early period in the history of the government" (quotation marks omitted)).

President "just to make a point about compliance with the statute." *SW Gen.*, 137 S. Ct. at 943.

That is especially true for presidential actions that were consistent with the preservationist goals of the Antiquities Act—as were many, if not all, previous adjustments. National monuments created in the first half of the twentieth century were sometimes based on imprecise data about the objects and lands to be protected, and many presidential modifications simply corrected those shortcomings. *See* John C. Ruple, *The Trump Administration and Lessons Not Learned from Prior Presidential National Monument Modifications*, 43 Harv. Envtl. L. Rev. (forthcoming 2019), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3272594. For instance, later surveys sometimes revealed that a monument's legal boundaries did not match the geographical features on the ground, *id.* at 50-51 (Timpanogos Cave monument), or did not accurately reflect the placement of the protected objects, *id*. at 46-48, 51-52 (Arches, Navajo, Petrified Forest monuments). At other monuments, once-protected items vanished over time, making the surrounding land no longer necessary for their protection. *Id*. at 52-54 (Natural Bridges monument). In some cases, the original monument designations accidentally included non-federal land, *id.* at 59-63, 76-77 (Colorado, Glacier Bay, Katmai, Mt. Olympus monuments), and even land that did not actually exist, *id*. at 49-50 (Great Sand Dunes monument). In other cases, the original reservations were marred by simple typos. *Id*. at 50 (Hovenweep monument).

The reasonableness of these adjustments does not mean that they were legal. But it does indicate why Congress may not have acted to stop them. When a president's conduct appeared to represent a good-faith effort to better tailor a monument to the objects it was originally meant to protect, challenging presidential authority might not have been worth the trouble. And even if legislators disagreed with a particular boundary modification, any attempt to rein in the executive would face steep odds: new legislation would have required the signature of the very president

who had just adjusted a monument, or veto-proof majorities. Thus, legislative inaction in the wake of prior monument reductions cannot be taken as a sign of agreement with the President's interpretation of the Antiquities Act. *See Helvering*, 309 U.S. at 121 ("we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle").

The Administration also cites Congress's overhaul of the land-withdrawal framework in the Federal Land Policy and Management Act of 1976 ("FLPMA"), Pub. L. No. 94-579, 90 Stat. 2743, arguing that FLPMA did not "alter presidential authority" and therefore is "evidence of congressional acquiescence." Def. Mem. 33. This argument is wrong as a matter of both law and fact. As a legal matter, when a court has interpreted a statutory provision, "congressional intent to ratify" that interpretation cannot be inferred from the mere fact that "Congress comprehensively revised the statutory scheme but did not amend that provision." *Alexander*, 532 U.S. at 292.

And as a factual matter, Congress did not even "revise[] the statutory scheme" when it enacted FLPMA. *Id*. Instead, it made every effort to *avoid* touching the Antiquities Act. FLPMA consolidated a range of land-use laws and gave new powers to the Interior Secretary, including authority to make, modify, and terminate federal land withdrawals. *See* FLPMA § 204(a), (*l*)(2), 90 Stat. 2751, 2754-55. But Congress made clear that "the Secretary shall not ... modify or revoke any withdrawal creating national monuments." *Id*. § 204(j), 90 Stat. 2754. This provision clarified that the Secretary's new powers did not include reducing or abolishing monuments. And because no one besides Congress had that authority—including the President—denying that authority to the Secretary would, Congress explained, "reserve to Congress the authority to modify and revoke withdrawals for national monuments created under the Antiquities Act." H.R. Rep. No. 94-1163, 1976 WL 14070, at *8 (1976); *id*. ("These provisions will insure that the integrity of the great national resource management systems will remain under the control of the Congress."). "It does

not follow," therefore, "that Congress' failure to overturn" presidential monument reduction authority in FLPMA was a concession of that authority. *Patterson*, 491 U.S. at 175 n.1. Indeed, "Congress was focused on issues not directly related" to monument reductions, *Sloan*, 436 U.S. at 120, as it had been more than 30 years since the last significant presidential reduction of a monument and more than 13 years since a president had adjusted a monument's boundaries at all.[8]

Finally, the Administration cites amendments to the Antiquities Act itself, noting again that Congress "never revoked the President's asserted authority to modify monument boundaries." Def. Mem. 32-33 (citing Pub. L. No. 81-787, § 1 (1950) (limiting establishment of national parks or monuments in Wyoming)); *see also* Pub. L. No. 96-487, § 1326 (1980) (limiting executive withdrawals of more than 5,000 acres in Alaska). But these a responded to controversial monument designations that stoked ire because of their impact on the affected states.[9] Those designations prompted congressional action because their unpopular on-the-ground ramifications went far beyond a disagreement in principle about the President's monument-reduction authority.

Indeed, these examples only highlight why courts do not rely on "isolated amendments to other provisions" of a statute. *Pub. Citizen, Inc. v. Dep't of Health & Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003). When "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments," it "is impossible to assert with any degree of assurance that

---

[8] *See* Nat'l Park Serv. Archeology Program, *Monuments List* (2018), https://www.nps.gov/archeology/sites/antiquities/MonumentsList.htm (providing the details of 1945's Santa Rosa Island monument reduction and 1963's Bandelier monument reduction). Consistent with this account of FLPMA, when Congress three years later modified certain monuments created by President Carter, a House Report acknowledged that "national monuments are permanent unless changed by the Congress." H.R. Rep. No. 96-97, pt. 1, at 393 (1979); *id*. at 142; *id*., pt. 2, at 93.

[9] *See, e.g.*, Richard M. Johannsen, *Public Land Withdrawal Policy and the Antiquities Act*, 56 Wash. L. Rev. 439, 453 (1981) (President Roosevelt's creation of Jackson Hole National Monument in 1943 "was bitterly opposed both in Wyoming and in Congress."); *id*. at 455 ("In one day, President Carter withdrew over four and a half times as much public land [in Alaska] as the total land withdrawn under the Antiquities Act by all prior Presidents in seventy-two years.").

congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation." *Alexander*, 532 U.S. at 292 (quotation marks omitted); *see Betts*, 492 U.S. at 168 ("Congress changed the specific result of *McMann* by adding a final clause to § 4(f)(2), but it did not change the controlling, general language of the statute. As Congress did not amend the relevant statutory language, we see no reason to depart from our holding in *McMann* ...."); *Pub. Citizen*, 332 F.3d at 668 ("Congress has neither re-enacted the entire PRO statute nor amended § 1320c-3(a)(14) at all. Rather, it has simply enacted a series of isolated amendments to other provisions.").

\* \* \* \* \*

In a telling passage of its brief, the Trump Administration states that "recognition of presidential modification authority here appropriately puts the Executive on equal footing with the Legislature." Def. Mem. 29. But our Constitution's Framers did not put the Executive on equal footing with the Legislature when it came to stewardship of the federal lands. The Property Clause lodges that power firmly in Congress, giving presidents only the authority Congress chooses to delegate. As shown above, Congress has not delegated the power to diminish national monuments.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied.

Respectfully submitted,

Dated: November 19, 2018

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

**APPENDIX:**
LIST OF *AMICI*

**U.S. Senate**

    Tom Udall
        Senator of New Mexico

    Tammy Baldwin
        Senator of Wisconsin

    Michael F. Bennet
        Senator of Colorado

    Richard Blumenthal
        Senator of Connecticut

    Cory Booker
        Senator of New Jersey

    Sherrod Brown
        Senator of Ohio

    Maria Cantwell
        Senator of Washington

    Tom Carper
        Senator of Delaware

    Catherine Cortez Masto
        Senator of Nevada

    Tammy Duckworth
        Senator of Illinois

    Richard J. Durbin
        Senator of Illinois

    Dianne Feinstein
        Senator of California

    Kirsten Gillibrand
        Senator of New York

    Kamala D. Harris
        Senator of California

**LIST OF *AMICI* – cont'd**

Martin Heinrich
    Senator of New Mexico

Mazie K. Hirono
    Senator of Hawai'i

Amy Klobuchar
    Senator of Minnesota

Patrick J. Leahy
    Senator of Vermont

Jeffrey A. Merkley
    Senator of Oregon

Patty Murray
    Senator of Washington

Brian Schatz
    Senator of Hawai'i

Chuck Schumer
    Senator of New York

Tina Smith
    Senator of Minnesota

Chris Van Hollen
    Senator of Maryland

Elizabeth Warren
    Senator of Massachusetts

Ron Wyden
    Senator of Oregon

**U.S. House of Representatives**

Raúl M. Grijalva
    Representative of Arizona

Alma S. Adams, Ph.D
    Representative of North Carolina

**LIST OF *AMICI* – cont'd**

Nanette Diaz Barragán
    Representative of California

Karen Bass
    Representative of California

Donald S. Beyer, Jr.
    Representative of Virginia

Earl Blumenauer
    Representative of Oregon

Salud Carbajal
    Representative of California

Kathy Castor
    Representative of Florida

Judy Chu
    Representative of California

Yvette D. Clarke
    Representative of New York

Wm. Lacy Clay
    Representative of Missouri

Emanuel Cleaver, II
    Representative of Missouri

James E. Clyburn
    Representative of South Carolina

Steve Cohen
    Representative of Tennessee

Gerry Connolly
    Representative of Virginia

Susan A. Davis
    Representative of California

Diana DeGette
    Representative of Colorado

## LIST OF *AMICI* – cont'd

Rosa L. DeLauro
    Representative of Connecticut

Suzan DelBene
    Representative of Washington

Mark DeSaulnier
    Representative of California

Ted Deutch
    Representative of Florida

Debbie Dingell
    Representative of Michigan

Lloyd Doggett
    Representative of Texas

Mike Doyle
    Representative of Pennsylvania

Keith Ellison
    Representative of Minnesota

Eliot L. Engel
    Representative of New York

Anna G. Eshoo
    Representative of California

Adriano Espaillat
    Representative of New York

Tulsi Gabbard
    Representative of Hawai'i

Ruben Gallego
    Representative of Arizona

John Garamendi
    Representative of California

Jimmy Gomez
    Representative of California

**LIST OF *AMICI* – cont'd**

Colleen Hanabusa
    Representative of Hawaiʻi

Alcee L. Hastings
    Representative of Florida

Steny Hoyer
    Representative of Maryland

Jared Huffman
    Representative of California

Pramila Jayapal
    Representative of Washington

Eddie Bernice Johnson
    Representative of Texas

Henry C. "Hank" Johnson, Jr.
    Representative of Georgia

Marcy Kaptur
    Representative of Ohio

Ruben J. Kihuen
    Representative of Nevada

Ron Kind
    Representative of Wisconsin

Barbara Lee
    Representative of California

Ted W. Lieu
    Representative of California

Zoe Lofgren
    Representative of California

Alan Lowenthal
    Representative of California

**LIST OF *AMICI* – cont'd**

Ben Ray Luján
    Representative of New Mexico

Michelle Lujan Grisham
    Representative of New Mexico

Stephen Lynch
    Representative of Massachusetts

Carolyn B. Maloney
    Representative of New York

Betty McCollum
    Representative of Minnesota

A. Donald McEachin
    Representative of Virginia

Jim McGovern
    Representative of Massachusetts

Jerry McNerney
    Representative of California

Grace Meng
    Representative of New York

Gwen Moore
    Representative of Wisconsin

Jerrold Nadler
    Representative of New York

Grace F. Napolitano
    Representative of California

Donald Norcross
    Representative of New Jersey

Eleanor Holmes Norton
    Representative of the District of Columbia

Tom O'Halleran
    Representative of Arizona

**LIST OF *AMICI* – cont'd**

Beto O'Rourke
    Representative of Texas

Frank Pallone, Jr.
    Representative of New Jersey

Jimmy Panetta
    Representative of California

Nancy Pelosi
    Representative of California

Ed Perlmutter
    Representative of Colorado

Chellie Pingree
    Representative of Maine

Mark Pocan
    Representative of Wisconsin

David E. Price
    Representative of North Carolina

Mike Quigley
    Representative of Illinois

Jamie Raskin
    Representative of Maryland

Jacky Rosen
    Representative of Nevada

Lucille Roybal-Allard
    Representative of California

Raul Ruiz, M.D.
    Representative of California

Bobby L. Rush
    Representative of Illinois

Gregorio Kilili Camacho Sablan
    Representative of the Northern Mariana Islands

**LIST OF *AMICI* – cont'd**

Jan Schakowsky
    Representative of Illinois

Robert C. "Bobby" Scott
    Representative of Virginia

José E. Serrano
    Representative of New York

Terri Sewell
    Representative of Alabama

Albio Sires
    Representative of New Jersey

Adam Smith
    Representative of Washington

Darren Soto
    Representative of Florida

Jackie Speier
    Representative of California

Thomas R. Suozzi
    Representative of New York

Mike Thompson
    Representative of California

Dina Titus
    Representative of Nevada

Paul D. Tonko
    Representative of New York

Nydia M. Velázquez
    Representative of New York

Debbie Wasserman Schultz
    Representative of Florida

Bonnie Watson Coleman
    Representative of New Jersey

**LIST OF *AMICI* – cont'd**

John Yarmuth
    Representative of Kentucky

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2018, the foregoing document was filed with the

Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: November 19, 2018

/s/ Brianne J. Gorod
Brianne J. Gorod
