# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WILDERNESS SOCIETY, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Case No. 1:17-cv-2587 (TSC) |
| v. | ) |
| | ) |
| DONALD J. TRUMP, in his official capacity as | ) |
| President of the United States, *et al*., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| GRAND STAIRCASE ESCALANTE | ) |
| PARTNERS, *et al*., | ) |
| | ) |
| | ) Case No. 1:17-cv-02591 (TSC) |
| Plaintiffs, | ) |
| v. | ) |
| | ) **CONSOLIDATED CASES** |
| DONALD J. TRUMP, in his official capacity as | ) |
| President of the United States, *et al*., | ) |
| | ) |
| Defendants. | ) |

## PROPOSED INTERVENOR STATE OF UTAH'S REPLY BRIEF
## SUPPORTING FEDERAL DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

Table of Contents                                                                                          ii

Table of Authorities                                                                                      iv

Introduction                                                                                                 1

Statement of Identity, Interest, and Authority                                               2

Argument and Authority                                                                              5

    I.     The Proclamations Creating GSENM and BENM
        Disregarded the Input of Utah's Elected Representatives        6

    II.    The Declaration of Landscape Monuments Such as
        GSENM and BENM Limit the Ability of States and
        Local Communities to Determine their Own Economic
        Condition                                                                                       8

        A.    Landscape National Monuments Remove Large,
            and Vital, Industry Sectors from Local and Rural
            Communities                                                                       8

        B.    Pre-Existing Rights to Continue Land Uses are
            Inhibited by National Monument Restrictions            10

    III.   National Monuments are Unnecessary to Permit—and
        Instead Constrain—Research, Recreation, and Traditional
        Land Uses                                                                                     12

        A.    Monument Designations Inhibit Research
            Opportunities by Leading to the Destruction of
            Archaeological Resources                                              13

            1.    The Federal Government Is Incapable of
                Protecting Archaeological Resources in
                GSENM and BENM as Originally Proclaimed       13

            2.    The Modified Monuments Facilitate
                Enforcement of Existing Laws Protecting
                Archaeological Resources                                     16

        B.    Monument Designations Limit, Rather Than
            Facilitate, Recreational Opportunities                    18

C.     Monument Designations May Limit, Rather Than
       Protect, Native American Uses of Monument
       Lands and Resources                                    21

Conclusion                                                    22

Request to Participate in Oral Hearing                        23

## <u>TABLE OF AUTHORITIES</u>

**Statutes**

    **Federal Statutes**

    16 U.S.C. §§ 470aa *et seq.*     13

    16 U.S.C. § 1604     7

    25 U.S.C. § 3001, *et seq.*     13

    42 U.S.C. § 1996     21

    43 U.S.C. § 1712     7

    54 U.S.C. §§ 300101 *et seq.*     13

    54 U.S.C. §§ 320101 *et seq.*     13

    **State Statutes**

    Utah Code Ann. §§ 9-8-301 *et seq.*     13

    **Code of Federal Regulations**

    40 C.F.R. § 1506.2     7

    **Rules**

    LCvR 7     1, 5

**Other Authorities**

    **Articles**

    Lavris, J.L., *A Perfect Pothunting Day*, Reference No. 059019146
(February 2007)     14

    Liston, L., *Sustaining Traditional Community Values*, 21 J. Land Resources
& Envtl. L. 585 (2001)     7

    Rasband, James R., *Utah's Grand Staircase: The Right Path to Wilderness
Preservation?*, 70 U. Colo. L. Rev. 483, 518-521 (1999)     11

    Tipps, B., *Archeology in the Grand Staircase Escalante National Monument:
Research Prospects and Management Issues*, Learning from the Land Science
Symposium (November 4-5, 1997)     14, 15,
17

Wrabley, Raymond B., *Managing the Monument: Cows and Conservation in Grandstaircase-Escalante* [sic] *National Monument*, 29 J. Land Resources & Envtl. L. 253 (2009)                                                                    11

Yonk, Ryan M. *et al.*, *Boon or Bust: Wilderness Designation and Local Economies*, THE JOURNAL OF PRIVATE ENTERPRISE 31(3), 2016, 1-19                       9, 10

Yonk, Ryan M. and Simmons, Randy T., *Politics, Economics, and Federal Land Designation: Assessment the Economic Impact of Land Protection – Grand Staircase-Escalante National Monument*, 14 MOUNTAIN PLAINS J. OF BUS. AND ECONOMICS 1 (2013)                                                         8

**Proclamations and Executive Orders**

Exec. Order No. 13007, Indian Sacred Sites, 61 Fed. Reg. 26771 (May 24, 1996)                                                                                       21

Pres. Proc. No. 6920, Establishment of the Grand Staircase – Escalante National Monument, 61 Fed. Reg. 50223 (Sep. 18, 1996)                               3, 4, 11, 12

Pres. Proc. No. 9558, Establishment of the Bears Ears National Monument, 82 Fed. Reg. 1139 (Dec. 28, 2016)                                                    3, 12

Pres. Proc. No. 9681, Modifying the Bears Ears National Monument, 82 Fed. Reg. 58081 (Dec. 4, 2017)                                                         6

Pres. Proc. No. 9682, Modifying the Grand Staircase-Escalante National Monument, Fed. Reg. 58089 (Dec. 4, 2017)                                            6

**Reports**

Bureau of Land Management, *Budget Justifications and Performance Information, Fiscal Year 2018*, III-5                                                     17

Bureau of Land Management, *Livestock Grazing Plan Amendment Environmental Impact Statement: Analysis of the Management Situation* (July 2015)              18

CRS Report, Federal Land Ownership: Overview and Data (March 3, 2017)     2

GAO, *Problems of Protecting and Preserving Federal Archeological Resources*, GAO/RCED-88-3 (December 1987)                                                14, 15

**Other**

Garfield County Resolution No. 2017-02                                       4

*Grand Staircase-Escalante National Monument Management Plan* (1999)      18-20,

22

Herbert, Gary R., Testimony Before the U.S. Senate Committee on Energy
and Natural Resources, Oversight Hearing on Potential Impacts of Large-Scale
Monument Designations (July 27, 2016)                                          15

House Concurrent Resolution 11, Concurrent Resolution Urging
the President to Rescind the Bears Ears National Monument
Designation (Feb. 3, 2017)                                                    3, 4

House Concurrent Resolution 12, Concurrent Resolution Urging
Federal Legislation to Reduce or Modify the Boundaries of the Grand
Staircase Escalante National Monument (Feb. 17, 2017)                          4

Kane County Resolution No. R2017-1                                            4

San Juan County Resolution                                                   4

# INTRODUCTION[1]

These companion cases arise out of President Donald Trump's proclamations issued under the Antiquities Act and downsizing two landscape national monuments located in the State of Utah: Grand Staircase – Escalante National Monument ("GSENM") and Bears Ears National Monument ("BENM"). On October 5, 2018 and after the Court denied motions to transfer this case to a Utah federal district court, Utah filed a motion to intervene in support of the federal defendants in both consolidated cases. This Court has not yet ruled on these motions.

Just before Utah's motions to intervene, the Federal Defendants filed a motion to dismiss in each of the consolidated cases.  All named parties have filed opening and response briefs; many *amici* have filed briefs, too.  Awaiting rulings on its motions to intervene, Utah believes that it is important that the Court has the opportunity to consider certain issues of particular significance to Utah which have not been addressed in the filed briefs, or on which Utah has a unique perspective. More specifically, Utah will address the *amicus* briefs filed by eleven states ("amici states").[2] Accordingly, Utah, as a proposed intervenor, submits this "reply" brief in support of the Federal Defendants' motion to dismiss. Heeding the Court's admonition to avoid unnecessary repetition, Utah incorporates by reference the briefs filed by the Federal Defendants.

---

[1] The State of Utah ("Utah") has sought leave from the Court to intervene in these proceedings.  This request for leave has not yet been granted.  To preserve its rights to weigh in on these proceedings, Utah files this reply brief in support of the Federal Defendants' motion to dismiss.  To the extent Utah is not granted intervention, Utah requests that this brief be considered as an *amicus* brief filed pursuant to LCvR 7(o)(1).

[2] *Amicus Curiae* Brief of the States of Washington, California, Hawaii, Maine, Maryland, New Mexico, New York, Oregon, Rhode Island, and Vermont, and the Commonwealth of Massachusetts in Support of Plaintiffs' Opposition to Federal Defendants' Motion to Dismiss ("Several States Amicus Brief"), ECF Dkt. 89 in Case 1:17-cv-02590-TSC (November 19, 2018); ECF Dkt. 74 in Case 1:17-cv-02587 (November 19, 2018).

Among the named parties (other than the Federal Defendants) and *amici*, Utah has the greatest stake in the outcome of this litigation. Some 65% of Utah's land (excluding tribal lands) is owned and administered by the federal government (a total of over 35 million acres).[3]

Throughout the period of its settlement and to the present day, Utah, its counties and its citizens have relied on these public lands for public revenues (direct and indirect) and ways of life.[4]  While it cherishes the magnificent natural wonders of these lands, Utah needs and deserves a balance among their multiple uses. Home to five national parks (Bryce, Zions, Arches, Canyonlands and Capitol Reef), eight national monuments(Cedar Breaks, Dinosaur, Hovenweep, Natural Bridges, Rainbow Bridge, Timpanogos Cave, Grand Staircase Escalante and Bears Ears), and two national recreation areas (Glen Canyon and Flaming Gorge), Utah cannot be faulted for questioning the scope of additional land-use restrictions. This is particularly true when, as here, those restrictions are accompanied by an influx of people that pose the greatest threat to the objects that the monuments are ostensibly intended to protect.

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY

Utah has legally protectible interests in the way public lands are managed within its borders.  As set forth in Utah's Motion to Intervene on Behalf of Defendants,[5] Utah receives

---

[3] *See* Map (Exhibit 1).  In contrast to Utah's interest in the outcome of these proceedings, the *amici* states cannot claim federal land ownership equivalent to Utah's.  Instead, the *amici states* have federal ownership in the following percentages: New York (0.6%); Rhode Island (0.7%); Maine (1.1%); Massachusetts (1.2%); Maryland (3.1%); Vermont (7.8%); Hawaii (20.0%); Washington (28.6%); New Mexico (35.4%); and Oregon (53.0%). See CRS Report, Federal Land Ownership: Overview and Data (March 3, 2017), pp. 7-8.

[4] The three Utah Counties in which GSENM and BENM are located also have significant percentage of federal land: Garfield Count – (90%; Kane County – 85%; and San Juan County – 61%).

[5] ECF Dkt. 46 in Case 1:17-cv-02587-TSC (October 5, 2018) ("Motion to Intervene").  Utah incorporates by this reference the arguments and interests set forth on pages 4 – 7 of the Motion to Intervene.

direct and indirect revenue from activities on federal land within the state;   state and private inholdings are located within the original boundaries of GSENM and BENM, and other pre-existing rights, including R.S. 2477 roads, are threatened if the proclamations diminishing the monuments are set aside.

On September 18, 1996, GSENM was created over the objection, and without the support, of Utah's local elected officials.[6]  As originally proclaimed, GSENM, located in Kane and Garfield Counties, Utah, encompassed nearly 1.9 million acres of land.  As discussed below, creation of GSENM imposed significant economic burdens on local communities, reduced uses of the land other than primitive recreation, and created ongoing contention between Utah and federal land managers regarding its management.  On December 28, 2016, BENM was proclaimed, also without the consent or approval of Utah's elected representatives.[7]  BENM encompassed approximately 1.4 million acres in San Juan County, Utah and, like GSENM, vastly exceeded the scope of national monuments Congress authorized in the Antiquities Act.

Utah has unequivocally expressed its official policy that GSENM should be diminished and BENM should be abolished or diminished.  On February 3, 2017, Utah's governor signed House Concurrent Resolution ("H.C.R.") 11, Concurrent Resolution Urging the President to Rescind the Bears Ears National Monument Designation.[8]  The resolution expresses Utah's commitment to "conservation and continued recreational access" while "allowing for productive

---

[6] Pres. Proc. No. 6920, Establishment of the Grand Staircase-Escalante National Monument, 61 Fed. Reg. 50223 (Sep. 18, 1996).

[7] Pres. Proc. No. 9558, Establishment of the Bears Ears National Monument, 82 Fed. Reg. 1139 (Dec. 28, 2016).

[8] Available at https://le.utah.gov/~2017/bills/hbillenr/HCR011.pdf (accessed December 10, 2018).

uses, including agriculture, timber production, and energy and natural resource development."[9] Based upon the facts set forth in the resolution, the document resolves "that the Legislature of the state of Utah, the Governor concurring therein, strongly urges the President of the United States to rescind the Bears Ears National Monument designation."[10]

Likewise, on February 17, 2017 Utah's governor signed H.C.R. 12, Concurrent Resolution Urging Federal Legislation to Reduce or Modify the Boundaries of the Grand Staircase Escalante National Monument.[11]  The resolution notes that GSENM "was created without consideration of roads, local economies, customs, culture, and heritage" and that the monument "resulted in diminished grazing rights, energy and mineral rights, public road access, state trust land properties, and resource use and preservation."[12]  The resolution "urges Utah's congressional delegation to support legislative action to reduce or modify boundaries of the GSENM to the minimum area necessary to protect antiquities identified in Presidential Proclamation 6920."[13]

Finally, Utah supports efforts to reign in misuse of the Antiquities Act and to protect scientific and cultural resources with appropriately-sized designations.  The creation of GSENM and BENM, respectively, abused the Antiquities Act.  Utah, accordingly, requested that BENM be diminished and provided a proposal to the United States setting forth suggested boundaries for

---

[9] H.C.R. 11, p. 1.

[10] H.C.R. 11, p. 5.

[11] Available at https://le.utah.gov/~2017/bills/hbillenr/HCR012.pdf (accessed December 10, 2018).

[12] H.C.R. 12, p. 2.

[13] H.C.R. 12, p. 3.  Similarly, the Utah Counties that house these two monuments each passed a resolution to seek the diminution in the size of the monuments to the "minimum acreage necessary to protect the antiquities and objects identified." *See* Garfield County Resolution No. 2017-02 (Exhibit 2); Kane County Resolution No. R2017-1 (Exhibit 3); and San Juan County Resolution (Exhibit 4).

a diminished national monument. Utah's proposal sought to meet the objectives of the Antiquities Act while enhancing the protection of the special resources in the Bears Ears region by suggesting the creation of a diminished monument boundary coupled with increased enforcement of existing laws and a withdrawal of mineral resources from development in significant areas in the greater Bears Ears region. Utah further supports the recent modifications to GSENM.

Based upon Utah's vested interests in the development and management of land within its borders, the development and use of resources within Utah, and its official policy positions with respect to each of the monuments, in accordance with LCvR 7(j)[14], Utah files this reply brief in support of the Federal Defendants' Motion to Dismiss.[15]

## ARGUMENT AND AUTHORITY

The Federal Defendants' motions to dismiss should be granted. First, the proclamations establishing GSENM and BENM disregarded the input of Utah's elected representatives and deprived Utah of providing meaningful input about the management and development of monument lands. The proclamations diminishing the monuments, on the other hand, meaningfully considered Utah's input for managing the monument lands. Second, the declaration of landscape monuments such as GSENM and BENM limit Utah's rural communities from determining their own economic condition. Such monuments remove large and vital industry sectors from local economies and inhibit the exercise of pre-existing rights to continue land uses. Contrary to the arguments of the *amici* states, national monuments are unnecessary to

---

[14] In the alternative, if the Court does not grant intervention to Utah before ruling on the Federal Defendants' motions to dismiss, Utah requests that this brief be considered as an *amicus* brief under LCvR 7(o)(1).

[15] For ease of reference throughout this brief, the State refers to the national monuments by their original names rather than the names of the diminished monuments.

protect research, recreation, and traditional land uses; instead, they constrain it.  For these

reasons, as more fully set forth below, the proclamations diminishing GSENM and BENM were

proper and the Utah requests that the Federal Defendants' motions to dismiss be granted.

**I.**  **The Proclamations Creating GSENM and BENM Disregarded the Input of Utah's Elected Representatives.**

Like other states, Utah has the right to give meaningful input about, and has vested

interests in, the management of federal land within its borders.  An implicit theme throughout the

*amici* states' briefing is their desire to control and provide input regarding management of the

federal land located within their respective states.  The *amici* states identify their interest in

promoting recreation and research on public lands and their aspirations to develop economic

growth based upon tourism and recreation industries.[16]  *Amici* states, like Utah, have a right and

a duty to provide input about the way public land within their borders is used and how resources

on those lands are developed.  Unfortunately, the original proclamations establishing GSENM

and BENM disregarded Utah's interests in favor of the requests of special interest groups.

Diminution of the monument boundaries[17] is a step toward addressing the abuses of the

Antiquities Act in the original monument creations and allows for uses of the monument lands in

a manner consistent with Utah's land use management and planning objectives.

The states' rights to provide input and direct federal management of land within their

borders have a long history and have been codified in several statutes.  The Federal Land Policy

and Management Act ("FLPMA") governs management of lands under the jurisdiction of the

---

[16] *See* Several States Amicus Brief, p. 3, 19-25.

[17] *See* Pres. Proc. No. 9682, Modifying the Grand Staircase-Escalante National Monument, Fed. Reg. 58089 (Dec. 4, 2017); Pres. Proc. No. 9681, Modifying the Bears Ears National Monument, 82 Fed. Reg. 58081 (Dec. 4, 2017).

Bureau of Land Management ("BLM").[18]   The compromise struck under FLPMA envisioned the federal government accommodating the land management policies and priorities of the states and local governments to the extent possible.   Under FLPMA, the BLM is required, to the extent lawful, to "coordinate the land use inventory, planning, and management activities" for BLM lands with the plans and programs of the states and local governments.[19]   The BLM is obligated to "provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands."[20]   Utah, however, was not given this opportunity in the original designation of GSENM and was treated like any other member of the public with respect to the designation of BENM.[21]   Instead of giving any weight to the statements of Utah's elected representatives, or the representatives of the political subdivisions in which the monuments are located, priority was given to special interest groups and persons other than state and local representatives.

---

[18] The BLM has management authority for the vast majority of the land within the original boundaries of both GSENM and BENM.  A small portion of the land within the original boundaries of BENM was managed by the United States Forest Service ("USFS").  The USFS is required to allow public participation in resource management plans, *see* 16 U.S.C. § 1604(d)(1) (West 2018), and must comply with coordination requirements under the National Environmental Policy Act ("NEPA").  *See* 40 C.F.R. § 1506.2(d) (requiring analyses to "discuss any inconsistency of a proposed action with any approved State or local plan and laws" and, where an inconsistency exists, the analysis "should describe the extent to which the agency would reconcile its proposed action with the plan or law").

[19] 43 U.S.C. § 1712(c)(9) (West 2018).

[20] 43 U.S.C. § 1712(c)(9) (West 2018).

[21] Local jurisdictions' input regarding the management of GSENM was largely disregarded. Liston, L., *Sustaining Traditional Community Values*, 21 J. LAND RESOURCES & ENVTL. L. 585 (2001).  Liston notes that the local government spent hundreds of hours providing input for the GSENM management plan, only to have "very little of that time and effort reflected in the final plan." *Id.* at 586.  The county spent thousands of dollars revising its land use plan to address the national monument. *Id.* at 587.  In many cases, the monument management plan conflicted with, seriously impacted, and rendered useless the county management plan. *Id.*

It was not until GSENM and BENM were modified that Utah's voice, and the voice of its local representatives, were heard and meaningfully considered by the Federal Defendants in management of the monument lands.  As recognized by the *amici* states, the policies and requests of the states housing national monuments should be respected and given significant weight, just as Utah's elected representatives' input regarding modifications to GSENM and BENM were in this case.

## II.    The Declaration of Landscape Monuments such as GSENM and BENM Limit the Ability of States and Local Communities to Determine their Own Economic Condition.

### A.    Landscape National Monuments Remove Large, and Vital, Industry Sectors from Local and Rural Communities.

The *amici* states identify the economic benefits they claim to have received from the existence of national monuments within their borders and suggest that the original GSENM and BENM monuments are likewise beneficial to Utah and its rural communities.  Contrary to these arguments, however, national monument declarations have the potential to create adverse economic conditions in the surrounding communities and the GSENM did create such conditions in Kane and Garfield Counties.

A recent study from Utah State University and Southern Utah University attempted to reconcile the conflicting assertions regarding whether national monument  land restrictions harm or help local economies.[22]  The researchers concluded that the GSENM designation "reduced the decade-to-decade growth in total nonfarm payrolls by an estimated $146 million, and had no statistically significant effect on per capita income or tax receipts."  In other words, Kane County and Garfield County experienced less growth than was expected given the counties'

---

[22] Yonk, Ryan M. and Simmons, Randy T., *Politics, Economics, and Federal Land Designation: Assessment the Economic Impact of Land Protection – Grand Staircase-Escalante National Monument*, 14 MOUNTAIN PLAINS J. OF BUS. AND ECONOMICS 1 (2013).

characteristics.  The analysis noted that "[t]he importance of economic development to those concerned about rural counties cannot be overstated" and concluded that their findings did not support an assertion "that increased land protection leads to increased economic activity."  The report concluded:

> Removing the option of extractive industry development from a county's economic portfolio can only allow that county to make a second-best decision as the county now has a restricted choice set.  If preserving land from extractive development were the best option for a county, we would expect to see more counties favoring this approach absent federal designation.

Likewise, a study published in 2016 confirms that formal designations of wilderness[23] "accompany worse economic outcomes, particularly when considering median household income, total tax receipts, and total payroll payments."[24]  The researchers concluded that "claims that wilderness designations promote economic growth are unfounded" and "[r]ecognizing that designations impose costs on local economies should inform a consensus-building approach to new wilderness area designations."[25]

The report also notes that "[w]ilderness shuts down access to resources traditionally used for extractive economic activities" and that "[t]hese losses may be somewhat offset by an increase in service sector activities, but the service sector jobs generally pay less than the

---

[23] Although the 2016 study applied specifically to wilderness, as discussed below, the land restrictions imposed in GSENM and that could be imposed in BENM approach wilderness restrictions.

[24] Yonk, Ryan M. *et al.*, *Boon or Bust: Wilderness Designation and Local Economies*, THE JOURNAL OF PRIVATE ENTERPRISE 31(3), 2016, 1-19, available at http://www.usu.edu/ipe/wp-content/uploads/ipePublications/2016_Journal_of_Private_Enterprise_vol_31_no_3_Fall_parte1.pdf (accessed December 12, 2018).

[25] *Id.* at 1.

extractive jobs that were lost."[26]  The analysis discusses the interplay between wilderness and

economics, concluding:

> Our data do not support the argument often stated by the environmental community that wilderness is good for a local economy.  In fact, the evidence suggests that wilderness harms local economies, if anything.
>
> If the test for whether or not to designate public lands as wilderness is an economic one, wilderness fails.  Our results show that wilderness is not justified on economic grounds. . . .[27]

Apart from the economic statistics, however, is the larger concern that it is improper to

restrict the economic opportunities available to isolated rural communities by removing from

their economic base the vast majority of extractive- and natural resource–based economic

activities.  Development is not necessarily inconsistent with  achieving environmental and

aesthetic objectives, as existing environmental laws and regulations guard against destruction of

environmental and aesthetic resources.  These counties and local families should be allowed to

choose for themselves the lawful means by which they make a living.  Allowing a single person

the right to remove options from local economies in order to serve the interests of unelected

special interest groups is an abusive use of the Antiquities Act.[28]

### B.     Pre-Existing Rights to Continue Land Uses are Inhibited by National Monument Restrictions.

Although the Antiquities Act does not give the President any authority whatsoever to

nullify, cancel, or otherwise appropriate valid existing rights, monument proclamations

---

[26] *Id.* at 7.

[27] *Id.* at 16-17.

[28] Even assuming the correctness of the *amici* states' assertions that national monuments create economic growth, *amici* have provided no support for the contention that a modified monument does not provide the same economic benefit as the monuments in their original form.  The natural beauty and recreational opportunities still exist and no studies or other analyses were cited demonstrating that a decline in the size of the monument corresponded to a decline in economic benefits, if any, from the monument.

significantly affect valid existing rights. [29]  As explained by Professor James R. Rasband,

"Making the withdrawal of federal land 'subject to valid existing rights' offers less protection to

the holder of a right in federal land than might initially appear.  The reason is that the existing

rights are not absolute but subject to a variety of restrictions."[30]  Protection of valid existing

rights has been interpreted to mean only that the restrictions cannot "'make economic

development completely unprofitable': essentially, as long as it does not constitute a Fifth

Amendment taking."[31]  Accordingly, "[i]n the end, therefore, the 'valid existing rights' language

probably does more to protect the federal treasury than rights holders. The language ensures that

the withdrawal itself will not be construed as a taking, but allows a variety of restrictions to

avoid degradation or impairment of the lands within the Monument."[32]  "Understood in this

light, the rights holder might be better off, in many cases, if the withdrawal purported to

eliminate her valid existing rights because just compensation would be available."[33]

Modification of GSENM and BENM has restored the ability to exercise rights pre-dating

the creation of the monuments.  While bare legal title before and after the national monument

proclamation remains in the United States, the monument declarations took from Utah and the

public various property interests and incidents of ownership, including multiple use of the land.[34]

---

[29] *See e.g.* Wrabley, Raymond B., *Managing the Monument: Cows and Conservation in Grandstaircase-Escalante* [sic] *National Monument*, 29 J. Land Resources & Envtl. L. 253 (2009) (detailing disputes over grazing management in the Grand Staircase-Escalante National Monument).

[30] Rasband, James R., *Utah's Grand Staircase: The Right Path to Wilderness Preservation?*, 70 U. Colo. L. Rev. 483, 518-521 (1999).

[31] *Id.* at 519-20.

[32] *Id.* at 520-21.

[33] *Id.* at n.172.

[34] *See e.g.* Pres. Proc. 6920, 61 Fed. R. at 50225 (withdrawing and appropriating federal land and interests "from entry, location, selection, sale, leasing, or other disposition under the public land

Uses and property interests available to Utah before the creation of the monuments, such as the establishment of new roads and rights of way, timber harvest, mineral location, entry, and patent, and mineral leasing, were either removed or significantly restricted by the proclamation of GSENM and BENM.  Modifications to the boundaries of GSENM and BENM allow holders of preexisting rights to more fully use and enjoy their property interests.

### III.    National Monuments are Unnecessary to Permit—and Instead Constrain—Research, Recreation, and Traditional Land Uses.

National monument designations do not create research, recreation, or traditional uses on monument land and instead serve to restrict such uses.  First, for research opportunities, monument designations for areas the size of GSENM and BENM lead to the destruction of archaeological resources because the federal government is incapable of protecting archaeological resources in such areas, especially with a large influx of visitors.  In contrast, the diminished monuments, which have smaller areas where existing protections are capable of being enforced, provide more meaningful protections than landscape monuments.  Second, landscape level monuments inhibit recreational opportunities because land within the monument are managed as *de facto* wilderness.  This results in the curtailment of recreational opportunities other than primitive recreation.  Third, restrictive management such as that used in GSENM may inhibit traditional Native American uses of the land by limiting access, unnecessarily restricting group size, and otherwise restricting activities related to traditional uses.

---

laws, other than by exchange that furthers the protective purposes of the monument"); Pres. Proc. 9558, 82 Fed. R. at 1143 (providing that "[a]ll federal lands and interests in lands within the boundaries of the monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws . . .").

A.    **Monument Designations Inhibit Research Opportunities by Leading to the Destruction of Archaeological Resources.**

1.    **The Federal Government Is Incapable of Protecting Archaeological Resources in GSENM and BENM as Originally Proclaimed.**

National monuments of the size of GSENM and BENM do not provide additional, meaningful protection of archaeological resources.  To the contrary, the creation of national monuments accelerates damage to and destruction of such resources and thereby prevent further meaningful research.  Damage to archaeological resources is especially acute in landscape level monuments such as GSENM and BENM, where literally thousands of antiquity sites exist and enforcing resource protection laws is nearly impossible.

Archaeological resources are protected by numerous laws that are intended to prevent, and in some instances criminalize, the vandalism, theft, and destruction of archaeological resources.  Among other laws are the Antiquities Act,[35] the Utah Antiquities Act,[36] the National Historic Preservation Act,[37] the Archaeological Resources Protection Act,[38] and the Native American Graves Protection and Repatriation Act.[39]  The problem, however, is that existing laws and regulations are not adequately enforced and are in many instances incapable of being enforced given the topography and other practical limitations of policing remote and undeveloped areas.

Inviting innumerable visitors to areas with significant and fragile archaeological resources, without a corresponding increase in enforcement, is irresponsible and inimical to the interests ostensibly driving the creation of national monuments.  As claimed by various *amici* in

[35] 54 U.S.C. §§ 320101 *et seq*. (West 2018).

[36] Utah Code Ann. §§ 9-8-301 *et seq.* (West 2018).

[37] 54 U.S.C. §§ 300101 *et seq.* (West 2018).

[38] 16 U.S.C. §§ 470aa *et seq.* (West 2018).

[39] 25 U.S.C. § 3001, *et seq.* (West 2018).

these proceedings, the existence of national monuments will increase visitation and recreation on public lands.  Archaeological studies worldwide reflect the fact that greater access to and visitation of antiquity sites leads to greater, not less, desecration.  This phenomenon has been found to occur on existing national monuments in the Southwest.  A 2009 study of factors contributing to antiquity site desecration and defacement at Canyon de Chelly National Monument in Arizona[40] found that the greatest contributors were increased access together with its corollary, increased visitation.  A paper that considered the impacts of the creation of the GSENM on archeological sites within the monument[41] confirmed the negative effects of increased visitation, concluding that "[i]ncreased visitation significantly accelerates impacts to archeological sites."

The difficulties in enforcing protections for antiquities are greatly exacerbated by the sheer size of the monuments and the number of antiquity sites.  A 1987 GAO Report[42] analyzed the problems associated with protecting archeological sites in the Four Corners area.  It recognized that, given the vast area and number of sites, it is virtually impossible to provide any type of physical protection.[43]  It also identified the several laws already in place that make

---

[40] *See e.g.* Lavris, J.L., *A Perfect Pothunting Day*, Reference No. 059019146 (February 2007) (noting that quantifying damage to archaeological sites in Canyon de Chelly "reveals that visitation is the most prolific, followed by vandalism then pothunting").

[41] Tipps, B., *Archeology in the Grand Staircase Escalante National Monument: Research Prospects and Management Issues*, Learning from the Land Science Symposium (November 4-5, 1997) ("Tipps 1997").  Tipps notes that creation of GSENM was "a two-edged sword" because "[s]ites will be protected from most development projects, but will face new threats as a result of heightened public awareness of the area and a huge concomitant rise in visitation."

[42] GAO, *Problems of Protecting and Preserving Federal Archeological Resources*, GAO/RCED-88-3 (December 1987), available at https://www.gao.gov/assets/150/145926.pdf (accessed December 10, 2018).

[43] *Id.* at 3-4, 26.

looting and desecration a crime[44] and concluded that the issue was not a lack of protection, but a lack of staffing, funding, and enforcement of existing laws.[45]  Although improved staffing and larger budgets may improve enforcement, it will remain impossible to truly protect the thousands of sites if access or visitation is dramatically increased.  Destruction of resources through increased visitation precipitated by naming these areas as national monuments will impede, not facilitate, research on these public lands.[46]

Utah's experience bears out that the creation of national monuments, without an increase in enforcement of existing protections, results in damage to and destruction of archaeological resources.  As discussed by Utah's Governor, Gary R. Herbert, in testimony before the U.S. Senate Committee on Energy and Natural Resources,

> In 2015, the Grand Staircase-Escalante had 1,400 reported cases of vandalism. According to the BLM, there have been only 25 cases of vandalism reported in the Bears Ears region since 2011.  That means the Grand Staircase, with its monument designation, currently experiences 140 times the rate of vandalism as does the Bears Ears region.
>
> Please do not misunderstand me: a single case of vandalism in this area is too much.  But the point remains, if we wish to protect and preserve this area, drawing lines on a map that will encourage increased visitation without a corresponding increase in law enforcement and land management resources is not a solution to vandalism and desecration problems.  Indeed, it will like[ly] worsen them.[47]

---

[44] *Id.* at 2, 12-15.

[45] *See id.* at 37.

[46] *See* Tipps 1997 ("Regardless of intent, the damage from increasing visitation was often substantial, always cumulative, and frequently affected the integrity of the site *and its future research potential*.") (emphasis added).

[47] Herbert, Gary R., Testimony Before the U.S. Senate Committee on Energy and Natural Resources, Oversight Hearing on Potential Impacts of Large-Scale Monument Designations (July 27, 2016), available at https://www.energy.senate.gov/public/index.cfm/files/serve?File_id=A8D9F89D-1181-4A74-B3C5-927850848E33 (accessed December 10, 2018).

Accordingly, the action that will most certainly put these cultural sites at greater risk, sites which have been preserved because of their remote location and lack of visitors, is to extend an invitation to unsupervised visitors to an un-policed area where enforcement of existing land use protections are sorely lacking. This approach is exactly what occurred with the original GSNM and BENM monuments. Contrary to the situation presented with GSENM and BENM, a diminished monument that is capable of being physically protected and vigorously managed provides more protection to sensitive archaeological resources than a large landscape monument that is incapable of being managed in a way as to handle the increased visitation that accompanies a national monument designation. Accordingly, the best means by which to protect the *amici* states' interest in continuing research on federal land is to diminish GSENM and BENM and other monuments that cannot be effectively policed.[48]

### 2.   The Modified Monuments Facilitate Enforcement of Existing Laws Protecting Archaeological Resources.

The BLM and USFS do not have the necessary resources to enforce existing protections of archaeological resources, meaning that increased visitation to all of the monument lands will result in damage and destruction to archaeological resources. The BLM lacked sufficient resources to manage the Bears Ears area before it became a monument; and the monument, as originally designated, would do nothing to encourage use of the available resources for resource

---

[48] It should be noted that, based upon the face of the *amici* states' briefing, most of the research identified by the *amici* states was completed before the land on which the research was conducted became a national monument. *See e.g.* Several States Amicus Brief, p. 22-23. Dr. Lipe's curriculum vitae discloses that his research relating to archaeology in the southwestern United States was published or submitted in or before 2016, meaning that all, or substantially all, of the research was completed before BENM was declared. *See* Curriculum Vitae, William D. Lipe (March, 2016), available at https://anthro.wsu.edu/documents/2016/04/cv-lipe-2.pdf/ (accessed December 12, 2018). Similarly, as shown by the proclamation establishing the Northeast Canyons and Seamounts Marine National Monument, the "intense scientific interest" existed long before the monument was declared on September 15, 2016. *See* Several States Amicus Brief, p. 23.

protection.   The BLM's resources are limited such that as of 2016, only 49% of designated national monuments and national conservation areas were "inventoried for the resources, objects, and values for which they were designated."[49]   The BLM's and Forest Service's performance in the Bears Ears region with respect to identifying all archaeological sites is even more limited, with around 90% of the land remaining uninventoried for archaeological resources.

Removing land from GSENM and BENM and directing visitors to smaller areas capable of physical protection and adequate enforcement will help protect the archaeological resources by reducing visitation to sites that are difficult or impossible to police.   To reduce harm arising from visitation attendant to the monument designation it may be necessary to develop "appropriate sites" and, after excavating those sites, promote those sites for visitation while reducing access to the remaining sites.[50]   "[V]isitors who have enough opportunities to visit interesting archaeological sites (that are developed and can sustain high levels of visitation) are less likely to visit more remote, undeveloped sites that are not able to withstand high levels of use without incurring significant damage."[51]   Accordingly, a smaller monument with appropriately developed sites and facilities will cause visitors to avoid visiting (and damaging) other undeveloped sites.[52]

---

[49] Bureau of Land Management, *Budget Justifications and Performance Information, Fiscal Year 2018*, III-5, available at https://www.doi.gov/sites/doi.gov/files/uploads/fy2018_blm_budget_justification.pdf (accessed December 12, 2018).

[50] Tipps 1997.

[51] *Id.*

[52] *Id.* (important factors include "[p]roviding toilet facilities, places to rest along the path to the site, and good vantage points for photographs").

**B.      Monument Designations Limit, Rather Than Facilitate, Recreational Opportunities.**

Landscape monuments are often accompanied by management directives in the proclamation that are interpreted in such a way as to limit the recreational uses that may be made of monument lands.  Utah's experience with the management of GSENM bears out the negative impact monument designation has on recreation.  Instead of being managed to enhance all forms of recreation, GSENM was managed to discourage tourism and all non-primitive forms of recreation, thereby depriving local communities of full range of economic opportunities that the many *amici* claim are available from national monument designations.  In particular, management of GSENM did not serve to increase or promote visitation and recreation, but instead unreasonably restricted these activities to a small area of the monument; unnecessarily constrained the monument's ability to accommodate visitors; and limited group activities.[53]

First, as expressed in the GSENM's management plan, the monument was managed for two purposes: (1) to ensure the Monument "remain[s] protected in its primitive, frontier state" and (2) to "provide opportunities for the study of scientific and historic resources."[54]  The GSENM management plan adopted policies to actively dissuade visitors from entering into the

---

[53] The overly restrictive management of the Monument is illustrated by the fact that no ACECs were designated in the monument based upon the conclusion that the protection of resources in proposed ACECs "will be substantially equivalent under either Monument authority or ACEC designation."  Bureau of Land Management, *Grand Staircase-Escalante National Monument Management Plan*, ACEC-1 (1999) ("GSENM Management Plan"), available at https://eplanning.blm.gov/epl-front-office/projects/lup/65870/79803/92581/GSENM_MP.pdf (accessed December 12, 2018).

[54] GSENM Management Plan, p. *iv*.  Bureau of Land Management, *Livestock Grazing Plan Amendment Environmental Impact Statement: Analysis of the Management Situation*, 80 (July 2015) ("2015 AMS"), available at https://eplanning.blm.gov/epl-front-office/projects/lup/69026/89782/107364/201507_GSENM_AMS_Final_508.pdf (accessed December 12, 2018).

monument's interior and to discourage visitor use.[55]  To accomplish these purposes, the GSENM management plan unreasonably limited, and deterred visitors from engaging in, many types of recreational activities.  All overnight camping required a permit and only "three existing small developed campgrounds" and "designated primitive camping areas" existed for the six percent of the monument that was managed to receive the most visitors.[56]  Despite purportedly receiving several hundred thousand visitors each year, the monument management plan allowed for only "up to 10" primitive camping sites in the Frontcountry zone and "up to 25" designated primitive camping sites in the Passage zone while prohibiting dispersed primitive camping in these areas.[57]  These limitations precluded any significant recreational activities within the monument or economic growth outside the monument to accommodate such activities.

Second, the BLM adopted policies that reduced the monument's ability to accommodate visitors.  Most parking areas within the monument were intended to accommodate only ten to twenty cars.[58]  The monument management plan, in addition to providing insufficient parking facilities, significantly restricted access to many parts of the Monument by closing hundreds of roads within the monument and leaving very few roads open for motorized or mechanized use.  ATV use was restricted to only about 60% of the routes that remained open.[59]  Similarly, by failing to provide adequate facilities to accommodate visitors, the BLM prevented numerous visitors from enjoying the monument.  With respect to recreational facilities, only "a relatively

---

[55] GSENM Management Plan, *iv-vii* (providing for "minor facilities" that are "located in small areas on the periphery of the Monument" and designating only four percent of the monument as "the focal point for visitation").

[56] *See* GSENM Management Plan, *v*.

[57] GSENM Management Plan, FAC-10, FAC-15; CAMP-1.

[58] *See* GSENM Management Plan, FAC-8, FAC-12.

[59] GSENM Management Plan, TRAN-5.

small number of modest pullouts, toilets, parking areas, trailheads, and picnic sites" were provided.[60]   The management plan limited trail construction to approximately six percent of the monument and allowed trails to be developed and maintained in the remainder of the monument only "where necessary to protect Monument resources."[61]

Third, the management plan severely restricted the size of groups that could travel together within the monument and restricted special events.  Group sizes in the Passage and Outback zones were generally limited to twenty-five people without a permit.[62]  In the Primitive zone, groups generally could not exceed 12 pack animals and 12 people without a permit and group size could generally not exceed 25 people even with a permit.[63]  Although outfitting and commercial operations are allowed, they must comply with the provisions regarding group size, along with all other management provisions.[64]  Bicycles were limited to using designated routes, meaning that they were required to share roads with vehicles, ATVs, and street legal motorized vehicles.[65]  These restrictions limited visitors' abilities to use GSENM for family gatherings, group activities, and economic pursuits.[66]

---

[60] GSENM Management Plan, WAT-1.

[61] *See* GSENM Management Plan, SSA-12, TRAN-12.

[62] GSENM Management Plan, GROUP-2, GROUP-3.

[63] GSENM Management Plan, GROUP-4.

[64] GSENM Management Plan, OG-1.

[65] GSENM Management Plan, TRAN-3, TRAN-4.

[66] For example, the Monument management plan recognizes that activities within the Fiftymile Mountain SRMA include, among other things, hunting.  GSENM Management Plan, SRMA-5. The management plan, however, states that "[v]isitors will not be encouraged to go to this area and commercial outfitting will be extremely limited."  *Id.*

**C.      Monument Designations May Limit, Rather Than Protect, Native American Uses of Monument Lands and Resources.**

National monument protections and restrictions will not increase protection of Native American practices or activities.  A monument proclamation is not needed to recognize such activities or allow them to continue, as such practices are already protected by statute and executive order.  In particular, the American Indian Religious Freedom Act[67] provides that it is "the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian . . . , including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."  Similarly, Executive Order No. 13007[68] provides that "[i]n managing Federal lands, each executive branch agency with statutory or administrative responsibility for the management of Federal lands shall, to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites."

Unfortunately, national monument designations often result in limited access to the national monument land.  The BENM proclamation prohibited the creation of "additional roads or trails designated for motorized vehicle use" unless they are for public safety purposes or for protecting monument objects.[69]  In addition, motorized and mechanized vehicle use is not allowed, except on designated trails.[70]  This may serve to limit Native Americans' ability to collect wood by limiting the areas in which they can use motorized or mechanized vehicles to

---

[67] 42 U.S.C. § 1996.

[68] Exec. Order No. 13007, Indian Sacred Sites, 61 Fed. Reg. 26771, 26771 (May 24, 1996).

[69] Pres. Proc. No. 9558, 82 Fed. Reg. at 1145.

[70] *Id.*

transport any wood that may be cut.  In addition, monument designation often results in the closure of roads, as occurred in GSENM, which will limit access to many areas in the monuments.

Large numbers of visitors to sacred areas used to perform ceremonies may detract from or interfere with the ability to conduct the ceremony or the sacred nature of the area.  Similarly, requiring permits for or restricting the areas in which herb, material, and wood gathering are allowed can make it significantly more difficult, or impractical, to engage in such activities.  For example, certain medicinal plants used by Native Americans may migrate and be found in areas several miles from where the plants were previously located.  Limiting collection to certain areas may result in the unavailability of traditional herbs and plants for periods of time.  Similarly, restrictions on areas in which wood may be gathered, permit requirements for gathering, or limitations on the amount of wood that is gathered, may significantly impact the practical availability of these resources to the local Native American population.[71]

## CONCLUSION

Utah requests that the Federal Defendants' motions to dismiss be granted.  The diminishment of GSENM and BENM is a step toward rectifying the abuses of the Antiquities Act that occurred when each monument was created over the objection and without the input of Utah's elected representatives.  Landscape monuments, such as GSENM and BENM, remove significant economic industries from rural communities and compromise existing rights to

---

[71] Management restrictions like those addressed above, will inhibit the exercise of Native American religious and traditional uses of monument lands and resources.  For example, GSENM's prior management plan required permits for group sizes over twenty five in ninety-six percent of the monument.  For nearly two thirds of the monument, group sizes generally could not exceed twelve people, even with a permit.  GSENM Management Plan, GROUP-2, GROUP-3, GROUP-4.  Fuel wood harvesting is only allowed in two very small areas, GSENM Management Plan, FP-1, Map 3, and collection of natural materials by Native Americans is allowed only pursuant to a BLM permit.  GSENM Management Plan, COL-1.

continue traditional uses on monument land.  National monuments such as GSENM and BENM are not necessary to create or preserve research, recreation, or other activities on the monument land.  For these reasons, the proclamations diminishing GSENM and BENM are appropriate and the Federal Defendants' motions to dismiss should be granted.

## REQUEST TO PARTICIPATE IN ORAL HEARING

Utah requests the opportunity to participate in any oral hearing on the Federal Defendants' motions to dismiss.

DATED:        December 13, 2018

Respectfully submitted,

/s/ Anthony L. Rampton
SEAN D. REYES (Utah Bar No. 7969)
Utah Attorney General
TYLER R. GREEN (982312)
Utah Solicitor General
ANTHONY L. RAMPTON (Utah Bar No. 3792)
KATHY A.F. DAVIS (Utah Bar No. 4022)
DAVID WOLF (Utah Bar No. 6688)
LANCE SORENSON (Utah Bar No. 10684)
Assistant Attorneys General
DAVID HALVERSON (992858)
Special Assistant Utah Attorney General
Utah Attorney General's Office
Utah State Capitol Complex
350 N. State Street, Suite 230
Salt Lake City, UT 84114-2320
seanreyes@agutah.gov
tylergreen@agutah.gov
arampton@agutah.gov
kathydavis@agutah.gov
dnwolf@agutah.gov
lancesorenson@agutah.gov
dhalverson@utah.gov
Telephone: (801) 538-9600

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 13, 2018, the undersigned electronically transmitted the

**PROPOSED INTERVENOR STATE OF UTAH'S REPLY BRIEF SUPPORTING**

**FEDERAL DEFENDANTS' MOTION TO DISMISS** to the Clerk's Office using the

CM/ECF system which will send notification of this filing to all counsel of record.

/s/ Anthony L. Rampton