# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WILDERNESS SOCIETY, *et al.*, )<br><br>Plaintiffs, )<br>v. )<br><br>DONALD J. TRUMP, in his official capacity as )<br>President of the United States, *et al*., )<br><br>Defendants. ) | Case No. 1:17-cv-2587 (TSC) |
| GRAND STAIRCASE ESCALANTE )<br>PARTNERS, *et al.*, )<br><br>Plaintiffs, )<br>v. )<br><br>DONALD J. TRUMP, in his official capacity as )<br>President of the United States, *et al*., )<br><br>Defendants. ) | Case No. 1:17-cv-02591 (TSC)<br><br>**CONSOLIDATED CASES** |
| AMERICAN FARM BUREAU FEDERATION, UTAH FARM BUREAU FEDERATION, GARFIELD COUNTY, KANE COUNTY, AND STATE OF UTAH<br><br>Defendants-Intervenors. | |

**CONSOLIDATED OPENING BRIEF OF INTERVENORS STATE OF UTAH, GARFIELD COUNTY, KANE COUNTY, AMERICAN FARM BUREAU FEDERATION, AND UTAH FARM BUREAU FEDERATION SUPPORTING FEDERAL DEFENDANTS' MOTION TO DISMISS**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iv

PROCEDURAL POSTURE AND INTRODUCTORY STATEMENT ..................................... 2

INTERVENORS' INTERESTS ..................................................................... 3

    State of Utah's Interests ................................................................. 3

    Counties' Interests .......................................................................... 6

    Farm Bureaus' Interests .................................................................. 8

ARGUMENT AND AUTHORITY ......................................................... 11

    I.    The President Properly Exercised His Authority To Issue The Modifying Proclamations. ................................................................. 12

        1.    The Antiquities Act Confers Statutory Authority Upon The President To Modify National Monuments.................................................. 13

            A.    The Antiquities Act Expressly Authorizes The President To Declare National Monuments. ................................................ 13

            B.    Courts Have Expansively Interpreted The President's Discretion Under The Antiquities Act............................................. 16

        2.    The Scope Of The Modifying Proclamations Does Not Exceed The Authority Granted Under The Antiquities Act. ...................................... 18

        3.    No Inconsistencies Exist Between The Antiquities Act And The Modifying Proclamations........................................................ 20

            A.    Congress Has Acquiesced In The President's Authority To Modify National Monument Reservations................................... 20

            B.    FLPMA's Limitations On The Secretary Of The Interior's Authority Do Not Restrict The President's Power Under The Antiquities Act. ......................................................... 23

            C.    Conflicting Advisory Legal Opinions Do Not Diminish the President's Authority to Modify National Monument Reservations. ................................................................. 26

    II.    The Modifying Proclamations Balance Competing Interests in the Public Lands. ................................................................. 28

1.      The Proclamations Creating GSENM And BENM Disregarded The Input Of Utah's Elected Representatives. ........................................................ 28

2.      The Declaration Of Landscape Monuments Such As GSENM And BENM Limit The Ability Of States And Local Communities To Determine Their Own Economic Condition ...................................................................... 31

        A.      Landscape National Monuments Remove Large, And Vital, Industry Sectors From Local And Rural Communities. .............. 31

        B.      Pre-Existing Rights To Continue Land Uses Are Inhibited By National Monument Restrictions. ................................................ 33

3.      National Monuments Are Unnecessary To Permit—And Instead Constrain—Research, Recreation, And Traditional Land Uses. ............. 35

        A.      Monument Designations Inhibit Research Opportunities By Leading To The Destruction Of Archaeological Resources. ........ 36

                i.      The Federal Government Is Incapable Of Protecting Archaeological Resources In GSENM And BENM As Originally Proclaimed. .................................................... 36

                ii.     The Modified Monuments Facilitate Enforcement Of Existing Laws Protecting Archaeological Resources. ..... 39

        B.      Monument Designations Limit, Rather Than Facilitate, Recreational Opportunities. ........................................................ 40

        C.      Monument Designations May Limit, Rather Than Protect, Native American Uses of Monument Lands and Resources. .................. 44

CONCLUSION ...................................................................................................... 46

REQUEST TO PARTICIPATE IN ORAL HEARING ........................................... 46

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Carter*, 462 F. Supp. 1155 (D. Alaska 1978) ........................................................17

*Alaska v. United States*, 545 U.S. 75 (2005) ........................................................................16

*Am. Fed'n of Gov't Employees, AFL-CIO v. Trump*, 318 F. Supp. 3d (D.D.C. 2018)13, 21

*Anaconda Copper Co. v. Andrus*, No. A79-101 Civil, 1980 U.S. Dist. LEXIS 17861 (D. Alaska Jun. 26, 1980)........................................................................................................18

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 457 (2002) ...........................................24

*Cameron v. United States*, 252 U.S. 450 (1920) .................................................................16

*Cappaert v. United States*, 426 U.S. 128 (1976).................................................................16

*Clinton v. Jones*, 520 U.S. 681 (1997).........................................................................16, 26

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S.Ct. 2028 (2015) ..................................15

*Henson v. Santander Consumer USA, Inc.*, 137 S.Ct. 1718 (2017)....................................13

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998) ..................................................................16

*Mass. Lobstermen's Ass'n v. Ross*, Civil Action No. 17-406 (JEB), 2018 WL 4853901 (D.D.C. Oct. 5, 2018)...........................................................................................15, 17, 21

*Midwest Oil v. United States*, 236 U.S. 459 (1915)............................................................23

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010)........................13

*Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002) ..........................17

*N. Haven Bd. Of Educ. v. Bell*, 456 U.S. 512, 535 (1982) .................................................21

*Public Lands Council v. Babbitt*, 529 U.S. 728, 731 (2000).................................................9

*Tulare Cty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002) ........................................................16

*United States v. California*, 436 U.S. 32 (1978) ................................................................16

*United States v. Diaz*, 499 F.2d 113 (9th Cir. 1974)..........................................................14

*Utah Ass'n of Ctys. v. Bush*, 316 F. Supp. 2d 1172 (D. Utah 2004).............7, 13, 16, 17, 18

*Wyoming v. Franke*, 58 F. Supp. 890 (D. Wyo. 1945) ..................................................17, 23

## Statutes

### Federal Constitution

U.S. Const. Art. II, § 1 ......................................................................................................26

### Federal Statutes

16 U.S.C. § 433 ...............................................................................................................14

16 U.S.C. §§ 470aa, *et seq.*..........................................................................................37

16 U.S.C. § 1604 .............................................................................................................30

16 U.S.C. § 3213 .............................................................................................................23

18 U.S.C. § 1866. ............................................................................................................14

25 U.S.C. §§ 3001, *et seq.*. ..........................................................................................36

42 U.S.C. § 1996.. ...........................................................................................................45

43 U.S.C. §§ 315, *et seq.* ...............................................................................................8

43 U.S.C. § 315b .............................................................................................................9

43 U.S.C. §§ 1391 - 1400 ...............................................................................................9

43 U.S.C. § 1394 .............................................................................................................9

43 U.S.C. §§ 1701, *et seq.* ............................................................................................9

43 U.S.C. § 1702 .............................................................................................................25

43 U.S.C. § 1712 .............................................................................................................30

43 U.S.C. § 1714 .......................................................................................................10, 25

43 U.S.C. §§ 1901 *et seq.* .............................................................................................9

54 U.S.C. §§ 320101 *et seq.*. ........................................................................................37

54 U.S.C. § 300101 *et seq.*. ..........................................................................................37

54 U.S.C. § 320301 ............................................................................................11, 13, 15, 22

48 Stat. 1269 ...................................................................................................................9

128 Stat. 3272 (2014). .....................................................................................................14

Pub. L. 94-579, 90 Stat. 2786 (1976)..............................................................................23, 26

**State Statutes**

Utah Code Ann. § 9-8-301 *et seq.*.................................................................................37

**Code of Federal Regulations**

40 C.F.R. § 1506.2 ........................................................................................................30

**Other Authorities**

**Articles**

Lavris, J.L., *A Perfect Pothunting Day*, Reference No. 059019146 (Feb. 2007) ..............37

Liston, L., *Sustaining Traditional Community Values*, 21 J. Land Resources & Envtl. L. 585 (2001)......................................................................................................................30

McKeller, Katie, *Garfield County Issues Unique State of Emergency*, Deseret News (Jun. 22, 2015) ......................................................................................................................33

Miller, Gil, and Heaton, Kevin, *Livestock Grazing on the Grand Staircase Escalante National Monument: Its Importance to the Local Economy* (Sep. 2015)......................8, 34

Rasband, James R., *Utah's Grand Staircase: The Right Path to Wilderness Preservation?*, 70 U. Colo. L. Rev. 483, 518-521 (1999) ..............................................34, 35

Shepherd, John F., *Up the Grand Staircase: Executive Withdrawals and the Future of the Antiquities Act*, 43 Rocky Mountain Mineral L. Inst. 4 (1997) .........................................22

Tipps, B., *Archeology in the Grand Staircase Escalante National Monument: Research Prospects and Management Issues*, Learning from the Land Science Symposium (Nov. 4-5, 1997) ..................................................................................................................37, 38, 41

Wrabley, Raymond B., *Managing the Monument: Cows and Conservation in Grandstaircase-Escalante* [sic] *National Monument*, 29 J. Land Resources & Envtl. L. 253 (2009)......................................................................................................................34

Yonk, Ryan M. *et al.*, *Boon or Bust: Wilderness Designation and Local Economies*, THE JOURNAL OF PRIVATE ENTERPRISE 31(3), 2016, 1-19 ....................................................32, 33

Yonk, Ryan M. and Simmons, Randy T., *Politics, Economics, and Federal Land Designation: Assessment the Economic Impact of Land Protection – Grand Staircase-Escalante National Monument*, 14 MOUNTAIN PLAINS J. OF BUS. AND ECONOMICS 1 (2013)....................................................................................................................... 31-32

**Proclamations and Executive Orders**

Exec. Order No. 13007, Indian Sacred Sites, 61 Fed. Reg. 26771 (May 24, 1996) .......... 45

Pres. Proc. No. 2295, 53 Stat. 2465 (Aug. 29, 1938) .......................................................... 27

Pres. Proc. No. 6920, Establishment of the Grand Staircase – Escalante National
Monument, 61 Fed. Reg. 50223 (Sep. 18, 1996) ...................................................... 4, 19, 35

Pres. Proc. No. 9558, Establishment of the Bears Ears National Monument, 82 Fed. Reg.
1139 (Dec. 28, 2016) ............................................................................................ 5, 19, 35, 45

Pres. Proc. No. 9681, Modifying the Bears Ears National Monument, 82 Fed. Reg. 58081
(Dec. 4, 2017) ...................................................................................................... 11, 19, 29

Pres. Proc. No. 9682, Modifying the Grand Staircase-Escalante National Monument, Fed.
Reg. 58089 (Dec. 4, 2017) ............................................................................... 2, 11, 19, 29

**Reports**

Allison, M. Lee, *et al.*, *A Preliminary Assessment of Energy and Mineral Resources
within the Grand Staircase-Escalante National Monument* iii, Circular 93, Utah
Geological Survey, Utah Department of Natural Resources (Jan. 1997) ............................ 7

Bureau of Land Management, *Budget Justifications and Performance Information, Fiscal
Year 2018*, III-5 .................................................................................................................. 40

Bureau of Land Management, *Livestock Grazing Plan Amendment Environmental Impact
Statement: Analysis of the Management Situation* (Jul. 2015) ............................................ 42

CRS Report, *Federal Land Ownership: Overview and Data* (2017) ............. 3-4, 21, 26, 27

CRS Report, *Antiquities Act; Scope of Authority for Modification of National Monuments*
(2016) .................................................................................................................................. 13

CRS Report, *Executive Order for Review of National Monuments: Background and Data*
(2017) .............................................................................................................................. 15, 27

CRS Report, *Authority of a President to Modify or Eliminate a National Monument*
(2000) .............................................................................................................................. 22, 23

GAO, *Problems of Protecting and Preserving Federal Archeological Resources*,
GAO/RCED-88-3 (Dec. 1987) ....................................................................................... 37, 38

Pub. Land L. Rev. Comm'n, *One Third of the Nation's Land: A Report to the President
and the Congress* (Jun. 20, 1970) ....................................................................................... 10

**Other**

40 Cong. Rec. 7888 (1906)..................................................................................................14

32 Op. Atty. Gen. 488 (1922)........................................................................................26, 27

39 Op. Atty. Gen. 185 (1938)........................................................................................27, 28

Bureau of Land Management, *Grand Staircase-Escalante Nat'l Monument and Kanab-Escalante Planning Area Draft Resource Mgmt. Plans and Envtl. Impact Statement*......19

Bureau of Land Management, *Bears Ears Nat'l Monument: Draft Monument Management Plan and Envtl. Impact Statement, Shash J'aa and Indian Creek Units* .....20

Garfield County Resolution No. 2017-02..............................................................................7

*Grand Staircase-Escalante National Monument Management Plan* (1999)41, 42, 43, 44, 46

Herbert, Gary R., Testimony Before the U.S. Senate Committee on Energy and Natural Resources, Oversight Hearing on Potential Impacts of Large-Scale Monument Designations (Jul. 27, 2016)...................................................................................................39

House Concurrent Resolution 11, Concurrent Resolution Urging the President to Rescind the Bears Ears National Monument Designation (Feb. 3, 2017) ...........................................5

House Concurrent Resolution 12, Concurrent Resolution Urging Federal Legislation to Reduce or Modify the Boundaries of the Grand Staircase Escalante National Monument (Feb. 17, 2017) .................................................................................................................5, 6

H.R. Rep. No. 68-1119 (1925) ............................................................................................27

H.R. Rep. No. 94-1163 (1976) ............................................................................................25

Kane County Resolution No. R2017-1 ..................................................................................7

Merriam-Webster, Definition of Declare. ...........................................................................14

San Juan County Resolution...................................................................................................7

San Juan County School District Resolution No. 2015-09 (May 9, 2017) ...........................7

Defendant Intervenors State of Utah ("Utah"), Garfield County, Kane County (collectively the "Counties"), American Farm Bureau Federation and Utah Farm Bureau Federation (collectively the "Farm Bureaus" and together with Utah and the Counties, the "Intervenors") file this consolidated opening memorandum supporting the Federal Defendants' motion to dismiss these consolidated cases.

Having been undertaken on at least eighteen separate occasions, presidential diminishment of monuments has not only been a common practice since the Antiquities Act was enacted, but is a proper exercise of presidential authority. First, the President had, and properly exercised, authority to issue the proclamations modifying the Grand-Staircase Escalante National Monument ("GSENM") and the Bears Ears National Monument ("BENM") (the "Modifying Proclamations"). The Antiquities Act confers statutory authority upon the President to modify national monuments and courts have expansively interpreted the President's discretion under the Antiquities Act. The scope of the Modifying Proclamations does not exceed the authority granted under the Antiquities Act and there are no inconsistencies between the Antiquities Act and the Modifying Proclamations. Congress has acquiesced in the President's authority to modify national monument reservations and did not alter such authority by enacting the Federal Land Policy and Management Act of 1976 ("FLPMA").

Second, the Modifying Proclamations balance competing interest in the public lands within GSENM's and BENM's original boundaries. The proclamations creating GSENM and BENM disregarded the input of Utah's elected representatives. Landscape monuments such as GSENM and BENM limit the ability of states and local communities to determine their own economic condition, remove large and vital industry sectors from local and rural communities,

and inhibit pre-existing rights to continue land uses. National monument reservations are

unnecessary to permit, and instead constrain, research, recreation, and traditional land uses by

leading to the destruction of archaeological resources and limiting recreational opportunities

and traditional uses of land within the monuments. For these reasons, as more fully explained

below, the Federal Defendants' motion to dismiss should be granted.

## PROCEDURAL POSTURE AND INTRODUCTORY STATEMENT

These companion cases arise out of President Donald Trump's proclamations issued

under the Antiquities Act downsizing two landscape national monuments located in the State

of Utah: GSENM and BENM. In December 2017, two lawsuits were filed challenging the

validity of President Trump's December 4, 2017 Presidential Proclamation Modifying the

Grand Staircase-Escalante National Monument.[1] These cases were consolidated by the Court

on February 15, 2018.[2] On March 7, 2018, the Farm Bureaus filed a motion seeking

intervention as defendants.[3] The Counties followed shortly thereafter with their May 1, 2018

motion to intervene.[4] Briefing on the Farm Bureau's and the Counties' motions to intervene

was stayed pending resolution of the Federal Defendants' motion to transfer these proceedings

to the United States District Court for the District of Utah.[5] After the Court entered its

September 24, 2018 Order denying the requested transfer, Utah moved to intervene in these

---

[1] Pres. Proc. No. 9682, Modifying the Grand Staircase-Escalante National Monument, 82 Fed. Reg. 58089 (Dec. 4, 2017) ("GSENM Modifying Proclamation").

[2] Order on Motion to Consolidate, ECF Dkt. 25 in Case No. 1:17-cv-2587 (Feb. 15, 2018).

[3] American Farm Bureau Federation's and Utah Farm Bureau Federation's Motion to Intervene, ECF Dkt. 28 in Case No. 1:17-cv-2587 (Mar. 7, 2018).

[4] Defendant-Intervenor's Motion to Intervene, ECF Dkt. 33 in Case No. 1:17-cv-2587 (May 1, 2018).

[5] Minute Order in Case No. 1:17-cv-2597 (Mar. 9, 2018); Minute Order in Case No. 1:17-cv-2587 (May 2, 2018).

proceedings.[6]

In the midst of briefing and consideration of the Intervenors' requests to intervene, the Federal Defendants filed their motion to dismiss claims by the various plaintiffs.[7] Oppositions to the Motion to Dismiss, and briefing by proposed *amici*, were filed between November 15, 2018 and November 19, 2018.[8] To preserve their rights to be heard with respect to the Motion to Dismiss, the Farm Bureaus and Utah filed *amicus* briefing in support of the Motion to Dismiss.[9] After the Federal Defendants filed their reply in support of the Motion to Dismiss, the Court granted Intervenors' requests to intervene.[10] In accordance with the Court's request for a briefing schedule, Intervenors elected to consolidate their briefs and file this single opening brief.[11]

## INTERVENORS' INTERESTS

**State of Utah's Interests**

Intervenors have aligned goals, but differing interests, in these proceedings. Among the named parties (other than the Federal Defendants) and *amici*, Utah has the greatest stake in the

---

[6] Order, ECF Dkt. 41 in Case No. 1:17-cv-2587 (Sep. 24, 2018); State of Utah's Motion to Intervene on Behalf of Defendants, ECF Dkt. 46 in Case No. 1:17-cv-2587 (Oct. 5, 2018).

[7] Federal Defendants' Motion to Dismiss ("Motion to Dismiss"), ECF Dkt. 43 in Case No. 1:17-cv-2587 (Oct. 1, 2018).

[8] *See* ECF Dkt. Nos. 61-63, 65, 67, 69, 71, 73-74, 76 in Case No. 1:17-cv-2587.

[9] Proposed Intervenor State of Utah's Reply Brief Supporting Federal Defendants' Motion to Dismiss, ECF Dkt. 79 in in Case No. 1:17-cv-2587 (Dec. 13, 2018); American Farm Bureau Federation's and Utah Farm Bureau Federation's [Proposed] Memorandum Supporting Federal Defendants' Motion to Dismiss, ECF Dkt. 80-1 in Case No. 1:17-cv-2587 (Dec. 13, 2018).

[10] Federal Defendants' Reply in Support of Their Motion to Dismiss, ECF Dkt. 81 in Case No. 1:17-cv-2587 (Dec. 13, 2018); Order, ECF Dkt. 83 in Case No. 1:17-cv-2587 (Jan. 11, 2019).

[11] By filing this consolidated opening brief, Intervenors do not waive any right to file independent briefs later in these proceedings. Given Intervenors' divergent interests in the matters at issue, which are neither coextensive nor identical among Intervenors, Intervenors reserve their respective rights to file independent briefing later in this matter should it appear that separate briefing is either necessary or desirable to address Intervenors' individualized interests.

outcome of this litigation. Some 65% of Utah's land (excluding tribal lands) is owned and administered by the federal government (a total of over 35 million acres).[12] Throughout the period of its settlement and to the present day, Utah, its counties and its citizens have relied on these public lands for public revenues (direct and indirect) and ways of life.[13] While it cherishes the magnificent natural wonders of these lands, Utah needs and is entitled to balance their multiple uses. Home to five national parks (Bryce, Zion, Arches, Canyonlands and Capitol Reef), eight national monuments (Cedar Breaks, Dinosaur, Hovenweep, Natural Bridges, Rainbow Bridge, Timpanogos Cave, Grand Staircase Escalante and Bears Ears), and two national recreation areas (Glen Canyon and Flaming Gorge), Utah cannot be faulted for questioning the scope of additional land-use restrictions. This is particularly true when, as here, those restrictions are accompanied by an influx of people that pose the greatest threat to the objects that the monuments are ostensibly intended to protect.

On September 18, 1996, GSENM was created over the objection, and without the support, of Utah's local elected officials.[14] As originally proclaimed, GSENM, located in Kane

---

[12] *See* Map, Exhibit 1. In contrast to Utah's interest in the outcome of these proceedings, the *amici* states cannot claim federal land ownership equivalent to Utah's. Instead, the states appearing as *amici* in these proceedings have federal ownership in the following percentages: New York (0.6%); Rhode Island (0.7%); Maine (1.1%); Massachusetts (1.2%); Maryland (3.1%); Vermont (7.8%); Hawaii (20.0%); Washington (28.6%); New Mexico (35.4%); and Oregon (53.0%). *See* CRS Report, Federal Land Ownership: Overview and Data (Mar. 3, 2017), p. 7-8, available at https://fas.org/sgp/crs/misc/R42346.pdf (accessed Feb. 7, 2019).

[13] The three Utah Counties in which GSENM and BENM are located also have significant percentages of federal land: Garfield County – 90%; Kane County – 85%; and San Juan County – 61%). Utah receives direct and indirect revenue from activities on federal land within the state; state and private inholdings are located within the original boundaries of GSENM and BENM, and other pre-existing rights, including R.S. 2477 roads, are threatened if the proclamations diminishing the monuments are set aside. Utah incorporates by reference the arguments and information set forth on pages 4 through 7 of its motion to intervene, State of Utah's Motion to Intervene on Behalf of Defendants, ECF Dkt. 46 in Case No. 1:17-cv-2587 (Oct. 5, 2018).

[14] Pres. Proc. No. 6920, Establishment of the Grand Staircase-Escalante National Monument, 61 Fed. Reg. 50223 (Sep. 18, 1996) ("GSENM Proclamation").

and Garfield Counties, Utah, encompassed nearly 1.9 million acres of land. GSENM's creation imposed significant economic burdens on local communities, reduced uses of the land other than primitive recreation, and created ongoing contention between Utah and federal land managers regarding its management. On December 28, 2016, BENM was proclaimed, also without the acquiescence or approval of Utah's elected representatives.[15] BENM encompassed approximately 1.4 million acres in San Juan County, Utah and, like GSENM, vastly exceeded the scope of national monuments Congress authorized in the Antiquities Act.

Utah has unequivocally expressed its official policy that GSENM should be diminished and BENM should be abolished or diminished. On February 3, 2017, Utah's governor signed House Concurrent Resolution ("H.C.R.") 11, Concurrent Resolution Urging the President to Rescind the Bears Ears National Monument Designation.[16] The resolution expresses Utah's commitment to "conservation and continued recreational access" while "allowing for productive uses, including agriculture, timber production, and energy and natural resource development."[17] Based upon the facts set forth in the resolution, the document resolves "that the Legislature of the state of Utah, the Governor concurring therein, strongly urges the President of the United States to rescind the Bears Ears National Monument designation."[18]

Likewise, on February 17, 2017 Utah's governor signed H.C.R. 12, Concurrent Resolution Urging Federal Legislation to Reduce or Modify the Boundaries of the Grand Staircase Escalante National Monument.[19] The resolution notes that GSENM "was created

---

[15] Pres. Proc. No. 9558, Establishment of the Bears Ears National Monument, 82 Fed. Reg. 1139 (Dec. 28, 2016) ("BENM Proclamation").

[16] Available at https://le.utah.gov/~2017/bills/hbillenr/HCR011.pdf (accessed Dec. 10, 2018).

[17] H.C.R. 11, p. 1.

[18] H.C.R. 11, p. 5.

[19] Available at https://le.utah.gov/~2017/bills/hbillenr/HCR012.pdf (accessed Dec. 10, 2018).

without consideration of roads, local economies, customs, culture, and heritage" and that the monument "resulted in diminished grazing rights, energy and mineral rights, public road access, state trust land properties, and resource use and preservation."[20] The resolution "urges Utah's congressional delegation to support legislative action to reduce or modify boundaries of the GSENM to the minimum area necessary to protect antiquities identified in Presidential Proclamation 6920."[21]

Finally, Utah supports efforts to reign in misuse of the Antiquities Act and to protect scientific and cultural resources with appropriately-sized designations. The creation of GSENM and BENM, respectively, abused the Antiquities Act. Utah, accordingly, requested that BENM be diminished and provided a proposal to the Department of the Interior setting forth suggested boundaries for a diminished national monument. Utah's proposal sought to meet the objectives of the Antiquities Act while enhancing the protection of the special resources in the Bears Ears region by suggesting the creation of a diminished monument boundary coupled with increased enforcement of existing laws and a withdrawal of mineral resources from development in significant areas in the greater Bears Ears region. Utah further supports the recent modifications to GSENM.

**Counties' Interests**

Kane and Garfield Counties, founded in 1864 and 1882, respectively, are rural jurisdictions located in southern Utah. Kane County is covered by multiple protected federal enclaves, such as the GSENM, Zion and Bryce Canyon National Parks, and the Glen Canyon National Recreation Area; with Lake Powell marking the County's southeast border. Approximately 85% of the land within Kane County is federally managed. The GSENM, prior to

---

[20] H.C.R. 12, p. 2.
[21] H.C.R. 12, p. 3.

modification, made up approximately 49% of Kane County's total land area. Meanwhile, federally owned or controlled land makes up approximately 93% of the total land area within Garfield County, and the GSENM, prior to modification, made up more than 600,000 acres, or 18%, of Garfield County's total land area.

Both counties strenuously opposed President Clinton's proclamation of the GSENM in 1996. Both participated, as members of the Utah Association of Counties, in an ultimately unsuccessful legal and constitutional challenge to its creation.[22] Likewise, in 2017, both Kane and Garfield counties publicly supported President Trump's executive order calling for the review of recent monument designations, and his later proclamation modifying the size of the GSENM. Each county unanimously passed resolutions calling on President Trump to shrink the monument to the "minimum acreage necessary to protect the antiquities and objects identified."[23]

The counties' decades-long opposition to the GSENM and support for the modifications made in 2017 stem from the negative economic and cultural effects the proclamation of the GSENM have had on their local communities. In 1997, the Utah Geological Survey estimated the value of recoverable coal within the Monument to be between $221 billion and $312 billion, in addition to the $2 billion to $17.5 billion worth of coal-bed methane, $20 million to $1.1 billion worth of oil and gas, and at least $4.5 million worth of other nonfuel minerals.[24] But for the effective prohibition on mineral exploration and development that came with monument designation, development of these natural resources would have brought hundreds, if not thousands, of new, stable, high-paying jobs to Kane and Garfield Counties.

---

[22] *Utah Ass'n of Counties v. Bush*, 316 F. Supp. 2d 1172 (D. Utah 2004).

[23] *See* Garfield County Resolution No. 2017-02, attached as Exhibit 2; Kane County Resolution No. R2017-1, attached as Exhibit 3, and San Juan County Resolution, attached as Exhibit 4.

[24] M. Lee Allison, *et al.*, *A Preliminary Assessment of Energy and Mineral Resources within the Grand Staircase-Escalante National Monument* iii, Circular 93, Utah Geological Survey, Utah Department of Natural Resources (Jan. 1997).

Likewise, federal restrictions on grazing put in place following the designation of the GSENM have "cost the Garfield-Kane Counties Economic Region 81 jobs, $863,049 in lost labor income, $2,216,628 in lost total value added and $9,101,801 in lost output."[25]

The people of Kane and Garfield Counties rely on the natural resources of their remote and rugged home in order to support themselves and their communities. The relief Plaintiffs seek would once again place in jeopardy the Counties' residents' ability to support themselves.

**Farm Bureaus' Interests**

The Farm Bureaus similarly have strong and vested interests in these proceedings and the diminishment of the BENM and GSENM Monuments. The modifications made by the President's December 4, 2017 proclamations will enhance the Farm Bureaus' members' ability to graze livestock in and around the monuments and, in so doing, protect their livelihoods, private property, custom, and culture. Ranching began in southeastern Utah in the 1880s.[26] Public land grazing today occurs mostly on Bureau of Land Management ("BLM") lands under the authority of the Taylor Grazing Act of 1934.[27] The Taylor Grazing Act authorizes grazing public lands both inside and outside of the national monuments in Utah. The Farm Bureaus' members rely on access to those public lands to sustain their livelihoods.[28] Consequently, the Court's decision on the motion to dismiss is not merely an academic or political debate; it will

---

[25] Gil Miller & Kevin Heaton, *Livestock Grazing on the Grand Staircase Escalante National Monument: Its Importance to the Local Economy* 2 (Sept. 2015), https://digitalcommons. usu.edu/cgi/viewcontent.cgi?article=1765&context=extension_curall.

[26] Memorandum for the President, p.8, Exhibit 1 to Tribal Plaintiffs' Response to Federal Defendants' Motion to Dismiss ("Tribal Plaintiffs' Opposition"), ECF Dkt. 74 in Case No. 1:17-cv-2590 (Nov. 15, 2018).

[27] 43 U.S.C. §§ 315, *et seq.* (West 2019).

[28] American Farm Bureau Federation's and Utah Farm Bureau Federation's Motion to Intervene, p. 12-16, ECF Dkt. 38 in Case No. 1:17-cv-2590 (Mar. 15, 2018); American Farm Bureau Federation's and Utah Farm Bureau Federation's Motion to Intervene, p. 12-14, ECF Dkt. 28-3 in Case No. 1:17-cv-2587 (Mar. 7, 2018).

significantly affect, for better or worse, the livelihoods of those members utilizing public lands for grazing in and around the monuments.

The Taylor Grazing Act "marked a turning point in the history of western rangelands."[29] Section 315 of the Act authorizes the Secretary of the Interior to withdraw from the public domain BLM lands that are chiefly valuable for grazing.[30] The concept of withdrawing grazing districts can be traced to the "legendary southwestern explorer, Major John Wesley Powell."[31] The year after President Theodore Roosevelt signed the Antiquities Act, he urged Congress to pass a law like the Taylor Grazing Act.[32] Not until 1934 was it signed into law by President Franklin Roosevelt for the dual purposes of public rangelands conservation and stabilization of the public lands livestock industry.[33] These purposes were fulfilled through the withdrawal of grazing districts and the statutory assurance that their use by ranchers would be "'recognized and acknowledged [and] adequately safeguarded.'"[34] Grazing on the BLM lands in and around the Utah monuments rests on this and subsequent statutory authority.

Grazing on U.S. Forest Service lands is authorized under other statutes such as the Federal Land Policy and Management Act ("FLPMA")[35] and the Public Rangelands Improvement Act of 1978.[36] Forest Service control of grazing began prior to the Antiquities Act of 1906 with the first adoption of grazing fees in 1905.[37] Established by Congress in 1964, the

---

[29] *Public Lands Council v. Babbitt*, 529 U.S. 728, 731 (2000).

[30] *Id.*

[31] *Id.* at 732.

[32] *Id.*

[33] *Id.* at 733 (citing 48 Stat. 1269).

[34] *Id.* at 733-34 (quoting 43 U.S.C. § 315b).

[35] 43 U.S.C. §§ 1701 *et seq.*

[36] 43 U.S.C. §§ 1901 *et seq.*

[37] Pub. Land L. Rev. Comm'n, *One Third of the Nation's Land: A Report to the President and*

Public Land Law Review Commission ("Commission") studied existing laws and procedures related to the administration of the public lands.[38] After six years of work, the Commission issued a report recommending to the President and Congress that new or enlarged national monuments should require an act of Congress.[39] Noting a period of time between 1956 and 1961 when a significant number of existing withdrawals were downsized, the Commission Report also recommended congressional action to establish a formal program to phase out and reinstate existing withdrawals subject to modification.[40] Congress partially adopted these recommendations, but banned the Secretary of the Interior from modifying or revoking national monuments under the Antiquities Act.[41] Congress did not address in FLPMA the President's authority to create, modify, or abolish national monuments.

Plaintiffs do not express concern about grazing in their opposition to the motion to dismiss.[42] Despite the absence of concern about grazing in and around the monuments, Plaintiffs' claims, if granted, would significantly jeopardize the Farm Bureaus' members who ranch in the area under the authority of multiple federal laws and regulations, just as they and their ancestors have done for generations over the last 150 years.

---

*the Congress* 105 (Jun. 20, 1970) ("Commission Report"), available at https://leg.mt.gov/content/Committees/Interim/2013-2014/EQC/Meetings/September-2013/one-third-of-nation.pdf (accessed Feb. 6, 2019).

[38] 43 U.S.C. §§ 1391-1400 (sunsetted Dec. 20, 1970 (43 U.S.C. § 1394(b) (1970))

[39] Commission Report at 54.

[40] *Id.* at 56.

[41] 43 U.S.C. § 1714(j) (West 2019).

[42] Only one such filing addresses grazing. *See* [Proposed] Brief of *Amicus Curiae* National Parks Conservation Association in Opposition to Federal Defendants' Motion to Dismiss, p. 24, ECF Dkt. 65-2 in Case No. 1:17-cv-2598 (Nov. 19, 2018). The Farm Bureaus dispute alleged impacts of grazing presented in that brief that were borrowed from a different analysis for a different area. The lack of concern may be attributable to the fact that grazing has occurred in the areas within the original GSENM and BENM since the late 1800s without apparent negative impacts that might, had they been truly impactful, otherwise have precluded the monument designations by three different Presidents.

## ARGUMENT AND AUTHORITY[43]

The Motion to Dismiss should be granted. First, the Modifying Proclamations were within the scope of the President's authority under the Antiquities Act. The Antiquities Act provides Presidents with expansive authority to declare objects as national monuments, but the President's authority to reserve land is limited to reserving only "the smallest area compatible with the proper care and management of the objects to be protected."[44] The Act does not contain any limitations on a President's ability to modify the area of land reserved for an existing monument should it be determined that the area reserved is not consistent with the Antiquities Act's limited reservation authority. Consistent with this framework, Presidents have modified existing monuments in the past, with congressional acquiescence.

Second, the Modifying Proclamations balance competing interests in the public land that was previously within GSENM's and BENM's boundaries and properly fulfill the purposes of the Antiquities Act's authorization to reserve land to protect monument objects. The Modified Proclamations, which were created with the input of both local elected representatives and members of the public, allow local communities to determine their own economic condition, provide more effective protections for archaeological resources, and allow research, recreation, and traditional land uses to continue.

---

[43] Intervenors incorporate by reference the Federal Defendants' briefing with respect to their motions to dismiss, including Memorandum in Support of Federal Defendants' Motion to Dismiss ("GSENM Motion to Dismiss"), ECF Dkt. 43-1 in Case No. 1:17-v-02587 (Oct. 1, 2018); Federal Defendants' Reply in Support of Their Motion to Dismiss, ECF Dkt. 81 in Case No. 1:17-v-02587 (Dec. 13, 2018); Memorandum in Support of Federal Defendants' Motion to Dismiss ("BENM Motion to Dismiss"), ECF Dkt. 49-1 in Case No. 1:17-v-02590 (Oct. 1, 2018); Federal Defendants' Reply in Support of Their Motion to Dismiss, ECF Dkt. 101 in Case No. 1:17-v-02590 (Dec. 13, 2018).

[44] 54 U.S.C. § 320301(b) (West 2019).

Because the President had authority to modify the GSENM and BENM monument reservations to comply with the Antiquities Act's express terms and the modified monuments comport with both the input of local elected officials and competing interests in the use of the public lands, the President's proclamations modifying GSENM and BENM[45] are proper and the Plaintiffs' complaints should be dismissed.

## I.      The President Properly Exercised His Authority To Issue The Modifying Proclamations.

The Antiquities Act is a broad delegation of authority from Congress to the President to declare national monuments and reserve land for the protection of monument objects. Well within the bounds of that authority, the President declared modified boundaries for GSENM and BENM and properly addressed the scope of grazing both inside and outside of the monuments. The President's actions were consistent with federal courts' interpretation of his authority, Congress's acquiescence in previous presidential modifications, FLPMA's affirmation of the President's undisturbed authority under the Antiquities Act, and unbounded by inconsistent opinions of subordinate legal officers.

In evaluating whether a Presidential proclamation exceeds statutory authority, the Court "must analyze the organic statute that supposedly confers statutory authority upon the President, assess the scope of a given executive order, and check for inconsistencies between the statute and the executive order."[46] Under these standards, the President had authority to make the Modifying Proclamations.

---

[45] *See* GSENM Modifying Proclamation; Pres. Proc. No. 9681, Modifying the Bears Ears National Monument, 82 Fed. Reg. 58081 (Dec. 4, 2017) ("BENM Modifying Proclamation") (collectively the "Modifying Proclamations").

[46] *Am. Fed'n of Gov't Employees, AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 393 (D.D.C. 2018), *appeal docketed*, No. 18-5289 (D.C. Cir. Sep. 26, 2018). "There is no clear distinction between proclamations and executive orders." Cong. Research Serv., *Antiquities Act: Scope of Authority*

1.     **The Antiquities Act Confers Statutory Authority Upon The President To Modify National Monuments.**

A.     **The Antiquities Act Expressly Authorizes The President To Declare National Monuments.**

"The Antiquities Act sets forth clear standards and limitations."[47] The Antiquities Act authorizes the President to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest . . . to be national monuments."[48] The President may, but is not required to, "reserve parcels of land as a part of the national monuments."[49] Any reservations, however, "shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."[50] If the President has taken these actions, then the "facts compel a finding in favor of the President's actions in creating the monument. That is essentially the end of the legal analysis."[51]

Under these standards, the President properly exercised his authority to issue the Modifying Proclamations. The President declared the two Utah national monuments and reserved the smallest area compatible with the proper care and management of the monument objects, which ends the legal analysis. Plaintiffs' and *amici*'s attempt to portray the President's actions with verbs such as "revoke" or "dismantle" and even "mutilate" or "dismember" is not

---

*for Modification of National Monuments* 3 (2016), available at https://www.peer.org/assets/docs/12_5_16_CRS_memo.pdf (accessed Feb. 6, 2019).

[47] *Utah Ass'n of Ctys v. Bush*, 316 F. Supp. 2d 1172, 1191 (D. Utah 2004). Where the language is plain and unambiguous, there is no need to delve into legislative history. *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718, 1725 (2017); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 259 n.3 (2010).

[48] 54 U.S.C. § 320301(a) (West 2019).

[49] 54 U.S.C. § 320301(b) (West 2019).

[50] *Id.*

[51] *Utah Ass'n of Ctys.*, 316 F. Supp. 2d at 1183; *accord* Opposition of Plaintiffs the Wilderness Society, et al., to Defendants' Motion to Transfer ("TWS Brief"), p. 20, ECF Dkt. 61 in Case No. 1:17-cv-2587 (Feb. 1, 2018) (the President may "'declare national monuments' and 'reserve' parcels of land to protect historic and scientific objects found there.").

only an inaccurate description of the Modifying Proclamations, but also based upon an improper

assumption that "declare," as used in the Antiquities Act, does not also include the ability to

modify monument reservations.[52] Contrary to these characterizations of the Antiquities Act's

provisions, the term "declare," as used in the Antiquities Act, includes the power to modify

national monument reservations.

"Declare" is not defined in the Antiquities Act. "Absent legislative definitions, [terms]

can have different meanings to different people."[53] Plaintiffs' apparent definition of "declare" to

include only establishing and expanding, improperly constrains the authority expressly granted

by the Antiquities Act. In 1907, "declare" meant "to make known by language."[54] Today,

"declare" still means "to make known formally, officially, or explicitly."[55] The Antiquities Act,

therefore, expressly authorizes the President to "declare" the size of national monuments,

whether through expansion or diminishment. Because the President proclaimed, or made known

by formal, official, and explicit language, the modifications to GSENM and BENM, the

President acted within the Antiquities Act's express grant of authority to "declare" national

monuments.[56]

---

[52] UDB Plaintiffs' Memorandum of Points and Authorities in Opposition to Federal Defendants' Motion to Dismiss ("UDB Brief"), p. 26, 32, ECF Dkt. 71 in Case No. 1:17-cv-2590 (Nov. 15, 2018); TWS Brief, p. 20; Amicus Curiae Brief of Conservatives for Responsible Stewardship in Support of Plaintiffs' Opposition to Federal Defendants' Motion to Dismiss, p. 6, 7, ECF Dkt. 85 in Case No. 1:17-cv-2590 (Nov. 19, 2018).

[53] *United States v. Diaz*, 499 F.2d 113, 114 (9th Cir. 1974) (interpreting the terms "ruling," "monument," or "object of antiquity" found in the enforcement provisions of the Antiquities Act, 16 U.S.C. § 433, *repealed* Dec. 19, 2014; 128 Stat. 3272 (2014) (*recodified* at 18 U.S.C. § 1866)).

[54] *Accord* TWS Brief, p. 20.

[55] Merriam-Webster, Definition of Declare, available at www.merriam-webster.com/dictionary/declare (accessed Feb. 6, 2019).

[56] While invocation of the Antiquities Act's legislative history is unnecessary given that the statute unambiguously allows the President to declare modifications to national monuments, that

14

The President's leeway in declaring the size of national monuments is emphasized by the Antiquities Act itself which precedes the verb "declare" with the instruction that "the President may, in the President's discretion," declare national monuments.[57] The notion that monument declarations can only be expansive contradicts the Act's only qualification of the President's discretion—a limitation to consider the "smallest area compatible with the proper care and management of the objects to be protected."[58] Thus, the only statutory guidance on the President's discretion to declare national monuments is one of limitation and not expansion.

Plaintiffs' arguments effectively require the Court to read additional language into the Antiquities Act, namely that "the President may, in the President's discretion, declare by public proclamation" *new or expanded* . . . "national monuments."[59] In effect, Plaintiffs ask the Court "'to add words to the law to produce what is thought to be a desirable result.'"[60] Past practice, however, demonstrates that the Plaintiffs' asserted limitation is neither an intended constraint, nor a part of, the Antiquities Act. Eighteen times since the enactment of the Antiquities Act, Presidents have either diminished or both enlarged and diminished national monuments.[61]

---

history nevertheless demonstrates that legislators intended the Act to limit the amount of land reserved for the protection of monument objects. During debate on the bill, Representative Stephens of Texas worried that the Act would be "abused" to reserve vast tracts of land "like the forest-reserve bill." He asked, "How much land will be taken off the market in the Western States by the passage of the bill?" Representative Lacey of Iowa responded, "Not very much. The bill provides that it shall be the smallest area necessary for the care and maintenance of the objects to be preserved." Representative Lacey added, "It is meant to cover the cave dwellers and cliff dwellers." 40 Cong. Rec. 7888 (1906).

[57] 54 U.S.C. § 320301(a) (West 2019).

[58] *Id*. at (b).

[59] *See*, *e.g.*, UDB Brief, p. 25-26.

[60] *Mass. Lobstermen's Ass'n v. Ross*, Civil Action No. 17-406 (JEB), 2018 WL 4853901, at *11 (D.D.C. Oct. 5, 2018) (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015)).

[61] Cong. Research Serv., *Executive Order for Review of National Monuments: Background and Data* 8, n.34 (2017) ("2017 CRS Report"), available at https://fas.org/sgp/crs/misc/R44988.pdf

### B.     Courts Have Expansively Interpreted The President's Discretion Under The Antiquities Act.

No court has ever overturned a presidential monument declaration under the Antiquities Act.[62] Instead, the Supreme Court, federal circuit courts, and federal district courts have uniformly supported broad presidential authority under the Act. The opinions follow "a tradition of federal courts' affording 'the utmost deference to Presidential responsibilities.'"[63]

Each of the Supreme Court's four opinions addressing the Antiquities Act have accorded broad deference to the President's actions under the Act. In *Cameron v. United States*,[64] the court affirmed President Theodore Roosevelt's declaration of the Grand Canyon National Monument over objections of mining claimants. Likewise, in *Cappaert v. United States*[65] the court ruled that President Hoover could include specific objects of historic or scientific interest in the Death Valley National Monument. In *United States v. California*,[66] the court ruled that President Truman had the power to include submerged lands and water in the Channel Islands National Monument. The court followed this same reasoning in *Alaska v. United States*[67] when it ruled that the Act had delegated to Presidents Coolidge and Franklin D. Roosevelt the power to preserve submerged land as part of the Glacier Bay National Monument.

Each of the lower court decisions addressing the President's actions under the Antiquities Act have similarly deferred to the President's discretion. The D.C. Circuit issued companion cases in 2002 in which the court held that the Act "confers very broad discretion on the President

---

(accessed Feb. 6, 2019).  Tables 4 and 5 of the 2017 CRS Report are attached as Exhibit 5.

[62] *Utah Ass'n of Ctys.*, 316 F. Supp. 2d at 1179-80.

[63] *In re Lindsey*, 158 F.3d 1263, 1280 (D.C. Cir. 1998), *quoting Clinton v. Jones*, 520 U.S. 681, 709 (1997).

[64] 252 U.S. 450 (1920).

[65] 426 U.S. 128, 142 (1976).

[66] 436 U.S. 32, 36 (1978).

[67] 545 U.S. 75, 101-102 (2005).

and separation of powers concerns are presented."[68] In both cases, the court dismissed complaints challenging presidential proclamations establishing seven national monuments as *ultra vires* and unconstitutional. Federal district courts likewise find broad presidential authority in the Act. In *Massachusetts Lobstermen's Association v. Ross*, this Court ruled that the President had authority to designate a marine national monument.[69] The federal district court in Wyoming upheld President Franklin D. Roosevelt's designation of the Jackson Hole National Monument because of the court's "limited jurisdiction" to determine if the President's actions were outside the scope of the Act. The court referred the plaintiffs to Congress.[70] The federal district court in Alaska refused to enjoin the consideration of a national monument designation in an environmental impact statement because the National Environmental Policy Act did not apply to monument designations by President Carter.[71] That same court ruled two years later that Presidents had established a broad pattern of using the authority granted by the Act in the face of congressional acquiescence, noting that Congress had the opportunity with the passage of FLPMA four years earlier to curtail the President's authority under the Antiquities Act and did not do so.[72] And as previously noted, the Utah District Court held that President Clinton had broad discretion to establish the Grand Staircase-Escalante National Monument under the Antiquities Act and the courts have no authority to determine whether the President abused his discretion.[73] Once President Clinton had designated the monument and set aside what he

---

[68] *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002); *Tulare Cty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002).

[69] 2018 WL 4853901, at *1.

[70] *Wyoming v. Franke*, 58 F. Supp. 890, 894, 896 (D. Wyo. 1945).

[71] *Alaska v. Carter*, 462 F. Supp. 1155, 1159-60 (D. Alaska 1978).

[72] *Anaconda Copper Co. v. Andrus*, No. A79-101 Civil, 1980 U.S. Dist. LEXIS 17861, *6 (D. Alaska Jun. 26, 1980).

[73] *Utah Assn. of Ctys.*, 316 F. Supp. 2d at 1183.

believed at the time to be the smallest area necessary to protect the monument, the President had complied with the statute and that was the "outer limit of judicial review."[74] Based upon the numerous, and consistent, cases acknowledging the President's authority under the Antiquities Act, the Court should accord significant deference to the President's discretion to make the Modifying Proclamations.

**2.      The Scope Of The Modifying Proclamations Does Not Exceed The Authority Granted Under The Antiquities Act.**

Defendant Intervenors incorporate by reference the Federal Defendants' briefing regarding the scope of the Modifying Proclamations.[75] Intervenors, and the Farm Bureaus in particular, focus specifically on the Modifying Proclamations' impacts to grazing on lands formerly within the GSENM and BENM national monuments.

The proclamation establishing GSENM provided that grazing would not be affected by the national monument designation and, more particularly, that nothing in the proclamation "shall be deemed to affect existing permits or leases for, or levels of, livestock grazing on Federal lands within the monument; existing grazing uses shall continue to be governed by applicable laws and regulations" other than the proclamation.[76] The GSENM Modifying Proclamation revised this provision of the original GSENM Proclamation to read that nothing in the proclamation "shall be deemed to affect authorizations for livestock grazing, or administration thereof, on Federal lands within the monument" and that "[l]ivestock grazing within the monument shall continue to be governed by laws and regulations other than this proclamation."[77] The primary difference between the proclamations is that the GSENM

---

[74] *Id*. at 1186.

[75] GSENM Motion to Dismiss, p. 38-39; BENM Motion to Dismiss, p. 37-38.

[76] GSENM Proclamation, 61 Fed. Reg. at 50225.

[77] GSENM Modifying Proclamation, 82 Fed. Reg. at 58094.

Proclamation grandfathered then-existing grazing while the GSENM Modifying Proclamation authorized revised or new grazing permits.[78]

The BENM Proclamation, on the other hand, provided that "[l]aws, regulations, and policies" followed by the Forest Service and BLM "in issuing and administering grazing permits or leases on lands under their jurisdiction shall continue to apply with regard to the lands in the monument to ensure the ongoing consistency with the care and management" of the monument objects.[79] Unlike the GSENM Proclamation, the BENM Proclamation did not grandfather existing grazing. The BENM Modifying Proclamation, however, used the same language as the GSENM Modifying Proclamation.[80] The BLM did not issue a monument plan following President Obama's Proclamation. Unlike the Grand Staircase planning area, the Bears Ears planning area does not include lands outside of the two smaller units of the national monument created by President Trump. The BENM draft management plan summary indicates that acreage available for grazing would remain relatively unchanged between the no-action and the preferred alternatives.[81]

---

[78] According to BLM's draft management plan for the monument, its preferred management alternative would make available approximately 81,000 acres of grazing in comparison to the "no action" alternative that would continue existing management under existing Resource Management Plans. Bureau of Land Management, *Grand Staircase-Escalante Nat'l Monument and Kanab-Escalante Planning Area Draft Resource Mgmt. Plans and Envtl. Impact Statement*, ES-5, ES-11, available at https://eplanning.blm.gov/epl-front-office/projects/lup/94706/155930/190910/GSENM-KEPA_Executive_Summary-508.pdf (accessed Feb. 6, 2019).

[79] BENM Proclamation, 82 Fed. Reg. at 1145.

[80] BENM Modifying Proclamation, 82 Fed. Reg. at 58086.

[81] Bureau of Land Management, *Bears Ears Nat'l Monument: Draft Monument Management Plan and Envtl. Impact Statement, Shash Jáa and Indian Creek Units*, ES-8, available at https://eplanning.blm.gov/epl-front-office/projects/lup/94460/154290/188907/BENM_Draft_MMPs-EIS_Executive_Summary.pdf (accessed Feb. 6, 2019).

The Modifying Proclamations, therefore, expanded BLM's and the Forest Services' authority to allow grazing access and use on the monument lands consistent with the numerous other statutes and regulations governing grazing on public lands. Nothing in the Modifying Proclamations, therefore, exceeds the President's authority under the Antiquities Act.

### 3. No Inconsistencies Exist Between The Antiquities Act And The Modifying Proclamations.

#### A. Congress Has Acquiesced In The President's Authority To Modify National Monument Reservations.

As demonstrated by Congress' inaction in the face of a long history of modification of national monument proclamations, the President has authority under the Antiquities Act to modify national monument boundaries. Congress has never passed a law in response to a presidential declaration modifying a national monument. In contrast, the two instances in which Congress responded to national monument proclamations involved proclamations establishing, not modifying, national monuments. Despite the regular practice of Presidential modification of national monuments, Congress has not amended the Antiquities Act to restrict the President's authority to make changes to monument reservations. This history demonstrates that the President has authority under the Antiquities Act to modify national monument boundaries.[82]

This Court's recent Antiquities Act decision in *Massachusetts Lobstermen's Association v. Ross* squarely addresses the acquiescence of Congress to presidential actions under the Antiquities Act. In *Massachusetts Lobstermen's Association*, this Court found that Congress's recodification of the Antiquities Act in 2014 without modifying the Act's reach "[a]ccentuat[es] the persuasiveness of the Executive's longstanding interpretation" of the Act.[83] Just like the

---

[82] A summary prepared by Intervenors describing Presidential proclamations diminishing national monuments is set forth at Exhibit 6.

[83] 2018 WL 4853901 at *6.

repeated acts of reserving submerged lands at issue in *Massachusetts Lobstermen's Association*, the longstanding practice of Presidential national monument modification, which includes eighteen separate reductions of national monument reservations, demonstrates that the Antiquities Act does not proscribe such actions.[84] "Had later Congresses understood the Antiquities to not reach [modification of monument reservations], as plaintiffs contend, one might expect them to have effectuated that understanding somewhere in the U.S. Code."[85] If the Antiquities Act did not provide authority to modify national monument reservations, as Plaintiffs contend, Congress could have effectuated that understanding when it recodified the Act in 2014.[86]

At the time the Antiquities Act was recodified in 2014, Congress had been specifically briefed on the President's modification of national monument reservations. In particular, the Congressional Research Service completed a report in 2000 entitled "Authority of a President to Modify or Eliminate a National Monument" in response to President Clinton's declaration establishing the Grand Staircase-Escalante National Monument and the accompanying controversy.[87] The report quoted the Act's provision that monuments should be confined to the

---

[84] 2017 CRS Report, Tables 4, 5, attached as Exhibit 5.

[85] *Mass. Lobstermen's Ass'n*, 2018 WL 4853901 at *8; *see also Am. Fed'n of Gov't Emps.*, 318 F. Supp. 3d at 416 ("given the widely-known sweeping exercise of presidential prerogative . . ., Congress' silence on the issue of the President's authority to continue to act in this arena speaks volumes about whether it actually intended to oust the President entirely from this sphere").

[86] *See also N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) ("Where 'an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'" (citations omitted).

[87] Cong. Research Serv., *Authority of a President to Modify or Eliminate a National Monument*, RS20627 1 (2000) ("2000 CRS Report"), available at https://www.everycrsreport.com/files/20000803_RS20647_2b3793dd24bf34f92905230627f1f54cc589b2be.pdf (accessed Feb. 6, 2019).

smallest possible area and then stated, "[n]umerous President have modified previously created monuments."[88] The report's summary states that no cases were found deciding the issue of presidential authority to revoke a national monument but it was "clear" that a President could modify an existing presidentially-created monument.[89]

In comparison to the numerous national monument modifications that did not elicit a Congressional response, the two instances where Congress has found an inconsistency between the President's actions and the scope of the Antiquities Act resulted in specific legislation addressing the President's missteps. President Franklin Roosevelt's designation of the Jackson Hole National Monument resulted in a statutory ban on new or enlarged national monuments in Wyoming.[90] Similarly, Congress terminated fifteen national monuments in Alaska and limited the President's ability to create future national monuments larger than 5,000 acres in the state without congressional approval.[91] If Congress believed that the Presidents' numerous modifications of national monument boundaries were outside the scope of the Antiquities Act, Congress had full authority and opportunity to correct any misapprehension of the extent of the President's authority.[92] Having failed to reign in such actions, Congress has acquiesced in the

---

[88] *Id.* at 3.

[89] *Id.* at 5.

[90] 54 U.S.C. § 320301(d). *See* John F. Shepherd, *Up the Grand Staircase: Executive Withdrawals and the Future of the Antiquities Act*, 43 Rocky Mountain Mineral L. Inst. 4, at § 4.03(3)(a) (1997) ("Shepherd").

[91] 16 U.S.C. § 3213(a).

[92] The enactment of FLPMA further supports Congress' acquiescence in the President's authority to modify national monument reservations. Congress expressly revoked its implied consent to withdrawal and reservation authority by enacting FLPMA. FLPMA § 704 provided that, "[e]ffective on or after the date of approval of this Act, the implied authority of the President to make withdrawals and reservations resulting from acquiescence of the Congress (U.S. v. Midwest Oil Co., 236 U.S. 459) . . . [is] repealed . . .." Pub. L. 94-579, 90 Stat. 2786 (1976).  In contrast to this express revocation of withdrawal and reservation authority, Congress did not revoke, expressly or otherwise, the President's authority to modify national monument

President's authority to modify national monument reservations.[93]  The Supreme Court has held

that a "long-continued practice, known to and acquiesced to by Congress, would raise a

presumption that [a presidential public lands decision] had been made in pursuance of its consent

or of a recognized administrative power of the Executive in the management of public lands."[94]

### B.     FLPMA's Limitations On The Secretary Of The Interior's Authority Do Not Restrict The President's Power Under The Antiquities Act.

FLPMA did not amend or repeal the Antiquities Act. FLPMA limits the Interior

Secretary's authority to modify or revoke national monuments, but does not speak to the

President's authority.[95] Plaintiffs' arguments improperly blur the clear distinction between the

President and his Secretary of the Interior and would require the Court to replace "Secretary" in

FLPMA with "President" or "Executive Branch" to bring the President within FLPMA's

limitation of authority.[96] Errant comments in a committee report are insufficient to disrupt the

careful and deliberate language ultimately enacted as 43 U.S.C. 1714.

---

proclamations despite decades of the practice and numerous instances in which the President diminished national monument reservations. *See id.* at §§ 703, 704.

[93] Similarly, if Congress wants to reverse the President's actions in the Utah monuments or further amend the Act to prevent similar, future declarations, it has full authority to do so under the Property Clause of the Constitution. As in *Wyoming v. Franke*, the Court should decline to interfere where Congress has delegated its authority over federal property to the President who then exercises that authority, albeit in a manner displeasing to some members of the Legislative Branch. *Wyoming*, 58 F. Supp. at 896.

[94] *Midwest Oil v. United States*, 236 U.S. 459, 474 (1915)("… the basis of a wise and quieting rule [is] that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself ….").

[95] 43 U.S.C. § 1714(j); 2000 CRS Report at 4.

[96] *See, e.g.*, UDB Brief, p. 29 ("[T]he *Executive Branch* has no right to modify or revoke national monuments"); Grand Staircase Escalante Partners Plaintiffs' Memorandum in Opposition to Federal Defendants' Motion to Dismiss ("GSEP Brief"), p. 1, ECF Dkt. 63 in Case No. 1:17-cv-2587 (Nov. 15, 2018) ("Congress . . . has not delegated any such powers to the *Executive Branch*.") (emphasis added).

The Supreme Court has found "no reason to give greater weight to the views" of individual senators "than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text."[97] When a statute is unambiguous, "this first canon is also the last: 'judicial inquiry is complete.'"[98] The Court must not "alter the text in order to satisfy the policy preferences of [a party]."[99] Instead, "these are battles that should be fought among the political branches and the industry" who "should not seek to amend the statute by appeal to the Judicial Branch."[100]

FLPMA intentionally and expressly distinguishes between Presidential and Secretarial powers and authorities and FLPMA's delineation of authority among Congress, the President, and the Secretary was the subject of careful deliberation and balancing of interests. Executive Branch delegation of duties was at the forefront when Congress codified FLPMA § 1714 because the section also prevents the Secretary from delegating withdrawal authority to any departmental personnel not appointed by the President and confirmed by the Senate.[101] Based on the plain language of the statute, FLPMA's express terms apply only to the Secretary of the Interior.

FLPMA defines "Secretary" to mean the Secretary of the Interior,[102] and not the President of the United States. Plaintiffs rely on a single, aberrant sentence in a House committee report to support their contention that FLPMA limits the President's authority to modify national monument reservations.[103] At the time that Congress was debating the competing legislation that

---

[97] *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 457 (2002).

[98] *Id.* at 462 (citations omitted).

[99] *Id.*

[100] *Id.*

[101] 43 U.S.C. § 1714(a).

[102] 43 U.S.C. § 1702(g).

[103] *See, e.g.*, TWS Brief, p. 34.

would become FLPMA, House Report No. 94-1163 accompanied House bill H.R. 13777, which

is the House bill amending the Senate bill that ultimately was enacted as FLPMA. In the section-

by-section analysis of the House legislation, the House committee wrote that the section

pertaining to land withdrawals "would also specifically reserve to the Congress the authority to

modify and revoke withdrawals for national monuments created under the Antiquities Act."[104]

The language from the committee report, however, is not consistent with how H.R. 13777 or

FLPMA was written. The plain language of both H.R. 13777 and FLPMA, as codified, limited

the authority of the Secretary, not the President. This plain language is supported by agency

comments on the House bill section that was ultimately enacted as FLPMA § 1714. In these

agency comments, the Undersecretary of Agriculture acknowledged that the section "applies to

actions by the Secretary of the Interior . . . ."[105] and the Department of the Interior Assistant

Secretary commented that the withdrawal procedures "do not reflect adequate consideration and

understanding of preexisting law in this area."[106]

The UDB Plaintiffs recognize the distinction between the President and the Secretary,

citing a draft of FLPMA that would have amended the Antiquities Act by deleting the President

and substituting the Secretary as the official empowered to declare national monuments, but

which was ultimately rejected in favor of what became 43 U.S.C. § 1714.[107] Nevertheless, the

TWS Plaintiffs persist in speculating that Congress's use of "Secretary" in FLPMA rather than

"President" was simply a drafting error.[108] Were this Court to accept the TWS Plaintiffs' theory

and substitute "President" for "Secretary," the Court would effectively amend the Antiquity

---

[104] H.R. Rep. No. 94-1163 at 9 (1976).

[105] H.R. Rep. No. 94-1163 at 39.

[106] *Id.* at 47.

[107] UDB Brief, p. 29.

[108] TWS Brief, p. 34 n.17.

Act's use of "President" by implication. FLPMA § 701(f) expressly states that "Nothing in the Act shall be deemed to repeal any existing law by implication."[109]

### C.    Conflicting Advisory Legal Opinions Do Not Diminish the President's Authority to Modify National Monument Reservations.

The Court should not ignore over 100 years of monument modification in favor of advisory legal opinions that inconsistently analyze the President's authority to modify national monument proclamations.[110] The power of the Executive Branch is vested in the President, who is responsible for the Executive Branch's actions.[111] Plaintiffs argue that the Court should disregard the decisions of fifteen Presidents—from Teddy Roosevelt to Donald Trump—who have modified national monuments, seven of whom diminished existing monument boundaries in favor of contradictory post-1906 opinions of Executive Branch lawyers.[112]

The U.S. Attorney General Harry Daugherty's opinion that once a monument is fixed it can be restored to the public domain only by Congress neither addresses, nor precludes, the President's authority to modify national monuments under the Antiquities Act.[113] The opinion is referenced in a letter to the House and Senate committees from Secretary of the Interior Hubert

---

[109] Pub. L. 94-579, 90 Stat. 2786; *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J. concurring).

[110] The UDB Plaintiffs argue that Solicitors at the Department of the Interior have opined that Presidents lack authority to modify national monuments. UDB Brief, p. 37. The Grand Staircase-Escalante Partners Plaintiffs more thoroughly analyze the Solicitors' opinions and conclude that those opinions have vacillated on the President's authority. GSEP Brief, p. 36-37. The futility of conflicting Solicitors' opinions is reiterated in the brief of the proposed Law Professors amici curiae stating that "internal executive branch opinions that contradict one another [] do not warrant much attention, let alone deference." Amicus Curiae Brief of Law Professors Supporting Plaintiffs' Opposition to Motion to Dismiss ("Law Professors' Brief"), p. 7, 8, n.2, ECF Dkt. 75-1 in Case No. 1:17-cv-2590 (Nov. 16, 2018).

[111] U.S. Const. Art. II, § 1.

[112] 2017 CRS Report, Table 3; *see* TWS Brief, p. 28 (arguing the courts need not consider post-1906 reductions of national monuments by Presidents).

[113] 32 Op. Atty. Gen. 488 (1922).

Work proposing legislation to provide withdrawal restoration authority to the President.[114] The

Attorney General's opinion did not mention the Antiquities Act or national monuments and

instead addressed whether the Department of Commerce had the power under a 1913 statute to

dispose of abandoned lighthouse sites reserved from the public domain initially in 1847 by

Executive Order, nearly sixty years before enactment of the Antiquities Act.[115] Citing statutes

that withheld power from the President to dispose of reserved lands, the Attorney General

concluded that the Secretary of Commerce did not have authority to restore a monument to the

public domain.[116] The Attorney General, however, did not cite the Antiquities Act that contains

no such prohibition. In contrast to the conclusions reached in the opinion, both before and after

the Attorney General's opinion, Presidents Wilson and Coolidge diminished Mount Olympus

National Monument for the second and third times by a total of 49.2%.[117]

In contrast to Mr. Daugherty's 1925 opinion, in 1938, Attorney General Homer

Cummings recognized the President's authority to modify national monument reservations under

the Antiquities Act's "smallest area" requirement.[118] Consistent with the conclusions expressed

in the 1938 analysis, less than a month before the opinion President Franklin D. Roosevelt

reduced White Sands National Monument to accommodate a highway right-of-way.[119] This 1938

opinion is more consistent with the actions of various Presidents pursuant to the Antiquities Act,

which includes numerous modifications to, and at times diminishment of, national monument

reservations. These conflicting advisory opinions, therefore, do not give substantial weight to

---

[114] H.R. Rep. No. 68-1119, at 2 (1925).

[115] 32 Op. Atty. Gen. at 490.

[116] *Id.*

[117] 2017 CRS Report, Table 3, 4 (Ex. 1).

[118] 39 Op. Atty. Gen. 185, 188 (1938).

[119] Proclamation No. 2295, 53 Stat. 2465 (Aug. 29, 1938).

any conclusion that the President lacks authority to modify national monument reservations

under the Antiquities Act.

## II.     The Modifying Proclamations Balance Competing Interests in the Public Lands.[120]

In addition to being legally sound and within the authority granted by the Antiquities Act,

the Modifying Proclamations considered and properly balance competing interests regarding the

designation and management of public lands within Utah. The Modifying Proclamations also

meaningfully considered Utah's input for managing the monument lands.  In contrast, the

proclamations initially establishing GSENM and BENM disregarded the input of Utah's elected

representatives and deprived Utah of providing meaningful input about the management and

development of monument lands. Additionally, overly-broad landscape monuments such as

GSENM and BENM limit Utah's rural communities from determining their own economic

condition. Such monuments remove large and vital industry sectors from local economies and

inhibit the exercise of pre-existing rights to continue land uses. Contrary to the arguments of the

*amici* states, national monuments are unnecessary to protect research, recreation, and traditional

land uses; instead, they constrain it. For these reasons, as more fully set forth below, the

Modifying Proclamations are proper and the Federal Defendants' motion to dismiss should be

granted.

### 1.     The Proclamations Creating GSENM And BENM Disregarded The Input Of Utah's Elected Representatives.

Like other states, Utah has the right to give meaningful input about, and has vested

interests in, the management of federal land within its borders. An implicit theme throughout the

---

[120] This section addresses certain issues of particular significance to Intervenors, and specifically Utah, that have not been addressed in the filed briefs, or on which Intervenors have a unique perspective. More specifically, Intervenors will address the *amicus* briefs filed by eleven states ("*amici* states").

*amici* states' briefing is their desire to control and provide input regarding management of the federal land located within their respective states. The *amici* states identify their interest in promoting recreation and research on public lands and their aspirations to develop economic growth based upon tourism and recreation industries.[121] *Amici* states, like Utah, have a right and a duty to provide input about the way public land within their borders is used and how resources on those lands are developed. Unfortunately, the original proclamations establishing GSENM and BENM disregarded Utah's interests in favor of the requests of special interest groups. Diminishment of the monument boundaries[122] is a step toward addressing the abuses of the Antiquities Act in the original monument creations and allows for uses of the monument lands in a manner consistent with Utah's land use management and planning objectives.

The states' rights to provide input and direct federal management of land within their borders have a long history and have been codified in several statutes. FLPMA governs management of lands under the jurisdiction of the BLM.[123] The compromise struck under FLPMA envisioned the federal government accommodating the land management policies and priorities of the states and local governments to the extent possible. Under FLPMA, the BLM is

---

[121] *See Amicus Curiae* Brief of the States of Washington, California, Hawaii, Maine, Maryland, New Mexico, New York, Oregon, Rhode Island, and Vermont, and the Commonwealth of Massachusetts in Support of Plaintiffs' Opposition to Federal Defendants' Motion to Dismiss ("Several States Amicus Brief"), ECF Dkt. 89 in Case 1:17-cv-02590-TSC (Nov. 19, 2018); ECF Dkt. 74 in Case 1:17-cv-02587 (Nov. 19, 2018), p. 3, 19-25.

[122] *See* GSENM Modifying Proclamation; BENM Modifying Proclamation.

[123] The BLM has management authority for the vast majority of the land within the original boundaries of both GSENM and BENM. A small portion of the land within the original boundaries of BENM was managed by the United States Forest Service ("USFS"). The USFS is required to allow public participation in resource management plans, *see* 16 U.S.C. § 1604(d)(1) (West 2019), and must comply with coordination requirements under the National Environmental Policy Act ("NEPA"). *See* 40 C.F.R. § 1506.2(d) (requiring analyses to "discuss any inconsistency of a proposed action with any approved State or local plan and laws" and, where an inconsistency exists, the analysis "should describe the extent to which the agency would reconcile its proposed action with the plan or law").

required, to the extent lawful, to "coordinate the land use inventory, planning, and management activities" for BLM lands with the plans and programs of the states and local governments.[124] The BLM is obligated to "provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands."[125] Utah and the local counties, however, were not given this opportunity in the original designation of GSENM and were treated like any other member of the public with respect to the designation of BENM.[126] Instead of giving any weight to the statements of Utah's elected representatives, or the representatives of the political subdivisions in which the monuments are located, priority was given to special interest groups and persons other than state and local representatives.

It was not until GSENM and BENM were modified that Utah's voice, and the voice of its local representatives, were heard and meaningfully considered by the Federal Defendants in management of the monument lands. As recognized by the *amici* states, the policies and requests of the states housing national monuments should be respected and given significant weight, just as Utah's elected representatives' input regarding modifications to GSENM and BENM were in this case.

---

[124] 43 U.S.C. § 1712(c)(9) (West 2019).

[125] 43 U.S.C. § 1712(c)(9) (West 2019).

[126] Local jurisdictions' input regarding the management of GSENM was largely disregarded. Louise Liston, *Sustaining Traditional Community Values*, 21 J. LAND RESOURCES & ENVTL. L. 585 (2001). Liston notes that the representatives from Garfield County spent hundreds of hours providing input for the GSENM management plan, only to have "very little of that time and effort reflected in the final plan." *Id.* at 586. The county spent thousands of dollars revising its land use plan to address the national monument. *Id.* at 587. In many cases, the monument management plan conflicted with, seriously impacted, and rendered useless the county management plan. *Id.*

2.    **The Declaration Of Landscape Monuments Such As GSENM And BENM Limit The Ability Of States And Local Communities To Determine Their Own Economic Condition.**

A.    **Landscape National Monuments Remove Large, And Vital, Industry Sectors From Local And Rural Communities.**

The *amici* states identify the economic benefits they claim to have received from the existence of national monuments within their borders and suggest that the original GSENM and BENM monuments are likewise beneficial to Utah and its rural communities. Contrary to these arguments, however, national monument declarations have the potential to create adverse economic conditions in the surrounding communities and the GSENM did create such conditions in Kane and Garfield Counties.

A recent study from Utah State University and Southern Utah University attempted to reconcile the conflicting assertions regarding whether national monument land restrictions harm or help local economies.[127] The researchers concluded that the GSENM designation "reduced the decade-to-decade growth in total nonfarm payrolls by an estimated $146 million, and had no statistically significant effect on per capita income or tax receipts." In other words, Kane County and Garfield County experienced less growth than was expected given the counties' characteristics. The analysis noted that "[t]he importance of economic development to those concerned about rural counties cannot be overstated" and concluded that their findings did not support an assertion "that increased land protection leads to increased economic activity." The report concluded:

> Removing the option of extractive industry development from a county's economic portfolio can only allow that county to make a second-best decision as the county now has a restricted choice set. If preserving land from extractive

---

[127] Yonk, Ryan M. and Simmons, Randy T., *Politics, Economics, and Federal Land Designation: Assessment the Economic Impact of Land Protection – Grand Staircase-Escalante National Monument*, 14 MOUNTAIN PLAINS J. OF BUS. AND ECONOMICS 1 (2013).

development were the best option for a county, we would expect to see more counties favoring this approach absent federal designation.

Likewise, a study published in 2016 confirms that formal designations of wilderness[128] "accompany worse economic outcomes, particularly when considering median household income, total tax receipts, and total payroll payments."[129] The researchers concluded that "claims that wilderness designations promote economic growth are unfounded" and "[r]ecognizing that designations impose costs on local economies should inform a consensus-building approach to new wilderness area designations."[130]

The report also notes that "[w]ilderness shuts down access to resources traditionally used for extractive economic activities" and that "[t]hese losses may be somewhat offset by an increase in service sector activities, but the service sector jobs generally pay less than the extractive jobs that were lost."[131] The analysis discusses the interplay between wilderness and economics, concluding:

> Our data do not support the argument often stated by the environmental community that wilderness is good for a local economy. In fact, the evidence suggests that wilderness harms local economies, if anything.
>
> If the test for whether or not to designate public lands as wilderness is an economic one, wilderness fails. Our results show that wilderness is not justified on economic grounds. . . .[132]

---

[128] Although the 2016 study applied specifically to wilderness, as discussed below, the land restrictions imposed in GSENM and that could be imposed in BENM approach wilderness restrictions.

[129] Yonk, Ryan M. *et al.*, *Boon or Bust: Wilderness Designation and Local Economies*, THE JOURNAL OF PRIVATE ENTERPRISE 31(3), 2016, 1-19, available at http://www.usu.edu/ipe/wp-content/uploads/ipePublications/2016_Journal_of_Private_Enterprise_vol_31_no_3_Fall_parte1.pdf (accessed Dec. 12, 2018).

[130] *Id.* at 1.

[131] *Id.* at 7.

[132] *Id.* at 16-17.

Apart from the economic statistics, however, is the larger concern that it is improper to restrict the economic opportunities available to isolated rural communities by removing from their economic base the vast majority of extractive- and natural resource- based economic activities. This loss of traditional industry—and the jobs that went with it—has led to a precipitous population decline that continues to threaten the very survival of local communities, forcing Garfield to declare a state of emergency in 2015 when student enrollment dropped so low that the local high school was unable to provide advanced placement classes or even field a football team.[133] Development is not necessarily inconsistent with achieving environmental and aesthetic objectives, as existing environmental laws and regulations guard against destruction of environmental and aesthetic resources. These counties and local families such as the Farm Bureaus' members should be allowed to choose for themselves the lawful means by which they make a living. Allowing a single person the right to remove options from local economies in order to serve the interests of unelected special interest groups is an abusive use of the Antiquities Act.[134]

### B.     Pre-Existing Rights To Continue Land Uses Are Inhibited By National Monument Restrictions.

Although the Antiquities Act does not give the President any authority whatsoever to nullify, cancel, or otherwise appropriate valid existing rights, monument proclamations

---

[133] Katie McKeller, *Garfield County Issues Unique State of Emergency*, DESERET NEWS (Jun. 22, 2015), available at https://www.deseretnews.com/article/865631229/Garfield-County-issues-unique-state-of-emergency.html (accessed Feb. 14, 2019).

[134] Even assuming the correctness of the *amici* states' assertions that national monuments create economic growth, *amici* have provided no support for the contention that a modified monument does not provide the same economic benefit as the monuments in their original form. The natural beauty and recreational opportunities still exist and no studies or other analyses were cited demonstrating that a decline in the size of the monument corresponded to a decline in economic benefits, if any, from the monument.

significantly affect valid existing rights. [135] As explained by Professor James R. Rasband,

"Making the withdrawal of federal land 'subject to valid existing rights' offers less protection to

the holder of a right in federal land than might initially appear. The reason is that the existing

rights are not absolute but subject to a variety of restrictions."[136] Protection of valid existing

rights has been interpreted to mean only that the restrictions cannot "'make economic

development completely unprofitable': essentially, as long as it does not constitute a Fifth

Amendment taking."[137] Accordingly, "[i]n the end, therefore, the 'valid existing rights' language

probably does more to protect the federal treasury than rights holders. The language ensures that

the withdrawal itself will not be construed as a taking, but allows a variety of restrictions to

avoid degradation or impairment of the lands within the Monument."[138] "Understood in this

light, the rights holder might be better off, in many cases, if the withdrawal purported to

eliminate her valid existing rights because just compensation would be available."[139]

Modification of GSENM and BENM has restored the ability to exercise rights pre-dating

the creation of the monuments. While bare legal title before and after the national monument

proclamation remains in the United States, the monument declarations took from Utah and the

---

[135] *See e.g.* Wrabley, Raymond B., *Managing the Monument: Cows and Conservation in Grandstaircase-Escalante* [sic] *National Monument*, 29 J. Land Resources & Envtl. L. 253 (2009) (detailing disputes over grazing management in the Grand Staircase-Escalante National Monument). *See also* Gil Miller & Kevin Heaton, *Livestock Grazing on the Grand Staircase Escalante National Monument: Its Importance to the Local Economy* 2 (Sep. 2015), available at https://digitalcommons.usu.edu/cgi/viewcontent.cgi?article=1765&context=extension_curall (accessed Feb. 14, 2019) (calculating that restrictions on pre-existing grazing rights under the GSENM "cost the Garfield-Kane Counties Economic Region 81 jobs, $863,049 in lost labor income, $2,216,628 in lost total value added and $9,101,801 in lost output.").

[136] Rasband, James R., *Utah's Grand Staircase: The Right Path to Wilderness Preservation?*, 70 U. COLO. L. REV. 483, 518-521 (1999).

[137] *Id.* at 519-20.

[138] *Id.* at 520-21.

[139] *Id.* at n.172.

public various property interests and incidents of ownership, including multiple use of the land.[140] Uses and property interests available to Utah before the creation of the monuments, such as the establishment of new roads and rights of way, timber harvest, mineral location, entry, and patent, and mineral leasing, were either removed or significantly restricted by the proclamation of GSENM and BENM. Modifications to the boundaries of GSENM and BENM allow holders of preexisting rights to more fully use and enjoy their property interests.

### 3. National Monuments Are Unnecessary To Permit—And Instead Constrain—Research, Recreation, And Traditional Land Uses.

National monument designations do not create research, recreation, or traditional uses on monument land and instead serve to restrict such uses. First, for research opportunities, monument designations for areas the size of GSENM and BENM lead to the destruction of archaeological resources because the federal government is incapable of protecting archaeological resources in such areas, especially with a large influx of visitors. In contrast, the diminished monuments, which have smaller areas where existing protections are capable of being enforced, provide more meaningful protections than landscape monuments. Second, landscape level monuments inhibit recreational opportunities because land within the monument are managed as *de facto* wilderness. This results in the curtailment of recreational opportunities other than primitive recreation. Third, restrictive management such as that used in GSENM may inhibit traditional Native American uses of the land by limiting access, unnecessarily restricting group size, and otherwise restricting activities related to traditional uses.

---

[140] *See e.g.* GSENM Proclamation, 61 Fed. Reg. at 50225 (withdrawing and appropriating federal land and interests "from entry, location, selection, sale, leasing, or other disposition under the public land laws, other than by exchange that furthers the protective purposes of the monument"); BENM Proclamation, 82 Fed. Reg. at 1143 (providing that "[a]ll federal lands and interests in lands within the boundaries of the monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws . . .").

A.     **Monument Designations Inhibit Research Opportunities By Leading To The Destruction Of Archaeological Resources.**

i.     **The Federal Government Is Incapable Of Protecting Archaeological Resources In GSENM And BENM As Originally Proclaimed.**

National monuments of the size of GSENM and BENM do not provide additional, meaningful protection of archaeological resources. To the contrary, the creation of national monuments accelerates damage to and destruction of such resources and thereby prevents further meaningful research. Damage to archaeological resources is especially acute in landscape level monuments such as GSENM and BENM, where enforcing resource protection laws across the entire monument is nearly impossible.

Archaeological resources are protected by numerous laws that are intended to prevent, and in some instances criminalize, the vandalism, theft, and destruction of archaeological resources. Among other laws are the Antiquities Act,[141] the Utah Antiquities Act,[142] the National Historic Preservation Act,[143] the Archaeological Resources Protection Act,[144] and the Native American Graves Protection and Repatriation Act.[145] The problem, however, is that existing laws and regulations are not adequately enforced and are in many instances incapable of being enforced given the topography and other practical limitations of policing remote and undeveloped areas.

Inviting innumerable visitors to areas with significant and fragile archaeological resources, without a corresponding increase in enforcement, is irresponsible and inimical to the

---

[141] 54 U.S.C. §§ 320101 *et seq.* (West 2019).

[142] Utah Code Ann. §§ 9-8-301 *et seq.* (West 2019).

[143] 54 U.S.C. §§ 300101 *et seq.* (West 2019).

[144] 16 U.S.C. §§ 470aa *et seq.* (West 2019).

[145] 25 U.S.C. § 3001, *et seq.* (West 2019).

interests ostensibly driving the creation of national monuments. As claimed by various *amici* in these proceedings, the existence of national monuments will increase visitation and recreation on public lands. Archaeological studies worldwide reflect the fact that greater access to and visitation of antiquity sites leads to greater, not less, desecration. This phenomenon has been found to occur on existing national monuments in the Southwest. A 2009 study of factors contributing to antiquity site desecration and defacement at Canyon de Chelly National Monument in Arizona[146] found that the greatest contributors were increased access together with its corollary, increased visitation. A paper that considered the impacts of the creation of the GSENM on archeological sites within the monument[147] confirmed the negative effects of increased visitation, concluding that "[i]ncreased visitation significantly accelerates impacts to archeological sites."

The difficulties in enforcing protections for antiquities are greatly exacerbated by the sheer size of the monuments and the number of antiquity sites. A 1987 GAO Report[148] analyzed the problems associated with protecting archeological sites in the Four Corners area. It recognized that, given the vast area and number of sites, it is virtually impossible to provide any type of physical protection.[149] It also identified the several laws already in place that make

---

[146] *See e.g.* Lavris, J.L., *A Perfect Pothunting Day*, Reference No. 059019146 (Feb. 2007) (noting that quantifying damage to archaeological sites in Canyon de Chelly "reveals that visitation is the most prolific, followed by vandalism then pothunting").

[147] Tipps, B., *Archeology in the Grand Staircase Escalante National Monument: Research Prospects and Management Issues*, Learning from the Land Science Symposium (Nov. 4-5, 1997) ("Tipps 1997"). Tipps notes that creation of GSENM was "a two-edged sword" because "[s]ites will be protected from most development projects, but will face new threats as a result of heightened public awareness of the area and a huge concomitant rise in visitation."

[148] GAO, *Problems of Protecting and Preserving Federal Archeological Resources*, GAO/RCED-88-3 (Dec. 1987), available at https://www.gao.gov/assets/150/145926.pdf (accessed Dec. 10, 2018).

[149] *Id.* at 3-4, 26.

looting and desecration a crime[150] and concluded that the issue was not a lack of protection, but a

lack of staffing, funding, and enforcement of existing laws.[151] Although improved staffing and

larger budgets may improve enforcement, it will remain impossible to truly protect the thousands

of sites if access or visitation is dramatically increased. Destruction of resources through

increased visitation precipitated by naming these areas as national monuments will impede, not

facilitate, research on these public lands.[152]

Utah's experience bears out that the creation of national monuments, without an increase

in enforcement of existing protections, results in damage to and destruction of archaeological

resources. As discussed by Utah's Governor, Gary R. Herbert, in testimony before the U.S.

Senate Committee on Energy and Natural Resources,

> In 2015, the Grand Staircase-Escalante had 1,400 reported cases of vandalism.
> According to the BLM, there have been only 25 cases of vandalism reported in
> the Bears Ears region since 2011. That means the Grand Staircase, with its
> monument designation, currently experiences 140 times the rate of vandalism as
> does the Bears Ears region.
>
> Please do not misunderstand me: a single case of vandalism in this area is too
> much. But the point remains, if we wish to protect and preserve this area, drawing
> lines on a map that will encourage increased visitation without a corresponding
> increase in law enforcement and land management resources is not a solution to
> vandalism and desecration problems. Indeed, it will like[ly] worsen them.[153]

Accordingly, the action that will most certainly put these cultural sites at greater risk,

sites which have been preserved because of their remote location and lack of visitors, is to extend

---

[150] *Id.* at 2, 12-15.

[151] *See id.* at 37.

[152] *See* Tipps 1997 ("Regardless of intent, the damage from increasing visitation was often
substantial, always cumulative, and frequently affected the integrity of the site *and its future
research potential*.") (emphasis added).

[153] Herbert, Gary R., Testimony Before the U.S. Senate Committee on Energy and Natural
Resources, Oversight Hearing on Potential Impacts of Large-Scale Monument Designations (Jul.
27, 2016), available at
https://www.energy.senate.gov/public/index.cfm/files/serve?File_id=A8D9F89D-1181-4A74-
B3C5-927850848E33 (accessed Dec. 10, 2018).

an invitation to unsupervised visitors to an un-policed area where enforcement of existing land use protections are sorely lacking. This approach is exactly what occurred with the original GSENM and BENM monuments. Contrary to the situation presented with GSENM and BENM, a diminished monument that is capable of being physically protected and vigorously managed provides more protection to sensitive archaeological resources than a large landscape monument that is incapable of being managed in a way as to handle the increased visitation that accompanies a national monument designation. Accordingly, the best means by which to protect the *amici* states' interest in continuing research on federal land is to diminish GSENM and BENM and other monuments that cannot be effectively policed.[154]

### ii.    The Modified Monuments Facilitate Enforcement Of Existing Laws Protecting Archaeological Resources.

The BLM and USFS do not have the necessary resources to enforce existing protections of archaeological resources, meaning that increased visitation to all the monument lands will result in damage and destruction to archaeological resources. The BLM lacked sufficient resources to manage the Bears Ears area before it became a monument; and the monument, as originally designated, would do nothing to encourage use of the available resources for resource protection. The BLM's resources are limited such that as of 2016, only 49% of designated national monuments and national conservation areas were "inventoried for the resources, objects,

---

[154] It should be noted that, based upon the face of the *amici* states' briefing, most of the research identified by the *amici* states was completed before the land on which the research was conducted became a national monument. *See e.g.* Several States Amicus Brief, p. 22-23. Dr. Lipe's curriculum vitae discloses that his research relating to archaeology in the southwestern United States was published or submitted in or before 2016, meaning that all, or substantially all, of the research was completed before BENM was declared. *See* Curriculum Vitae, William D. Lipe (Mar., 2016), available at https://anthro.wsu.edu/documents/2016/04/cv-lipe-2.pdf/ (accessed Dec. 12, 2018). Similarly, as shown by the proclamation establishing the Northeast Canyons and Seamounts Marine National Monument, the "intense scientific interest" existed long before the monument was declared on September 15, 2016. *See* Several States Amicus Brief, p. 23.

and values for which they were designated."[155] The BLM's and Forest Service's performance in the Bears Ears region with respect to identifying all archaeological sites is even more limited, with around 90% of the land remaining uninventoried for archaeological resources.

Removing land from GSENM and BENM and directing visitors to smaller areas capable of physical protection and adequate enforcement will help protect the archaeological resources by reducing visitation to sites that are difficult or impossible to police. To reduce harm arising from visitation attendant to the monument designation, it may prove necessary to develop "appropriate sites" and, after studying those sites, promote those sites for visitation while reducing access to the remaining sites.[156] "[V]isitors who have enough opportunities to visit interesting archaeological sites (that are developed and can sustain high levels of visitation) are less likely to visit more remote, undeveloped sites that are not able to withstand high levels of use without incurring significant damage."[157] Accordingly, a smaller monument with appropriately developed sites and facilities will cause visitors to avoid visiting (and damaging) other undeveloped sites.[158]

### B. Monument Designations Limit, Rather Than Facilitate, Recreational Opportunities.

Landscape monuments are often accompanied by management directives in the proclamation that are interpreted in such a way as to limit the recreational uses that may be made of monument lands. Utah's experience with the management of GSENM bears out the negative

---

[155] Bureau of Land Management, *Budget Justifications and Performance Information, Fiscal Year 2018*, III-5, available at https://www.doi.gov/sites/doi/files/uploads/fy2018_blm_budget_justification.pdf (accessed Dec. 12, 2018).

[156] Tipps 1997.

[157] *Id.*

[158] *Id.* (important factors include "[p]roviding toilet facilities, places to rest along the path to the site, and good vantage points for photographs").

impact monument designation has on recreation. Instead of being managed to enhance all forms of recreation, GSENM was managed to discourage tourism and all non-primitive forms of recreation, thereby depriving local communities of full range of economic opportunities that the many *amici* claim are available from national monument designations. In particular, management of GSENM did not serve to increase or promote visitation and recreation, but instead unreasonably constrained the monument's ability to accommodate visitors and limited group activities.[159]

First, as expressed in the GSENM's management plan, the monument was managed for two purposes: (1) to ensure the Monument "remain[s] protected in its primitive, frontier state" and (2) to "provide opportunities for the study of scientific and historic resources."[160] The GSENM management plan adopted policies to actively dissuade visitors from entering into the monument's interior and to discourage visitor use.[161] To accomplish these purposes, the GSENM management plan unreasonably limited, and deterred visitors from engaging in, many types of recreational activities. All overnight camping required a permit and only "three existing small developed campgrounds" and "designated primitive camping areas" existed for the six percent of

---

[159] The overly restrictive management of the Monument is illustrated by the fact that no ACECs were designated in the monument based upon the conclusion that the protection of resources in proposed ACECs "will be substantially equivalent under either Monument authority or ACEC designation." Bureau of Land Management, *Grand Staircase-Escalante National Monument Management Plan*, ACEC-1 (1999) ("GSENM Management Plan"), available at https://eplanning.blm.gov/epl-front-office/projects/lup/65870/79803/92581/GSENM_MP.pdf (accessed Dec. 12, 2018).

[160] GSENM Management Plan, p. *iv*. Bureau of Land Management, *Livestock Grazing Plan Amendment Environmental Impact Statement: Analysis of the Management Situation*, 80 (Jul. 2015) ("2015 AMS"), available at https://eplanning.blm.gov/epl-front-office/projects/lup/69026/89782/107364/201507_GSENM_AMS_Final_508.pdf (accessed Dec. 12, 2018).

[161] GSENM Management Plan, *iv-vii* (providing for "minor facilities" that are "located in small areas on the periphery of the Monument" and designating only four percent of the monument as "the focal point for visitation").

the monument that was managed to receive the most visitors.[162] Despite purportedly receiving several hundred thousand visitors each year, the monument management plan allowed for only "up to 10" primitive camping sites in the Frontcountry zone and "up to 25" designated primitive camping sites in the Passage zone while prohibiting dispersed primitive camping in these areas.[163] These limitations precluded any significant recreational activities within the monument or economic growth outside the monument to accommodate such activities.

Second, the BLM adopted policies that reduced the monument's ability to accommodate visitors. Most parking areas within the monument were intended to accommodate only ten to twenty cars.[164] The monument management plan, in addition to providing insufficient parking facilities, significantly restricted access to many parts of the Monument by closing hundreds of roads within the monument and leaving very few roads open for motorized or mechanized use. ATV use was restricted to only about 60% of the routes that remained open.[165] Similarly, by failing to provide adequate facilities to accommodate visitors, the BLM prevented numerous visitors from enjoying the monument. With respect to recreational facilities, only "a relatively small number of modest pullouts, toilets, parking areas, trailheads, and picnic sites" were provided.[166] The management plan limited trail construction to approximately six percent of the monument and allowed trails to be developed and maintained in the remainder of the monument only "where necessary to protect Monument resources."[167]

---

[162] *See* GSENM Management Plan, *v*.

[163] GSENM Management Plan, FAC-10, FAC-15; CAMP-1.

[164] *See* GSENM Management Plan, FAC-8, FAC-12.

[165] GSENM Management Plan, TRAN-5.

[166] GSENM Management Plan, WAT-1.

[167] *See* GSENM Management Plan, SSA-12, TRAN-12.

Third, the management plan severely restricted the size of groups that could travel together within the monument and restricted special events. Group sizes in the Passage and Outback zones were generally limited to twenty-five people without a permit.[168] In the Primitive zone, groups generally could not exceed 12 pack animals and 12 people without a permit and group size could generally not exceed 25 people even with a permit.[169] Although outfitting and commercial operations were allowed, they were required to comply with the provisions regarding group size, along with all other management provisions.[170] Bicycles were limited to using designated routes, meaning that they were required to share roads with vehicles, ATVs, and street legal motorized vehicles.[171] These restrictions limited visitors' abilities to use GSENM for family gatherings, group activities, and economic pursuits.[172]

Based upon experience with GSENM, monument designation tends to increase visitation while restricting the types of activities available to visitors and failing to protect monument objects.  Despite the restrictions in visitor activities, however, as a practical matter landscape monuments are incapable of being managed in a way that properly accommodates visitation and protects the natural and archaeological resources within the monument.  As discussed above, although the GSENM management plan severely restricted recreational uses in GSENM, this restrictive management failed to protect the damage to archaeological resources flowed from the increased visitation associated with monument designation.  Instead, as discussed above,

---

[168] GSENM Management Plan, GROUP-2, GROUP-3.

[169] GSENM Management Plan, GROUP-4.

[170] GSENM Management Plan, OG-1.

[171] GSENM Management Plan, TRAN-3, TRAN-4.

[172] For example, the Monument management plan recognizes that activities within the Fiftymile Mountain SRMA include, among other things, hunting. GSENM Management Plan, SRMA-5. The management plan, however, states that "[v]isitors will not be encouraged to go to this area and commercial outfitting will be extremely limited." *Id.*

vandalism and desecration in GSENM vastly exceeded the amount of desecration occurring in

the area that was later designated as BENM.  The restrictive management instead exacerbated

problems associated with increased visitation by failing to provide appropriate facilities,

enforcement, and accommodations for visitors.  Accordingly, the unreasonable limitations on

recreational and economic opportunities not only harmed local communities, reduced

recreational opportunities, and diminished visitor experiences, but also failed to accomplish the

monument's purported objective of preserving monument objects.

> **C.    Monument Designations May Limit, Rather Than Protect, Native American Uses of Monument Lands and Resources.**

National monument protections and restrictions will not increase protection of Native

American practices or activities. A monument proclamation is not needed to recognize such

activities or allow them to continue, as such practices are already protected by statute and

executive order. In particular, the American Indian Religious Freedom Act[173] provides that it is

"the policy of the United States to protect and preserve for American Indians their inherent right

of freedom to believe, express, and exercise the traditional religions of the American Indian . . . ,

including but not limited to access to sites, use and possession of sacred objects, and the freedom

to worship through ceremonials and traditional rites." Similarly, Executive Order No. 13007[174]

provides that "[i]n managing Federal lands, each executive branch agency with statutory or

administrative responsibility for the management of Federal lands shall, to the extent practicable,

permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate

access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid

adversely affecting the physical integrity of such sacred sites."

---

[173] 42 U.S.C. § 1996.

[174] Exec. Order No. 13007, Indian Sacred Sites, 61 Fed. Reg. 26771, 26771 (May 24, 1996).

Unfortunately, national monument designations often result in limited access to the national monument land. The BENM proclamation prohibited the creation of "additional roads or trails designated for motorized vehicle use" unless they are for public safety purposes or for protecting monument objects.[175] In addition, motorized and mechanized vehicle use is not allowed, except on designated trails.[176] This may serve to limit Native Americans' ability to collect wood by limiting the areas in which they can use motorized or mechanized vehicles to transport any wood that may be cut. In addition, monument designation often results in the closure of roads, as occurred in GSENM, which will limit access to many areas in the monuments.

Large numbers of visitors to sacred areas used to perform ceremonies may detract from or interfere with the ability to conduct the ceremony or the sacred nature of the area. Similarly, requiring permits for or restricting the areas in which herb, material, and wood gathering are allowed can make it significantly more difficult, or impractical, to engage in such activities. For example, certain medicinal plants used by Native Americans may migrate and be found in areas several miles from where the plants were previously located. Limiting collection to certain areas may result in the unavailability of traditional herbs and plants for periods of time. Restrictions on areas in which wood may be gathered, permit requirements for gathering, or limitations on the amount of wood that is gathered may significantly impact the practical availability of these resources to the local Native American population.[177]

---

[175] BENM Proclamation, 82 Fed. Reg. at 1145.

[176] *Id.*

[177] Management restrictions like those addressed above, will inhibit the exercise of Native American religious and traditional uses of monument lands and resources. For example, GSENM's prior management plan required permits for group sizes over twenty five in ninety-six percent of the monument. For nearly two thirds of the monument, group sizes generally could not exceed twelve people, even with a permit. GSENM Management Plan, GROUP-2, GROUP-

## CONCLUSION

The Federal Defendants' motion to dismiss should be granted. The President acted within his authority when he issued the Modifying Proclamations. The diminishment of GSENM and BENM is a step toward rectifying the abuses of the Antiquities Act that occurred when each monument was created over the objection and without the input of Utah's elected representatives. Landscape monuments, such as GSENM and BENM, remove significant economic industries from rural communities and compromise existing rights to continue traditional uses on monument land. National monuments such as GSENM and BENM are not necessary to create or preserve research, recreation, or other activities on the monument land. For these reasons, the proclamations diminishing GSENM and BENM are appropriate and the Federal Defendants' motion to dismiss should be granted.

## REQUEST TO PARTICIPATE IN ORAL HEARING

Intervenors request the opportunity to participate in any oral hearing on the Federal Defendants' motion to dismiss.

DATED:          February 15, 2019.

---

3, GROUP-4. Fuel wood harvesting is only allowed in two very small areas, GSENM Management Plan, FP-1, Map 3, and collection of natural materials by Native Americans is allowed only pursuant to a BLM permit. GSENM Management Plan, COL-1.

Respectfully submitted,


/s/ Anthony L. Rampton
SEAN D. REYES (Utah Bar No. 7969)
Utah Attorney General
TYLER R. GREEN (982312)
Utah Solicitor General
ANTHONY L. RAMPTON (Utah Bar No. 3792)
KATHY A.F. DAVIS (Utah Bar No. 4022)
DAVID WOLF (Utah Bar No. 6688)
LANCE SORENSON (Utah Bar No. 10684)
Assistant Attorneys General
DAVID HALVERSON (992858)
Special Assistant Utah Attorney General
Utah Attorney General's Office
Utah State Capitol Complex
350 N. State Street, Suite 230
Salt Lake City, UT 84114-2320
seanreyes@agutah.gov
tylergreen@agutah.gov
arampton@agutah.gov
kathydavis@agutah.gov
dnwolf@agutah.gov
lancesorenson@agutah.gov
dhalverson@utah.gov
Telephone: (801) 538-9600

*Attorneys for Intervenor State of Utah*



s/ Zhonette Brown
Zhonette Brown, D.C. Bar No. 463407
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
zhonette@mountainstateslegal.com

*Attorney for Intervenors Garfield County, Utah and Kane County, Utah*

/s/ William G. Myers III
William G. Myers III (D.C Bar No. 408573)
HOLLAND & HART LLP
P.O. Box 2527
Boise, Idaho 83701-2527
wmyers@hollandhard.com
Telephone: (208) 342-5000

Victoria A. Marquis (Montana Bar No. 13226)
*(admitted pro hac vice)*
HOLLAND & HART LLP
P.O. Box 639
Billings, Montana 59103
vamarquis@hollandhart.com
Telephone: (406) 252-2166

*Attorneys for Intervenors American Farm Bureau Federal and Utah Farm Bureau Federation*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 15, 2019, the undersigned electronically transmitted the

**CONSOLIDATED OPENING BRIEF OF INTERVENORS STATE OF UTAH,**

**GARFIELD COUNTY, KANE COUNTY, AMERICAN FARM BUREAU FEDERATION,**

**AND UTAH FARM BUREAU FEDERATION SUPPORTING FEDERAL**

**DEFENDANTS' MOTION TO DISMISS** to the Clerk's Office using the CM/ECF system

which will send notification of this filing to all counsel of record.

/s/ Anthony L. Rampton