# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE WILDERNESS SOCIETY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-02587 (TSC) |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| GRAND STAIRCASE ESCALANTE | ) | |
| PARTNERS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:17-cv-02591 (TSC) |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al.*, | ) | |
| | ) | **CONSOLIDATED CASES** |
| Defendants. | ) | |

**FEDERAL DEFENDANTS' RESPONSE TO BRIEFS OF AMICI CURIAE**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.    The Text, Purpose, and Legislative History of the Antiquities Act Authorize the President to Modify Monument Boundaries ..................................................... 2

        A.    Presidential modification, not revocation, authority is at issue ................... 3

        B.    The plain language of the Act is consistent with presidential modification authority ............................................................................... 4

        C.    A recently issued decision from the District of Alaska provides no relevant guidance ...................................................................................... 8

        D.    Defendants' interpretation does not create a nondelegation issue ................ 9

    II.    Congress' Acquiescence, Culminating in FLPMA, to the Longstanding and Extensive History of Presidential Modification of Monument Boundaries Corroborates the Act's Modification Authority ................................................... 10

        A.    Congress' refusal to reverse the President's past exercise of modification authority under the Act supports Defendants' interpretation ........................................................................................ 11

        B.    Congress' enactment of FLPMA provides affirmative evidence that Congress agreed with the President's interpretation of the Antiquities Act ................................................................................... 14

    III.    The Law Professors' "Ratification" Argument fails ............................................ 17

    IV.    Amici's Policy Arguments are Unavailing ......................................................... 19

CONCLUSION ............................................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**

*Al-Bihani v. Obama*,
   619 F.3d 1 (D.C. Cir. 2010) ......................................................................................... 11

*\*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Kahn*,
   618 F.2d 784 (D.C. Cir. 1979) ..................................................................... 12, 13, 16, 17

*Apex Hosiery Co. v. Leader*,
   310 U.S. 469 (1940) ..................................................................................................... 15

*Armstrong v. Townsend*,
   8 F. Supp. 953 (S.D. Ind. 1934) ..................................................................................... 3

*Bd. of Governors of Fed. Reserve Sys. v. First Lincolnwood Corp.*,
   439 U.S. 234 (1978) ..................................................................................................... 12

*Cameron v. United States*,
   252 U.S. 450 (1920) ....................................................................................................... 5

*Cochnower v. United States*,
   248 U.S. 405 (1919) ....................................................................................................... 3

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ..................................................................................................... 18

*Halstead v. United States*,
   55 Ct. Cl. 317 (Ct. Cl. 1920) .......................................................................................... 3

*Henson v. Santander Consumer USA Inc.*,
   137 S. Ct. 1718 (2017) ................................................................................................. 16

*League of Conservation Voters v. Trump (LCV)*,
   Case No. 3:17-CV-00101-SLG, 2019 WL 1431217 (D. Alaska Mar. 29, 2019) ..................... 9

*Little v. Barreme*,
   6 U.S. 170 (1804) ......................................................................................................... 18

*Marbury v. Madison*,
   1 Cranch 137 (1803) ..................................................................................................... 11

*McCulloch v. Maryland*,
   4 Wheat 316 (1819) ..................................................................................................... 11

*Miller v. Youakim*,
   440 U.S. 125 (1979) ................................................................................................. 12, 13

*Mt. States Leg. Found. v. Bush*,
   306 F.3d 1132 (D.C. Cir. 2002) .................................................................................. 5, 10

*\*Nat'l Ass'n of Broadcasters v. FCC (NAB)*,
   569 F.3d 416 (D.C. Cir. 2009) .................................................................................. 15, 17

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)..................................................................... 11

*Russello v. United States*,
    464 U.S. 16, 23 (1983)…………………………………………………...15

*Ryan v. United States*,
    260 U.S. 90 (1922)........................................................................ 3

*Tubman v. Berwager*,
    57 A.2d 822 (Md. 1948) ............................................................... 3

*Tulare Cty. v. Bush*,
    306 F.3d 1138 (D.C. Cir. 2002)................................................... 5

*United States v. California*,
    436 U.S. 32 (1978)........................................................................ 5

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996)..................................................................... 22

*Washington v. FEC*,
    904 F.3d 1014 (D.C. Cir. 2018)................................................... 13

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)..................................................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................ 11, 18

*Zemel v. Rusk*,
    381 U.S. 1 (1965)......................................................................... 15

**Statutes**

42 U.S.C. § 4332(C) ........................................................................ 21

43 U.S.C. § 1341(a) ......................................................................... 9

43 U.S.C. § 1702(j) .......................................................................... 16

43 U.S.C. § 1714(a) ......................................................................... 17

43 U.S.C. § 1714(j).................................................................... 15, 16

43 U.S.C. § 1782(c) ......................................................................... 21

54 U.S.C. § 300308 .......................................................................... 21

54 U.S.C. § 300320 .......................................................................... 21

54 U.S.C. § 306108 .......................................................................... 21

54 U.S.C. § 320301(b) ......................................................... 2, 6, 8, 10, 20

Pub. L. No. 105-335 § 3, 112 Stat. 3139 (1998) ........................................................ 18

Pub. L. No. 105-335, § 7, 112 Stat. 3139 (1998) ....................................................... 18

**Regulations**

7 C.F.R. § 228.8(g) ................................................................................................... 21

36 C.F.R. § 800.4(b) ................................................................................................. 21

43 C.F.R. § 3809.11 .................................................................................................. 21

43 C.F.R. § 3809.415 ................................................................................................ 21

43 C.F.R. § 3809.420 ................................................................................................ 21

**Other Authorities**

S. Rep. Nos. 105-574 (1998) .................................................................................... 18

*The Monumental Legacy of the Antiquities Act of 1906*,
37 Ga. L. Rev. 473 (2003) ................................................................................... 5

Nat'l Park Serv., Land Resources Div., *2018 National Park Service Acreage Report*,
https://www.nps.gov/subjects/lwcf/upload/NPS-Acreage-12-31-2018.pdf ............... 4

Nat'l Park Serv., *Archeology Program, Monuments List ("NPS Monuments List")*,
https://www.nps.gov/archeology/sites/antiquities/monumentslist.htm ...................... 4

**INTRODUCTION**

At issue in this case is whether the President, in modifying the Grand Staircase-Escalante National Monument ("Monument") to reflect what he determined to be "the smallest area compatible" with the proper care and management of the Monument objects, properly invoked his authority under the Antiquities Act of 1906.  *See* Proc. 9682, 82 Fed. Reg. 58,089 (Dec. 4, 2017).[1]  Federal Defendants have moved to dismiss the claims of the two sets of plaintiffs ("Plaintiffs") in this case because they lack standing and their claims are not ripe and fail as a matter of law.  Mot. Dismiss, ECF No. 43.  To assist in its determination of Federal Defendants' motion, the Court granted four groups of amici curiae permission to file amicus briefs addressing "the President's authority to decrease monuments under the [Antiquities] Act."  Order, ECF No. 94 at 6 (March 20, 2019).  Specifically, the court granted the motions of three archaeological organizations (the "Archaeological Organizations"), Conservatives for Responsible Stewardship (the "Conservatives"), the Law Professors, and Members of Congress ("Members").  In addition, eleven states (the "States") filed an amicus brief as of right under LCvR 7(o).  *See* ECF No. 74.

For the most part, the five amicus groups (together "Amici") raise very few contentions that were not previously and comprehensively addressed in the briefing on Federal Defendants' motion to dismiss.[2]  Ultimately the Amici, like Plaintiffs, cannot successfully contest the fact that the President's interpretation of the Antiquities Act to authorize modification of existing

---

[1] Federal Defendants will use the same abbreviations for the parties and pleadings as they did in their opening brief in support of their motion to dismiss.  *See* Defs. Br. 1-2 & n.1, ECF No 43-1.

[2] Some of the Amici include issues that fall outside the scope of the issue the Court authorized the Amici to address, namely the President's modification authority under the Act.  Defendants have generally not responded to such arguments, both because these arguments (1) fall outside of the purview of the Court's order, and (2) they have already been addressed by Federal Defendants in their prior briefing.

monuments is consistent with the Act's plain language and context.  Nor can they overcome the import of Congress' long-standing and ongoing refusal to restrain the President's exercise of the Act's modification authority, which strongly implies that Congress has not deemed the enduring presidential interpretation of the Act as requiring corrective action.  Finally, the Amici's arguments that presidential modification authority is inconsistent with the Act's overall purpose and broad congressional policy are without merit.[3]

## ARGUMENT

I.     **The Text, Purpose, and Legislative History of the Antiquities Act Authorize the President to Modify Monument Boundaries.**

The Antiquities Act's plain text requires that any lands reserved for a national monument in all cases "shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."  54 U.S.C. § 320301(b).  As Federal Defendants demonstrated in their opening and reply briefs in support of their motion to dismiss, this mandatory and non-discretionary language evidences Congress' intent to authorize Presidents to correct prior presidential reservations of land that do not comport with this mandate.  Defs. Br. 25-29; Defs. Reply 18-21.

In their briefs, Amici duplicate Plaintiffs' position and counter that the Act unambiguously authorizes the President *only* to "create national monuments with few limitations."  States Br. 9; *See also* Bears Ears Law Professors Br.[4] 3 (arguing Act authorizes only declaring monuments

---

[3]Although the Court ordered the Amici to file "individual amicus briefs regarding the President's authority to decrease monuments under the Act," and instructed them to "endeavor to eliminate unnecessary repetition by incorporating Plaintiffs' and one another's filing by reference when possible," ECF No. 94 at 7, only the Conservatives filed a revised brief.  *See* ECF No. 99.
[4] The Law Professors Amicus Brief in this case, ECF No. 98 ("GSENM Law Professors Br."), incorporates by reference the amicus brief ("Bears Ears Law Professors Br.") by law professors in *Hopi Tribe v. Trump*, 17-cv-02590, ECF No. 124.  *See* GSENM Law Professors Br. 10.  As a result, this brief addresses arguments set forth in both Law Professors' briefs.

and reserving lands for such monuments); Members Br. 8 (citing *Cochnower v. United States*, 248 U.S. 405, 407-08 (1919)).  Federal Defendants previously have addressed this argument at length.  Defs. Br. 25-29; Defs. Reply at 18-21.[5]  However, certain of the Amici make additional points that require responses, which are provided below.

### A.  Presidential modification, not revocation, authority is at issue.

As an initial matter, the Amici attempt to obscure the relevant issue before the Court, proffering arguments such as that the Antiquities Act does not "authorize the [P]resident to *revoke* or shrink existing national monuments."  States Br. 9 (emphasis added); Bears Ears Law Professors Br. 4, 5 (Act provides no authority to "*revoke* or repeal monument designations" or to "*revoke* or modify monuments") (emphasis added); Archaeological Organizations Br. 11 (arguing President lacks authority to "rescind the prior designation of the Monuments"); Members Br. 1 (arguing that Congress did not "grant presidents the discretion to *abolish* or diminish the size of existing national monuments") (emphasis added); Conservatives Br. 6 (arguing Act does not confer power to President "to *revoke* national monuments or to diminish reserved lands in any material respect") (emphasis added).  But the Grand Staircase-Escalante National Monument has not been "abolished" or "revoked."  It remains a national monument— and in fact continues to contain over 1 million acres.  Proc. 9682, 82 Fed. Reg. at 58,093.  As such, it remains larger than the great majority of other national monuments, and, significantly larger than several national parks in its vicinity, including Arches, Bryce, Mesa Verde, and Zion

---

[5] Federal Defendants previously addressed *Cochnower*, 248 U.S. at 407.  Defs. Reply 18-19 (explaining that *Cochnower* addressed an opposite, rather than a constituent, power). Furthermore, since its issuance, *Cochnower* has only rarely been cited—and generally in the limited setting of compensation for government employees or contractors.  *See Armstrong v. Townsend*, 8 F. Supp. 953, 957 (S.D. Ind. 1934); *Ryan v. United States*, 56 Ct. Cl. 103, 107 (Ct. Cl. 1921), *aff'd*, 260 U.S. 90 (1922); *Halstead v. United States*, 55 Ct. Cl. 317, 318 (Ct. Cl. 1920); *Tubman v. Berwager*, 57 A.2d 822, 822 (Md. 1948).

National Parks. *See* Nat'l Park Serv., Archeology Program, Monuments List ("NPS Monuments List"), *available at* https://www.nps.gov/archeology/sites/antiquities/monumentslist.htm (last visited Apr. 9, 2019); Nat'l Park Serv., Land Resources Div., 2018 National Park Service Acreage Report, *available at* https://www.nps.gov/subjects/lwcf/upload/NPS-Acreage-12-31-2018.pdf (last visited April 11, 2019). The pertinent issue is whether the Act—based on its text, purpose, and the history of its implementation—authorizes the President to *modify* the boundaries of an existing Monument. As demonstrated in the next section (and Federal Defendants' prior briefs), the Act does so.

### B. The plain language of the Act is consistent with presidential modification authority.

In the Antiquities Act, Congress specifically instructed the President to ensure that "the limits of [such reservation] in *all cases* shall *be confined* to the smallest area compatible with the proper care and management of the objects to be protected." 34 Stat. 225, § 2 (1906) (emphasis added). Amici (and Plaintiffs) have no trouble reading into the Act an implied authority to modify the boundaries to *enlarge* the lands reserved for a monument—despite the absence of express textual authorization. Accordingly, they cannot reasonably dispute that the "smallest area" requirement firmly supports Federal Defendants' interpretation—that the President has the authority to modify Monument boundaries.

The Amici variously make a handful of arguments addressing the language and context of the Antiquities Act. But none of these arguments overcomes the compatibility of the Act's text—and its "smallest area" requirement—with Federal Defendants' interpretation of the Act as granting presidential modification authority.

The Members seek to avoid the import of the Act's "smallest area" directive by claiming that it was included only "to limit the size of new monument designations," to address concerns

of legislators who "did not want to grant the President broad authority to establish new reserves on federal lands, in light of their experience with Theodore Roosevelt and his decisions setting aside vast tracts of public land as forest reserves.'"  Members Br. 9 (quoting Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 GA. L. REV. 473, 481 (2003)).  But the Members' assertion that the "smallest area" language constrains only the size of initial monument designations does not comport with the courts' understanding of the President's authority under the Act.

Rather, the courts regularly have held that the Antiquities Act *does* grant the President broad authority to reserve vast tracts of public lands as national monuments.  *See Cameron v. United States*, 252 U.S. 450, 455-56 (1920) (holding that reservation of lands for Grand Canyon was appropriate under the Antiquities Act); *United States v. California*, 436 U.S. 32, 36 (1978) (holding that President could "reserve the submerged lands and waters within the one-mile belts" of the Channel Islands); *Mt. States Leg. Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002) (rejecting argument that Act authorized designation of only "rare and discrete man-made objects" because Supreme Court had ruled the "Grand Canyon and similar sites" were properly designated); *Tulare County v. Bush*, 306 F.3d 1138, 1142 (D.C. Cir. 2002) (upholding designation of ecosystems and broad scenic vistas as monument objects).

As a result, the Act's language is far better interpreted as establishing authority for the President to unilaterally act, and continue to act, to ensure Monument reservations were reserved to the requisite "smallest area"—rather than imposing a prohibition on Presidents creating new, vast reserves—which the courts have not seen fit to rigorously enforce in deference to presidential prerogatives.[6]

---

[6] Members suggest that Congress would have wanted to retain a slower, deliberative process for

The Members make a second effort to discount the "smallest area" requirement by arguing that presidential modification authority could be read into the Forest Reserve Act of 1891 on the same theory.  Members Br. 9.  But this argument fails for two reasons.

First, despite the Members' assertion, it is not clear that the President did *not* have modification authority under the Forest Reserve Act.  To be sure, in 1897 Congress enacted the Sundry Civil Appropriations Act,[7] which expressly clarified the President's authority to modify forest reserves.  *See* Act of June 4, 1897, ch. 2, 30 Stat. 11, 34 ("to remove any doubt which may exist pertaining to the authority of the President thereto, the President of the United States is hereby authorized and empowered to revoke, modify, or suspend any and all such Executive orders and proclamations").  But as explained more fully in Defendants' Reply Brief, some members of Congress thought that the President already had that authority under the Forest Reserve Act.  *See* Defs. Reply 22-23.  For that reason, the 1897 statute expressly adopted a "belt and suspenders" approach, "*to remove any doubt* which may exist."  30 Stat. at 34 (emphasis added).  Second, even assuming that the 1891 Forest Reserve Act did *not* include presidential modification authority, its language is plainly different from that used in the Antiquities Act.  The language that the Members rely on—the instruction that the President "declare the

---

diminishing monuments, and thus Presidential modification authority is "fundamentally at odds" with the protective rationale of the statute.  Members Br. 7.  In addition to lacking both textual and historical support, the argument improperly presumes that Congress did not trust presidential determinations about the extent of land reservations needed to protect monument objects.  To the contrary, the plain text of the Antiquities Act makes clear that Congress fully entrusted and indeed required the President to exercise his discretion to determine the "smallest area compatible" with the protection of the objects "in all cases."  54 U.S.C. § 320301(b).

[7] This statute, formally entitled "An Act making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight, and for other purposes," has been variously referred to in the briefing of Defendants' motion to dismiss as the Sundry Civil Appropriations Act of 1897, the Forest Service Organic Act, and the Forest Service Organic Administration Act.

establishment of such reservations and the limits thereof"—only requires the President to

identify boundaries.  *See* Act of March 3, 1891, ch. 562, 26 Stat. 1103.  Unlike the Antiquities

Act, the Forest Reserve Act provides no constraints upon or criteria to apply in specifying the

limits of the reservations.

Next, several of the Amici duplicate Plaintiffs' arguments that the Sundry Civil

Appropriations Act and the Pickett Act of 1910, by more expressly authorizing the modification

of withdrawals or reservations, demonstrate that the Antiquities Act did not authorize such

modifications.  *See, e.g.,* Bears Ears Law Professors Br. 7; Members Br. 8.  Federal Defendants

previously addressed these contentions in their reply brief, Defs. Reply 21-22, and Amici offer

nothing new requiring an additional response with respect to these two statutes.  However, the

Amici also make the same argument based on a statute that directed the President to create the

Colonial National Monument, which expressly authorized the President to make later

modifications to the Monument.  *See* Bears Ears Law Professors Br. 10 (citing Act of July 3,

1930, 46 Stat. 855 (1930)); Conservatives Br. 7 (same).  This statute (hereinafter the "CNM

Act") fails to support the Amici's argument for two reasons.

First, the CNM Act specifically instructed the President to create a new monument without

any reference to the President's authority in the Antiquities Act.  *See* 46 Stat. at 855.  It therefore

has questionable relevance to assessing the President's ordinary, unilateral exercise of his

authority under the Antiquities Act.  Second, even if the CNM Act were relevant here, it

corroborates Federal Defendants' interpretation of the Antiquities Act.  The CNM Act was

enacted nearly 25 years after the Antiquities Act—and after presidents had both enlarged and

reduced the size of several existing monuments.  *See* Defs. Br. 6-7 & 7 n.4.  Consistent with this

practice, the CNM Act expressly authorizes the President to modify the monument boundaries.

*See* 46 Stat. at 855 § 2 (providing that "boundaries so established may be *enlarged or diminished* by subsequent proclamation or proclamations of the President upon the recommendations of the Secretary of the Interior . . .") (emphasis added).  Thus, to the extent the CNM Act has any relevance on interpretation of the 1906 Antiquities Act, it appears to reflect Congressional acceptance of the appropriateness of presidential modifications of monument boundaries— consistent with existing practice under the Antiquities Act.[8]

Finally, the States argue that the Act's use of the term "reserve" corroborates their interpretation that the Act does not allow subsequent modifications.  States Br. 10.  But nothing in the use of the term "reserve" negates Congress' instruction to the President to ensure that any lands reserved "be confined to the smallest area compatible with the proper care and management of the objects to be protected."  54 U.S.C. § 320301(b).

In sum, Amici, like Plaintiffs, cannot overcome Federal Defendants' demonstration that their interpretation of the Antiquities Act is consistent with its plain meaning and context.

### C.  A recently issued decision from the District of Alaska provides no relevant guidance.

On March 19, the District of Alaska issued a decision in *League of Conservation Voters v. Trump ("LCV")*, Case No. 3:17-CV-00101-SLG, 2019 WL 1431217 (D. Alaska Mar. 29, 2019).  The case issued subsequent to Amici's filing of their briefs and they did not address it in their briefs, but because it contains some analysis that is tangentially relevant to the statutory

---

[8] As noted above, Amici (and Plaintiffs) agree that Presidents can enlarge existing monuments— despite the lack of any express authorization in the Antiquities Act.  Presumably, they would also agree that the CNM Act's express recognition of the President's authority to *enlarge* the Colonial National Monument does not imply that enlargement authority is absent from the Antiquities Act.  But by the same token, Amici and Plaintiffs cannot consistently argue that Congress' express authorization to diminish the Colonial National Monument implies that diminishment authority is absent from the Antiquities Act.

interpretation issues discussed above, Defendants briefly address it here.[9]

The issue in *LCV* was whether Section 12(a) of the Outer Continental Shelf Leasing Act ("OCSLA") allows a President to vacate a prior withdrawal of lands under the Act.  *Id.*  Section 12(a) provides that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf."  43 U.S.C. § 1341(a). While the plaintiffs in *LCV* argued that OCSLA's failure to expressly authorize revocation of a prior withdrawal conclusively established that such revocation authority was ultra vires, the court disagreed.  Although the court agreed that the "statute does not expressly grant to the President the authority to revoke prior withdrawals," it reasoned that "the statute's inclusion of the phrase 'from time to time' renders the text of Section 12(a) ambiguous," and therefore proceeded to analyze the structure and history of OCSLA.  *LCV*, 2019 WL 1431217, at *7.  The court ultimately held that OCSLA did not authorize revocation of a prior withdrawal.  *Id.* at *13.

Federal Defendants disagree with the *LCV* court's ultimate determination—but regardless, the decision is of limited relevance to this case.  To begin with, the decision addressed revocation authority, rather than modification authority.  Even more importantly, OCSLA does not contain anything like the "smallest area" requirement in the Antiquities Act. Nonetheless, the *LCV* court's determination that OCSLA was ambiguous with respect to whether the President's authority to revoke a prior withdrawal certainly does not support the Amici's (or the Plaintiffs') argument that the Antiquities Act unambiguously bars presidential modifications of monument boundaries.

### D.  Defendants' interpretation does not create a nondelegation issue.

---

[9] Plaintiffs in this case have filed a notice of authority alerting the Court to the *LCV* case.  ECF No. 101.

The Conservatives argue that the Court should not construe the Antiquities Act as containing modification authority in order to avoid a "grave constitutional question," namely whether the Antiquities Act violates the nondelegation doctrine. *See* Conservatives Br. 8-9. But the contention that the Act fails to lay down an "intelligible principle" to govern the exercise of modification authority has no basis. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). The Antiquities Act imposes such a principle: it requires that any lands reserved "be confined to the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(b). This standard satisfies the intelligible principle requirement. *See Am. Trucking Ass'ns*, 531 U.S. at 474-76 (collecting Supreme Court authorities approving of congressional statutes containing intelligible principles); *Mountain States*, 306 F.3d at 1137.[10]

## II. Congress' Acquiescence, Culminating in FLPMA, to the Longstanding and Extensive History of Presidential Modification of Monument Boundaries Corroborates the Act's Modification Authority.

Presidents have modified monument boundaries to exclude lands at least eighteen times, with the first modification taking place only five years after the passage of the Antiquities Act (as well as modifying boundaries to enlarge monuments on many occasions). Defs. Br. 4-7, 29-33; Defs. Reply 24-27. As Federal Defendants previously explained, the eighteen modifications over many decades qualify as a "longstanding 'practice of the government,'" which can "inform [a court's] determination of 'what the law is.'" *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (quoting *McCulloch v. Maryland*, 4 Wheat 316, 401 (1819) and *Marbury v. Madison*, 1 Cranch 137, 177 (1803)); *Al-Bihani v. Obama*, 619 F.3d 1, 26 (D.C. Cir. 2010). Moreover,

---

[10] Federal Defendants addressed a similar argument, raised by the Plaintiff Tribes, in *Hopi v. Trump*, 17-cv-002590, in their reply in support of their motion to dismiss in that case. *See* ECF No. 101 at 22-26. Federal Defendants incorporate that discussion herein by reference.

despite amending the Antiquities Act in 1950—and despite expressly addressing the executive branch's modification authority when enacting the Federal Land Policy and Management Act ("FLPMA") in 1976, Congress never acted to reverse the President's modification of monument boundaries.  Defs. Br. 29-33; Defs. Reply 24-29.  Like Plaintiffs, Amici are wholly unable to overcome this strong evidence corroborating Federal Defendants' interpretation of the President's authority under the Act.

### A.  Congress' refusal to reverse the President's past exercise of modification authority under the Act supports Defendants' interpretation.

The Members' first argument—that it is irrelevant that Congress failed to react to prior presidential modifications—fails both as a matter of common sense and binding case law.  They argue that congressional acquiescence is relevant only with respect to determining the executive branch's authority in the *absence* of a statute—and not where, as here, the dispute involves interpretation of delegated authority under a statute.  Members Br. 10-11.  But the Members provide no authority that actually supports their argument.  Rather, they interpret Federal Defendants' argument as relying primarily upon cases such as *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), which focused on implied power.  But unlike in *Youngstown Sheet & Tube Co.,* Federal Defendants do not contend that the President's modification authority arises from anything *other* than the Antiquities Act; Federal Defendants' contention is that the President's long-standing interpretation of the Act is strongly corroborated by Congress' refusal to reverse such interpretation.[11]

Even more problematic for the Members, the D.C. Circuit case that they highlight,

---

[11] As a result, significant portions of the arguments made by the various Amici focusing on *Youngstown* and similar cases are simply not relevant to the issues before the Court.  *See* Bears Ears Law Professors Br. 10-11; Members Br. 12-15; States Br. 17.

*American Federation of Labor & Congress of Industrial Organizations v. Kahn*, 618 F.2d 784,

787 (D.C. Cir. 1979), confirms Federal Defendants' argument.  In *Kahn*, the D.C. Circuit

addressed whether an executive order, authorizing denial of government contracts to companies

that failed to comply with certain employment standards, was within the authority granted the

President under the Federal Property and Administrative Services Act ("FPASA").  In light of

the FPASA's "imprecise definition" of presidential authority, the Court relied heavily on the

President's past exercise of his authority under the Act and congressional acquiescence to that

practice.  The Court reasoned:

> Of course, the President's view of his own authority under a statute is not
> controlling, but *when that view has been acted upon over a substantial period of
> time without eliciting congressional reversal, it is "entitled to great respect."*  As
> the Supreme Court observed this Term, the "construction of a statute by those
> charged with its execution *should be followed* unless there are *compelling
> indications* that it is wrong."

*Kahn*, 618 F.2d at 790 (quoting *Bd. of Governors of Fed. Reserve System v. First Lincolnwood

Corp.*, 439 U.S. 234, 248 (1978) & *Miller v. Youakim*, 440 U.S. 125, 144 n.25 (1979) (emphasis

added)).  The court upheld the executive order.  *Id.* at 793.

    *Kahn*, a D.C. Circuit decision, is binding authority here, and when applied to this case

strongly supports Federal Defendants' position because the President's view of modification

authority under the Antiquities Act has "been acted upon over a substantial period of time

without eliciting congressional reversal," and is therefore "entitled to great respect."  *See id* at

790.  Indeed, under *Kahn*, the Court should follow the President's construction of the Act unless

there are "compelling indications that it is wrong."  *See id.*

    There are no such compelling indications.  As demonstrated above and in Defendants'

prior briefs, the President's longstanding interpretation that the Antiquities Act provides

modification authority is consistent with the text of the statute.  Thus, the States' argument—that

"'congressional acquiescence cannot change the plain meaning of enacted text'"—has no import here.  States Br. 15 (quoting *Citizens for Resp. & Ethics in Washington v. FEC*, 904 F.3d 1014, 1018 (D.C. Cir. 2018)).

Nor do the Amici's attempt to distinguish past presidential modifications of monuments provide a "compelling indication" that the President's interpretation of the Act is wrong.  First, regardless of whether prior modifications differed in size and/or purpose, each remains a *modification* nonetheless, and each reflects a consistent interpretation by the President—and action based on that interpretation—that the Antiquities Act empowers presidential modifications of existing monuments.  *See also* Defs. Reply 27-28.  Because that interpretation has never been reversed by Congress, it is entitled to "great deference," *Kahn*, 618 F.2d at 790.

Second, Amici are simply wrong in their attempts to distinguish prior modifications. Although some prior modifications did differ either in size or impetus from that in Proclamation 9682, others did not, as Federal Defendants demonstrated in responding to parallel arguments from Plaintiffs.  *See* Defs. Reply 27-28 & n.24 (noting, inter alia, substantial reductions to Navajo National Monument, Mt. Olympus National Monument, and Petrified Forest National Monument).[12]

Finally, one of Amici's efforts to distinguish a prior modification—that of Mount Olympus National Monument—bears special treatment.  Specifically, the Law Professors argue that the substantial reductions to the Mount Olympus National Monument actually arose from the President's War Powers, as an effort to ensure the availability of Sitka Spruce for aircraft

---

[12] Other examples include President Roosevelt's reduction of President Hoover's so-called "Grand Canyon II" national monument by 71,854 acres from 273,145 in 1940 and President Truman's 1945 reduction of the Santa Rosa Island National Monument by nearly 50%, from 9,500 acres to 4,700 acres, six years after it was established.  *See* Proc. 2392, US_APP000023; Proc. 2659, US_APP000028; Monuments List.

construction for World War I.  Bears Ears Law Professors Br. 12-13 (asserting that the proclamation was "supported by the President's Article II powers").  But the Law Professors' speculation has no support in the relevant presidential proclamation—rather, it expressly invoked the Antiquities Act as authorizing the modification.  Proc. 1293, Defs. App'x, ECF No. 102, at US_APP000015.  Nor is their speculation supported by the Graves Report, prepared to address the proposed modification.  *See* Defs. Reply 32-33; US_APP000076-88.  Finally, their contention is not supported by reality:  the Proclamation issued on May 11, 1915—nearly two years *before* the United States entered into World War I on April 6, 1917.  *See* Joint Resolution, ch. 1, 40 Stat. 1 (April 6, 1917).  As a result, President Wilson could not have reduced the Monument "to respond to war-time exigencies," as the Law Professors claim.  *See* Bears Ears Law Professors Br. 13.

### B. Congress' enactment of FLPMA provides affirmative evidence that Congress agreed with the President's interpretation of the Antiquities Act.

Finally, the Amici fail to rebut Federal Defendants' argument that Congress' passage of FLPMA further demonstrated its acceptance and acquiescence to the President's authority to modify national monuments.  "Under some circumstances, Congress' failure to repeal or revise in the face of such administrative interpretation has been held to constitute persuasive evidence that that interpretation is the one intended by Congress."  *See Zemel v. Rusk*, 381 U.S. 1, 11 (1965) (cited by Members Br. 18).  And, as the Members admit, this is especially true when, although Congress may not have amended the statute in question, it "has enacted *other* laws whose terms, by implication, ratify the interpretation a court or agency has given the statute in question."  Members Br. 17 (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 488 (1940)).

That is precisely what happened here.  In 1976, Congress enacted FLPMA to comprehensively address the executive branch's withdrawal and reservation authority.  Pub. L.

No. 94-579, § 204(j), 90 Stat. 2743 (1976) (codified as 43 U.S.C. § 1714(j)).  As discussed in

Federal Defendants' prior briefs, FLPMA specifically addressed executive branch modification

of monument withdrawals under the Antiquities Act, providing that the Secretary of the Interior

could not "modify or revoke any withdrawal creating national monuments under chapter 3203 of

title 54."  Defs. Reply 28 (quoting 43 U.S.C. § 1714(j)).  But—despite the demonstrated history

of *presidential* modifications of national monuments under the Antiquities Act—Congress did

*not* prohibit or constrain such modifications in FLPMA.  Furthermore, elsewhere FLPMA

specifically addresses (and limits) the President's authorities related to withdrawals.  *Cf.* 43

U.S.C. § 1714(j).  Under these circumstances, FLPMA must be interpreted as continuing

Congress' acceptance and acquiescence to the President's authority to modify national

monuments.  *Nat'l Ass'n of Broadcasters v. FCC* ("*NAB*"), 569 F.3d 416, 421 (D.C. Cir. 2009)

(noting that an "omission is intentional where Congress has referred to something in one

subsection but not in another").  *See also Russello v. United States*, 464 U.S. 16, 23 (1983)

("Where Congress includes particular language in one section of a statute but omits it in another

section of the same Act, it is generally presumed that Congress acts intentionally and purposely

in the disparate inclusion or exclusion") (internal citation & quotation omitted).

　　　　FLPMA's enactment therefore is fatal to the Members' argument that congressional

*inaction* is insufficient to demonstrate congressional approval of the President's interpretation.

Members Br. 17.  Congress's acquiescence is demonstrated both by its *inaction* in that it did not

enact legislation directly reversing the President's interpretation of the Antiquities Act—but also

by its *action*, in enacting FLPMA, wherein it expressly addressed the question of executive

branch monument modification authority.  Similarly, the Law Professors' citation to *Henson v.*

*Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017), is inapposite.  There, the Court

noted that "[i]t is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that . . . it never faced." *See* Bears Ears Law Professors Br. 10.  In contrast, here Congress *did* face, and expressly addressed, the question of monument modification when it enacted FLPMA.[13]

The Law Professors seek to avoid this decisive circumstance by arguing that FLPMA's provision limiting secretarial authority to modify monuments "makes little sense" and therefore must either be a drafting error on the part of Congress or "an attempt to clarify that Congress reserved the authority to alter monument boundaries to itself."  Bears Ears Law Professors Br. 15 n.4.  This argument represents an absurd reading of FLPMA's relevant provisions.  Contrary to the Law Professors' assertion, it was very logical, and in fact necessary, for Congress to specifically address the Secretary's authority to modify monuments in FLPMA.  FLPMA granted the Secretary new, broad authorities for withdrawal revocation and modification.  In particular, FLPMA granted authority to the Secretary of the Interior to "make, modify, extend, or revoke" withdrawals or reservations,[14] subject to the limitations contained in that section, including 43 U.S.C. § 1714(j).  43 U.S.C. § 1714(a).  Without the express limitation in § 1714(j), FLPMA could have been read to authorize the Secretary to modify or revoke monument reservations.  Indeed, the Members admit as much.  *See* Members Br. 23 ("[Section 204(j)] clarified that the Secretary's new powers [under FLPMA] did not include reducing or abolishing monuments.").

---

[13] The Members' argument that congressional inaction is necessarily irrelevant also fails because it is in direct contradiction to the D.C. Circuit's instruction in *Kahn*.  *See* 618 F.2d at 790 (holding that court should respect President's interpretation of his or her authority when it has been "acted upon over a substantial period of time *without eliciting congressional reversal*") (emphasis added).

[14] FLPMA defines withdrawals as including reservations.  *See* 43 U.S.C. 1702(j) ("the term 'withdrawal' means withholding an area of Federal land from settlement, sale, location, or entry . . . or reserving the area for a particular public purpose or program . . .").

Amici (and Plaintiffs) cannot, therefore, ignore the plain import of FLPMA's silence as to

presidential modification authority by arguing that Congress made a mistake.  Nor, as discussed

in Defendants' reply brief, can Amici ask the Court to find an intent by Congress to "reserve the

authority to alter monument boundaries to itself" when that intent "appears nowhere in the

statute."  *NAB*, 569 F.3d at 422.

In sum, Amici are no more successful in rebutting Congress' longstanding acquiescence

to the President's exercise of modification authority than Plaintiffs were.  The President's

interpretation is therefore "entitled to great respect" and should be upheld by the Court.  *See*

*Kahn*, 618 F.2d at 790.

## III.    The Law Professors' "Ratification" Argument fails.

The Law Professors argue that Proclamation 9682 was unlawful because Congress, after

the creation of the Monument, "exerted its authority and express clear intent as to the

Monument's boundaries and conservation purpose" in enacting the Utah Schools and Land

Exchange Act ("Exchange Act"), the Automobile National Heritage Area Act ("Heritage Area

Act") and Omnibus Public Land Management Act of 2009 ("OPLMA").  GSENM Law

Professors Br. 10, 18.  But as Federal Defendants previously demonstrated, the argument that

Congress "adopted and ratified the boundaries" of the Monument has no basis.[15]

Like Plaintiffs, the Law Professors provide no authority for their theory that by enacting

legislation that touches somehow on a national monument, Congress can be deemed as adopting

and ratifying the boundaries of a national monument.  The only authority the Law Professors

identify is inapposite case law that does not address any issue related to their adoption and

---

[15] Federal Defendants previously addressed parallel contentions from Plaintiffs, and incorporate
their prior arguments by reference.  Defs. Br. 33-37; Defs. Reply 31-34.

ratification theory. *See* GSENM Law Professors Br. 11 (citing, inter alia, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155 (2000) (holding that FDA does not have authority to regulate tobacco given Congress' enactment of other statutes creating a distinct regulatory scheme); *Youngstown*, 343 U.S. at 586 (addressing presidential authority in the *absence* of any statutory authorization relied upon by the government); *Little v. Barreme*, 6 U.S. 170, 178 (1804) (addressing whether an executive branch officer could be held personally liable for acting under presidential instructions that misconstrued authority under a statute)).

The Law Professors' unhelpful citations aside, their argument fails because they cannot show that Proclamation 9682 was contrary to any statute enacted by Congress. *See* Defs. Br. 33-37; Defs. Reply 31-34.  The Law Professors rely primarily on the Exchange Act, a 1998 statute that ratified an agreement transferring ownership of lands between the federal government and the State of Utah, culminating negotiations that had been ongoing *before* the Monument was even created.  *See* Defs. Br. 35 (citing Pub. L. No. 105-335, §§ 3, 7, 112 Stat. 3139 (1998)).  By its terms, the purpose of the Exchange Act was limited to transferring state-owned acreage within various federal land management units (including, but not limited to, the Monument)[16] to the United States.  §§ 8 & 9, 112 Stat. at 3139; S. Rep. No. 105-574, at 2 (1998).  Contrary to the Law Professors' suggestion, the Exchange Act does not demonstrate congressional intent to identify the appropriate boundaries of the Monument.  In fact, Congress did not make any express determination as to whether the lands exchanged with the State should necessarily remain part of a national monument—the Exchange Act noted only that "*certain* State school

---

[16] The Land Exchange Act addressed more than just the Monument—indeed, the United States obtained more acres of state-owned lands within the boundaries of other federal land management units (200,000 acres of surface estate and 76,000 acres of mineral estate) than it did within the Monument boundaries (176,600 acres of surface estate, and 24,165 acres of mineral estate). 112 Stat. at 3139.

trust lands within the Monument . . . have substantial noneconomic scientific, historic, cultural, scenic, recreational, and natural resources," implying that "certain" other such State school trust lands within the Monument did not. *Id.* § 2.27.

The Law Professors' arguments under the Heritage Act and OPLMA are cursory and unconvincing—and have been fully addressed in prior briefing. *See* Defs. Br. 34-37; Defs. Reply 31-34. Suffice to say, neither the minor boundary adjustments made in those statutes—nor the codification of the already-existing National Landscape Conservation System in the OPLMA—demonstrate congressional intent to fix the boundaries of the Monument, or to address the President's modification authority under the Antiquities Act.

## IV.    Amici's Policy Arguments are Unavailing.

Failing to overcome the President's interpretation of the Antiquities Act based on the statute's text and longstanding presidential practice, several of the Amici argue that presidential authority to modify monument boundaries is incompatible with the Antiquities Act's ultimate purpose. *See, e.g.,* Conservatives Br. 8; Members Br. 4-7; Archaeological Organizations Br. 11-16.[17] As Federal Defendants demonstrated in their reply brief, modification of a monument to

---

[17] For their part, the Archaeological Organizations spend considerable portions of their brief demonstrating that concerns for preservation of archaeological sites provided an important impetus for enactment of the Antiquities Act, and that preservation of lands or resources providing "context" for specific sites may be important for archaeological study. Archaeological Organizations Br. 11-16. Federal Defendants do not dispute any of this—but the Archaeological Organizations fail to demonstrate why this is inconsistent with Federal Defendants' interpretation of the Act. To the extent the Archaeological Organizations are arguing that Proclamation 9682 failed to comply with the Antiquities Act because the President abused his discretion in making his determination of the appropriate boundaries of the Monument, such argument is precluded as a matter of law, as discussed in the Federal Defendants' briefs. *See* Defs. Br. 38-41; Defs. Reply 36-38. Similarly, claims by other Amici that the President abused his authority, for instance, by considering objects' "uniqueness," *see* Conservatives Br. 9-10, are (1) outside the scope of what the Court invited amici to address; and (2) addressed previously by Federal Defendants at the above-referenced portions of their briefs.

ensure that "[t]he limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected" is in no way contrary to the "essential purpose" of the Antiquities Act.  *See* 54 U.S.C. § 320301(b); Defs. Reply 23-24.

Certain of the Amici also argue that allowing presidential modification of monuments would be inconsistent with Congress' more recent statutes that emphasize protection of natural resources.  *See* States Br. 18 (finding that Congress had acquiesced in presidential modification authority would "undermine decades of congressional efforts to protect the nation's historic and natural treasures"); Bears Ears Law Professors Br. 13 (arguing that their interpretation of the Act is "consistent with Congress's comprehensive statutory scheme for federal lands management"). These arguments are illogical.

The fact that Congress has enacted the statutes identified by the Amici, specifically the Wilderness Act in 1964, the National Historic Preservation Act ("NHPA") in 1966, the National Environmental Policy Act ("NEPA") in 1970, the National Forest Management Act in 1976, and the FLPMA, also in 1976, is simply immaterial to the question of the President's modification authority under the Antiquities Act.  Enactment by various Congresses in the 1960s and 1970s of multiple laws addressing a very broad range of federal land management and natural resources issues provides no guidance in determining the congressional intent behind a specific statutory provision that Congress enacted more than half a century earlier.[18]

Otherwise, the only relevance of the statutes referenced by the Amici is to corroborate Federal Defendants' argument that Proclamation 9682 risks no imminent injury to the plaintiffs

---

[18] This is, of course, in contrast to the scenario addressed above, when in FLPMA, Congress expressly addressed modification authority related to monuments created under the Act and restricted secretarial authority while leaving the President's authority to do so alone.  *See* discussion *supra* at 14-17.

in this lawsuit because of the protective overlay provided by these other laws.  FLPMA required

the creation of Wilderness Study Areas ("WSAs"), which must be managed protectively.  43

U.S.C. § 1782(c).  Hundreds of thousands of acres that have been excluded from the Monument

remain protected as WSAs.  *See* Defs. Br. 9, 15 n.7; Defs. Reply 5.  Before Federal Defendants

engage in any "major federal action" that could have significant environmental impacts or an

"undertaking" that could impact a historic property, they will have to comply with the

requirements of NEPA and the NHPA respectively.  *See* 42 U.S.C. § 4332(C); 54 U.S.C. §§

300308, 306108.[19]

Finally, the Members argue that a finding of modification authority would be bad policy

because it would undermine Congress' power.  Members Br. 7.  It is unclear why this would be

the case: as the Amici emphasize, *Congress* ultimately has power over the federal lands under

the Property Clause.  *See* Members Br. 4; Bears Ears Law Professors Br. 10.  As such, Congress

has always had the ability to enlarge, reduce, or eliminate existing national monuments; convert

national monuments into national parks; and itself create national monuments—and as the

Members note, Congress has utilized all of these authorities in the past.  Members Br. 7; *see also*

NPS Monuments List.  In fact, Congress has the authority to render this litigation moot by

---

[19] While not within the scope of the briefing the Court authorized the Amici to address (i.e., the President's authority to modify monuments), the Archaeological Organizations argue that FLPMA, the NHPA, and the Archaeological Resources Protection Act do not ensure protection of archaeological resources.  However, they cannot dispute that each statute does impose protections and processes designed for the protection of such resources—nor can the Court assume, as Amici and Plaintiffs ask the Court to do—both that (1) potentially-destructive activities will be proposed by third parties, or that (2) BLM will fail to carry out legal obligations to prevent "unnecessary or undue degradation."  Defs. Reply 6 (quoting 43 C.F.R. §§ 3809.415, 3809.420).  *See also* 43 C.F.R. § 3809.11; 7 C.F.R. § 228.8(g).  Finally, the Archaeological Organizations' assertion, at page 11 of their brief, that inventory activity for cultural resources will no longer occur in lands excluded from the Monument, is incorrect.  *See* 54 U.S.C. §§ 300320, 306108; 36 C.F.R. § 800.4(b).

legislatively overturning Proclamation 9682 if it so chooses.  Congress' authority therefore is in no way threatened by the proclamation, which merely invokes the power Congress delegated the President, and which is fully subject to congressional reversal.[20]

## CONCLUSION

The President's invocation of the Antiquities Act to modify the boundaries of the Grand Staircase-Escalante National Monument, such that it comprises "the smallest area compatible" with the proper care and management of the Monument objects, was wholly consistent with the text and past implementation of the Antiquities Act.  Amici are no more successful than Plaintiffs in overcoming this reality, and the Plaintiffs' Complaints in this matter should be dismissed.

Respectfully submitted this 17th day of April, 2019,

JEAN E. WILLIAMS
Deputy Assistant Attorney General

*/s/ Romney S. Philpott*
Romney S. Philpott
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th St., #370
Denver, CO 80202
Phone:  303-844-1810

---

[20] Both the Members and the Conservatives accuse Federal Defendants of seeking to "put the Executive on equal footing with the Legislature when it came to stewardship of the federal lands."  Members Br. 25; *see also* Conservatives Br. 14.  Both amici misconstrue Federal Defendants' statement.  Specifically, Federal Defendants argued that, just as one Congress may not bind its successors, normally one President cannot bind his or her successors, because that is not how our system of government generally works.  *See* Defs. Br. 32 ("'[R]ecognition of presidential modification authority here appropriately puts the Executive on equal footing with the Legislature, as the Supreme Court has recognized that 'one legislature may not bind the legislative authority of its successors'") (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996)).  Federal Defendants certainly recognize the primacy of Congress in addressing matters under the Property Clause's purview.

E-mail:  Romney.Philpott@usdoj.gov

Judith E. Coleman
U.S. Department of Justice,
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Phone:  202-514-3553
Email:  Judith.Coleman@usdoj.gov

Attorneys for Federal Defendants

23

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2019, I electronically filed the foregoing document and its attachments with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all parties.

*/s/ Romney S. Philpott*
Romney S. Philpott
