**TWS PLAINTIFFS' [PROPOSED] MOTION FOR LEAVE TO FILE SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE WILDERNESS SOCIETY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 1:17-cv-02587 (TSC) |
| GRAND STAIRCASE ESCALANTE PARTNERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 1:17-cv-02591 (TSC)<br><br>**CONSOLIDATED CASES** |
| AMERICAN FARM BUREAU FEDERATION, *et al.*,<br><br>Intervenor-Defendants. | |

**TWS PLAINTIFFS' [PROPOSED]**
**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**
**FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1. Plaintiffs The Wilderness Society *et al*.[1] (collectively, "TWS Plaintiffs") file this second amended and supplemented complaint pursuant to Federal Rule of Civil Procedure 15 challenging President Donald J. Trump's repeated unlawful attempts to dismantle Grand Staircase-Escalante National Monument ("Grand Staircase" or "the Monument").

2. When Congress enacted the Antiquities Act of 1906 ("the Act"), it gave presidents a narrowly defined portion of its exclusive authority under the Property Clause, U.S. Const. art. IV, § 3, cl. 2, to "declare" national monuments and "reserve" land for their protection, but not to abolish them in whole or in part. Pub. L. No. 59-209, 34 Stat. 225 (codified at 54 U.S.C. § 320301(a)-(b)). Yet President Trump has attacked multiple national monuments and twice exceeded his defined statutory delegation with respect to Grand Staircase. He first did so in December 2017 by purporting to remove nearly 900,000 acres from Grand Staircase, which Plaintiffs swiftly challenged in this lawsuit. Proclamation No. 9682, 82 Fed. Reg. 58,089 (Dec. 4, 2017) ("the 2017 Dismantling Proclamation"). He then took even more extreme action on July 13, 2026, when he purported to revoke monument status for over 1.6 million acres—or about 90% of the monument. Proclamation No. 11,044, 91 Fed. Reg. 45,179 (July 13, 2026) ("the 2026 Dismantling Proclamation"). Plaintiffs now challenge that action as well.

3. Grand Staircase's rich history and scientific wonders give it national significance for all Americans. The Monument preserves millennia of the landscape's rockbound history in its

---

[1] The Wilderness Society, Grand Canyon Trust, National Parks Conservation Alliance, Great Old Broads for Wilderness, Western Watersheds Project, WildEarth Guardians, Sierra Club, Center for Biological Diversity, Southern Utah Wilderness Alliance, and Natural Resources Defense Council. As noted in TWS Plaintiffs' Motion for Leave to Amend and Supplement, this complaint reflects the addition of National Parks Conservation Association and the withdrawal of Defenders of Wildlife.

towering cliffs stretching from the Grand Canyon National Park to Bryce Canyon National Park. As the last place mapped in the continental United States, its largely untouched, natural condition makes Grand Staircase an ideal living laboratory for scientific discovery. The stepwise cliffs from which Grand Staircase derives its name make it a uniquely clear window into the age of dinosaurs. Its uplifted rock faces expose fossils that would otherwise be deep underground and hard to access. Some fossils discovered in Grand Staircase are found nowhere else in the world. Since the Monument's designation, scientists have discovered at least 15 new species of dinosaurs in Grand Staircase.

4. President Trump's unlawful actions imperil these and other irreplaceable resources by opening the lands around them to hard rock mining; oil, gas, and coal leasing; and other destructive uses that the default federal land laws generally authorize. Indeed, mining companies located claims on the excised lands following the 2017 Dismantling Proclamation and have already done so again following the 2026 Dismantling Proclamation.

5. Plaintiffs ask the Court to enforce the limits of Congress's narrow delegation of power to the President. A "monument" by definition is something that lasts—"[a]n enduring evidence or example."[2] Abolishment in whole or in part is antithetical to the Act's plain language, and the President's claim of such authority is utterly unreasonable and a patent misconstruction of the Act.

6. Through the Act, Congress entrusted the President with a defined delegation of authority to swiftly protect resources and the lands surrounding them from destructive uses. Thanks to Congress's foresight, Americans enjoy a diverse system of national monuments that

---

[2] 6 Oxford English Dictionary 636 (1913).

tell the country's story from its earliest inhabitants to the present. Some, like the many national monuments designated by President Theodore Roosevelt (who signed the Act into law), protect natural features thousands of years, sometimes eons, in the making.[3] Others preserve Indigenous cultural heritage.[4] And others memorialize darker aspects of our history so we can commemorate and learn from lessons of the past.[5] The weighty power to remove monument protections and erase the history embedded in the country's public lands is one Congress reserved for itself.

7. President William J. Clinton added to this rich tapestry when he exercised his authority under the Act thirty years ago and declared Grand Staircase a national monument. Proclamation No. 6920, 61 Fed. Reg. 50,223 (Sep. 18, 1996) ("the 1996 Designating Proclamation"). In the years that followed, Congress demonstrated its intent for the Monument to endure. Congress has purchased pre-existing mineral leases in the Monument to prevent destructive activities from moving forward and destroying irreplaceable resources. Congress has also added hundreds of thousands of acres to the Monument, including by writing a $50 million check to the state of Utah for lands it held inside the Monument's boundaries. Congress's affirmations and investments would make little sense if the President could undo them with the stroke of a pen.

---

[3] *See, e.g.*, Proclamation No. 793, 35 Stat. 2174 (Jan. 9, 1908) (protecting the "primeval" forest of old-growth trees in Muir Woods National Monument); Proclamation No. 794, 35 Stat. 2175 (Jan. 11, 1908) (declaring the Grand Canyon a National Monument).

[4] *See, e.g.*, Proclamation No. 9558, 82 Fed. Reg. 1139 (Dec. 28, 2016) (Bears Ears National Monument); Proclamation No. 10,533, 88 Fed. Reg. 17,987 (Mar. 21, 2023) (Avi Kwa Ame National Monument).

[5] *See, e.g.*, Proclamation No. 7395, 66 Fed. Reg. 7347 (Jan. 17, 2001) (Minidoka Internment National Monument); Proclamation No. 10,870, 89 Fed. Reg. 100,289 (Dec. 9, 2024) (Carlisle Federal Indian Boarding School National Monument).

8. Yet the 2017 Dismantling Proclamation undid Congress's work and stripped the Monument of protection. Although President Joseph R. Biden, Jr. restored the Monument in 2021, Proclamation No. 10,286, 86 Fed. Reg. 57,335 (Oct. 8, 2021) ("the 2021 Restoration Proclamation"), that was not soon enough to prevent new hard rock mining claims and destructive ground-disturbing activity.

9. President Trump has once again dismantled Grand Staircase, this time with deeper cuts that will cause greater harm to Plaintiffs. Like the 2017 Dismantling Proclamation, the 2026 Dismantling Proclamation quickly opens Grand Staircase to mining and sets the stage for wider-scale destruction.

10. Congress did not authorize presidents to revoke national monument status. As demonstrated here, such revocations lead to erratic ping-ponging of monument designations and inevitably result in irreplaceable loss of the scientific and historic "objects" the Act authorizes the President to protect. Instead, Congress intended national monuments to be durable—unless Congress itself acts using its Property Clause powers. The continuing harm to Plaintiffs from President Trump's 2017 unlawful action underscores why Congress reserved for itself the consequential, and distinct, power to revoke national monument protections.

11. By revoking protections from Grand Staircase, the President has, without lawful authority, put at risk countless irreplaceable resources, nullified Congress's exercise of its constitutional powers to consolidate and expand the Monument, and created uncertainty for people who rely on the lands remaining in their undeveloped state for their livelihoods, recreational pursuits, studies, and spiritual sustenance. Accordingly, this Court should declare President Trump's 2017 and 2026 Proclamations to be unlawful. Actions by the Department of the Interior and the Bureau of Land Management ("the Bureau"), under the direction of the

Secretary of Interior and the Director of the Bureau, (collectively, "Agency Defendants"), to implement the President's unlawful proclamation are likewise unlawful and should be enjoined.

**JURISDICTION AND VENUE**

12. This case arises under the Constitution and the laws of the United States. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question).

13. The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and its inherent authority to issue equitable relief. Relief addressed to the Agency Defendants is also authorized by 5 U.S.C. §§ 703, 706.

14. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiffs The Wilderness Society and National Parks Conservation Association reside in this District, and because the Southern Utah Wilderness Alliance, Natural Resources Defense Council, Center for Biological Diversity, and Sierra Club maintain offices in the District.

16. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and (e)(1) because the Defendants reside in this District. Additionally, the events giving rise to the action challenged here took place in this judicial district. President Trump signed and issued the 2026 Dismantling Proclamation in this District. Former Interior Secretary Ryan Zinke's national monument review and transmittal of his recommendations to the President concerning Grand Staircase took place in this District. Any review and recommendations made by current Interior Secretary Doug Burgum concerning Grand Staircase took place in this District. Interior officials' actions in furtherance of the 2017 and 2026 Dismantling Proclamations took place in this District.

## PLAINTIFFS

17. Plaintiff THE WILDERNESS SOCIETY is a non-profit national organization founded in 1935. Headquartered in Washington, D.C., The Wilderness Society has members who reside throughout the nation, including in Utah. The Wilderness Society's mission is uniting people to protect America's wild places.

18. Prior to the national monument designation, The Wilderness Society worked for years to protect wilderness and other sensitive lands ultimately included within Grand Staircase-Escalante National Monument in the 1996 Designating Proclamation and the 2021 Restoration Proclamation. The Wilderness Society supported Grand Staircase's creation, and since 1996 it has continued to advocate for the protection of all lands within its borders.

19. Many of The Wilderness Society's members, including Ray Bloxham, visit the Monument, including the areas that have now been stripped of protection, to experience their remote wilderness quality, view wildlife, camp, hike, and enjoy the vivid, natural beauty of the area. Additionally, its members enjoy viewing the Monument's numerous archaeological and paleontological sites. Its members, including Mr. Bloxham, plan to visit the area regularly in the future, including in the next year.

20. Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC. ("NRDC"), is a non-profit environmental membership organization with hundreds of thousands of members nationwide. Part of NRDC's core mission is to preserve the earth's wild places and wildlife, to safeguard the integrity of undeveloped lands, and to prevent the destructive impacts of extractive industry exploration and development on public lands.

21. NRDC actively supported the designation and restoration of Grand Staircase.

22. NRDC has individual members, including Moab resident Susan Harrington who uses and enjoys the Monument lands (including the areas that have now been stripped of

protection) for scientific study, hiking and recreation, wildlife viewing, meditation and quiet contemplation, education, and aesthetic appreciation. These NRDC members live in Utah and intend to continue visiting the Monument lands frequently, including in the next year.

23. Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE ("SUWA") is a non-profit environmental membership organization with members in all fifty states and offices in Washington, D.C., and Utah. It is dedicated to the sensible management of federal public lands within the State of Utah, the preservation and protection of plant and animal species, the preservation and protection of cultural and archaeological resources, and the permanent preservation of Utah's remaining wild lands.

24. SUWA staff and members have worked for decades to obtain protection for Grand Staircase. In the early 1990s, SUWA opposed a large coal mine and associated developments in the heart of the Monument. SUWA staff and members actively supported the national monument designation to preserve the objects identified in the 1996 Designating Proclamation for current and future generations of Americans.

25. SUWA has individual members, including Ray Bloxham and Kya Marienfeld, who often visit Grand Staircase (including the areas that have now been stripped of protection) for spiritual renewal, recreation, photography, and appreciation of the area's significant natural resources, flora and fauna, and geology. Both Mr. Bloxham and Ms. Marienfeld have hiked, camped, appreciated archaeological sites, and explored in the excluded portions of Circle Cliffs, Wolverine Bench, Paria River Corridor, and along the Hole-in-the-Rock Road, among many other excluded areas. SUWA members, including Mr. Bloxham and Ms. Marienfeld, plan to visit the area regularly in the future, including in the next year.

26. Plaintiff GRAND CANYON TRUST is a non-profit public lands advocacy organization with members who live and work throughout the Colorado Plateau. Through its advocacy, Grand Canyon Trust ensures that the Colorado Plateau remains characterized by vast open spaces, healthy ecosystems, and communities enjoying a sustaining relationship with the natural environment.

27. Grand Canyon Trust's members and staff supported President Clinton's designation of Grand Staircase, and President Biden's 2021 restoration of the Monument, and have since advocated for additional protections.

28. Grand Canyon Trust's members and staff, including Tim Peterson, regularly visit areas in the Monument, including the areas that have now been stripped of protection, to recreate, find solitude, practice photography and other creative arts, experience the unique landscape, examine the region's unique geology and paleontology, monitor and study wildlife and plants, and view Native American cultural sites, including ancient structures, pictographs, and petroglyphs. Mr. Peterson and other Grand Canyon Trust members and staff will continue to visit the Monument lands in the future to engage in these activities, including in the next year.

29. Plaintiff NATIONAL PARKS CONSERVATION ASSOCIATION ("NPCA") is a non-profit national organization whose primary mission is to address major threats facing protected federal lands such as national parks and national monuments. NPCA has more than 1.9 million members and supporters throughout the United States.

30. NPCA advocates to decision-makers and the public for the protection of federal lands. NPCA has been a strong and consistent advocate for safeguarding the threatened scientific and cultural resources within Grand Staircase.

31. NPCA has members, including Ray Bloxham who regularly visit the Monument (including lands that have now been stripped of protection) to camp, sightsee, view native wildlife and vegetation, hike, and enjoy the many scientific and cultural sites that can be found there. Mr. Bloxham and other members also plan to visit the Monument regularly in the future, including in the next year.

32. Plaintiff GREAT OLD BROADS FOR WILDERNESS ("Great Old Broads") is a national grassroots non-profit organization, led by elders, that seeks to protect the interests of senior populations who value roadless areas, enjoy them without mechanized means of transportation, and want to see these areas protected in their natural state for future generations. Great Old Broads has over 10,000 members and supporters, many of whom reside or engage in recreational activities in Utah.

33. Great Old Broads has conducted educational, stewardship, documentation, and advocacy activities related to the lands within Grand Staircase. Great Old Broads has also monitored land health and watershed health conditions in multiple field visits over many years in Grand Staircase.

34. Because Great Old Broads is headquartered in Durango, Colorado, many of its members consider Grand Staircase-Escalante their "backyard." Members, including Steve Allen, regularly visit the Monument (including the areas that have now been stripped of protection) to hike, backpack, enjoy the outstanding scenery and fascinating archaeological sites, view native plant and animal life, take photographs, conduct historical research, and experience the remoteness and quiet of the area. Mr. Allen and other members will continue to do so, including in the next year.

35. Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a non-profit conservation organization founded in 1993 with the mission of protecting and restoring western watersheds and wildlife.

36. WWP has a longstanding interest in the preservation of Grand Staircase and has for many years advocated for protection of its native plants and ecosystem health. WWP has participated in a biological soil crust study, taken photos of riparian damage, monitored pinyon-juniper woodlands, made presentations on vegetation treatments to the Monument's managers, submitted numerous public comments regarding management of the Monument, appeared in a TV segment on grazing impacts to the Monument, and conducted field trips in the Monument.

37. WWP staff and members, including Laura Welp, Erik Molvar, and Cyndi Tuell regularly use lands in the Monument (including the areas that have now been stripped of protection) for hiking, wildlife viewing, nature study, photography, scenery viewing, and viewing of geological and archaeological features. Mr. Molvar, Ms. Welp, and other members and staff make multiple trips to the monument each year, and have concrete plans to visit in the future, including in the next year.

38. Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit organization with over 176,000 members that is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. The protection of Grand Staircase is vital to this work because the Monument preserves large tracts of unfragmented wildlife habitat and migration routes.

39. Guardians' members and supporters recreate on public lands in Utah and specifically in Grand Staircase. Guardians' staff and members, including Louise Excell and David Pettit, frequently visit the Monument for the purposes of hiking, observing archeological

sites, bird watching, observing wildlife, spiritual rejuvenation, landscape photography, and other recreational and professional pursuits. Ms. Excell, Mr. Pettit, and other Guardians' members and staff have firm plans to continue visiting the monument (including the areas that have now been stripped of protection) in the future, including in the next year.

40. Plaintiff SIERRA CLUB is a national nonprofit organization with 64 chapters and about 599,549 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass the continued protection, use, and enjoyment of Grand Staircase-Escalante National Monument for its members and supporters within Utah and across the United States. The Utah Chapter of Sierra Club has approximately 4,155 members.

41. Sierra Club's particular interests in this case stem from its advocacy in support of the initial monument designation and ensuring that the resources within Grand Staircase-Escalante are properly protected. Sierra Club has members who use and enjoy the monument on a regular basis for outdoor recreation, nature study, birdwatching, photography, fishing, canoeing, hunting, backpacking, camping, solitude, and other activities.

42. For example, Sierra Club Utah Chapter member James Catlin first visited the area that would become the monument in 1976. For years, he actively supported protection for the monument through scientific research and public engagement. He attended the ceremony when President Clinton designated the monument. Mr. Catlin plans to continue visiting the Monument (including the areas that have now been stripped of protection) in the future, including in the next year.

43. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a national non-profit organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has over 120,000 members and is headquartered in Tucson, Arizona.

44. Within the southwestern United States, the Center has a long history of environmental advocacy, public lands conservation, and working to protect species and habitats that occur within the Monument. Further, Center members participated in efforts to establish the Monument.

45. The Center's members, including Taylor McKinnon, have visited the public lands within the Monument (including the areas that have now been stripped of protection) for hiking, camping, viewing and studying wildlife, photography, and other vocational and recreational activities. The Center's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their activities in these areas. Mr. McKinnon and other members and staff have specific intentions to continue using and enjoying these areas frequently and on an ongoing basis in the future, including in the next year.

46. The Plaintiff organizations actively supported the designation of Grand Staircase in 1996 and its restoration in 2021. Since then, Plaintiffs have participated in numerous public processes to safeguard the Monument, including commenting on the development of the monument management plans, grazing authorizations and allotment availability designations, oil and gas drilling on pre-existing leases, motorized vehicle management, watershed restoration, and recreation management.

47. In their efforts to support the Monument, many of the Plaintiff groups submitted comments on the Department of the Interior's national monument review between May and July

2017; submitted comments and protests relating to the Bureau's management planning process; and advocated for the Monument's restoration.

48. The interests Plaintiffs seek to protect are germane to each organization's purpose, and neither the claims asserted nor the relief requested requires the participation of individual members in this lawsuit.

**DEFENDANTS**

49. Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States. He currently resides and conducts his duties in Washington, D.C.

50. Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior of the United States.

51. Secretary Burgum is responsible for ensuring that the Department of the Interior and its constituent agencies, including the Bureau, comply with the applicable law, including the 1996 and 2021 Proclamations' direction and requirements for managing the Monument.

52. The Secretary of the Interior resides and conducts his duties in Washington, D.C.

53. Defendant STEVE PEARCE is sued in his official capacity as the Director of the Bureau of Land Management, a bureau within the U.S. Department of the Interior.

54. The Director of the Bureau is responsible for ensuring that the Bureau complies with the applicable law, including the 1996 and 2021 Proclamations' direction and requirements for managing the Monument.

55. The Director of the Bureau presently resides and conducts his duties in Washington, D.C.

56. The above-named Defendants have the authority, ability, and obligation to remedy the harms alleged to Plaintiffs and their members.

## BACKGROUND

### I. Congress enacted the Antiquities Act to protect historic or scientific resources on federal lands for future generations.

57. The U.S. Constitution's Property Clause gives Congress the exclusive "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Exercising this power, Congress has enacted laws setting up default rules for federally owned lands while also creating "reservations" of lands for specific purposes (such as national parks) or placing limitations on lands' use. *Compare, e.g.*, 30 U.S.C. § 22 *et seq.* (General Mining Act of 1872 that makes lands open to the location of mining claims unless withdrawn), *with* An Act Establishing Yellowstone National Park, 17 Stat. 32 (1872) (codified at 16 U.S.C. § 21) (reserving land for the first national park and withdrawing it from "settlement, occupancy, or sale").

58. The President, in contrast, has no independent constitutional authority over federal public lands. Congress may delegate certain aspects of its Property Clause authority to the President, but when it does so, the President may exercise authority only within the defined scope of the delegation.

59. Starting in the 1800s, Congress began enacting legislation delegating authority to the President to protect resources on federal lands in its stead. For example, the Forest Reserve Act of 1891 authorized the President to "declare the establishment of [forest] reservations and the limits thereof." Act of March 3, 1891, § 24, 26 Stat. 1095, 1103 (1891). Whether done by Congress directly or through a delegation to the President, such reservations were necessary to prevent resource loss facilitated by the general land laws that promoted resource extraction or conversion of public lands to private ownership.

60. As Congress delegated aspects of its land-reservation authority to the Executive Branch, Congress faced the question of what to do if it disagreed with the reservation. When Congress wanted the President to have the ability to revoke a reservation in whole or in part, it delegated the authority expressly. *See, e.g.*, 1897 Organic Act, 30 Stat. 11, 36 (1897) (codified at 16 U.S.C. § 473) (amending Forest Reserve Act to authorize the President to "modify any Executive order . . . establishing any forest reserve").

61. By the turn of the twentieth century, Congress saw a need to delegate to the Executive Branch authority to swiftly protect historic and scientific resources on federal lands. *See* H.R. Rep. No. 59-2224, at 2-3 (1906). Without protections, private parties looted these lands and sold off valuable objects, entered the lands to extract minerals (destroying the scientific and historic resources in the process), or sought to profit by claiming lands for themselves and then charging admission to the public.

62. With an eye towards preserving America's distinct heritage for future generations, Congress enacted the Antiquities Act in 1906. The Act authorizes the President to do two things: (1) to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and (2) to "reserve parcels of land as a part of the national monuments" that comprise "the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(a), (b).

63. A national monument designation immediately confers enhanced protection for the identified "objects of historic or scientific interest" and for the reserved lands on which they are found. *See* 54 U.S.C. § 320301(a). Once designated as a national monument, those lands must be "manage[d]" for the "protect[ion]" of the objects of historic or scientific interest located

there. *Id.* § 320301(b). The land is also "reserve[d]" for purposes of monument protection and thereafter exempt from the operation of certain laws that facilitate extractive use, like the General Mining Act of 1872.

64. Congress has time and again demonstrated its approval of national monuments and the durability of the protections they confer.

65. When Congress updated federal land law in 1976 through the Federal Land Policy and Management Act, it rescinded numerous public lands provisions but notably left the President's authority to create national monuments intact.

66. In 2009, Congress enacted the Omnibus Public Land Management Act, which included all Bureau-managed national monuments—including Grand Staircase—within a newly established "National Landscape Conservation System." The National Landscape Conservation System's purpose is to "conserve, protect, and restore nationally significant landscapes that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations." Pub. L. No. 111-11, § 2002, 123 Stat. 991, 1095 (2009) (codified at 16 U.S.C. § 7202(a)). Then-existing monuments, as well as those established thereafter, were included in the system. 16 U.S.C. § 7202(b)(1)(A).

## II. Grand Staircase-Escalante National Monument is a living laboratory for scientific study.

### *A. Objects of historic or scientific interest are found throughout the Monument.*

67. Both President Clinton's 1996 Designating Proclamation establishing the Grand Staircase-Escalante National Monument, and President Biden's 2021 Proclamation restoring it, describe in detail the geological, paleontological, ecological, archaeological, historic, and cultural significance of Grand Staircase and the objects of historic or scientific interest found there, and they set forth requirements essential to their future protection. 61 Fed. Reg. at 50,223-

26; 86 Fed. Reg. at 57,344-46. The fossils, geological formations, plants, animals, habitats, and cultural objects described below are found throughout Grand Staircase and are among the objects of historic or scientific interest identified in the Proclamations.

68. The Grand Staircase from which the Monument derives its name is a series of multi-colored cliffs rising in a stairstep fashion, creating a renowned and massive geological formation. 61 Fed. Reg. at 50,223; 86 Fed. Reg. at 57,337.




*Fig. 1: Photo of the Grand Staircase from Yovimpa Point (Credit: NPS Photo / Peter Densmore, https://perma.cc/K65A-PRSX)*

69. Grand Staircase's stratified geological formations make it a world-class paleontological site by exposing fossils that would otherwise be deep underground. 61 Fed. Reg. at 50,223-24; 86 Fed. Reg. at 57,337, 57,340. Sites in Grand Staircase contain fossils of mollusks, turtles, crocodilians, lizards, fishes, and mammals (some of which are found nowhere else in the world). 61 Fed. Reg. at 50,223-24; 86 Fed. Reg. at 57,341-42, 57,343. The Kaiparowits Plateau, a fifty-mile-long, high-elevation escarpment in the heart of the Monument,

"contains one of the best and most continuous records of Late Cretaceous terrestrial life in the world." 61 Fed. Reg. at 50,224; 86 Fed. Reg. at 57,340.

70. Grand Staircase contains numerous cultural sites because it has long been a point of intersection and contact for different Native American cultures. Diverse groups of Ancestral Puebloan cultures mingled in the area, leaving irreplaceable objects and sites. 61 Fed. Reg. at 50,224; 86 Fed. Reg. at 57,338-39. The cultural landscape of the Grand Staircase, as well as sites within it, continue to hold importance for Native American tribes today.

71. Due to its cliffs' steep elevation changes, Grand Staircase contains an unusually high number of different habitats in a concentrated area. 61 Fed. Reg. at 50,224-25; 86 Fed. Reg. at 57,337. The geologic uplift, deformation, and erosion of the landscape have exposed large expanses of soil layers with distinct physical and chemical characteristics, which, in turn, support numerous vegetative communities, endemic plants, and their pollinators. The Monument is "perhaps the richest floristic region in the Intermountain West." 61 Fed. Reg. at 50,224; *accord* 86 Fed. Reg. at 57,335.

72. Undisturbed by human impacts, remote locations within Grand Staircase harbor relict plant communities, with pinyon-juniper communities containing trees up to 1,400 years old. 61 Fed. Reg. at 50,224; 86 Fed. Reg. at 57,340. Over 200 species of birds are found in the Monument, including bald eagles, peregrine falcons, and neotropical migrant birds that concentrate around rivers and streams within Grand Staircase. 61 Fed. Reg. at 50,225; 86 Fed. Reg. at 57,337.

***B. The 1996 Designating Proclamation***

73. To protect the objects of historic or scientific interest in the region, in 1996, President Clinton exercised his authority under the Antiquities Act to declare the Grand Staircase-Escalante National Monument. 61 Fed. Reg. at 50,225. Given the high concentration

and interconnectedness of the objects of historic or scientific interest, President Clinton determined that a continuous 1.7 million acres represented the smallest reservation compatible with the proper care and management of the objects contained therein. *Id.*

***C. Subsequent congressional action***

74. Following the designation, Congress has enacted multiple statutes to endorse, enhance, and fulfill the promise of the Grand Staircase.

75. In 1998, Congress ratified a land-exchange agreement between the State of Utah and the federal government to "further the interest of . . . the[] [Monument's] conservation resources." Utah Schools and Lands Exchange Act of 1998, Pub. L. No. 105-335, § 2, 112 Stat. 3139, 3141 (1998). As part of the agreement, Utah exchanged approximately 176,000 acres of land that it owned scattered throughout the Monument's boundaries (called "inholdings"), plus the mineral interests in an additional 24,000 acres, for a $50 million payment and equivalent federal lands and mineral interests outside Grand Staircase's boundaries. Pub. L. No. 105-335, §§ 2-3, 7, 112 Stat. at 3139-41. Congress found that Utah's inholdings, located throughout the Monument, had substantial "scientific, historic, cultural, scenic, recreational, and natural resources, including ancient Native American archaeological sites and rare plant and animal communities," and that "[d]evelopment of surface and mineral resources" on such lands "could be incompatible with the preservation of these scientific and historic resources for which [Grand Staircase] was established." Pub. L. No. 105-335, § 2(2)-(3), 112 Stat. at 3139.

76. Also in 1998, Congress passed another statute adjusting Grand Staircase's boundaries, adding some lands and removing others. Automobile National Heritage Area Act, Pub. L. No. 105-355, § 201, 112 Stat. 3247, 3252-53 (1998). On balance, this statute added approximately 5,546 more acres to Grand Staircase.

77. Together, these two acts of Congress modified Grand Staircase's boundaries and added roughly 181,500 acres of land to the Monument, plus mineral interests in an additional 24,000 acres, bringing its total area to nearly 1.9 million acres.

78. Not long thereafter, to ensure lasting protection from coal mining, Congress appropriated $19.5 million to buy back pre-existing coal leases within Grand Staircase's Kaiparowits Plateau. Department of the Interior and Related Agencies Appropriations Act, 2000, Pub. L. No. 106-113, § 601, 113 Stat. 1501, 1501A-215 (1999). The United States subsequently acquired the leases with these funds, with one company receiving $14 million for 34,449 acres of coal claims.

79. In 2009, as part of the Omnibus Public Land Management Act, Congress made one more small modification to the Monument's boundaries. Pub. L. No. 111-11, § 2604, 123 Stat. 991, 1119-20 (2009) (removing roughly 25 acres from the Monument to exclude a ranch).

80. In total, Congress added over 206,000 acres to Grand Staircase and appropriated nearly $70 million to close literal gaps in the Monument's protections.

81. In light of Congress's actions, the federal government has previously argued in legal briefs that Congress ratified Grand Staircase's boundaries.

***D. The 2017 Dismantling Proclamation***

82. On April 26, 2017, President Trump issued Executive Order 13,792, 82 Fed. Reg. 20,429 (Apr. 26, 2017), which directed the Secretary of the Interior to "review" national monuments designated since 1996—the year President Clinton designated the Monument.

83. As part of the national monument review, the Bureau collected information on oil, gas, coal, and mining potential in lands within Grand Staircase. The information collection noted that the Utah Geological Service estimated there were 11 billion tons of technologically recoverable coal in Grand Staircase. Then-Secretary of the Interior Ryan Zinke visited Grand

Staircase in 2017, and Kane County officials presented him with a map that proposed excluding major areas with coal deposits from the Monument.

84. On December 4, 2017, President Trump issued his proclamation revoking monument status from nearly half of Grand Staircase. 82 Fed. Reg. at 58,093-95. The 2017 Dismantling Proclamation replaced the original continuous monument with three fragmented, smaller "units," which the President named the "Grand Staircase," the "Kaiparowits," and the "Escalante Canyons" units. *Id.*

85. The 2017 Dismantling Proclamation abolished monument status for objects of historic or scientific interest on nearly 900,000 acres of lands—including 80,000 acres of land that Congress itself had added to the Monument since 1996. President Trump claimed at that time that this was the smallest area compatible with the protection of the remaining objects. *Id.* at 58,093. The new boundaries excluded land that the U.S. Geological Survey identified as containing coal deposits.

### *E. The 2021 Restoration Proclamation*

86. On the first day of his presidency, President Biden directed the Secretary of the Interior to determine whether he should restore national monuments that President Trump had dismantled, including Grand Staircase. *See* Exec. Order No. 13,990, § 3, 86 Fed. Reg. 7037, 7038 (Jan. 20. 2021).

87. In June 2021, then-Secretary of the Interior Deb Haaland released her report after meeting with the Governor of Utah, the entire Utah congressional delegation, and Tribal Leaders. US Dep't of the Interior, Report on Restoring National Monuments (2021). Noting "[q]uestions about the legality" of the 2017 Dismantling Proclamation (and other national monument reductions), the Secretary stated that "pressing threats" to monument resources that emerged after the 2017 Dismantling Proclamation proved that the original proclamation establishing the

monument was "prudent and prescient." *Id.* at 14. As a result, the Secretary recommended restoring Grand Staircase to its pre-2017 boundaries.

88. On October 8, 2021, President Biden adopted the Secretary's recommendations in full. 86 Fed. Reg. at 57,335. The 2021 Restoration Proclamation found that the 2017 Dismantling Proclamation "remove[d] protection from objects of historic and scientific interest," including "some resources [the designating] Proclamation . . . specifically identifie[d]." *Id*. Anything short of national monument status was insufficient because other laws neither "provide[d] the Department of the Interior with the specific mandate to ensure proper care and management" of the Monument's resources nor "withdr[e]w the lands from the operation of the public land, mining, and mineral leasing laws." *Id.* at 57,344.

89. The 2021 Restoration Proclamation found that under the pre-2017 boundaries, "[s]cientists . . . utilized every corner of the monument in their efforts to better understand our environment, our history, our planet's past, and our place in the universe." *Id.* at 57,336. Thus, the 1996 Designating Proclamation boundaries (with Congress's additions) were the "smallest area compatible with the proper care and management of the objects of historic and scientific interest" named in both the 2021 Restoration Proclamation and the 1996 Designating Proclamation. *Id.*

***F. The 2026 Dismantling Proclamation***

90. Early in his second term, President Trump issued multiple executive orders prioritizing extractive activity on federal lands. *See, e.g.*, Exec. Order No. 14,154, §§ 2(a), 3(b), 90 Fed. Reg. 8353, 8354 (Jan. 20, 2026) (directing agency heads to review all agency actions that "burden" the development of "domestic energy resources" including oil, coal, and critical minerals); Exec. Order No. 14,261, §§ 2, 4, 90 Fed. Reg. 15,517, 15,517 (Apr. 8, 2025)

(directing the Secretary of the Interior, among others, to identify coal resources on federal lands and "impediments" to mining).

91. President Trump dismantled Grand Staircase a second time on July 13, 2026. The 2026 Dismantling Proclamation claimed that many of the geological features of the Monument, including ones the 2017 Dismantling Proclamation determined merited protection, were "generic" and merely "scenic" and not objects of historic or scientific interest. 91 Fed. Reg. at 45,179. It further asserted that other cultural, paleontological, and geological resources in the Monument were of "relative commonness" and therefore not of particular historic or scientific interest. *Id.* at 45,179.

92. Based on the President's assertion that the 2021 Restoration Proclamation protected "objects of no significant historic or scientific interest," the 2026 Dismantling Proclamation determined that a smaller reservation of land was warranted. *Id*. The 2026 Dismantling Proclamation also claimed that other laws protected some of the objects of historic or scientific interest named in the 2021 Restoration Proclamation (although it did not identify which objects), so a reservation of land was not necessary. *Id.* The 2026 Dismantling Proclamation also expressed a desire to use the Monument as a domestic supply of minerals and generally alluded to "greater budgetary and resource constraints" as reasons to exclude lands included in the Monument by the 2021 Restoration Proclamation. *Id.* at 45,180-82.




*Fig 2: Map of the Monument's boundaries under the 1996/2021, 2017, and 2026 Proclamations (Credit: SUWA)*

93. The 2026 Dismantling Proclamation replaced the Monument with two much smaller, fragmented "units": the Canyons of the Escalante Unit (172,641 acres) and the Kaiparowits Horizon Unit (8,900 acres). *Id.* at 45,181. The new boundaries excluded many objects specifically named by the previous proclamations as objects of historic or scientific interest, including the Grand Staircase itself, which the 2017 Dismantling Proclamation

described as a "one of the iconic landscapes of the American West." 82 Fed. Reg. at 58,091. The new boundaries also excluded lands described in the 2017 Dismantling Proclamation as rich with cultural and historic resources. For instance, the Kaiparowits Plateau, and in particular the Fifty-Mile Mountain area, contains "hundreds of cultural resource sites" that have enabled archeological research into the Fremont and Ancestral Puebloan cultures that occupied the area "starting in the early 1100s." *Id.* The Kaiparowits Horizon Unit includes an entirely separate exclave known as East Clark Bench, a rectangular tract of land that Congress added to the Monument through the Automobile National Heritage Area Act of 1998, stranded approximately 20 miles south of the other isolated parcel that together comprise the noncontiguous Kaiparowits Horizon Unit.

94. In total, the 2026 Dismantling Proclamation abolished monument status for objects of historic or scientific interest on over 1.6 million acres of land from Grand Staircase—including approximately 157,295 acres of land that Congress itself had added to the Monument since 1996. It also excluded several hundred thousand acres of land that President Trump himself declared in 2017 were eligible for national monument protection and that met the "smallest area" criteria.

## III. Repeated dismantling has harmed, and will continue to harm, Grand Staircase.

### *A. Grand Staircase's national monument designation had immediate benefits that have compounded over three decades.*

95. The 1996 monument designation protected Grand Staircase from extractive uses and human disturbances that would have harmed or destroyed its objects of historic or scientific interest. Overlapping statutes set the default rules for what activities are allowed on federal public lands. Some statutes govern specific types of extractive activities that apply on all federal lands that are not reserved or withdrawn for special purposes. *See, e.g.*, 30 U.S.C. § 22 *et seq.*

(General Mining Act of 1872). Other statutes provide default principles for the agency managing the lands. *See* 43 U.S.C. § 1732(a) (general mandate for the Bureau). These principles guide an agency's decisions on where and at what levels to allow certain types of ground-disturbing activity (such as off-road vehicles) when the agency creates land management plans governing particular areas. *See id.* § 1712(c) (establishing criteria for Bureau land management plans).

96. Although agencies must conduct environmental reviews before permitting destructive activity, these reviews are insufficiently protective on lands dense with historic or scientific resources. On such lands, any ground disturbance poses a substantial risk of inadvertently unearthing and destroying treasures millennia in the making. Moreover, the foundation of the southern Utah desert ecosystem is a fragile soil composed of living organisms such as algae, bacteria, and fungi. *See* 86 Fed. Reg. at 57,335 (highlighting the area's "unusual and diverse soils"). Left undisturbed, these "cryptobiotic" soils form a hard protective crust that prevents erosion and provides nutrients that make it possible for plants to grow in an otherwise harsh environment. Cryptobiotic soil crusts can take hundreds of years to recover from ground-disturbing activity, while unique plant communities, and the life they sustain, suffer or perish in the meantime.

97. National monument status changed the default principles for managing Grand Staircase. The 1996 Designating Proclamation conferred immediate protections and placed the proper care and management of the Monument's objects of historic or scientific interest at the forefront of the Bureau's decisions.

98. ***Prohibiting hard rock mining.*** The monument designation immediately withdrew the Monument's lands from the location of new hard rock mining claims. *See* 61 Fed. Reg. at 50,225. The General Mining Act of 1872, 30 U.S.C. § 22 *et seq.*, governs the mining of hard rock

minerals such as copper, uranium, titanium, alabaster, cobalt, and zirconium, all of which are present in Grand Staircase. Under the Bureau's regulations implementing the General Mining Act, prospectors do not need permits or other prior authorization before locating, recording, and conducting certain types of surface-disturbing operations on hard rock mining claims on open lands. *See, e.g.*, 43 C.F.R. §§ 3809.5, 3809.10(a) (allowing non-mechanized sample collection); *id.* §§ 3809.5, 3809.10(b), 3809.21(a) (allowing noticed exploratory activities causing surface disturbances of five acres or less). Prospectors may stake—that is, mark the ground with wooden stakes, flags, or other signage—hard rock mining claims on any federal land that is open to mineral entry. *See id.* § 3832.11(c). Claimants record their claims with both the county recorder's office and the Bureau and pay a fee to each. *See id.* §§ 3832.1(a)(2), 3832.12.

99. The harms from hard rock mining activity are substantial and long-lasting. Even exploratory activity can pollute the soil, produce unsightly waste and debris, scrape lasting scars into the soil, remove native vegetation, disturb wildlife habitat, increase erosion, harm water quality, and damage the cultural and paleontological resources dispersed throughout monument lands. Full-scale mining operations can excavate large pits in the ground and mar or destroy geological formations.

100. Although a national monument designation does not void valid pre-existing claims, additional approval procedures and restrictions apply to their development to minimize harm to objects of historic or scientific interest. *See* 43 C.F.R. § 3809.11(c)(7) (requiring Bureau review and approval for almost all ground-disturbing activity); *id.* § 3809.100(a)-(b) (requiring the Bureau to determine whether claims are valid before allowing ground-disturbing activity).

101. Because of the 1996 Designating Proclamation, the Bureau could not accept new mining claims and was obligated to limit development on existing ones.

102. ***Prohibiting coal, oil, and gas leasing.*** The national monument designation also withdrew the monument lands from mineral leasing. *See* 61 Fed. Reg. at 50,225. The Mineral Leasing Act of 1920 governs, among other things, coal, oil, and gas extraction on federal lands. 30 U.S.C. § 181 *et seq.* In general, the Bureau may lease non-withdrawn or unreserved federal lands for ten years or more once certain statutory procedures have been completed.

103. When lands are open to mineral leasing, the managing agency will accept nominations for new leases and conduct lease sales at which interested parties may bid. The federal government retains ownership of the land, but a leaseholder may apply for permits to extract mineral resources, and the government generally extends a lease as long as the leaseholder continues extracting. *See, e.g.*, 43 C.F.R. § 3107.21 (requiring lease extension so long as paying quantities of oil or gas are produced); *id.* § 3475.2 (coal leases extended if "the condition of continued operation is met").

104. Coal leasing and mining threats were active within Grand Staircase until President Clinton acted. The Bureau had sold coal leases in large parts of the fossil-rich Kaiparowits Plateau. The Bureau had also sold oil and gas leases in the Circle Cliffs, a paleontologically rich region in the Monument near Capitol Reef National Park that contains unusually large, unbroken petrified wood specimens. *See* 61 Fed. Reg. at 50,223; 86 Fed. Reg. at 57,338.

105. Coal mining and oil and gas drilling result in long-term harm to the leased land and the surrounding areas. Those harms include the excavation of mines and unsightly pits; the construction of well pads and other facilities; the scraping of surface vegetation and displacement of native fauna; the construction of new roads and pipelines (with resulting truck traffic, fumes, introduction of noxious weeds, and other damage); and air and water pollution.

Mining and drilling activities scar the landscape and cause dust, haze, and light pollution—disrupting not only the leased parcels themselves, but also the surrounding areas.

106. ***Limiting off-road vehicles.*** In addition to automatically limiting mining and leasing, the 1996 national monument designation permeated the Bureau's decisionmaking by requiring the agency to "manage the monument" in a manner consistent with "the purposes of this proclamation." 61 Fed. Reg. at 50,225. Protecting objects of historic or scientific interest became the paramount management objective.

107. In furtherance of the new management objective, the 1996 Designating Proclamation directed the Bureau to prepare a monument management plan to replace the existing, more permissive management plan. 61 Fed. Reg. at 50,225.

108. One of the most important elements of the management planning process is the designation of off-road vehicle areas and trails. One pass of a motorized vehicle can leave visible tracks, marked by crushed vegetation and long-lasting scars on fragile cryptobiotic soil crusts. These tracks invite follow-on use, which exacerbates the harm of the initial impact. Increased off-road vehicle use also creates a substantial increased risk of harm to cultural sites.

109. The 1996 Designating Proclamation led to management decisions that reduced the areas and routes where the public was permitted to drive off-road vehicles.

110. ***Promoting research and public education.*** In addition to preventing harm, the monument management plan detailed the Bureau's commitment to share scientific knowledge and cultural values with the public. The benefits of national monument protections can be seen in the three decades following Grand Staircase's designation in 1996. Fossils excavated from the Grand Staircase have been studied, interpreted, and displayed in local, regional, and national museums. Paleontologists recovered thousands of fossils from the Kaiparowits Plateau, and

those fossils significantly advanced scientists' understanding of the ecosystems that existed before the Cretaceous-Paleogene extinction. Fifteen species of dinosaurs previously unknown to science were discovered. 86 Fed. Reg. at 57,340.

111. Zoological and botanical research also flourished in Grand Staircase. Scientists identified over 600 species of bees in the Monument, including dozens that were unknown to scientists before 2003. 86 Fed. Reg. at 57,335.

***B. The 2017 Dismantling Proclamation harmed Grand Staircase.***

112. Because of the 2017 Dismantling Proclamation, the Department of the Interior and the Bureau stopped prioritizing the "proper care and management of the objects to be protected" on the lands removed from Grand Staircase. 54 U.S.C. § 320301(b). In the nearly four years that it was in effect, the 2017 Dismantling Proclamation allowed new mining claims and exploration on those claims that harmed Grand Staircase in ways that cannot easily be undone.

113. The 2017 Dismantling Proclamation revoked protections from hard rock mining for Grand Staircase by providing that within 60 days after the proclamation's issuance (February 2, 2018): "the public lands excluded from the monument reservation shall be open to: (1) entry, location, selection, sale or other disposition under the public land laws; (2) disposition under all laws relating to mineral . . . leasing; and (3) location, entry, and patent under the mining laws." 82 Fed. Reg. at 58,093.

114. Between February 2, 2018, and October 8, 2021 (the date on which President Biden restored protections), claimants located at least forty new mining claims on lands protected by the 1996 Designating Proclamation but excluded by the 2017 Dismantling Proclamation. Many of these claims are located near unique geological formations that Plaintiffs' members visited while the 2017 Dismantling Proclamation was in place and still visit to this day.

For example, near the paleontologically rich Circle Cliffs, prospectors located thirty claims that may contain cobalt and that they refer to as the "Mesa claims."



*Fig. 3: Circle Cliffs (Credit: Jeff Foott)*

115. Claimants typically notify others of their claim through flags, posts, and other markers. Location activities are noticeable by design and do not require agency approval.

116. Claimants could and did quickly engage in ground disturbing activity.

117. Although large scale mining requires a "plan of operations," a claimant may undertake extensive "notice"-level activities—that is, activities "causing surface disturbance" of up to five acres—by sending the Bureau "notice" of planned operations, paying a bond, and waiting fifteen calendar days after the Bureau receives the notice. 43 C.F.R. §§ 3809.10(b), 3809.21(a), 3809.312(c), 3809.503(c). Unless the Bureau requests additional information or takes other specific actions within that fifteen-day window, the claimant may proceed with ground-disturbing work. The Bureau is not required to, and often does not, notify the public that it has received a notice from a claimant, let alone take public input before allowing notice-level activity to move forward.

118. Notice-level activity can include road construction, the use of mechanized earth-moving equipment, and the use of truck-mounted drilling equipment. *See* 43 C.F.R. §§ 3809.5, 3809.10, 3809.21(a), 3809.312(a). The environmental harms of notice-level mining activities are substantial: polluting the air and soil, scraping lasting scars into the soil, removing native vegetation, disturbing wildlife habitat, increasing erosion, and harming water quality. Notice-level activity also increases truck traffic on the roads near the mine site.

119. The auditory and visual effects of notice-level mining activities—including dust, mechanical noise, and light pollution—can extend well beyond the boundaries of the mining claims themselves, broadly impacting large areas that would otherwise be quiet and pristine. Visual and auditory disturbances can be seen and heard for miles, especially on mesas and slickrock expanses in the Monument's rocky desert landscape, where there is relatively little vegetation to dampen sound or to obstruct viewsheds.

120. Notice-level mining activities can also harm fragile cultural, archaeological, and paleontological resources, which are widely dispersed throughout the excised lands. The Bureau does not require National Historic Preservation Act review or surveys for archaeological resources before notice-level operations proceed. *See, e.g.*, 36 C.F.R. Part 800; 43 C.F.R.§ 3809.313.

121. Notice-level activity could and did occur in Grand Staircase following the 2017 Dismantling Proclamation. For example, in September 2018, a company called Penney's Gemstones staked multiple claims that it called "Creamsicle" for alabaster mining in the northern portion of the former monument lands near Bryce Canyon National Park. Penney's Gemstones conducted notice-level activity while the 2017 Dismantling Proclamation was operative. This

activity left visible scars on the exposed faces of pale pink and orange cliffs where rock has been removed by mechanized equipment. There were also visible vehicle tracks leading to the site.



*Fig. 4: Rock scarring from notice-level mining activity at the Creamsicle Mine site (Credit: SUWA)*

122. The 2017 Dismantling Proclamation also paved the way for more widespread destructive activities, including increased off-road vehicle use and oil and gas leasing. In 2020, as directed by the 2017 Dismantling Proclamation, the Bureau finalized new management plans for the dismantled Monument. For the management plan governing the excised lands, the Bureau immediately opened the new 116-acre Little Desert "play area" where off-road vehicles could traverse cross-country (i.e., off-trail).

123. The management plan for the excised lands also opened more than 650,000 acres of land previously closed to mineral leasing. President Biden restored monument status to these lands before leases could be offered.

### *C. The 2021 Restoration Proclamation did not completely undo the harms to Grand Staircase from the 2017 Dismantling Proclamation.*

124. The 2021 Restoration Proclamation provided Plaintiffs' members benefits similar to the 1996 Designating Proclamation. *See supra* ¶¶ 95-111. Incorporating the 1996 Designating Proclamation by reference, the 2021 Restoration Proclamation restored national monument status to the unlawfully excised lands; withdrew them from hard rock mineral entry and location; and withdrew them from oil, gas, and coal leasing. The 2021 Restoration Proclamation once again placed the protection of objects of historic or scientific interest at the forefront of the Bureau's decisions and required the Bureau to issue a new monument management plan. The resulting 2025 management plan added concrete protections like closing the Little Desert off-road vehicle play area.

125. Nonetheless, the 2017 Dismantling Proclamation harmed, and continues to threaten a substantial risk of harm to, Grand Staircase and Plaintiffs' members. Despite the 2021 Restoration Proclamation, the Bureau has continued to treat mining claims located 60 days after the 2017 Dismantling Proclamation's issuance (February 2, 2018) and before the 2021 Restoration Proclamation (October 8, 2021) as valid existing rights, even though President Trump lacked lawful authority to open that land to mining claims during that period. After October 8, 2021, the Bureau reviewed plans and corresponded with claimants as if their claims were validly located.

126. The mining claims staked under the 2017 Dismantling Proclamation harmed, and continue to threaten a substantial risk of harm to, Grand Staircase and Plaintiffs' members. Plaintiffs' members, including Mr. Bloxham, Ms. Marienfeld, Mr. Peterson, and Mr. Allen recreate in areas where mining activity could be visible or audible such as Bryce Canyon and Cottonwood Canyon Road (near where the Creamsicle claims are located). Moreover, Plaintiffs'

members, including Mr. Allen, Mr. Bloxham, Ms. Harrington, Mr. Peterson, Ms. Marienfeld, and Ms. Welp, regularly recreate near where the thirty Mesa mining claims are located such as areas near the Circle Cliffs, Silver Falls, and Moody Canyon. Activity on these claims harms the recreational and aesthetic interests of Plaintiffs' members.

127. Plaintiffs' injuries are directly traceable to the 2017 Dismantling Proclamation. Had the 1996 Designating Proclamation remained in place, the new mining claims could not have been located or developed.

128. Allowing mining claims and development on Monument lands means that irreplaceable resources are damaged: objects of historic or scientific interest may be destroyed, as may the context on which scientists and archaeologists depend when studying resources on undisturbed lands. For Grand Staircase in particular, the new mining claims opened holes in the Monument's protections after Congress took pains to plug them by acquiring inholdings and buying back leases following Grand Staircase's designation in 1996.

### *D. The 2026 Dismantling Proclamation will further harm Plaintiffs and their members*

129. The 2026 Dismantling Proclamation creates a substantial and imminent risk of harm to the lands and objects of interest stranded outside the Monument's vastly diminished boundaries and, thus, to Plaintiffs and their members. Indeed, a prospector has already attempted to locate new mining claims on recently excised Monument land. Moreover, Agency Defendants have already indicated that they have decided not to comply with the 2021 Restoration Proclamation by taking down signage on lands excised by the 2026 Dismantling Proclamation.

130. Each of the Plaintiff organizations has individual members who regularly use and enjoy Grand Staircase, including the lands stripped of monument status by the 2026 Dismantling Proclamation. Many of these members live in Utah or northern Arizona within driving distance

of the Monument. They know the landscape intimately and return to it multiple times each year for hiking and recreation, wildlife viewing, exploration, and spiritual renewal. Some also perform fieldwork in the Monument, documenting landscape conditions and wilderness characteristics.

131. Plaintiffs' members value the beauty, remoteness, natural quiet, and largely unspoiled nature of the landscape and the geological, paleontological, archaeological, historic, cultural, and ecological resources found throughout the Monument, including in areas that the 2026 Dismantling Proclamation excluded from the Monument.



*Fig. 5: Grosvenor Arch (Credit: Tim Peterson)*

132. The 2026 Dismantling Proclamation excludes lands replete with objects of historic or scientific interest, many of which the 2021 Restoration Proclamation expressly named. The excluded lands include part of the Circle Cliffs, White Canyon Flat, Hole-in-the-Rock Road, Scorpion Flat, Fortymile Ridge, Dry Fork and Coyote Gulch, Chimney Rock, Wahweap Hoodoos, the Paria River corridor, Buckskin Gulch, West Clark Bench, Wire Pass,

Long Canyon, House Rock Valley Road, and Kitchen Corral Wash. Objects expressly named by the 2017 Dismantling Proclamation, including Burr Trail, Grosvenor Arch, Wolverine Bench, Fiftymile Bench, Cottonwood Wash and the Cockscomb, Vermillion Cliffs, Skutumpah Terrace, and the White Cliffs, are also now excluded. Plaintiffs' members have visited, and intend to continue visiting, these areas.



*Fig. 6: Cockscomb (Credit: Tim Peterson)*

133. Lands that have been stripped of monument protection are at immediate risk of harm.

134. The 2026 Dismantling Proclamation removes restrictions on existing mining claims such as the Creamsicle and Mesa claims. While the Monument's protections were in place, the claimants could not engage in notice-level activity. *See* 43 C.F.R. § 3809.11(c)(7). Now that the Monument's protections have been lifted, there is a substantial risk that claimants will quickly commence notice-level activities, such as using mechanized earth-moving equipment and truck-mounted drilling equipment, similar to those conducted by Penney's Gemstones conducted at Creamsicle before 2021.

135. The noise and destruction of resources from notice-level activity and associated increase in traffic will harm the recreational and aesthetic interests of Plaintiffs' members who hike, camp, backpack, photograph, and enjoy quiet recreation and meditation in areas surrounding mining claims. Noise and visual disturbances from mining would interfere with Plaintiffs' members' ability to engage in these activities.

136. For example, Mr. Allen, Mr. Bloxham, Ms. Harrington, Mr. Peterson, Ms. Marienfeld, and Ms. Welp use the lands surrounding the Mesa claims for hiking, quiet recreation, and other activities. There is a substantial risk that mining activity, including notice-level activity, will commence on the Mesa claims, harming the ability of Plaintiffs' members to use and enjoy the surrounding lands for their current activities.

137. The 2026 Dismantling Proclamation also creates a substantial risk of additional harmful activity at the Creamsicle mine. Mr. Bloxham, Ms. Marienfeld, Mr. Peterson, and Mr. Allen use the lands surrounding the Creamsicle mine, such as Bryce Canyon and Cottonwood Canyon Road, for hiking, quiet recreation, and other activities. Auditory and visual disturbances are perceptible even at a considerable distance from the Creamsicle site. Prior exploration activity at the Creamsicle mine under the 2017 Dismantling Proclamation harmed the recreational and aesthetic interests of Plaintiffs' members, and there is a substantial risk of additional notice-level activity that will harm the ability of Plaintiffs' members to use and enjoy the surrounding lands for their current activities.

138. The injuries to Plaintiffs' members are directly traceable to the 2026 Dismantling Proclamation. If the 2021 Restoration Proclamation were still in place, notice-level mining activity could not occur on the Creamsicle and Mesa mining claims. *See* 43 C.F.R. § 3809.11(c)(7) (requiring a plan of operations for most ground-disturbing activity on existing

claims in national monuments). Under the 2026 Dismantling Proclamation, however, notice-level activity can occur at the Creamsicle and Mesa claims without such constraints, and with minimal (if any) agency restrictions or opportunity for the public to object. *See* 43 C.F.R. §§ 3809.10(b), 3809.21(a). The Bureau is unlikely to restrict notice-level activity on the Mesa claims given the 2026 Dismantling Proclamation's express purpose of promoting mining of certain minerals including cobalt. *See* 91 Fed. Reg. at 45,181.

139. There is now a substantial risk that the Bureau will approve larger, more destructive mining operations on existing claims, including the Creamsicle and Mesa mining claims. If the 2021 Restoration Proclamation remained in place, the Bureau could not approve a plan of operations on those claims unless and until it conducted a validity determination. *See* 43 C.F.R. § 3809.100(a). Even after a validity determination, the Bureau could approve a plan of operations only if it conducted an environmental analysis and determined that mining operations would not harm the Monument's objects. *See* 86 Fed. Reg. at 57,344-45.

140. Without the Monument's protections in place, claimants on preexisting claims, such as the Mesa claims, can submit plans of operation for a mine without needing to undergo a validity determination. Penney's Gemstones has already undergone a validity determination and has submitted a plan of operations for larger operations at Creamsicle. The Bureau no longer has to consider or effectuate the protection of the Monument's objects as its paramount objective when reviewing the Creamsicle plan of operations. There is a substantial likelihood of more destructive activity than the Bureau would have allowed under the 2021 Restoration Proclamation at these preexisting claims, given the 2026 Dismantling Proclamation's express purpose of promoting mining.

141. In addition to existing claims, there is a substantial risk that prospectors will locate new claims and engage in similarly destructive activity. The 2026 Dismantling Proclamation directed the Bureau, as of September 11, 2026 (60 days after the proclamation was issued), to disregard the 2021 Restoration Proclamation's ban on mineral entry and location for the lands excised from Grand Staircase. *Id.* at 45,182. After September 11, 2026, the Bureau will comply with the 2026 Dismantling Proclamation and allow mineral entry and location on the excised lands.

142. At least one prospector has already filed mining claims on the excised lands, even before the 60-day waiting period has lapsed. On August 6, 2026, Craig Rosequist filed two claims with the Kane County Recorder's Office on land near the Vermilion Cliffs that the 2026 Dismantling Proclamation unlawfully stripped of protection.

143. Due to the 2026 Dismantling Proclamation, prospectors will be able to locate even more new mining claims on lands that Plaintiffs' members use for recreation and field study. Prospectors will advertise their claims using posts, flags, and other markings that harm the aesthetic, recreational, and other interests of Plaintiffs' members, including by impairing members' ability to experience solitude and engage in spiritual renewal.

144. Moreover, there is a substantial risk that prospectors will quickly begin destructive notice-level mining operations, such as using mechanized earth-moving equipment and truck-mounted drilling equipment, similar to the activities Penney's Gemstones conducted at the Creamsicle mine under the 2017 Dismantling Proclamation. Notice-level activities on new mining claims would further harm the recreational, scientific, spiritual, aesthetic, and other interests of Plaintiffs' members. For prospectors who submit plans of operation, there is a substantial likelihood that the Bureau will impose fewer restrictions before authorizing ground-

disturbing activity than it would have when the Monument was intact under the 2021 Restoration Proclamation. The risk is particularly high for claims potentially containing chromium, cobalt, copper, iron, lead, manganese, molybdenum, nickel, silver, thorium, titanium, uranium, vanadium, zinc, and zirconium, which the 2026 Dismantling Proclamation names as “critical minerals” for which “domestic supplies” should be increased. 91 Fed. Reg. at 45,181.

145. Because of the 2026 Dismantling Proclamation, Agency Defendants will prepare one or more new management plans that will replace the existing 2025 Monument Management Plan. There is a substantial risk that these new management plans, like the ones put in place after the 2017 Dismantling Proclamation, will lead to formerly protected lands being opened to motorized vehicle use and road construction. The 2026 Dismantling Proclamation places emphasis on “public access” through motorized and non-motorized vehicles. *See* 91 Fed. Reg. at 45,183. The 2017 Dismantling Proclamation did not contain such language but still led to new off-road vehicle trails and areas. Opening more areas to off-road vehicles will harm Plaintiffs’ members’ aesthetic, cultural, spiritual, recreational, scientific, and educational interests by authorizing increased noise and physical damage to the land, water, wildlife habitat, scenery, and cultural resources that Plaintiffs’ members wish to enjoy in their pristine state when they visit the Monument.

146. The new management plan will likely treat most of the excised lands as open to mineral leasing—including for coal, oil, and gas—under the Mineral Leasing Act. 30 U.S.C. § 181 *et seq*. The risk of oil and gas leasing on these lands is heightened by the passage of the One Big Beautiful Bill Act, which the Bureau interprets as dramatically limiting its discretion to refrain from offering lands for oil and gas leasing and imposing new requirements mandating

leasing of oil and gas. *See* Pub. L. No. 119-21, tit. V, subtit. A, § 50101(a)-(d), 139 Stat 72, 137-39 (2025) (amending leasing laws).

147. There is a substantial risk of leasing in areas where leasing previously occurred, such as the Kaiparowits Plateau and the Circle Cliffs. In these areas, the Bureau cancelled leases, or lessees let them lapse, because of the 1996 Designating Proclamation's mineral withdrawal. And, for some areas, Congress took the extraordinary step of appropriating funds to buy the leases back to halt further development. There is a substantial risk that the Bureau will once again make these lands available for leasing like it did under the previous management plan for excised lands, despite their high natural, archaeological, and paleontological resource concentrations and Congress's appropriations.

148. Defendants' actions adversely affect and irreparably injure the Plaintiffs and their members, and those injuries will continue unless the Court grants the relief Plaintiffs seek.

149. Plaintiffs' injuries would be redressed by the Court declaring the 2017 and 2026 Dismantling Proclamations void *ab initio* and enjoining Agency Defendants from implementing them. With the Court declaring the 2026 Dismantling Proclamation void *ab initio*, the 2021 Restoration Proclamation controls Agency Defendants' conduct going forward. *See* 86 Fed. Reg. at 57,345 (directing the Secretary of the Interior to manage the monument "in accordance with the terms, conditions, and management direction provided by [the 2021 Restoration] proclamation and, unless otherwise specifically provided herein, those provided by [the 1996 Designating Proclamation], the latter of which are incorporated herein by reference").

150. Reinstatement and implementation of the 2021 Restoration Proclamation would redress Plaintiffs' injuries by preventing all future mining claims, stopping mineral leasing, and limiting development on valid existing claims. Voiding the 2026 Dismantling Proclamation

would redress the injuries that Plaintiffs are suffering, and will continue to suffer, from new mining claims, mineral leases, and permits issued while the Agency Defendants implement the 2026 Dismantling Proclamation.

151. With the Court declaring the 2017 Dismantling Proclamation void *ab initio*, the 1996 Designating Proclamation would have controlled the Monument lands up until 2021. Implementation of the 1996 Designating Proclamation for that period—1996 to 2021—would redress Plaintiffs' injuries by rendering a legal nullity all mining claims located while the Agency Defendants treated the 2017 Dismantling Proclamation as operative, thereby redressing the ongoing harm those illegal mining claims inflict upon Plaintiffs.

152. Plaintiffs have no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**
**The 2017 Dismantling Proclamation is *ultra vires***
***(All Defendants)***

153. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

154. Judicial review is available to ensure that the President's actions are consistent with constitutional principles; that the President's actions are within the scope of his statutory and constitutional authority; and that the President's actions do not violate laws enacted by Congress.

155. The President has the authority to regulate federal lands only to the defined extent that Congress has delegated that authority to the President.

156. In issuing his December 4, 2017 Proclamation, President Trump acted wholly without authority under, and thus violated, the Antiquities Act, 54 U.S.C. § 320301. Under the Act, Congress authorized the President to declare national monuments and reserve lands, not to

abolish national monuments either in whole or in part. In issuing the December 4, 2017 Proclamation, President Trump did not purport to rely on a source of authority other than the Antiquities Act. *See* 82 Fed. Reg. at 58,093.

157. In addition, the 2017 Dismantling Proclamation violates Congress's own enactments with respect to Grand Staircase's boundaries and protections. Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991 (2009); Utah Schools and Lands Exchange Act of 1998, Pub. L. No. 105-335, 112 Stat. 3139 (1998); Automobile National Heritage Area Act, Pub. L. No. 105-355, 112 Stat. 3247 (1998).

158. In the alternative, even if the Act gives presidents some narrow authority to remove protections for national monuments, the 2017 Dismantling Proclamation exceeds that authority. That Proclamation's own language and the context surrounding it show that it was in furtherance of unrelated policy goals—energy and mineral extraction—rather than based on any statutory criteria. Eliminating protections for the Monument's numerous objects of historic or scientific interest in order to advance unrelated policy goals rebuts any presumption of regularity. The President did not exercise any statutory authority delegated to him under the Act in issuing the 2017 Dismantling Proclamation.

159. As a result, the 2017 Dismantling Proclamation revoking monument status from nearly half of the Grand Staircase-Escalante National Monument, and stripping monument protection from innumerable objects of scientific and historic importance, lacked any authority and is *ultra vires* and unlawful. The President has no such authority to dismantle a national monument.

**SECOND CLAIM FOR RELIEF**
**The 2017 Dismantling Proclamation violates**
**the U.S. Constitution and the separation-of-powers doctrine**
***(All Defendants)***

160. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

161. Judicial review is available to ensure that presidential actions are consistent with constitutional principles and that the President has not unlawfully intruded on Congress's exclusive power over federal public lands under the Property Clause of the U.S. Constitution. U.S. Const. art. IV, § 3, cl. 2.

162. The Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." U.S. Const. art. IV, § 3, cl. 2. The President has the authority to regulate such property only to the defined extent that Congress has delegated that authority to the President.

163. Congress has not delegated the President any authority to rescind or reduce the national monument designations of his predecessors or of Congress. Nor has Congress delegated the President any authority to remove lands from national monuments that Congress itself has added.

164. To the contrary, Congress has repeatedly exercised its sole prerogative to reduce or rescind national monuments once designated, including by intentionally setting and modifying Grand Staircase's boundaries through a series of legislative acts. *See, e.g.*, Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991 (2009); Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, 112 Stat. 3139 (1998); Automobile National Heritage Area Act, Pub. L. No. 105-355, 112 Stat. 3247 (1998).

165. The President has no independent authority to reduce or rescind a national monument.

166. In issuing his December 4, 2017 Proclamation, President Trump exceeded his authority under Article II of the U.S. Constitution and intruded on Congress's exclusive power to regulate federal property under the Property Clause, in violation of the doctrine of separation of powers.

**THIRD CLAIM FOR RELIEF**
**Agency implementation of the 2017 Dismantling Proclamation violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.***
***(Agency Defendants)***

167. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

168. The Administrative Procedure Act confers a right of action on any person adversely affected by a final agency action or a failure to act and waives the federal government's sovereign immunity. 5 U.S.C. §§ 701-706.

169. Because President Trump had no lawful authority to dismantle the Grand Staircase-Escalante National Monument, any action by Agency Defendants to implement the 2017 Dismantling Proclamation is arbitrary and capricious and not in accordance with law.

170. As a result of the 2017 Dismantling Proclamation, Agency Defendants made a final decision to adhere to the 2017 Dismantling Proclamation rather than to the 1996 Designating Proclamation for mining claims located between February 2, 2018 and October 8, 2021. Agency Defendants are violating the terms of the 1996 Designating Proclamation by treating hard rock mining claims located in the excluded lands during that period (which the 1996 Designating Proclamation prohibited) as valid and allowing mining activity to move forward. Agency Defendants will not carry out their duties under the 1996 Designating

Proclamation with respect to mining claims located between February 2, 2018 and October 8, 2021 unless and until this Court declares the 2017 Dismantling Proclamation invalid.

**FOURTH CLAIM FOR RELIEF**
**The 2026 Dismantling Proclamation is *ultra vires***
***(All Defendants)***

171. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

172. In issuing his July 13, 2026 Proclamation, President Trump acted wholly without authority under, and thus violated, the Antiquities Act, 54 U.S.C. § 320301.

173. The 2026 Dismantling Proclamation violates Congress's own enactments with respect to Grand Staircase's boundaries and protections. Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991 (2009); Utah Schools and Lands Exchange Act of 1998, Pub. L. No. 105-335, 112 Stat. 3139 (1998); Automobile National Heritage Area Act, Pub. L. No. 105-355, 112 Stat. 3247 (1998). In issuing the July 13, 2026 Proclamation, President Trump did not purport to rely on a source of authority other than the Antiquities Act. *See* 91 Fed. Reg. at 45,182.

174. In the alternative, even if the Act gives presidents some narrow authority to remove protections for national monuments, the 2026 Dismantling Proclamation exceeds that authority. The Proclamation's own language and the context surrounding it show that it was in furtherance of unrelated policy goals—energy and mineral extraction—rather than based on any statutory criteria. *See, e.g.*, *id.* at 45,180-81 (promoting mining interests). Eliminating protections for the Monument's numerous objects of historic or scientific interest—many of which the President previously recognized were of such interest—in order to advance unrelated policy

goals rebuts any presumption of regularity. The President did not exercise any statutory authority delegated to him under the Act in issuing the 2026 Dismantling Proclamation.

175. As a result, the 2026 Dismantling Proclamation revoking monument status from over 90% of the Grand Staircase-Escalante National Monument, and stripping monument protection from innumerable objects of scientific and historic importance, lacked any authority and is *ultra vires* and unlawful. The President has no such authority to dismantle a national monument.

**FIFTH CLAIM FOR RELIEF**
**The 2026 Dismantling Proclamation violates**
**the U.S. Constitution and the separation-of-powers doctrine**
***(All Defendants)***

176. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

177. The President has no independent authority to reduce or rescind a national monument.

178. In issuing his July 13, 2026 Proclamation dismantling Grand Staircase-Escalante National Monument, President Trump exceeded his authority under Article II of the U.S. Constitution and intruded on Congress's exclusive power to regulate federal property under the Property Clause, in violation of the doctrine of separation of powers.

**SIXTH CLAIM FOR RELIEF**
**Agency implementation of the 2026 Dismantling Proclamation violates**
**the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.***
***(Agency Defendants)***

179. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

180. Because President Trump had no lawful authority to dismantle the Grand Staircase, any action by Agency Defendants implementing the 2026 Dismantling Proclamation is arbitrary and capricious and not in accordance with law.

181. Since President Trump issued the 2026 Dismantling Proclamation, Agency Defendants have made a final decision to implement the 2026 Dismantling Proclamation, rather than the 2021 Restoration Proclamation going forward as evidenced by their actions such as removing signs from excised land. Agency Defendants are violating and will violate the terms of the 2021 Restoration Proclamation by managing the excised monument lands as available for mineral exploration and development under the General Mining Act of 1872; by treating new hard rock mining claims located in the excluded lands (which were prohibited by the 2021 Restoration Proclamation) as valid and allowing mining activity to move forward; by allowing development on existing mining claims to move forward without restrictions and protections required for claims on national monument lands; and by preparing a monument management plan incorporating the 2026 Dismantling Proclamation's diminishment of the Monument's boundaries.

182. Agency Defendants will not carry out their duties under the 2021 Restoration Proclamation with respect to the excised lands so long as the 2026 Dismantling Proclamation remains in place.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully request that the Court:

1. Declare that President Trump's 2017 and 2026 Dismantling Proclamations are *ultra vires*, invalid, and void *ab initio*;

2. Declare that the 2017 and 2026 Dismantling Proclamations exceed the scope of the President's authority under Article II of the U.S. Constitution, violate the separation of powers doctrine, and are invalid and void *ab initio*;
3. Issue injunctive relief against Agency Defendants barring their implementation of the 2017 and 2026 Dismantling Proclamations (including any management plans or subsidiary plans premised on the Dismantling Proclamations), directing them to carry out the duties imposed on them by the 2021 Restoration Proclamation, and directing them to carry out the duties imposed by the 1996 Designating Proclamation with respect to the mining claims located between February 2, 2018, and October 8, 2021;
4. Declare that any mining claims, mineral leases, or other permits or authorizations premised on the validity of the 2017 and 2026 Dismantling Proclamations are void *ab initio*;
5. Award Plaintiffs fees and costs pursuant to 28 U.S.C. § 2412; and
6. Grant such other relief as the Court deems just and proper.

Dated September 2, 2026.

Respectfully submitted,

*/s/ Thomas Delehanty*

Heidi McIntosh (*pro hac vice*)
Thomas Delehanty (*pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel.: (303) 623-9466
Fax: (303) 623-8083
E-mail: hmcintosh@earthjustice.org
E-mail: tdelehanty@earthjustice.org

*Counsel for The Wilderness Society, Grand Canyon Trust, National Parks Conservation Association, Great Old Broads for Wilderness, Western Watersheds Project, WildEarth Guardians, Sierra Club, and Center for Biological Diversity*

*/s/ Jacqueline Iwata*
Jacqueline M. Iwata (D.C. Bar No. 1047984)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
Tel.: (202) 289-6868
Fax: (415) 795-4799
E-mail: jiwata@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Stephen Bloch*
Stephen H.M. Bloch (*D.D.C. admission pending*)
Hanna Larsen (*D.D.C. admission pending*)
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
E-mail: steve@suwa.org
E-mail: hanna@suwa.org

*Counsel for Southern Utah Wilderness Alliance*