**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Wilderness Society, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Donald J. Trump, *et al.*,<br><br>Defendants. | Civil Action No. 1:17-cv-02587 (TSC) |
| Grand Staircase Escalante Partners, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Donald J. Trump, *et al.*,<br><br>Defendants. | Civil Action No. 1:17-cv-02591 (TSC)<br><br>CONSOLIDATED CASES |

**PARTNERS PLAINTIFFS' SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundation (collectively, "Plaintiffs" or "Partners Plaintiffs"), by and through their undersigned counsel, for their Second Amended and Supplemental Complaint for Declaratory

and Injunctive Relief against Defendants Donald J. Trump, Douglas J. Burgum, and Stevan E. Pearce (collectively, "Defendants")[1], state as follows:

## NATURE OF THE ACTION

1. This lawsuit seeks to overturn President Donald Trump's unconstitutional, unlawful, and unauthorized proclamations, Proclamation 9682, 82 Fed. Reg. 58,089 (Dec. 4, 2017) (the "2017 Proclamation") and Proclamation 11044, 91 Fed. Reg. 45,179 (July 13, 2026) (the "2026 Proclamation" and collectively, with the 2017 Proclamation, the "Dismantling Proclamations"), which purport to dramatically shrink the boundaries of Grand Staircase-Escalante National Monument ("Grand Staircase," or "the Monument") and eliminate protections for the sensitive resources located there. The purpose of the Dismantling Proclamations, as stated in unequivocal terms, is to promote mining, resource extraction, and other activities inconsistent with protection of Monument objects of historic or scientific interest.

2. Plaintiffs challenge Defendant Trump's latest 2026 Proclamation, as well as continue to seek to invalidate by this action any still operative effects from the prior 2017 Proclamation, such as mining claims, that are void *ab initio.*

3. Defendant Trump's repeated efforts to shrink the Monument are unconstitutional and *ultra vires* exercises of a power committed to Congress and not delegated to the Executive Branch. Under the Antiquities Act of 1906, ch. 3060, §§ 1–4, 34 Stat. 225, 225 (1906) (codified as amended at 54 U.S.C. §§ 320301–320303) (the "Act"), a President may "declare . . . historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and "reserve parcels of land as a part of the national monuments." *Id.* In passing

[1] Defendants Burgum and Pearce are, apart from Defendant Trump, referred to collectively as "Agency Defendants."

the Act, Congress granted the President broad authority to protect lands necessary for preserving sensitive resources. The text and history of the Act demonstrate that Congress did not delegate any complementary authority to rescind or reduce monument designations or protections. That power resides solely with Congress under Article IV of the Constitution, the Property Clause.

4. Defendant Trump's repeated efforts to eliminate Grand Staircase's protections intrude on powers constitutionally reserved for Congress, in violation of bedrock separation of powers principles. These efforts ignore explicit post-proclamation Congressional enactments through which Congress has asserted its plenary authority under the Property Clause to ratify the Monument's boundaries, and they attempt to usurp authority clearly belonging to Congress. They run directly counter to the focused yet limited protective authority Congress provided to the President under the Antiquities Act.

5. These unilateral Executive actions put at risk a key part of our nation's natural, historic, and cultural legacy. Congress has recognized that Grand Staircase is one "of the most renowned conservation land units in the United States." Utah Sch. and Lands Exch. Act, Pub. L. No. 105-335, § 2(14), 112 Stat. 3139, 3141 (1998). It is comprised of an area in southern Utah that was first granted permanent protection as a national monument on September 18, 1996, pursuant to the President's authority under the Antiquities Act. Proclamation No. 6920, 110 Stat. 4561 (Sep. 18, 1996) (the "1996 Proclamation").

6. The creation of Grand Staircase—and the Monument's 2021 restoration, *see infra* ¶ 14—were consistent with longstanding Presidential practice and the established interpretation of the Antiquities Act. Since 1906, Presidents of both parties have used the Act to preserve over 170 areas, including expansive geographic areas and natural—as well as man-made—objects. President Theodore Roosevelt used the Act to protect, among other areas, the Grand Canyon, and,

in *Cameron v. United States*, 252 U.S. 450 (1920), the Supreme Court upheld this designation precisely because of the Grand Canyon's vast size.

7. At its creation, Grand Staircase totaled approximately 1.7 million acres and was established to protect the thousands of irreplaceable sensitive scientific, historic, prehistoric, archaeological, paleontological, cultural, and natural resources located across its landscape—many of which are unlike those found anywhere else on Earth. *See* 110 Stat. at 4564. The Monument encompasses one of the most fossil-rich areas in the world, and study of the Monument has resulted in groundbreaking discoveries. The ability to find and study hundreds of exquisitely preserved extinct vertebrate, invertebrate, and plant species has, in just the past three decades or so, added to human understanding of millennia of Earth's history. The Monument "serve[s] as a premier outdoor laboratory and a place for understanding the natural environment, our history, our planet's past, and our place in the universe." Bureau of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante National Monument Science Plan 2025 § 1.1 (Jan. 2025), https://www.blm.gov/sites/default/files/docs/2025-02/GSENM-SciencePlan-2025.pdf [hereinafter "2025 Science Plan"].

8. The Monument is a particularly important source of fossils from the Late Cretaceous Era, the end of the Age of Dinosaurs. It is similarly important for the study of the Triassic Period because it contains fossil records documenting the recovery from Earth's largest extinction event at the end of the preceding Permian Period, and for the study of the behaviors of Jurassic-Period ancient animals. As a result, the Monument is an epicenter for the research activities of numerous academic institutions and museums that have enhanced humanity's understanding of the fossil record. Likewise, the Monument abounds in archaeological resources left behind by the many indigenous peoples, including the Fremont and Ancestral Puebloan

cultures, and the early Mormon pioneers that occupied the region. Only a small portion of the paleontological and archaeological records have thus far been surveyed. The Monument is in one of the most remote areas in the contiguous United States and includes unique ecosystems and irreplaceable geological formations.

9. The Monument's original boundaries were the "smallest area compatible with the proper care and management" of the protected resources. 110 Stat. at 4564; *see* 54 U.S.C. § 320301(b). Congress later used its legislative power to ratify and confirm the creation of the Monument and expand it to approximately 1.9 million acres, approving an extensive land swap to remove a range of State-owned in-holdings and further protect Grand Staircase's precious resources. *See* Utah Sch. and Lands Exch. Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998); Act of Nov. 6, 1998, Pub. L. No. 105-355, §§ 201–202, 112 Stat. 3247, 3252–53. Congress specifically legislated to protect the Monument's "scientific, historic, cultural, scenic, recreational, and natural resources, including ancient Native American archeological sites and rare plant and animal communities" from "development of surface and mineral resources . . . that could be incompatible with . . . preservation . . . ." Utah Sch. and Lands Exch. Act, Pub. L. No. 105-335, §§ 2, 3, 112 Stat. 3139, 3139–41.

10. Neither the Constitution, the Antiquities Act, nor any other provision of law authorizes the President to eliminate existing national monument protections.

11. On December 4, 2017, President Donald J. Trump issued the 2017 Proclamation, which purported to rely on the Antiquities Act to eliminate significant portions of Grand Staircase's permanent protections. The 2017 Proclamation asserted that the Monument was "modified and reduced." Replacing it were five substantially diminished and non-contiguous areas (comprising three units named the "Grand Staircase," the "Kaiparowits," and the "Escalante

Canyons" Units). The total area of the "modified and reduced" monument was 1,003,863 acres, which excluded approximately half the area of Grand Staircase-Escalante National Monument. This was an unprecedented usurpation of legislative authority. The Antiquities Act does not authorize the President to reduce a national monument's boundaries.

12. In addition to reducing the boundaries, the 2017 Proclamation authorized activities harmful to the very resources the Monument was designated to protect. On February 2, 2018, the Proclamation opened the excluded areas of the Monument to irreparable extractive activities, asserting that "the public lands excluded from the monument reservation shall be open to: (1) entry, location, selection, sale or other disposition under the public land laws; (2) disposition under all laws relating to mineral and geothermal leasing; and (3) location, entry, and patent under the mining laws." 82 Fed. Reg. at 58,093. Indeed, the President purported to exclude from the Monument land that Congress itself had added in the just-mentioned land swap. The Antiquities Act does not authorize the President to open protected resources up to such destructive activities.

13. Following the 2017 Proclamation, private parties took advantage of the purported authorization to conduct extractive activities and began mining operations on the land excluded from the Monument. Second Decl. of Scott Berry, ¶ 9 *Grand Staircase Escalante Partners v. Trump*, No. 17-2591 (D.D.C. Nov. 7, 2019), ECF No. 44-2. This was in direct contravention of the 1996 Proclamation. These activities are a lasting scar on a resource that was permanently protected as a vast, primitive frontier area. The mining operations also took place within rock formations designated by the Bureau of Land Management ("BLM") as containing important paleontological resource potential and in the vicinity of known paleontological sites that, in part, formed the basis for the 1996 Proclamation. Certain activities purportedly authorized by the 2017

Proclamation have continuing harmful effects on the resources of the Monument, despite later Presidential actions, and should be declared void *ab initio*.

14. On October 8, 2021, President Biden issued a proclamation restoring the pre-2017 Proclamation boundaries of the Monument. Proclamation 10286 of Oct. 8, 2021, Grand Staircase-Escalante Nat'l Monument, 86 Fed. Reg. 57,335, 57,344–57,345 (Oct. 15, 2021) (the "2021 Restoring Proclamation"). The 2021 Restoring Proclamation identified the many objects of historic and scientific interest distributed throughout the borders of Grand Staircase-Escalante National Monument as they existed prior to the 2017 Proclamation and found that the restored borders were the "smallest area compatible with [those objects'] proper care and management." *Id. at* 57,344. The 2021 Restoring Proclamation found that under the pre-2017 boundaries, "[s]cientists . . . utilized every corner of the monument in their efforts to better understand our environment, our history, our planet's past, and our place in the universe." *Id.* Once again, these objects were subject to the essential protection that had persisted for two decades prior to the unlawful 2017 Proclamation.

15. On March 4, 2026, several Members of the Utah Congressional Delegation introduced joint resolutions of disapproval under the Congressional Review Act ("CRA") to attempt to render the 2025 Resource Management Plan for the Monument, which implemented the 2021 Restoring Proclamation, of no force and effect. H.R.J. Res. 151, 119th Cong. (2026); S.J. Res. 109, 119th Cong. (2026). This effort failed. *Attempt To Overturn Grand Staircase-Escalante Management Plan Fails*, Nat'l Parks Traveler (June 12, 2026), https://www.nationalparkstraveler.org/2026/06/attempt-overturn-grand-staircase-escalante-management-plan-fails.

16. On July 13, 2026, Defendant Trump again undertook to usurp congressional authority by issuing the 2026 Proclamation, acting in defiance of this long-established Monument and the settled expectations around it; the numerous Congressional actions that ratified and confirmed the Monument's boundaries and the protections it created; and the failure of recent Congressional efforts under the CRA to alter those protections.

17. In the 2026 Proclamation, Defendant Trump went significantly further in attempting to dismantle the Monument and its protections than he did in his prior 2017 Proclamation. Whereas the 2017 Proclamation purported to reduce the area of the Monument by approximately half, the 2026 Proclamation purports to reduce the Monument by more than 90 percent (from approximately 1.87 million acres to only 181,541 acres).

18. The 2026 Proclamation erroneously asserts that "the Antiquities Act permits the President to remove land from [a] monument." 91 Fed. Reg. at 45,179.

19. Defendant Trump claimed that the 1996 Proclamation and 2021 Restoring Proclamation protected "items that are not historic landmarks, historic or prehistoric structures, or objects of historic or scientific interest." *Id.* Defendant Trump also asserted that some items previously protected are "not unique to the Monument" but rather are "relative[ly] common" and therefore "not of particular historic or scientific interest." *Id.* at 45,179–80. Notably, Defendant Trump did not justify the exclusion from the Monument of land or objects that had remained protected under his prior 2017 Proclamation.

20. Like the 2017 Proclamation, the 2026 Proclamation purports to authorize activities harmful to the very resources the Monument was designated to protect. The 2026 Proclamation opens the excluded areas of the Monument to irreparable extractive activities, including mining and disposition, beginning September 11, 2026. 91 Fed. Reg. at 45,182.

21. The Dismantling Proclamations abandon and fracture numerous objects specifically identified for protection in the 1996 Proclamation and 2021 Restoring Proclamation. Moreover, the 2026 Proclamation even purports to exclude from Monument protections objects specifically identified for protection in the 2017 Proclamation, such as the Grosvenor Arch, Vermillion Cliffs, the Cockscomb, White Cliffs, Paria Townsite, and Dance Hall Rock. These unlawful efforts to shrink the Monument fundamentally compromise the qualities that the original 1996 Proclamation identified as worthy of and meriting legal protection. The impermanent nature of the protections that results from Defendants' actions runs directly contrary to Congress's purpose in enacting the Antiquities Act and affording the President the Act's extraordinary powers to set aside and protect lands and objects.

22. Because of the Dismantling Proclamations, Monument lands and resources both inside and outside of the diminished boundaries have been and will no longer be afforded the protections national monuments are due. Inside the boundaries, BLM is directed to prioritize Defendants' preferred uses, such as livestock grazing and timber management. *See* 91 Fed. Reg. at 45,183. Outside the boundaries, the President's actions eliminate prohibitions against extractive activity (such as mining and oil and gas drilling), undermine protections essential to preventing the degradation of sensitive resources (such as through untrammeled access, casual collection of paleontological resources, vandalism, and looting), and undercut the numerous programs, initiatives, business ventures, and projects that rely on the status and protections of the Monument. The 2026 Proclamation, in particular, makes plain Defendant Trump's intent to promote the industrialized extraction of numerous minerals within the contested boundaries, such as chromium, cobalt, copper, iron, lead, manganese, molybdenum, nickel, silver, thorium, titanium, uranium, vanadium, zinc, and zirconium. 91 Fed. Reg. at 45,180.

23. Defendant Trump's repeated, anti-protective, and unlawful attempts to reduce the size of the Monument have caused and will continue to cause direct and indirect harm to the organizations, businesses, and individuals who value the Monument and depend on its protections for advancing scientific research, their livelihoods, and their recreational and aesthetic enjoyment and spiritual fulfillment. This harms the American people by undermining the protection of key treasured portions of our nation's public lands legacy.

24. Plaintiffs ask this Court to declare the 2017 Proclamation and 2026 Proclamation void and to enjoin Agency Defendants from implementing them. The grounds for this request are: (a) Defendant Trump illegally exercised authority that the Constitution vests solely in Congress; (b) Defendant Trump's actions are *ultra vires* because they exceed the scope of the President's powers under the Antiquities Act; and (c) Defendant Trump's actions are *ultra vires* and unconstitutional because they override boundaries that Congress has confirmed and ratified by legislation on multiple occasions. Even if this Court were to find that Defendant Trump has some authority to eliminate monument protections—which he does not—the Dismantling Proclamations are unlawful because they are rooted in factors wholly unrelated to the text and purpose of the Antiquities Act, as underscored by explicit statements in the Dismantling Proclamations and the gross inconsistencies between the rationales and conclusions of Trump's successive actions. Finally, the Agency Defendants' implementation of the Dismantling Proclamations violates the Administrative Procedure Act.

## PARTIES

### *Plaintiffs*

Grand Staircase Escalante Partners

25. Plaintiff Grand Staircase Escalante Partners ("Partners") is a non-profit corporation exempt from taxation under 26 U.S.C. § 501(c)(3), founded in 2004 and organized under the laws

of the state of Utah. The organization's foundational purpose, as reflected in its bylaws, is to support, protect, maintain, and advance Grand Staircase as established in the 1996 Proclamation.

26. Partners currently has 362 members and employs 13 paid staff members. Its governing board is comprised of 11 members. Between 2017 and the present, Partners has represented a total of 2,225 members.

27. Partners' membership is composed of scientists and scholars (geologists, botanists, paleontologists, archaeologists, ecologists, biologists, historians, and others), residents and business leaders from gateway towns, community leaders, artists (writers, photographers, illustrators, etc.), recreationalists (hikers, bicyclists, birdwatchers, wildlife watchers, stargazers, etc.), and other individuals who seek the ongoing preservation of the Monument. These members are drawn from 49 states and five countries.

28. In 2004, Partners became the official "Friends" organization of the Monument when it entered into a Memorandum of Understanding with BLM. Pursuant to this agreement, Partners and BLM shared goals of enhancing public knowledge of and appreciation for the Monument's lands and resources, and GSEP received funding from BLM to run a number of key programs—including several paleontology-, site stewardship-, and education-focused programs—on the Monument's behalf. BLM terminated the original "Friends" agreement in the wake of the 2017 Proclamation. From 2016 to June 2019, Partners' collaborative relationship with BLM and vital stewardship of the Monument was organized under a "Grant and Cooperative Agreement" with BLM.

29. Following the 2021 Restoring Proclamation, a new Friends Group Partnership Agreement between the Paria River District on behalf of GSENM and Partners was signed on July 24, 2023 for a renewable five-year term. Under this agreement, BLM and Partners agreed to share

goals with respect to the Monument including: (1) ecological restoration and conservation; (2) Wilderness Study Area (WSA) monitoring; (3) stewardship/visitor impact prevention and mitigation activities; (4) recreation area/trail projects; (5) Tribal relations, co-stewardship, and cultural resource inventories/protection; (6) paleontological, archaeological, geological, flora and fauna research; (7) science and climate change adaptation; and (8) education and community outreach.

30. Partners also serves as a philanthropic partner of the Monument that generates revenue in support of the activities described in the Friends Group Partnership Agreement by way of applying for grants, soliciting donations, leading tours, hosting special events to highlight Monument science, performing and facilitating research, and developing memberships and earned income through online sales.

31. Partners' current work covers five important areas that enhance the visitor experience and protect Monument resources: Stewardship and Sustainable Visitation; Restoration; Tribal Engagement; Native Plants; and Outreach. Examples of this work include:

a. carrying out visitor education programming, such as preventative search and rescue trainings that help people of all ages safely enjoy Grand Staircase;

b. supporting BLM with graffiti remediation, dispersed campsite cleanups, trail work, invasive plant removal, and trash removal;

c. being a central participant in the largest ecosystem restoration program in the region—and the largest riparian restoration project in BLM history—the Escalante River Watershed Project, which also helps to secure extensive outside financial resources for the operation and management of the Monument; and

d. partnering with BLM's Seeds of Succes Program to collect native plant seeds to ensure native plants can be grown in quantities sufficient to perform large-scale restoration after natural and human-caused disasters.

32. As BLM has recognized, "Grand Staircase-Escalante Partners (GSEP) functions in an important role within the partnership by coordinating private funding and by providing guidance to the conservation corps supporting the project." Bureau of Land Mgmt., U.S. Dep't of the Interior, *Grand Staircase-Escalante National Monument Annual Manager's Report—Fiscal Year 2016* at 16 (Dec. 31, 2016), https://www.blm.gov/sites/blm.gov/files/documents/files/GSENM_Annual_Managers%20Report.pdf.

33. Partners also works to promote the vibrant local communities surrounding the Monument. Partners collaborates with local businesses in support of the Monument's activities and programs, contributes to community economic development, and participates in numerous community events.

34. Since its founding, Partners has been inextricably intertwined with the Monument, and its programmatic activity has grown as the organization has grown. The organization began after citizens in Kanab met to discuss their support for the establishment of Grand Staircase, and the Monument Manager asked these individuals to form a "Friends" organization.

35. Partners has steadily grown its initiatives—often at BLM's request—to promote and safeguard the Monument. Partners' programs have grown from assisting BLM with "Walks and Talks"—an educational initiative for visitors and local residents—into a broad panoply of programs. By 2012, Partners had developed a full suite of educational programs, set up robust paleontological and archaeological programs, and engaged in extensive restoration efforts.

36. Although Partners was forced to limit some of its programming after funding sources were terminated amidst cutbacks during the first Trump Administration, Partners was able to develop new funding relationships following the 2021 Restoring Proclamation. This funding has enabled Partners to continue longstanding programs as well as offer novel programming—in areas such as native plant seed collection and tribal partnerships—to support the Monument and develop its connections with surrounding communities.

37. Partners supports Grand Staircase in all arenas and works to enhance public understanding of, respect for, and enjoyment of the Monument among the general public. For example, Partners submitted comments to BLM as part of the land management planning process that followed both the 2017 Proclamation and the 2021 Restoring Proclamation. Partners also actively participates in the formal Federal Advisory Committee Act-chartered Monument Advisory Committee ("MAC") for Grand Staircase; Partners' members have served in various MAC roles, including as representatives for the "Public at Large," the "Conservation" community, the "Outfitter and Guide" community, the "Geology" community, and the "Dispersed Recreation" community.

38. Members of Partners visit or otherwise actively use and enjoy Grand Staircase's lands and resources for recreation, aesthetic and spiritual enjoyment, wildlife viewing, photography, and artistic inspiration, and would continue to do so but for the 2026 Proclamation. Members experience and appreciate the solitude created by the serene and peaceful nature of a landscape that stretches undisturbed by human activity as far as the eye can see. The members' use and enjoyment of these areas are inextricably intertwined with the Monument's sensitive resources and are affected by the condition of the area and the status of the Monument's resource protections.

39. By opening the excluded lands to "entry, location, selection, [and] sale" under the public land laws, "disposition under all laws relating to mineral and geothermal leasing," and "location, entry, and patent under the mining laws," 82 Fed. Reg. at 58,093; 91 Fed. Reg. at 45,182, the Dismantling Proclamations threaten current and future uses of the Monument by Partners' members. For example, lands previously protected are and will be subject to the broader public land management laws, including the General Mining Law of 1872, 30 U.S.C. §§ 21 *et seq*. That law allows prospectors, without prior permit or authorization from any government agency, to enter federal land in search of mineral deposits and to undertake exploratory activities. Following the 2017 Proclamation, some prospectors took advantage of the loss of protections and began mining operations, to the detriment of the aesthetic interests of members of Partners. *See* Decl. of John C. Holland, ¶¶ 7(b)–(e) *Garfield County v. Trump*, No. 22-00059 (D. Utah Nov. 23, 2022), ECF No. 31-2.

40. Members of Partners rely on Grand Staircase's designation as a national monument in their professional scientific and research work, and in their educational endeavors, and have continuing plans to do so.

41. Jacqualine Grant, Ph.D., who has served as the Executive Director of Partners since January 2, 2024, has been visiting the Monument since October 2012 as a public lands enthusiast, scientific researcher, and professor. From 2012 to 2023, Grant worked as a professor in the disciplines of Biology and Geosciences at Southern Utah University and directed the Garth and Jerri Frehner Museum of Natural History at Southern Utah University. In her role as a scientist and scholar, she has published over twenty peer-reviewed scientific papers that have received over 1,370 citations.

42. Grant owns property in Kane County that is less than 4,000 feet from the 2021 boundary of the Monument. The actions taken by Defendants remove protections from land within view of Grant's property and open the Monument to mining operations, expanded cattle grazing operations, and other ground disturbing activities such as geothermal operations. These activities will affect Grant's ability to use her property the way she intended when she purchased it.

43. Grant currently visits the Monument approximately twelve times per year. She plans to continue to visit the Monument in the future, including the lands excluded from its borders by the Dismantling Proclamations. The actions of Defendants diminish her current and future aesthetic, spiritual, recreational, and scientific interests in the Monument.

44. For example, when Grant's family visits the property and cabins at Deer Springs Ranch, they drink water from a spring. By opening the Monument to mining operations, expanded cattle grazing operations, and other ground disturbing activities, the actions of Defendants put the quality and safety of the water that Grant's family and other members of the Ranch drink at imminent risk.

45. Grant and her family also hike on the Monument. The actions of Defendants increase her and her family's anxiety and stress over the fate of their favorite hiking trails on the Monument and their continued unimpeded access to Monument lands.

46. Grant and her family use this property to experience the natural soundscapes of the Monument, such as the call of songbirds, hooting of owls, and howling of coyotes. The Dismantling Proclamation opens lands purportedly excluded from the Monument to activities that will disturb local fauna and increase noise pollution, changing the Monument-area soundscape.

47. Grant and her family also use the Monument to experience dark night skies and views of the Milky Way, which is now unseeable by approximately 80% of Americans because of

light pollution. Artificial lighting associated with mining operations will result in increased light pollution, compromising their enjoyment of the Monument-area's dark night skies.

48. Partners' members also rely on Grand Staircase's national monument designation to make business decisions, secure funding for and invest in their businesses, increase the value of their investments, attract customers, and increase their revenue. By eliminating significant protections at Grand Staircase, the Dismantling Proclamations harm the value of members' investments and adversely impact their revenue streams. Visitors will see this elimination of Grand Staircase's protections as damaging the area's scenic and recreational status. This change will directly reduce the number of visitors and lead to a concomitant reduction in revenue.

49. Blake Spalding, a member of Partners since 2004, has lived in Boulder, Utah since late 1999. Since February 2000, Spalding has been a co-owner and chef of the Hell's Backbone Grill & Farm, a farm-to-table restaurant serving "Four Corners Cuisine" in Boulder, Utah. Spalding is also a co-owner and operator of the Boulder Mountain Lodge, a quiet tourism-focused lodge on which Hell's Backbone Grill sits. She has operated the Boulder Mountain Lodge since January 2025.

50. Spalding visits the Monument almost daily and has consistently for the twenty-seven years she has lived in Boulder. She walks her dogs, hikes, and camps at the Monument. She particularly enjoys seeking out remote locales that lack the notoriety of some of the more well-known locations. She plans to continue routinely visiting the Monument as long as she is able. Because the Dismantling Proclamations will expose the Monument to more destructive uses, including ATV riding and extractive mining, Spalding will be prevented from enjoying her experiences in the Monument, and she will no longer have reason to visit affected areas.

51. Spalding and her business partner Jen Castle chose Boulder, Utah as the location for Hell's Backbone Grill & Farm specifically because of its proximity to the Grand Staircase-Escalante National Monument. Both had previously worked as Grand Canyon river cooks, providing food to those traveling through the Canyon, and wanted to continue preparing and serving food to people in the heart of the wilderness. The fact that President Clinton had designated Grand Staircase as a national monument three years before was a crucial factor in Spalding's decision: she was convinced that, as a result of the 1996 Proclamation, this beautiful landscape would be protected and maintained in its natural state, and that tourism related to the monument would sustain their business.

52. A founding premise of Spalding's restaurant is that the food prepared should reflect the Monument and the surrounding communities. Spalding and Castle use a blend of Western Range cowboy recipes, Mormon cultural flavors, historical Puebloan influences, and Southwestern farm ingredients. To the extent possible, most of their ingredients are sourced locally, including many from the restaurant's own sustainable farm, also located in Boulder.

53. Now in its twenty-seventh season, Hell's Backbone has received national recognition for its approach to organic, ethical, and regionally and seasonally appropriate cuisine. The restaurant enjoys one of the highest Zagat ratings in Utah and has been repeatedly recognized at the James Beard Awards, most recently as a semi-finalist in the "Outstanding Restaurant" category in 2022 and 2023. The restaurant was also chosen to represent Utah's Slow Food movement in an exhibit in the Smithsonian Museum in Washington, D.C. and has been featured in publications including The New Yorker, The New York Times, The Wall Street Journal, Bon Appetit, Outside Travel, and O: the Oprah Magazine.

54. The growth in Spalding's businesses is entirely attributable to the increased traffic to the Monument. Even though Hell's Backbone Grill has won a number of awards and received attention from national reviewers and newspapers, Boulder is considered one of the most remote towns in the contiguous 48 United States. Based upon Spalding's interactions with her patrons, it is the Monument and its natural beauty that draws people to this area and into her restaurant and lodge.

55. In the last several years, the fate of Grand Staircase has been a regular topic of conversation at the tables in Hell's Backbone Grill. Many of Spalding's patrons view Grand Staircase as one of the most pristine and beautiful areas of the United States and are aghast at the idea that the Dismantling Proclamations strip its protections. On the basis of her many conversations with patrons, Spalding believes that the Dismantling Proclamations will lead many visitors to view the lands as damaged and that they will no longer return to Boulder to patronize her restaurant and lodge.

56. The Dismantling Proclamations will imperil Spalding's restaurant and lodge. If these establishments survive, Spalding believes that it will require reducing staff and scaling back operations considerably.

57. Nathan Waggoner has been an active member of Partners since 2009. He has been a resident of Escalante, Utah, since 2006 and is the owner of Escalante Outfitters.

58. Waggoner has been a guide in Escalante for twenty years. He conducts guided fly fishing and natural history tours on the Monument. He also owns a horse-packing business and runs supply trips for restoration and trail-clearing projects in the region. He holds permits for Dixie National Forest and Grand Staircase Escalante National Monument. Waggoner has been actively involved in coordinating the growing guiding community through serving as Chair of the

Grand Staircase Regional Guide Association, which worked closely with land managers to create a management plan that supported outfitters, guides, and sustainable recreation.

59. Escalante Outfitters is the Waggoner family's business. Three generations of his family have run and operated the business since 2006. His family's aim is to achieve a harmonious and prosperous affinity with cultural and natural resources by helping others enjoy Southern Utah and by doing their part to give back to the environment through conservation, education and reducing their ecological footprint.

60. Since Waggoner acquired his company in 2006, Escalante Outfitters has grown to include an outdoor guiding service, an outdoor gear store, camping facilities and cabin rentals, and a full-service restaurant and cafe. In twenty years, Waggoner has grown the business from a $450,000 gross income business to a $1.9-million business in 2025. In the last five years, Waggoner and his family have invested over half a million dollars in infrastructure alone. They made these investments in their business's future and success in reliance on the Monument's protections. The uncertainty created by the Dismantling Proclamations undermines the stability Waggoner needs to continue to make investments in his business.

61. Visitors who stay at Waggoner's family business, dine at his family's restaurant, and use his business's guiding services come to enjoy the Monument's natural resources and remote and undeveloped nature. In Waggoner's experience, a significant proportion of these visitors will no longer desire to visit the Monument because its reduced boundaries and reduced protections result in a materially higher likelihood of destructive and/or disruptive activities, including but not limited to mining, drilling, and uncontrolled off-road vehicle use.

62. Thirty-five percent of the guided trips that Waggoner leads are in areas purportedly to be excluded from the Monument by the 2026 Proclamation. Customers are far less likely to want to take excursions to these unprotected areas.

63. Waggoner's business has already encountered adverse financial impacts likely attributable to the 2026 Proclamation. His business saw approximately $24,000 in total income losses from the date of the 2026 Proclamation (July 13, 2026) to the end of August 2026, compared to the same period in the 2025 season.

64. Many members rely on the Monument's scale in their marketing and other materials. As a result of the elimination of Grand Staircase's protections, Partners and its members will be harmed and forced to spend substantial time and resources revising marketing information, business plans, and other material. Further, the resource extraction contemplated by the 2026 Proclamation will be inconsistent with the recreational and aesthetic attributes at the heart of the businesses of Partners' members and will greatly diminish the value of those businesses.

65. The Dismantling Proclamations harm Partners because they undermine Partners' organizational activities and the multitude of programs that Partners offers and participates in. For example, the 2017 Proclamation forced Partners to expend additional resources to monitor and prevent additional damage to protected objects removed from the Monument. *See* Decl. of Nicole Croft ¶¶ 6–11, *Grand Staircase Escalante Partners v. Trump*, No. 17-2591 (D.D.C. Nov. 7, 2019), ECF No. 44-1. Partners expects that the 2026 Proclamation will require it to spend these additional resources again to prevent additional damage to objects removed from protection.

66. The Dismantling Proclamations caused Partners to lose previously reliable funding and are likely to cause further such harm. Following the 2017 Proclamation, Partners lost funding from BLM. Decl. of Nicole Croft ¶ 9 *Grand Staircase Escalante Partners v. Trump*, No. 17-2591

(D.D.C. Nov. 7, 2019), ECF No. 44-1. Further, the lack of support from BLM amidst the new management regime made it more difficult for Partners to secure funding from other sources. *Id.* ¶ 9(e). Similar harms are likely to result from the 2026 Proclamation.

67. Partners has also worked closely to help to facilitate the work of the Grand Staircase-Escalante Inter-Tribal Coalition (GSEITC), a coalition of Tribal Nations that aims to ensure Tribal voices, perspectives, and priorities are meaningfully included in the management of the Monument, and that advocates for the long-term protection of the Monument for present and future generations. GSEITC is composed of representatives from the Hopi Tribe, Kaibab Band of Paiute Indians, Navajo Nation, Paiute Indian Tribe of Utah, Ute Mountain Ute Tribe, and the Zuni Tribe. These Tribal Nations maintain cultural, spiritual, and ceremonial ties to the Monument and their support shows how intimately connected the Monument is to the multiple communities that inhabit the surrounding region. Partners' collaboration with GSEITC to protect the Monument's cultural and historic resources is harmed by the Dismantling Proclamations.

68. Finally, like the 2017 Proclamation, the 2026 Proclamation is once again harming Partners by speeding degradation of sensitive resources currently protected by the Monument and enjoyed by Partners' members. The purported elimination of Monument protections creates the risk of rock art vandalism, artifact removal, illegal digging, ATV use across sensitive areas, and artifact and fossil theft. Indeed, these harms are greatly exacerbated by the 2026 Proclamation, which removes protections for vast swaths of the Monument that were protected even by the 2017 Proclamation.

Conservation Lands Foundation

69. Plaintiff Conservation Lands Foundation (the "Foundation" or "CLF") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws

of Delaware, and headquartered in Durango, Colorado. The Foundation maintains regional offices in the District of Columbia and four states.

70. The Foundation's organizational purpose is to promote environmental conservation through assisting the National Landscape Conservation System ("NLCS," also known as the "National Conservation Lands") and the preservation of open space and wilderness. The National Conservation Lands are part of a Federal Government land designation system that encompasses 38 million acres and 2,700 river miles of National Monuments, National Conservation Areas, Wilderness and Wilderness Study Areas, Wild and Scenic Rivers, National Scenic and Historic Trails, and other special designations. *See* 16 U.S.C. § 7202. Grand Staircase, as configured under its pre-2017 Proclamation boundaries, is the largest and among the best-known units in the National Conservation Lands.

71. The Foundation is the only non-profit in the country specifically dedicated to establishing and safeguarding the National Conservation Lands. The Foundation's core business activities include providing individual conservation and stewardship groups with technical advice, mentoring, tools, trainings, and other services to ensure successful on-the-ground projects affecting the National Conservation Lands. The Foundation also offers guidance to groups on effective advocacy and community education. The Foundation's resources and expertise in government relations, advocacy, communications, and outreach provide local advocates with insights into developments affecting the National Conservation Lands, including Grand Staircase, as well as the tools needed to influence those developments.

72. BLM frequently lacks the resources necessary to effectively steward and protect all 245 million acres of public land it is responsible for managing, which includes the entirety of the National Conservation Lands System. As an organization, the Foundation guides, facilitates, and

engages in on-the-ground conservation and restoration activities within the National Conservation Lands System, and Grand Staircase, in particular.

73. The Foundation created the Friends Grassroots Network, which is comprised of over 80 organizations located in eleven states, including Partners, to support the National Conservation Lands. Member organizations conduct and organize a wide range of conservation-related activities in partnership with and on behalf of the Foundation, including clean-up projects, trail maintenance and rebuilding, riverbank and stream restoration, removal of invasive species, closure of illegal roads, water quality monitoring, enhancement of wildlife habitat, and improvement of recreational access. Collectively, Friends Grassroots Network member organizations have almost half a million members who volunteer and engage with these conservation activities. The Foundation supports Friends Grassroots Network organizations in part by providing crucial services and organizational support such as trainings regarding organizational capacity building, volunteer recruitment and management, and fundraising. The Foundation and the Friends Grassroots Network also cooperate in public advocacy and education efforts to promote conservation of public lands.

74. In the Monument area, the Foundation has provided consistent organizational support for Partners and for its conservation programs, including more than twenty grants totaling $675,000 since 2008. The Foundation also supports the Grand Staircase Regional Guide Association, a non-profit which supports back country and tour guiding permit holders within Grand Staircase.

75. The Foundation has also consistently advocated on behalf of conservation efforts in the Monument and against efforts to reduce the Monument's boundaries. For example, the Foundation submitted comments to BLM as part of the land management planning process

following the 2017 Proclamation and the 2021 Restoring Proclamation, and, in recent years, has repeatedly engaged Congress on the importance of the Monument.

76. The Dismantling Proclamations have caused and will cause substantial harm to the Foundation. The Foundation's organizational interests in protecting and conserving National Conservation Lands are jeopardized by the Dismantling Proclamations, which purport to reduce the size of Grand Staircase—the largest and one of the most well-known units in the National Conservation Lands System. Lands removed from the Monument will likewise be removed from the National Conservation Land System and subjected to degradation and exploitation, harming the Foundation's interests.

77. As a direct result of the Dismantling Proclamations, the Foundation has diverted and will divert funds from stewardship and public education activities towards contractor resources for additional communications and policy guidance needed to counteract anticipated harms to the Monument.

78. Further, the Foundation anticipates that the 2026 Proclamation will negatively impact its fundraising efforts. Damage to the Monument resulting from the 2026 Proclamation is expected to reduce donor interest in the Foundation's activities and negatively impact the Foundation's ability to engage and catalyze its donors.

79. The Foundation plays a large role in preserving the Grand Staircase's values and resources; any elimination of the Monument's protections causes the Foundation direct, immediate, and irreparable injury. Damage to such a prominent unit poses a grave threat to the Foundation's programs aimed at maintaining the National Conservation Lands.

Society of Vertebrate Paleontology

80. Plaintiff Society of Vertebrate Paleontology (the "Society" or "SVP") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of California, and headquartered in McLean, VA. The Society has approximately 1,900 members as of August 2026. The Society's membership includes both professional and amateur paleontologists.

81. As set out in the Society's constitution, the Society's purpose is to advance the science of vertebrate paleontology and facilitate the cooperation of persons concerned with the history, evolution, ecology, comparative anatomy, and taxonomy of vertebrate animals, as well as the field occurrence, collection, and study of fossil vertebrates and the stratigraphy of the beds in which they are found. The Society also supports the discovery, conservation, and protection of vertebrate fossils and fossil sites.

82. To advance vertebrate paleontology, the Society: organizes an annual international scientific conference for its members; periodically sponsors symposia at other scientific conferences; distributes merit-based grants, fellowships, and awards for paleontological research, artwork, and educational outreach; establishes professional standards for the collection and curation of fossils, for the management of paleontological data, and for the documentation of paleontological research; works with policymakers, lawmakers, and regulators in the United States and around the world to establish regulatory and legal protection of scientifically valuable fossil resources; publishes the Journal of Vertebrate Paleontology; and raises funds to support the aforementioned activities. The Society also works toward fostering scientific, educational, and personal understanding of vertebrate fossils and fossil sites by paleontologists and the general public.

83. The Society and its members have longstanding scientific interest in Grand Staircase and actively work to enhance the scientific value and public appreciation of the paleontological resources at the Monument.

84. Because of the Monument's exceptional fossil resources, Society members were among the earliest advocates for the creation of the Monument; indeed, research conducted by Society members is referenced in the 1996 Proclamation, the 2017 Proclamation, the 2021 Restoring Proclamation, and the 2026 Proclamation.

85. Since the 1996 Proclamation, the Society has continued its advocacy for the Monument. For example, the Society and its members submitted comments to BLM as part of the land management planning process after both the 2017 Proclamation and the 2021 Restoring Proclamation; and, on March 13, 2019, former Society President Dr. David Polly testified before Congress regarding the Monument's "profound impact on science." *See Forgotten Voices: The Inadequate Review and Improper Alteration of Our National Monuments, Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (2019) (Statement of P. David Polly, Former President, Society of Vertebrate Paleontology) [hereinafter "*Forgotten Voices*"].

86. Members of the Society visit and regularly conduct paleontological field research within Grand Staircase and rely on its designation to protect the paleontological and geological resources upon which their professional scientific and research work, educational endeavors, and careers depend. More than 200 members of the Society have conducted field research in the Monument, and, as of August 23, 2026, twenty-nine individual members have ongoing research projects on paleontological resources from the Monument and the lands purportedly excluded from it. Notably, eleven of the nineteen scientific papers about the paleontology of Grand Staircase published in the last twelve months were authored by members of the Society.

87. Grand Staircase's national monument status provides for the permanent protection of field sites with scientifically important vertebrate fossils and guarantees future access for purposes of verifying previous data and conclusions. Because the Monument's exceptional paleontological resources were specifically protected under the 1996 Proclamation and the 2021 Restoring Proclamation, preservation of those resources was prioritized over other potentially conflicting uses of the land.

88. Paleontological research at the Monument is ongoing, and there is abundant evidence to indicate that it will continue to yield scientifically important results well into the future. New discoveries are still being made at rates that indicate that the full inventory of the fossil taxa[2] preserved at the Monument has not yet been recovered. In scientific terms, this is referred to as the "steep side of the collection curve." A "collection curve" is a statistical way of looking at the number of taxa sampled relative to the amount of effort expended to recover them in the field. When an area is first studied, the number of new discoveries is large relative to the amount of time expended. As research continues, however, new discoveries become rarer. At Grand Staircase, researchers are still in the first phase of this "curve," which means that important scientific work should continue for decades or centuries in those areas with the protective regime that the Monument affords.

89. Nevertheless, the Dismantling Proclamations purport to upend Monument priorities and remove significant areas containing important paleontological resources from the Monument. These changes imperil the work done by the Society and its members by increasing the risk of loss

[2] Taxa are scientifically classified groups of organisms that share traits, such as species, genera, or families.

or destruction to the paleontological resources that Society members study and altering the conditions that make Society members' work possible.

90. Members of the Society rely on Monument protections to secure financial resources to conduct research, as grant distributors are unwilling to support projects whose resources may be compromised, or whose sites may be altered or rendered inaccessible over time. Following the 2017 Proclamation, projects conducted by Society members on active research sites that had previously been within the Monument's boundaries were suspended due to the risks posed by increased ATV and vehicle use and other ground-disturbing activities. The 2026 Proclamation is expected to likewise hamper the Society's research efforts across the even greater land area purportedly excluded from the Monument.

91. Similarly, members of the Society have lost and will lose access to public funding opportunities because excluded lands are no longer considered NLCS lands. *See* 16 U.S.C. § 7202(b). Specific grants exist to conduct research on NLCS lands. These grants are no longer available for projects on the excluded lands, as they have been stripped of the relevant protective designation.

92. Not only does the elimination of protections prevent new projects and discoveries, but it also prevents the deployment of new methods and technologies to ask new scientific questions of old, well-studied sites because of the range of disruptions that may be expected. For example, in 2017, Daigo Yamamura of the University of Arkansas published research on the paleoenvironment and paleoclimate of the Late Cretaceous era using new stable isotope analytic techniques. His research was based on earlier collections housed at the Natural History Museum of Utah, which he then verified by sampling sediments from the original sites at the Monument. He was able to carry out this research because of the precise locality information available for the

previously collected specimens, which is mandated by the Monument's scientific work policy, and because he was able to revisit the same sites, which remained intact.

93. Similarly, in 2025, James Kirkland, Joe Sertich, and Alan Titus published a precision temporal sequence of the origins and extinctions of Cretaceous dinosaur species for use in studying processes of evolution and extinction in the Mesozoic and for determining the age of rock units where dinosaurs occur. Their study required compilation of data on where dinosaurs have been found in Grand Staircase-Escalante, the sedimentology and broader paleontology of the rocks at the original sites, and isotopic and other geochemical analyses of the sediments at those sites.

94. Society members' current and future use and enjoyment of these areas are integrally intertwined with the Monument's sensitive resources, its fossil resources in particular, and are affected by the condition of the areas and the delineation and effectiveness of its protections.

95. David Polly, a member of the Society since 1987 and former Board Member and President of the organization, is employed at Indiana University as a Professor in the Department of Earth and Atmospheric Sciences and has worked in this capacity since 2006. His job duties include research in paleontology and related fields, teaching, and service to the university.

96. Polly has forty-two years of paleontological research experience, including eight years conducting research on the paleontology of Grand Staircase Escalante National Monument and elsewhere in southern Utah on the impacts of land management policy on paleontological research. He holds an active paleontological research permit for the state of Utah from the Bureau of Land Management.

97. On March 13, 2019, Polly testified before Congress regarding Grand Staircase's "profound impact on science," including the registration of over 2,000 vertebrate fossil specimens

and the discovery at the Monument of new fossil dinosaurs like the Lythronax, as well as fossil mammals, birds, lizards, snakes, plesiosaurs, fish, plants, and insects.

98. Following the 2017 Trump Proclamation, when the lands purportedly excluded from Grand Staircase were opened to mining and other ground disturbing activities, Polly observed first-hand the difficulties Society members encountered when conducting paleontological research on these lands. For example, projects on active research sites that had previously been within Grand Staircase Monument's boundaries were suspended because of increased risks to the integrity and quality of the projects posed by increased ATV and vehicle use and other ground-disturbing activities.

99. Now that mining and other ground-disturbing activities are resulting and will result from the 2026 Proclamation, Polly's interests as a scientist and leader of the Society are again injured, as are those of other Society members.

*Defendants*

100. Defendant Donald J. Trump is the President of the United States. In his official capacity, he signed the 2017 Proclamation and 2026 Proclamation purporting to reduce the boundaries of Grand Staircase-Escalante National Monument and diminishing its protections. President Trump's official residence and his principal offices are in Washington, D.C. Plaintiffs sue President Trump in his official capacity.

101. Defendant Douglas J. Burgum is the Secretary of the Department of the Interior. In his official capacity, he is responsible for implementing the provisions and requirements of applicable federal laws on federal lands, including the responsibility to protect Grand Staircase. He is also responsible for implementing the 2026 Proclamation that eliminates Grand Staircase's

protections. Secretary Burgum's principal office is in Washington, D.C. Plaintiffs sue Secretary Burgum in his official capacity.

102. Defendant Stevan E. Pearce is the Director of the Bureau of Land Management. In his official capacity, he is responsible for implementing the provisions and requirements of applicable federal laws on federal lands overseen by BLM, including the responsibility to protect Grand Staircase. He is also responsible for implementing the 2026 Proclamation that eliminates Grand Staircase's protections. Director Pearce's principal office is in Washington, D.C. Plaintiffs sue Director Pearce in his official capacity.

**JURISDICTION AND VENUE**

103. Plaintiffs' claims arise under the Property Clause of the Constitution, U.S. Const. art. IV, § 3, cl. 2, and the Antiquities Act, 54 U.S.C. §§ 320301–320303, and concern the lack of Presidential authority to eliminate or curtail a national monument's protections and to constrict its boundaries. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

104. Venue in this District is proper under 28 U.S.C. § 1391(e)(1) because this is a civil action brought against officers of the United States acting in their official capacities and under color of legal authority, and this is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred."

105. Because Plaintiffs allege that Defendants acted in excess of their statutory and constitutional authority, and seek only declaratory relief against Defendants in their official capacity and injunctive relief against Agency Defendants in their official capacity, the sovereign immunity of the United States is not implicated. *See, e.g.*, *Larson v. Domestic & Foreign Comm.*

*Corp.*, 337 U.S. 682, 689–90 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963); 5 U.S.C. § 706(2).

106. The declaratory, injunctive, and other relief requested is authorized by 28 U.S.C. §§ 1651, 2201–2202, and this Court's general equitable powers.

**LEGAL BACKGROUND**

107. The Property Clause of the U.S. Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The President has limited authority over federal property only to the extent Congress has expressly delegated.

108. Congress delegated to the President certain limited power under the Property Clause when it enacted the Antiquities Act on June 8, 1906. *See* 54 U.S.C. § 320301(a), (b). The Act authorizes the President of the United States to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and to "reserve parcels of land as a part of the national monuments" that comprise the "smallest area compatible with the proper care and management of the objects to be protected." *Id*. § 320301(a), (b). Neither the Act nor any other statute contains language authorizing the reduction or removal of national monuments. *See id.*

109. Whereas other statutes enacted around the same time as the Antiquities Act sometimes delegated to the President the authority to "revoke, modify, or suspend" the status of public lands, *see, e.g.*, Forest Service Organic Act of 1897, Pub. L. No. 2, 30 Stat. 34 (1897), Congress provided the President with no such authority under the Antiquities Act.

110. Rather, Congress passed the Antiquities Act to empower the President to permanently protect sensitive resources and lands absent later Congressional changes to those

areas. No authority exists for a President to eliminate already established national monument protections in part or in full. Those authorities rest solely with Congress.

111. Since its passage in 1906, the Antiquities Act has been used over 300 times to protect lands within the more than 160 national monuments.

112. In 1976, Congress passed the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.* ("FLPMA"), further specifying the restrictions on, and directives for, the Executive Branch's management of Federal lands, including the designation and management of national monuments. In passing FLPMA, Congress preserved the President's unique but limited authorities under the Antiquities Act. Additionally, the management regime specified by FLPMA incorporates procedural protections under other statutes, including the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, where agency-level management actions are authorized.

113. Under FLPMA, BLM is required to manage federal public lands "under principles of multiple use" "except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law." 43 U.S.C. § 1732(a). The 1996 Proclamation creating Grand Staircase-Escalante National Monument constitutes such superseding provisions of law dedicating the Monument to specific protective uses.

114. After the 1996 Proclamation, Congress passed multiple laws revising the area, boundaries, and status of Grand Staircase to further these protections. *See infra*, ¶¶ 125–130.

## FACTUAL ALLEGATIONS

### ***I. The First Two Decades of Grand Staircase-Escalante National Monument***

*A. Establishment of the Monument in 1996*

115. Prior to Grand Staircase's creation, the area covered by the Monument was well known as a rich source of important archaeological and paleontological resources, with studies pursued in the Monument area since the 1800s. *See* David D. Gillette & Martha C. Hayden, *A Preliminary Inventory of Paleontological Resources within the Grand Staircase-Escalante National Monument, Utah* 7, Utah Dep't of Nat. Res. (1997), https://ugspub.nr.utah.gov/publications/circular/C-96.pdf (last visited Jul. 29, 2026). Early archaeology within the Monument boundaries was critical in advancing scientific understanding of cultures in the region. *See* David B. Madsen, *A Preliminary Assessment of Archaeological Resources within the Grand Staircase-Escalante National Monument, Utah* 6, Utah Dep't of Nat. Res. (1997), https://ugspub.nr.utah.gov/publications/circular/C-95.pdf (last visited Jul. 29, 2026).

116. Grand Staircase was created by presidential proclamation on September 18, 1996 to permanently safeguard this trove of sensitive resources. *See* 1996 Proclamation, 110 Stat. at 4564. The 1996 Proclamation specifically identified numerous sensitive historic, prehistoric, and scientific resources throughout the Monument as the basis for protecting the area. *See generally id*.

117. The lands of the Monument were "set apart and reserved . . . for the purpose of protecting the objects identified" in the 1996 Proclamation. *Id*. at 4563–64. In total, the 1996 Proclamation reserved 1.7 million acres for the protection of the plethora of sensitive resources that span the entirety of the Monument. *See id*.

118. The 1996 Proclamation provides that "[a]ll Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from entry,

location, selection, sale, leasing, or other disposition under the public land laws . . . ." *Id.* at 4564. As a result, all new mining claims and oil and gas leasing activities were prohibited within the Monument area as of September 18, 1996.

119. The 1996 Proclamation also allowed for the continuation of grazing to ensure that longstanding land uses remained largely undisturbed. After the Monument was established, however, conservation groups purchased some grazing permits from ranchers in some areas along the Escalante River. In a process approved by BLM, these permits were retired in order to protect this fragile riparian zone. Conservation groups, including Partners, have dedicated significant resources to protecting and restoring these areas along the Escalante River. *See* Decl. of Nicole Croft ¶ 11, *Grand Staircase Escalante Partners v. Trump*, No. 17-2591 (D.D.C. Jan. 20, 2018), ECF No. 44-1.

120. In his announcement of the Monument, President Clinton also announced an intent to pursue an exchange with the Utah state government of land holdings within the Monument to preserve the Monument's integrity while allowing the State to develop resources in other areas of the State owned by the federal government. *Utah Land Exch.: Hearing on H.R. 3830 Before the H. Subcomm. on Nat'l Parks, Forests and Lands*, 105th Cong. (1998) (statement of Michael Leavitt, Governor of Utah).

*B. Management of the Monument After the 1996 Proclamation*

121. Grand Staircase was the first national monument over which BLM was given management authority. The 1996 Proclamation requires BLM to manage the Monument "to implement the purposes of this proclamation." 110 Stat. at 4564.

122. In November 1999, pursuant to the 1996 Proclamation and its obligations under 43 U.S.C. § 1712(a) to "develop, maintain, and, when appropriate, revise land use plans," BLM issued

the 1999 Management Plan, which provided detailed guidelines for managing the Monument in accordance with the 1996 Proclamation (as opposed to under general multiple use principles). *See generally* Bureau of Land Mgmt., U.S. Dep't of the Interior, *Grand Staircase-Escalante Nat'l Monument Approved Mgmt. Plan – Rec. of Decision* (1999) [hereinafter "1999 Management Plan"].

123. The 1999 Management Plan was created after extensive public engagement, including, for example, over two dozen public scoping workshops and open houses in cities and towns across the country, including in: Kanab, Utah; Escalante, Utah; Denver, Colorado; Washington, D.C.; San Francisco, California; Flagstaff, Arizona; and Albuquerque, New Mexico, in which the public provided input about the draft management plan. *See* Bureau of Land Mgmt., U.S. Dep't of the Interior, *Grand Staircase Escalante Nat'l Monument: Proposed Mgmt. Plan, Final Env't. Impact Statement* 4.1–4.3 (1999).

124. The 1999 Management Plan adopted two basic precepts: (i) the Monument must be protected in "its primitive, frontier state" in order to safeguard the sensitive scientific and historic resources, and (ii) the Monument should continue to provide unparalleled opportunities for the scientific study of those resources. *See* 1999 Management Plan, *supra* ¶ 122, at iv. BLM concluded that significant development will undermine and destroy the very qualities of the Monument that preserve these sensitive resources and create the scientific opportunities for which the Monument was established and is best known.

*C. Post-Establishment Congressional Activity Ratifying the Monument*

125. In 1998, two years after the Monument's establishment, Congress ratified by law an agreement between the State of Utah and the Secretary of the Interior involving the exchange of Utah school trust lands distributed in checkerboard fashion within the borders of Grand Staircase. *See* Utah Sch. and Lands Exch. Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998). A map showing the wide distribution of these lands is affixed below:




126. The broad purpose of this Act was conservation: Congress recognized that Utah's inholdings "may contain significant economic quantities of mineral resources," and that "[d]evelopment of [such] resources . . . could be incompatible with the preservation of these scientific and historic resources for which the Monument was established." *Id.* § 2(3), 112 Stat. at 3139. As part of the legislation, the state exchanged "approximately 176,698.63 acres of land and

the mineral interest in approximately an additional 24,000 acres" that were "within the exterior boundaries of the Monument" for federal land outside the Monument boundaries. Agreement to Exch. Utah Sch. Trust Lands between the State of Utah and the United States of America § 2(E). The agreement specifically stated that any lands acquired by the United States "within the exterior boundaries of the Monument . . . shall become a part of the Grand Staircase-Escalante National Monument, and shall be subject to all the laws and regulations applicable to the Monument." *Id.* § 5. The same legislation provided Utah with an additional $50 million in compensation. *See* Utah Sch. and Lands Exch. Act § 7, 112 Stat. at 3142. The exchange served to "eliminate th[e] potential incompatibility" between the "[d]evelopment of surface and mineral resources on State school trust lands within the Monument" and "the preservation of these scientific and historic resources for which the Monument was established." *Id.* § 2(3), 112 Stat. at 3139.

127. Later in 1998, Congress made additional boundary adjustments to Grand Staircase by removing land from the Monument in certain areas and adding it in others. The statute explicitly references "[t]he boundaries of the Grand Staircase-Escalante National Monument," and it ratifies and confirms alterations of those existing lands and boundaries. Act of November 6, 1998, Pub. L. No. 105-355, §§ 201–202, 112 Stat. 3247, 3252–53.

128. In 2004, the U.S. District Court for the District of Utah confirmed that the 1996 Proclamation satisfied the statutory requirements for the creation of national monuments, including determinations that the objects identified were appropriate for protection under the Act and that the area delineated was the "smallest area compatible" with protecting these sensitive resources. *See Utah Ass'n of Cntys v. Bush*, 316 F. Supp. 2d 1172, 1178 (D. Utah 2004).

129. In 2009, Congress made further boundary adjustments by removing a parcel of land from Grand Staircase and conveying it to a private entity. The legislation states that the

"boundaries of the Grand Staircase-Escalante National Monument in the State of Utah are hereby modified to exclude the Federal land" conveyed to that private entity. These changes were signed into law by the President. *See* Omnibus Public Land Management Act, Pub. L. No. 111-11, § 2604, 123 Stat. 991, 1120 (2009).

130. In 2009, Congress also permanently established the National Landscape Conservation System. The legislation included Grand Staircase within its then-existing boundaries in the NLCS. Pub. L. No. 111-11, § 2002, 123 Stat. at 1095. The NLCS specifically requires BLM to manage national monuments in a way "that protects the values for which the components of the system were designated." 16 U.S.C. § 7202(a), (c)(2).

## ***II. The Monument and its Invaluable Resources***

### *A. Scientific Research and Discoveries within the Monument*

131. As delineated by the 1996 Proclamation as modified and ratified by Congress,[3] the Monument contains a wide distribution of protected objects and has provided a wellspring of significant scientific research. BLM has recognized the "many opportunities for research" in the Monument including the Monument's "world renowned" paleontological resources, "extremely high floristic diversity," and "outstanding density and diversity of cultural sites." 2025 Science Plan, *supra* ¶ 7, § 2.1.

132. Scientists have flocked to Grand Staircase because it is a landscape protected for its scientific values. Researchers have published "hundreds" of publications on resources in the Monument, 2025 Science Plan, *supra* ¶ 7, § 2.1.2, and continue to conduct research throughout the Monument. For example, in 2024, BLM staff in the Monument processed more scientific

[3] As the lands designated by the 1996 Proclamation as modified by Congress are the same as the lands that would be designated by the 2021 Restoring Proclamation (as described below), these are referred to together for simplicity as the "1996 Proclamation" in this section.

research applications through its online portal than any other BLM unit. Bureau of Land Mgmt., U.S. Dep't of the Interior, *Grand Staircase-Escalante National Monument Manager's Annual Report FY24* at 5 (2025), https://www.blm.gov/sites/default/files/docs/2025-05/GSENM_FY24_ManagersReport_508.pdf [hereinafter "FY24 Manager's Report"]. Since the 1996 Proclamation, paleontological researchers alone have dedicated more than 100-person years to the study of GSENM's fossil record. Alan L. Titus et al., *Twenty-Five Years of Paleontological Research in Grand Staircase-Escalante National Monument, Utah: Public Lands in Service to Science and the Public*, 41 Park Stewardship Forum 402, 412 (Sep. 15, 2025), https://escholarship.org/uc/item/4p99h1nq [hereinafter "Paleontological Research in Grand Staircase"].

133. Paleontological potential is widely dispersed throughout the Monument as delineated by the 1996 Proclamation and 2021 Restoring Proclamation. Of the lands that have been assessed by BLM for their fossil yield potential, approximately 60% are classified as having "very high" or "high" paleontological potential (Potential Fossil Yield Classification Class 5 or Class 4). Bureau of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante Nat'l Monument Proposed Res. Mgmt. Plan and Final Envt'l Impact Statement at 3-124–3-130 (Aug. 29, 2024) [hereinafter "2024 Final EIS"]. Conversely, less than .007 percent of the assessed monument is classified as having "very low" paleontological potential (PFYC Class 1). *Id.* This extraordinary paleontological potential is well illustrated in the following BLM mapping of Potential Fossil Yields:




*Id.* App. A, Fig. 3-24.

134. Work at Grand Staircase has informed humanity's understanding of "how the Earth recovered from its largest extinction" and "how Earth's ecosystems became 'modern' because of the rise of flowering plants." *See Forgotten Voices*, *supra* ¶ 85.

135. In BLM's own estimation, the "uniqueness" and "continuity" of the fossil record in the Monument, could "probably qualify" the Kaiparowits Plateau as a UNESCO World Heritage Site. 2025 Science Plan, *supra* ¶ 7, § 2.2.2. This should come as no surprise: researchers have made and continue to make groundbreaking paleontological discoveries within the Monument. *See id.*; FY24 Manager's Report, *supra* ¶ 132 at 7. For instance:

a. Since 1996, researchers have discovered dozens of previously unknown species, including fourteen new species of dinosaur. Paleontological Research in Grand Staircase, *supra* ¶ 132 at 409, 412. Researchers have also found hundreds of species of fish, turtles, amphibians, lizards, snakes, birds, and mammals. 2025 Science Plan, *supra* ¶ 7, at 2-7.

b. Discoveries include the oldest tyrannosaurid (*Lythronax argestes*), the oldest named ancestor of Tyrannosaurus rex, and one of the oldest named ceratopsians (*Diabloceratops eatoni*), a relative of the iconic Triceratops. *See* Mark A. Loewen, et al., *Ceratopsid Dinosaurs from the Grand Staircase of Southern Utah, in at the Top of the Grand Staircase: The Late Cretaceous of Southern Utah* 488–503 (Alan L. Titus & Mark A. Loewen, eds. 2013); Mark A. Loewen, et al., *Tyrant Dinosaur Evolution Tracks the Rise and Fall of Late Cretaceous Oceans*, 8 PLoS One 1 (2013), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0079420.

c. As paleontologist Dr. Randall Irmis has put it, "these species that we're finding in Grand Staircase-Escalante National Monument, whether they be dinosaurs or crocodiles or turtles or mammals, they're only found in this one place . . . They're found nowhere else on Earth." Meghan Bartels, *Teenage Dinosaur Fossil Discovery Reveals What Puberty Was Like for a Tyrannosaur*, Newsweek (Oct. 20, 2017), http://www.newsweek.com/teenage-dinosaur-fossil-discovery-reveals-puberty-tyrannosaur-689448.

d. In terms of volume, as of 2024, BLM has tracked approximately 52,000 paleontological specimens from the Monument to various museum collections. *See* 2024 Final EIS, *supra* ¶ 133, at App. I, I-61.

136. The protections of objects within the boundaries of the 1996 Proclamation safeguard sites for future paleontological research. Without such protections, the paleontological resources would be under threat. Any kind of mining operation, whether for "critical minerals," coal, shale gas, or alabaster, is a major threat to such resources.

137. For paleontologists, the importance of the geological context in which the fossils sit rivals the importance of the fossils themselves. The rocks and other formations that surround a given fossil allow paleontologists to understand the climate, temperature, and rainfall of the world in which the fossil creature once lived. Another important way to understand the biological, climatological, and environmental context of large vertebrate paleontological sites is through study of invertebrate and plant fossils found in the area. Without protection of the geological context and invertebrate and plant fossils throughout the Monuments, these resources will be compromised.

138. As delineated by the 1996 Proclamation, Grand Staircase also contains a remarkable degree of biological diversity. *See* 2025 Science Plan, *supra* ¶ 7, §§ 2.2.4–2.2.8. For example, the Monument contains "about 50 percent of the Colorado Plateau's floral diversity and approximately 40 percent of its rare flora." *Id.* at 2-11. New plant species still continue to be discovered. *Id.* More than 1,450 animal species have been described within the Monument, including 660 known species of bee. *Id.* at 2-1, 2-22.

139. Extensive elimination of the Monument's protections will inevitably lead to habitat changes that will permanently harm this diversity. As BLM admitted after the 2017 Proclamation,

"mineral development in KEPA [BLM's term for lands excluded by the 2017 Proclamation], renewable energy development in KEPA, livestock grazing . . . and transportation would result in short- and long-term direct, adverse impacts on fish and wildlife resources through surface disturbance, habitat alteration, and disturbance/displacement." Bureau of Land Mgmt., U.S. Dep't of the Interior, Grand Staircase-Escalante Nat'l Monument and Kanab-Escalante Plan. Area Proposed Res. Mgmt. Plans and Final Env't. Impact Statement at 3-28 (2019) [hereinafter "2019 Final EIS"].

140. The Monument continues to be a rich source of historic and archaeological research as well. *See* 2025 Science Plan, *supra* ¶ 7, § 2.2.14; *see also* R. E. Burillo, ed., *Enigmatic and Endangered: Cultural and Natural Wonders of Greater Grand Staircase-Escalante*, 33(1 & 2) Archaeology Southwest 3, 3–4, 16–17, 24–25 (describing the richness and diversity of archaeological and paleontological resources and the scientific research on Monument lands and land excluded by the 2017 Proclamation).

141. Archaeological resources encompassed within the Monument as delineated by the 1996 Proclamation and the 2021 Restoring Proclamation include "both prehistoric and historic sites," such as "abundant rock art panels, occupation sites, ceremonial sites, and countless other sites and artifacts." 2019 Final EIS, *supra* ¶ 139, at E-11. The Monument also preserves historical resources from more recent eras. Historic resources associated with the Paiute, Ute, Hopi, Zuni, and Navajo are contained within Grand Staircase's pre-2017 Proclamation boundaries. Further, resources from an important era of Mormon history are protected, including the famous Hole-in-the-Rock trail.

142. As BLM has recognized, the Monument "contains an incredibly rich archaeological record that dates back over 10,000 years," 2025 Science Plan, *supra* ¶ 7, at 2-31, including "an

entire record of the development, rise, and fall of prehistoric agriculture on the northern Colorado Plateau," Bureau of Land Mgmt., U.S. Dep't of the Interior, Analysis of Management Situation—Grand Staircase-Escalante Nat'l Monument and Kanab-Escalante Planning Area at 248 (Aug. 15, 2018) [hereinafter "2018 Analysis of Management Situation"].

143. While only 7 percent of the Monument-area has been comprehensively surveyed for cultural resources, 2024 Final EIS, *supra* ¶ 133, at App. D, D-14, site density analyses of archaeological inventory projects within the Monument indicate that over 100,000 archaeological sites may lie within Grand Staircase's pre-2017 Proclamation boundaries. *See* David B. Madsen, *A Preliminary Assessment of Archaeological Resources within the Grand Staircase-Escalante National Monument, Utah,* 5, Utah Dep't of Nat. Res. (1997), https://ugspub.nr.utah.gov/publications/circular/C-95.pdf (last visited Aug. 1, 2026). As reflected in the map affixed below, a predictive model developed in 2018 by the University of Utah Archaeological Center anticipates the widespread presence of cultural resources throughout the Monument-area. *See, e.g.*, Peter M. Yaworsky et al., *Archaeological Potential of the Grand Staircase-Escalante National Monument* (Oct. 2018), https://www.researchgate.net/publication/332452547_Archaeological_Potential_of_the_Grand_Staircase-Escalante_National_Monument.




*Id.*

144. Elimination of the Monument's protections endangers the resources underlying the many discoveries made within the Monument—by weakening protections against vandalism and looting, for example—and the process of discovery itself by permanently undermining the opportunities for scientific research. As BLM noted when assessing the potential future effects of the 2017 Proclamation, "[l]ooting of sites, which has been considered a great risk in the past, has *lessened dramatically* with the advent of monument designation and associated educational and

interpretive programs at GSENM." 2018 Analysis of Management Situation, *supra* ¶ 142, at 28 (emphasis added).

*B. The Monument and the Surrounding Communities*

145. Designation and reservation of Grand Staircase-Escalante National Monument has been a boon to the local communities and economies. BLM purposefully located major visitor centers and other visitor opportunities in nearby towns instead of within the Monument itself, *see* 1999 Management Plan, *supra* ¶ 122, at iv, which had the intended effect of ensuring that the economic development generated by the Monument was situated in the surrounding communities. Surrounding communities such as Kanab, Escalante, and Boulder have seen a proliferation of small businesses, and there are now over 100 outfitters and guides with business operations tied to the Monument. Moreover, total employment in the Monument region has grown since Grand Staircase's creation: the population has grown by 26 percent between 2001 and 2022, and jobs have grown by 51 percent. *See* Headwaters Economics, *Grand Staircase-Escalante National Monument—A Summary of Economic Performance in Surrounding Counties* at 1 (2026), https://headwaterseconomics.org/wp-content/uploads/2025/11/2026HE-GrandStaircaseEscalante-Fact-Sheet-2026.pdf. The elimination of Grand Staircase's protections threatens these gains.

146. Prior to the Monument's creation, employment had begun to shift away from traditional commodity-based industries and toward more sustainable service-based industries. This trend has continued. Professional services jobs (*e.g.*, doctors, hospitality workers, and teachers) have grown 83 percent from 2001 to 2022 and comprise much of the employment growth in the Monument region. *Id.* This growth has not come at the expense of traditional jobs in areas such as agriculture, mining, and timber: "[l]ong before the monument's creation, commodity

industries . . . were becoming a smaller share of the overall economy in the Grand Staircase-Escalante Region. These industries remain a small part of the region's economy today." *Id*. at 2. The elimination of Grand Staircase's protections threatens this more robust economic structure.

147. As expected, this robust job growth and economic development has positively impacted personal income—real per capita income increased 41 percent from 2001 to 2022. *Id.* at 1.

148. Aside from direct economic benefits, the communities have also benefitted from having a more direct and concrete role in advising BLM on land management decisions within the Monument. Under the 1999 Management Plan, the Secretary of the Interior established a Monument Advisory Committee (the "MAC"). *See* 1999 Management Plan, *supra* ¶ 122, at 66. This committee, formed to advise BLM on Monument management, originally comprised members with expertise in archaeology, paleontology, geology, botany, wildlife biology, history, social science, and systems ecology, as well as elected officials from Garfield and Kane Counties, a state or tribal government representative, an educator, a representative of the environmental community, an outfitter and guide that operates within Grand Staircase, and a livestock grazing permittee operating within the Monument. Robust community input was thus institutionally woven into the Monument's management. Most recently, the MAC provided important insight that assisted the creation and adoption of the 2025 Management Plan and 2025 Science Plan.

149. Grand Staircase has also been woven into the region's cultural experience and opportunities, as evidenced by the numerous festivals celebrating the community connections to the Monument, including the Boulder Heritage Festival, the Escalante Canyons Arts Festival, and the Amazing Earthfest in Kanab. The extensive elimination of Grand Staircase's protections will weaken and undermine these cultural community offerings.

## ***III. The Monument Since Defendant Trump's First Actions in 2017***

*A. The 2017 Proclamation and Subsequent Mining Activities*

150. After two decades of stability following the 1996 Proclamation, the last ten years in Grand Staircase have been characterized by whipsawing protections due to Defendant Trump's repeated and *ultra vires* efforts to reduce the Monument.

151. On December 4, 2017, President Trump issued the 2017 Proclamation, which "modified and reduced" the existing Monument by 861,974 acres, a reduction of 46 percent. 82 Fed. Reg. 58,089, 58,093 (Dec. 4, 2017).

152. The 2017 Proclamation asserted—without citation to the Antiquities Act, case law construing the Act, or any other source of law—that "[d]etermining the appropriate protective area involves examination of a number of factors, including the uniqueness and nature of the objects, the nature of the needed protection, and the protection provided by other laws." *Id.* at 58,089. It concluded, without further specificity, that "in light of the research conducted since designation . . . many of the objects identified by the [1996 Proclamation] are not unique to the monument[] and . . . are not of significant historic or scientific interest." *Id.* at 58,091.

153. The 2017 Proclamation's assessment of the uniqueness and value of the resources excluded from the Monument was pretextual, inaccurate, arbitrary and capricious, and not supported by fact. As BLM itself concluded following the 2017 Proclamation: "[r]esource conditions have not changed . . . but management objectives . . . have." 2018 Analysis of Management Situation, *supra* ¶ 142, at 3.

154. Between February 2, 2018 and October 8, 2021 (the date of the 2021 Restoring Proclamation), the lands excluded from the Monument were, under the terms of the 2017 Proclamation, purportedly opened to "disposition under all laws relating to mineral and geothermal

leasing[] and [] location, entry, and patent under the mining laws." 82 Fed. Reg. at 58,093. One such law is the General Mining Law of 1872, 30 U.S.C. §§ 21 *et seq.*, pursuant to which "anyone can enter open public lands, undertake excavation, stake mining claims, and set up mining operations." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324 (D.C. Cir. 1987).

155. Lands protected by national monument status are exempt from the scope of the General Mining Law. *See Cameron v. United States*, 252 U.S. 450, 455 (1920) (noting that "inclusion of [land] in the monument . . . withdrew that part from the operation of the mineral land law"). But between February 2, 2018 and October 8, 2021, any interested private individual could walk onto the newly-excluded areas without notice to BLM and use hand tools or portable suction dredges to collect rock, soil, and mineral species. *See* 43 C.F.R. §§ 3809.5; 3809.605(b). Individuals could undertake even more disruptive sampling, drilling or development of surface and underground workings, so long as BLM is provided 15 days advanced notice of the resource extraction. *See* 43 C.F.R. §§ 3809.5, 11, 21.

156. Groups sought to take advantage of this opening of the newly-excluded lands to extractive activity. Between February 2018 and October 2021, private parties staked dozens of claims on these lands.

157. For example, multiple groups filed claims to mine in the Butler Valley, an area excluded from the Monument under the 2017 Proclamation. The area is rich in alabaster, and, as BLM reported, "has a reputation for being some of the best in the country for sculpting." Bureau of Land Mgmt., U.S. Dep't of the Interior, *Mineral Potential Report for the Lands Now Excluded from Grand Staircase-Escalante National Monument* at 50 (April 2018), https://npshistory.com/publications/blm/grand-staircase-escalante/mineral-potential-2018.pdf. This area is also excluded from the Monument under the 2026 Proclamation.

158. Following the 2017 Proclamation, Penney's Gemstones began a mining operation on a set of alabaster claims it has named "Creamsicle," in an area purportedly excluded from the Monument, after BLM issued a notice to proceed on September 20, 2019. *See* Second Decl. of Scott Berry, Attach. 1 *Grand Staircase Escalante Partners v. Trump*, No. 17-2591 (D.D.C. Nov. 7, 2019), ECF No. 44-2. There are documented paleontological resources in the vicinity of the Creamsicle site. *See* Fourth Decl. of David Polly ¶¶ 14-23 *Grand Staircase Escalante Partners v. Trump*, No. 17-2591 (D.D.C. Nov. 7, 2019), ECF No. 44-4. The damage that has resulted from this mining will hinder the ability of members of the Society to conduct paleontological research.

159. Similarly, Alpine Gems LLC ("Alpine") filed an application to begin mining operations on several claims in the same area. The draft mine proposal contemplates an open pit quarry, up to 15–25 feet in depth. Fifty to one hundred tons of material per year will be removed from the site indefinitely pursuant to its notice. Alpine proposed to use both a backhoe and explosives to alter the landscape in search of alabaster, a form of gypsum typically used in carving or sculpting. Alpine further proposed to store moved earth and alabaster on site until there is enough to haul away, and to improve and expand 300 feet of an existing road to facilitate access.

160. Following the 2017 Proclamation, BLM has repeatedly acknowledged that surface-disturbing activities, including mining operations, would result in "adverse impacts on paleontological resources" through "physical damage or destruction of fossils," 2019 Final EIS, *supra* ¶ 139, at 3-47; *see also* 2024 Final EIS, *supra* ¶ 133, at 3-144, and that "subsurface excavation or other types of ground-disturbing activities would have the greatest potential to damage cultural resource sites, artifacts, and/or features" as well, 2019 Final EIS, *supra* ¶ 139, at 3-20; *see also* 2024 Final EIS, *supra* ¶ 133, at 3-100.

161. Mining operations, and the damage they leave on the landscape, interfere with the ability of members of Partners to recreate and enjoy the aesthetic values of the Monument—these members visit the area in part to enjoy tranquility, natural wonders, and solitude. Members of Partners have visited the threatened areas in the past and have concrete plans to return to them in the future. Mining operations interfere with the business activities and livelihoods of Partners' members who depend on the attractiveness of the remote and undeveloped nature of the Monument for their guiding and tourist activities.

162. Mining operations, and the damage they leave on the landscape, disturb the critical context for paleontological research and discovery, and that allows for the improvement of research methods over time. This interferes with the research activities and livelihoods of Society members.

*B. The 2021 Restoring Proclamation*

163. On October 8, 2021, President Biden issued the 2021 Restoring Proclamation, identifying the many objects of historic and scientific interest distributed throughout the boundaries of Grand Staircase-Escalante National Monument as they existed prior to the 2017 Proclamation and finding that those boundaries encompassed the "smallest area compatible with [those objects'] proper care and management." 86 Fed. Reg. 57,335, 57,344 (Oct. 15, 2021).

164. The 2021 Restoring Proclamation found that under the pre-2017 boundaries, "[s]cientists . . . utilized every corner of the monument in their efforts to better understand our environment, our history, our planet's past, and our place in the universe." *Id.* That Proclamation found that, "[t]he entire Grand Staircase-Escalante landscape . . . is an object of historic and scientific interest requiring protection under the Antiquities Act" as well as that "there are innumerable objects of historic or scientific interest within this extraordinary landscape." *Id.* Once

again, these objects were subject to the essential protection that had persisted for two decades prior to the unlawful 2017 Proclamation. The 2021 Proclamation was consistent with Congress's fundamental protective purpose in enacting the Antiquities Act, as well as with Congress's purpose in ratifying and confirming the Monument's boundaries as they existed prior to the 2017 Proclamation. The 2021 Restoring Proclamation has been subject to on-going judicial review. *See Garfield Cnty. v. Trump*, 179 F.4th 814 (10th Cir. 2026).

165. Pursuant to the 2021 Restoring Proclamation, BLM undertook to review the management situation in the Monument and, on January 6, 2025, approved a revised resource management plan that "reinstates the original [pre-2017 Proclamation] boundaries and management conditions while emphasizing the protection of monument objects and facilitating continued scientific research." Bureau of Land Mgmt., U.S. Dep't of the Interior, *Grand Staircase-Escalante National Monument RMP*, https://www.blm.gov/programs/planning-and-nepa/plans-in-development/utah/gsenm-rmp (last visited Aug. 19, 2026); *see* Bureau of Land Mgmt., U.S. Dep't of the Interior, *Grand Staircase-Escalante National Monument, Record of Decision, Approved Resource Management Plan*, at 1-1 (Jan. 6, 2025) (hereinafter "2025 Management Plan"); *see also* 90 Fed. Reg. 2,741 (Jan. 13, 2025).

*C. The 2026 Proclamation*

166. Since taking office, Defendant Trump has repeatedly articulated his plans to increase exploration for and extraction of energy and minerals from Federal lands. On the day of his inauguration, President Trump signed Executive Order 14,145, "Unleashing American Energy." It reads, in relevant part:

> It is the policy of the United States: to encourage energy exploration and production on Federal lands. . . to establish our position as the leading producer and processor of non-fuel minerals, including rare earth minerals. . . ensuring that an

> abundant supply of reliable energy is readily accessible in every State and territory of the Nation.

90 Fed. Reg. 8,353, 8,353 (Jan. 20, 2025).

167. On February 3, 2025, Secretary Burgum issued Secretarial Order No. 3418, also entitled "Unleashing American Energy." The memorandum directed his assistant secretaries to submit plans within 15 days to include "actions to review and, as appropriate, revise all withdrawn public lands" under the Antiquities Act. It specifically emphasized its goals to "prioritize reducing barriers to the use of Federal lands for energy development, consistent with the principle of multiple use," "offer more parcels of the public land for oil and gas leasing," and "review and, as appropriate, revise all undue burdens on the domestic mining and processing of nonfuel minerals." Sec'y of the Interior, Order No. 3418, Unleashing American Energy (Feb. 3, 2025), at 5-6, https://www.doi.gov/sites/default/files/document_secretarys_orders/so-3418-signed.pdf. The 2026 Proclamation resulted from these recommendations, and Secretary Burgum's memorandum makes clear that management of Grand Staircase will prioritize energy development, oil and gas extraction, and mining.

168. On March 4, 2026, several Members of the Utah Congressional Delegation introduced joint resolutions of disapproval under the CRA to attempt to overturn the 2025 Resource Management Plan for the Monument, which implemented the 2021 Restoring Proclamation. H.R.J. Res. 151, 119th Cong. (2026); S.J. Res. 109, 119th Cong. (2026).

169. On June 11, 2026, the deadline for the Senate to overturn the 2025 Management Plan by simple majority vote passed without action by Congress. Tim Peterson, *Grand Staircase-Escalante National Monument Dodges Attack in Congress*, Grand Canyon Trust (Jun. 17, 2026), https://www.grandcanyontrust.org/blog/victory-grand-staircase-escalante-national-monument-is-safe/.

170. Congress was acutely aware of the 1996 and 2021 Proclamations' boundaries of the Monument as implemented in the 2025 Management Plan and had the opportunity to disavow those boundaries through a streamlined legislative process. It instead left the 2025 Management Plan in place.

171. On July 13, 2026, President Trump issued the 2026 Proclamation, "modify[ing] the boundaries of the Monument . . . to exclude approximately 1.69 million acres of land[,]" a reduction of 89 percent. 91 Fed. Reg. at 45,182. President Trump unilaterally took this action notwithstanding the long-settled expectations around the Monument; the numerous Congressional actions that ratified and confirmed the Monument's boundaries and the protections it created; and the failure of Congressional efforts under the CRA to undo those protections.

172. The 2026 Proclamation—a cursory document of only half the length of the 2021 Restoring Proclamation—begins from the erroneous premise that "the Antiquities Act permits the President to remove land from the monument and return it to its prior federally managed status." 91 Fed. Reg. at 45,179.

173. Not only does the 2026 Proclamation strip protections from lands included in the 1996 and 2021 Proclamations, but it also asserts that the Monument as established by Defendant Trump's 2017 Proclamation was "too vast" because "our Nation's need to reduce its reliance on foreign sources of several resources vital to our economic and national security, including resources located within the Monument, is greater than it was in 2017." 91 Fed. Reg. at 45,182.

174. The 2026 Proclamation also justifies its new Monument boundaries on the basis of "practical limitations on the BLM's land management resources and funding." 91 Fed. Reg. at 45,180. However, although Defendant Trump has tried to sharply curtail BLM's land management resources and funding, Congress has rejected these proposals in enacted law. *See* Cong. Res. Serv.,

IF13121, Bureau of Land Management: FY2026 Appropriations (Apr. 2, 2026), https://www.congress.gov/crs-product/IF13121 (noting that the Administration's total requested budget was $899 million but the budget enacted by Congress was $1,378.4 million).

175. The 2026 Proclamation's assessment of the uniqueness and value of the resources excluded from the Monument is based on extra-statutory factors, and is pretextual, inaccurate, arbitrary and capricious, and contrary to a century of judicial precedent affirming the appropriateness of protecting such objects.

176. The elimination of Monument protections by the 2017 Proclamation and the 2026 Proclamation threatens the scientific resources within the Monument and economic, recreational, and aesthetic services and features created and nurtured by the Monument.

177. Mining development and ground-disturbing activities even more extensive than those which occurred after the 2017 Proclamation are likely to result as a consequence of Defendant Trump's 2026 Proclamation. Indeed, the Proclamation invites such mining: "The Grand Staircase-Escalante region contains several resources that are vital to our economic and national security. These resources include several critical minerals[,] . . . create jobs, fuel prosperity, and are essential to important sectors of the economy." 91 Fed. Reg. at 45,180.

178. Although the 2026 Proclamation purports to open lands excluded from the Monument to mining and disposition starting on September 11, 2026, prospectors have already begun to file mining claims on lands purportedly excluded from the Monument. *See,* Maxine Joselow, *Mining Claims Staked on Land That Trump Cut From Monuments*, N.Y. Times (Aug. 14, 2026), https://www.nytimes.com/2026/08/14/climate/mining-trump-utah-monuments.html.

179. On August 6, 2026, a mining claim was staked in a newly excluded area of the Kimball Valley, just below the Vermillion Cliffs near E. Highway 89. The claim is at the site of

the pre-Monument King Mine that was established in 1908 and produced manganese after World War II. The manganese was mined from the Triassic-aged Chinle Formation, which BLM has assessed as having a "high" Potential Fossil Yield Classification for paleontological resources. Since the establishment of the Monument in 1996, three paleontological sites have been discovered within the boundaries of this claim, including one within 100 feet of the open-pit quarries at the old King Mine, plus five more within two miles of the claim.

180. Moreover, the areas to be opened for mining and disposal under the 2026 Proclamation are far more extensive than they were in the 2017 Proclamation, threatening vastly more precious objects of historic and scientific interest. Mining activities have damaged and will continue to damage the objects in GSENM that are validly protected under the 1996 Proclamation and 2021 Restoring Proclamation.

*D. Sensitive Resources Removed from Protection by the 2017 and 2026 Proclamations*

181. The areas excluded from the Monument by the Dismantling Proclamations contain numerous sensitive resources, including objects specifically identified in the 1996 Proclamation and the 2021 Restoring Proclamation. Geological formations such as the Waterpocket Fold, portions of the Kaiparowits Plateau, and the Grand Staircase cliff sequence have been removed or their protections reduced. Historical locations such as archaeological sites in the Circle Cliffs and the Hole-in-the-Rock trail have been excluded and carved up. Biological resources, such as bear habitat, desert bighorn sheep habitat, and the Paria River wildlife corridor, have been split or removed from the Monument. These objects and lands depend upon Grand Staircase as a cohesive, undeveloped unit in its delineation prior to the Dismantling Proclamations for their continued protection. The Dismantling Proclamations upend that cohesion and immediately threaten the continued integrity of these resources and others.

182. BLM's own analysis following the 2017 Proclamation, and again demonstrated in its extensive 2024 Environmental Impact Statement findings as part of its planning process, contradicts the conclusion that the objects excluded from the Monument under the 2017 Proclamation and the 2026 Proclamation do not have "significant historic or scientific interest." For example:

a. BLM prepared and released for public review a map showing the location of known cultural and paleontological discoveries within the Monument. As reflected below, this map demonstrates that thousands of known sites and areas of high paleontological and archaeological potential for new discoveries were excluded from the Monument under the 2017 Proclamation.



b. In 2018, BLM concluded that "lands in the KEPA"—the Kanab-Escalante Planning Area, BLM's term for lands excluded from the Monument under the 2017 Proclamation—"contain some of the highest site densities and *most important sites* in the Planning Area" for cultural resources and recognized that these sites "may not see an emphasis on research projects," which would be "a serious loss of research potential." 2018 Analysis of Management Situation, *supra* ¶ 142, at 30.

c. BLM also found that vertebrate Late Cretaceous fossils—"one of the truly globally unique resources" found in the region—are present and plentiful in the excluded lands. *Id.* at 273, 301. Likewise, "[n]o Permian strata occur in the [retained] GSENM," but are "exposed only . . . within [excluded] lands." *Id.* at 269. The Tropic Shale, which yields "spectacular, pristinely preserved ammonite and other fossils," and is one of the only fully marine geological units in the Monument, is "also mostly on [excluded] lands." *Id.* at 274.

d. At least 1,200 scientifically important fossil sites were excluded under the 2017 Proclamation, representing entire chapters of the paleontological record. This figure comes from BLM itself and likely undercounts the number of sites that have already been identified, given admitted backlog in data entry.

183. Because the 2026 Proclamation purports to exclude virtually all[4] of the lands excluded under the 2017 Proclamation—plus a further 800,000 acres—the paleontological sites excluded under the 2017 Proclamation are also excluded under the 2026 Proclamation, as are innumerable others. As reflected in the Map below, the 2026 Proclamation purports to exclude

[4] Approximately 900 acres excluded under the 2017 Proclamation are included in the Monument following the 2026 Proclamation. Upon information and belief, this irregularity is apparently attributable to efforts to map the Monument's boundaries to the natural topography.

almost all of the fossil sites identified by the Department of the Interior prior to the 1996 Proclamation as well as the vast majority of the Monument's most fossiliferous lands.




184. Several known critical paleontological resources and formations are excluded under the Dismantling Proclamations. For instance:

a. *All* of the Monument's Cambrian fossils are excluded. These fossils, the oldest in the Monument area, document the largest mass extinction in Earth's history.

b. Much of the petrified forest referred to in the 1996 Proclamation is excluded. This forest, which comprises a large section of the Circle Cliffs area, contains the second largest concentration of petrified wood in North America and

includes the preserved trunks of ancient trees, like *Araucarioxylon*. Fossils in the area also contain some of the earliest evidence for insect metamorphosis.

c. Important paleontological sites in the Wahweap Formation, which was named in the 1996 Proclamation, are excluded, including the site where the unique horned dinosaur *Machairoceratops* was discovered.

d. All of the Naturita (Dakota) Formation mammal localities from Bulldog Bench outside of Cannonville are excluded. This is the only Cenomanian nonmarine vertebrate fauna in the world and has produced many "type" species of mammals.

e. North America's best Turonian-age microvertebrate locality, located outside of Henrieville, is excluded from the Monument.

f. Virtually all of the Tropic Shale—which was specifically named in the 1996 Proclamation—is excluded from the Monument. The Tropic Shale is one of the only fully marine geological units in the Monument—from when this region was covered by water eons ago—and is part of the Late Cretaceous aged sequence of ecosystems referred to in the 1996 Proclamation. The Tropic Shale captures a critical moment in the transition from pliosaur- and ichthyosaur-dominated oceans of the Jurassic and Early Cretaceous to the polycotylid- and mosasaur-dominated seas of the Late Cretaceous. Loss of the Tropic Shale resource would destroy scientists' ability to understand this transition. Important paleontological resources preserved in the Tropic Shale include: evidence for extinction that preceded the asteroid impact at the end of the Cretaceous that killed the dinosaurs; the Earth's earliest mosasaurs, which were giant marine lizards from the time of the dinosaurs;

the very last pliosaur, a giant apex predator of these ancient seas, named *Brachauchenius*; and missing links in the origin of polycotylid plesiosaurs, which were long-necked marine reptiles that became extinct at the end of the Cretaceous period.

185. The 2017 Proclamation purported to exclude more than 65,000 acres that were specifically added to the Monument by Congress when it ratified and confirmed the land exchange agreement between Utah and the Federal Government. *See* Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998).

186. Similarly, the 2026 Proclamation purports to exclude 333 of 366 total parcels that were specifically added to the Monument by Congress when it ratified and confirmed the land exchange agreement between Utah and the Federal Government. *See* Utah Schools and Lands Exchange Act, Pub. L. No. 105-335, § 3, 112 Stat. 3139, 3141 (1998).

187. The 2017 Proclamation and 2026 Proclamations undermine the protections necessary for preserving both the sensitive resources described above and others. Following the 2017 Proclamation, for example, BLM recognized that impacts on paleontological and geological resources are likely to result from "management decisions that increase public access and therefore increase the likelihood of the loss of paleontological resources through vandalism and unlawful collecting." 2019 Final EIS, *supra* ¶ 139, at 3-145. And in choosing to ensure the protection of these areas through its 2025 Resource Management Plan, BLM acknowledged that, "any management decisions that include increased areas of allowed surface disturbance, such as construction, ROW leasing, increases in recreation, and increases in OHV [Off-Highway Vehicle] use, could affect paleontological resources. Unmitigated surface-disturbing activities could dislodge or damage paleontological resources and features that were not visible before surface

disturbance. Crushing, breaking, or displacement of paleontological resources could result in the permanent loss of the resources, the scientific data they could provide, and the associated contextual data. Where surface disturbance is not mitigated or reclaimed, paleontological resources may be subjected to long-term damage or destruction from erosion. . . . Actions that provide further human access to BLM-managed lands and lead to activities like vandalism and unauthorized collection could also impact paleontological resources." 2024 Final EIS, *supra* ¶ 133, at 3-133–3-134.

188. Despite describing the rich paleontological sources in the area, the 2026 Proclamation declines to provide them meaningful protection, thus underscoring that the decision was not rooted in the President's authority under the Antiquities Act. For example, the 2026 Proclamation explains that its proposed Kaiparowits Horizon Unit "has provided critical insights into the ancient ecosystems of the Western Interior seaway and the rich diversity of dinosaurs, reptiles, and other vertebrates and is considered a globally important paleontological resource," while at the same time removing the vast majority of the highly fossiliferous Kaiparowits Plateau from the Monument. *See* 91 Fed. Reg. at 45,181. Indeed, notable paleontological specimens celebrated by BLM were discovered in areas now excluded from the reconfigured Monument. *See, e.g.*, Bureau of Land Mgmt., U.S. Dep't of the Interior, *Grand Staircase-Escalante National Monument Continues to Demonstrate Its Scientific Significance: Research Published on Tiny Dinosaur Eggs Found in Kaiparowits Formation* (June 9, 2023), https://www.blm.gov/blog/2023-06-09/grand-staircase-escalante-national-monument-continues-demonstrate-its-scientific; Bureau of Land Mgmt., U.S. Dep't of the Interior, *Grand Staircase-Escalante National Monument Nets Important Dinosaur Discovery* (Feb. 11, 2022), https://www.blm.gov/blog/2022-02-11/grand-staircase-escalante-national-monument-nets-important-dinosaur-discovery. Despite

acknowledging that some breakthrough paleontological discoveries are "recent" and that exploration of this resource remains ongoing, the 2026 Proclamation reduces the Kaiparowits Horizon Unit to less than 10,000 acres—barely fifteen square miles.

189. As an indication of the continuing potential for new scientific discoveries, in the weeks preceding the 2026 Proclamation, paleontologists recovered an "exceptionally rare" specimen from the Monument: a baby duck-billed dinosaur in its "original life position, with the vertebrae, backbone, and leg bones still connected." Jonathan May, *Rare Baby Duck-billed Dinosaur Fossil Airlifted from Southern Utah*, KUTV (June 30, 2026), https://kutv.com/news/local/rare-baby-duck-billed-dinosaur-fossil-airlifted-from-southern-utah.

190. Defendant Trump's unlawful Proclamations compromise a vast array of scientific resources, reducing the potential for future discoveries like this one, thereby denying humanity essential knowledge about history and ourselves—and in flagrant violation of the Constitution and the Antiquities Act.

## CLAIMS FOR RELIEF

## COUNT ONE

*The President Lacks Constitutional Authority to Eliminate National Monument Protections Via the 2017 Proclamation* (All Defendants)

191. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

192. Judicial review is available to ensure that actions of the President are consistent with the Constitution and to ensure that the President has not usurped Congress' powers.

193. The U.S. Constitution explicitly grants to Congress plenary and exclusive authority over federal lands. *See* U.S. Const. art. IV, § 3, cl. 2.

194. The U.S. Constitution grants no authority over federal lands to the President.

195. Through the Antiquities Act, Congress has delegated to the President only the authority to create national monuments. The Antiquities Act delegated to the President no authority to eliminate or otherwise compromise national monument protections in part or in full.

196. Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections via the 2017 Proclamation is an unconstitutional exercise of legislative authority by the Executive Branch in violation of the Constitution's separation of powers.

197. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury flowing from President Trump's unlawful action.

**COUNT TWO**

*The President Lacks Constitutional Authority to Eliminate National Monument Protections Via the 2026 Proclamation* (All Defendants)

198. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

199. Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections via the 2026 Proclamation is an unconstitutional exercise of legislative authority by the Executive Branch in violation of the Constitution's separation of powers.

200. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury flowing from President Trump's unlawful action.

**COUNT THREE**

*The 2017 Proclamation Is Ultra Vires Because the Antiquities Act Does Not Authorize the Elimination of National Monument Protections* (All Defendants)

201. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

202. The Antiquities Act delegates limited authority to the President to declare national monuments and reserve land as part of such monuments.

203. The Antiquities Act does not explicitly or implicitly grant authority to eliminate national monument protections in part or in full. *See Learning Res., Inc. v. Trump*, 607 U.S. 229, 230–31 (2026) (rejecting a novel interpretation of a longstanding statute because it would result in "a transformative expansion of the President's authority" and emphasizing that the Court "ha[s] long expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers," particularly where "the purported delegation involves [a] core congressional power" (citation omitted)).

204. The Antiquities Act does not explicitly or implicitly grant authority to the President to subsequently decide that duly protected objects are no longer worthy of protection.

205. Congress has never amended the Antiquities Act to grant the President such additional authority over national monuments, despite attempts to do so.

206. Congress has amended the Antiquities Act only to restrict Presidential authority.

207. Congress has repeatedly demonstrated that it retains the sole power to eliminate national monument protections.

208. Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections via the 2017 Proclamation is not authorized by the Antiquities Act, is contrary to its protective purposes, and is *ultra vires*.

209. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury flowing from Defendant Trump's unlawful action.

**COUNT FOUR**

*The 2026 Proclamation Is Ultra Vires Because the Antiquities Act Does Not Authorize the Elimination of National Monument Protections* (All Defendants)

210. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

211. Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections via the 2026 Proclamation is not authorized by the Antiquities Act, is contrary to its protective purposes, and is *ultra vires*.

212. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury flowing from Defendant Trump's unlawful action.

**COUNT FIVE**

*The 2017 Proclamation Is Ultra Vires and Unconstitutional Because it Disturbs Monument Boundaries and Lands That Have Been Repeatedly Codified by Congress* (All Defendants)

213. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

214. The President has no authority to alter reservations or withdrawals of federal lands specifically enacted by Congress.

215. The Constitution is explicit on how legislation enacted by Congress and signed into law by the President may be amended or repealed. Article I of the Constitution prescribes a "single, finely wrought and exhaustively considered[] procedure": passage of a new bill by both houses of Congress and presentment to the President for signature or veto. *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983); *see* U.S. Const. art. I, § 7, cl. 2, 3.

216. Under the Constitution, the Executive has a prescribed, limited set of roles in the lawmaking process. The Constitution recognizes some role for the Executive via the Recommendation Clause and the Presentment Clause, which creates the President's veto power. Outside of these roles, however, the Executive Branch has no authority to change a

Congressionally enacted law to suit the President's policy. U.S. Const. art. II, § 3; id. § 7, cl. 2; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad."); *cf. Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 441 (2017) (Gorsuch, J., dissenting) ("If a statute needs repair, there's a constitutionally prescribed way to do it. It's called legislation. . . . the difficulty of making new laws isn't some bug in the constitutional design: it's the point of the design, the better to preserve liberty."). Given this clearly defined process for making laws, the Supreme Court has recognized that "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. . . .Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 637–38 (J. Jackson, concurring).

217. Here, Congress has asserted its plenary authority to ratify and confirm the full boundaries of Grand Staircase-Escalante National Monument after its creation, including by adding and removing land from the Monument.

218. Congress has asserted its plenary authority over the Monument by permanently establishing the National Landscape Conservation System and the units that System is composed of, which includes Grand Staircase-Escalante National Monument.

219. Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections via the 2017 Proclamation encroaches on this Congressional prerogative and seeks to

seize power that is explicitly assigned to a separate branch of government. It is therefore unconstitutional, *ultra vires*, and without legal effect.

220. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury flowing from President Trump's unlawful action.

**COUNT SIX**

*The 2026 Proclamation Is Ultra Vires and Unconstitutional Because it Disturbs Monument Boundaries That Have Been Repeatedly Codified by Congress* (All Defendants)

221. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

222. Defendants' attempt to eliminate Grand Staircase-Escalante National Monument's protections via the 2026 Proclamation encroaches on this Congressional prerogative and is unconstitutional, *ultra vires*, and without legal effect.

223. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury flowing from President Trump's unlawful action.

**COUNT SEVEN**

*The 2017 Proclamation is Ultra Vires Because the President Lacks Authority to Rely on Extra-Statutory Factors to Eliminate Protections for Objects or Reduce Monument Boundaries*
(All Defendants)

224. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

225. Even if the Court were to find that the President has some authority to eliminate national monument protections, the Antiquities Act does not grant the President *carte blanche* authority to overturn properly promulgated Monument proclamations.

226. While the President has significant discretion in how designations occur under the Antiquities Act, that discretion is not boundless. To overturn a properly promulgated and

judicially sanctioned prior proclamation, the President needs a clear basis rooted in the statute for overcoming the prior Presidential determination.

227. The 1996 and 2021 boundaries of Grand Staircase-Escalante National Monument protect myriad sensitive resources, including a plethora of geological, archaeological, paleontological, historical, prehistorical, and biological objects. The Monument has been widely regarded as the "Science Monument."

228. Since 1996, new sensitive resources have been discovered throughout the Monument. Surveys indicate that many more sensitive resources await discovery, further demonstrating the world-class nature of the resources at the Monument. Because valid objects are widely distributed throughout the entire area of the 1996 and 2021 boundaries of the Monument, a reduction in size cannot be justified on the basis of statutory factors. The protection of these objects relies on maintaining the entirety of the land in an undeveloped state.

229. The 2017 Proclamation fails to articulate any clear legal or factual basis for undoing the 1996 Proclamation and eliminating its protections.

230. While the grounds for review of the President's discretion in taking these actions is extremely narrow, "[c]ompatibility is not a blank check to the President to reserve any amount of land and for whatever reasons he deems important. Instead, reservations 'shall' be based on their compatibility 'with the proper care and management of the objects to be protected.' § 320301(b)." *Garfield County v. Trump*, 179 F.4th 814, 826 n. 9 (10th Cir. 2026). The departure from a protective purpose in Defendants' actions is ultra vires.

231. Defendants' grounds for eliminating protections from Grand Staircase-Escalante National Monument and its sensitive resources lack basis in law or fact and are *ultra vires*.

232. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury from Defendants' actions.

**COUNT EIGHT**

*The 2026 Proclamation is Ultra Vires Because the President Lacks Authority to Rely on Extra-Statutory Factors to Eliminate Protections for Objects or Reduce Monument Boundaries*
(All Defendants)

233. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

234. The 2026 Proclamation fails to articulate any clear legal basis for undoing the 2021 Proclamation and eliminating its protections.

235. Under the Antiquities Act, the President is not authorized to use non-statutory considerations, such as "energy dominance" and perceived resource constraints, to determine that "objects" are no longer worthy of protection or to revise the "smallest area compatible with the proper care and management of the objects to be protected."

236. Defendants' grounds for eliminating protections from Grand Staircase-Escalante National Monument and its sensitive resources lack basis in law or fact and are *ultra vires*.

237. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury from Defendants' actions.

**COUNT NINE**

*Agency Implementation of the 2017 Proclamation Violates the Administrative Procedure Act, 5 U.S.C. § 551* et seq. (Agency Defendants)

238. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

239. The Administrative Procedure Act (APA) confers a right of action on any person adversely affected by a final agency action or a failure to act and waives the federal government's sovereign immunity. 5 U.S.C. §§ 701–706.

240. Because Defendant Trump had no lawful authority to eliminate protections on the Monument, any action by Agency Defendants to implement the 2017 Proclamation is arbitrary and capricious and not in accordance with law.

241. As a result of the 2017 Proclamation, Agency Defendants made a final decision to adhere to the 2017 Proclamation rather than the 1996 Proclamation for mining claims located between February 2, 2018 and October 8, 2021. Agency Defendants are violating the terms of the 1996 Proclamation by treating mining claims staked in the excluded lands during that period as valid and allowing mining activity to move forward, contrary to the prohibitions set forth in the 1996 Proclamation.

242. Plaintiffs and their members have no adequate remedy at law and, absent relief from this Court, will suffer irreparable injury from Agency Defendants' actions.

**COUNT TEN**

*Agency Implementation of the 2026 Proclamation Violates the Administrative Procedure Act, 5 U.S.C. § 551* et seq. (Agency Defendants)

243. Plaintiffs restate and incorporate all the foregoing paragraphs of this Complaint as though fully set forth herein.

244. Because Defendant Trump had no lawful authority to eliminate protections on the Monument, any action by Agency Defendants to implement the 2026 Proclamation is arbitrary and capricious and not in accordance with law.

245. As a result of the 2026 Proclamation, Agency Defendants have made a final decision to implement the 2026 Dismantling Proclamation, rather than the 2021 Restoring

Proclamation. Agency Defendants will violate the terms of the 2021 Restoring Proclamation by managing the lands purportedly excluded from the Monument contrary to the prohibitions set forth in the 2021 Proclamation.

246. Plaintiffs and their members have no adequate remedy at law and, absent relief from this court, will suffer irreparable injury from Agency Defendants' actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundation respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

A. A declaration that:

i. the 2026 Proclamation is not authorized by Article II of the U.S. Constitution and violates the separation of powers;

ii. the 2026 Proclamation exceeds the President's delegated power under the Antiquities Act and is *ultra vires*;

iii. the 2026 Proclamation exceeds the President's delegated power and is *ultra vires* because of Congress' subsequent confirmation and ratification of the Monument's boundaries;

iv. the 2017 Proclamation is not authorized by Article II of the U.S. Constitution and violates the separation of powers;

v. the 2017 Proclamation exceeds the President's delegated power under the Antiquities Act and is *ultra vires*;

vi. the 2017 Proclamation exceeds the President's delegated power and is *ultra vires* because of Congress' subsequent modification and ratification of the Monument's boundaries;

vii. the 1996 and 2021 Proclamations remain operative with regard to the objects identified in those Proclamations and lands within those boundaries, as modified by Congress;

viii. any mining claims, mineral leases, or other permits or authorizations premised on the validity of the 2017 or 2026 Proclamations are void *ab initio*; and

ix. Agency Defendants are obligated to manage Grand Staircase-Escalante National Monument pursuant to terms of the 2021 Restoring Proclamation and the 2025 management plan that implemented it, or its predecessor the 1996 Proclamation and 1999 Management Plan that implemented it.

B. An injunction:

i. Invalidating the 2017 Proclamation and 2026 Proclamation as unlawful *ab initio;*

ii. barring Agency Defendants Burgum and Pearce from recognizing, enforcing or otherwise carrying out the 2017 Proclamation or 2026 Proclamation;

iii. barring Agency Defendants from issuing any regulations or other administrative orders pursuant to the 2017 Proclamation or 2026 Proclamation; and

iv. requiring Agency Defendants to comply with the provisions of the 1996 and 2021 Proclamations and the 2025 and 1999 Management Plans, as appropriate.

C. An award of attorney's fees, expenses, and costs; and

D. Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

September 2, 2026

/s/ Gary S. Guzy
Gary S. Guzy (375977)
Scott C. Weidenfeller (489630)
John Mizerak (155488)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington, DC 20001
Tel: 202-662-5381
Fax: 202-778-5381
gguzy@cov.com
sweidenfeller@cov.com
jmizerak@cov.com

*Attorneys for Plaintiffs Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundation*